1   MARK D. SELWYN, SBN 244180
        mark.selwyn@wilmerhale.com
2   THOMAS G. SPRANKLING, SBN 294831
        thomas.sprankling@wilmerhale.com
3   WILMER CUTLER PICKERING
        HALE AND DORR LLP
4   2600 El Camino Real, Suite 400
    Palo Alto, CA 94306
5   Tel.: 650.858.6000 / Fax: 650.858.6100

6   JOSHUA H. LERNER, SBN 220755
        joshua.lerner@wilmerhale.com
7   WILMER CUTLER PICKERING
        HALE AND DORR LLP
8   One Front Street, Suite 3500
    San Francisco, CA 94111
9   Tel.: 628.235.1000 / Fax: 628.235.1001

10  AMY K. WIGMORE, *pro hac vice*
        amy.wigmore@wilmerhale.com
11  WILMER CUTLER PICKERING
        HALE AND DORR LLP
12  2100 Pennsylvania Ave NW
    Washington, DC 20037
13  Tel.: 202.663.6000 / Fax: 202.663.6363

14  [Counsel appearance continues on next page]

15  *Attorneys for Defendant Apple Inc.*

16

17              **UNITED STATES DISTRICT COURT**
        **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

18

19  MASIMO CORPORATION,                CASE NO. 8:20-cv-00048-JVS (JDEx)
    a Delaware corporation; and
20  CERCACOR LABORATORIES, INC.,       **APPLE'S [PROPOSED] POST-TRIAL**
    a Delaware corporation,            **FINDINGS OF FACT AND**
21                                     **CONCLUSIONS OF LAW**
                    Plaintiffs,
22
            v.
23                                     Trial: Nov. 5, 2024
    APPLE INC.,                        Hearing: January 27, 2025, 1:30 p.m.
24  a California corporation,

25                  Defendant.

26              REDACTED VERSION OF DOCUMENT
27              PROPOSED TO BE FILED UNDER SEAL

28

JOSEPH J. MUELLER, *pro hac vice*
  joseph.mueller@wilmerhale.com
SARAH R. FRAZIER, *pro hac vice*
  sarah.frazier@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: 617.526.6000 / Fax: 617.526.5000

NORA Q.E. PASSAMANECK, *pro hac vice*
  nora.passamaneck@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
Tel.: 720.274.3152 / Fax: 720.273.3133

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

KENNETH G. PARKER, SBN 182911
  Ken.parker@haynesboone.com
HAYNES AND BOONE, LLP
660 Anton Boulevard, Suite 700
Costa Mesa, CA 92626
Tel. 650.949.3014 / Fax: 949.202.3001

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ................................................................. 1

I.      APPLE BEGAN WATCH DEVELOPMENT IN 2012 ...................................... 1

II.     APPLE MADE THE MAIN DESIGN DECISIONS FOR APPLE
        WATCH'S OPTICAL PPG SENSOR BY JANUARY 2014 ............................. 1

III.    DR. LAMEGO WAS HIRED BY APPLE IN LATE JANUARY 2014,
        WORKED THERE FOR SIX MONTHS, AND, IN ACCORD WITH
        POLICIES AND EXPLICIT DIRECTIONS, DID NOT PROVIDE ANY
        PLAINTIFFS' CONFIDENTIAL INFORMATION TO APPLE ...................... 2

IV.     ALLEGED TRADE SECRETS ........................................................... 7

        A.      The Alleged Light Piping Trade Secrets .................................. 8

                1.      L4 ........................................................................ 8

                        a)      *Plaintiffs Never Possessed The Full Scope Of L4* ............... 8

                        b)      ███████████████████████████████
                                █████████████████████████████, *Was*
                                *Well Known Before 2014* ..................................... 10

                        c)      *Plaintiffs Published L4* ..................................... 15

                        d)      *No Independent Economic Value of L4* ........................ 16

                        e)      ██████████████████ *As Described In L4*
                                *Before Dr. Lamego Arrived, But* █████████████
                                ██████████████████████ *As L4*
                                *Requires* ..................................................... 17

                2.      L5 ....................................................................... 23

                        a)      *Plaintiffs Only Possessed* ████████████
                                █████████████████ ............................................ 24

                        b)      ████████████████ *L5 and* █████████████
                                █████████████ *Are Generally Known* ..................... 27

c) *Plaintiffs Did Not Keep* ██████████
██████████ *Secret* ........................................................ 29

d) *No Independent Economic Value of L5* ................................ 31

e) *Apple Did Not Have* ██████████
██████████
██████ ................................................................ 32

B. The Alleged Demodulation Trade Secrets ................................................. 37

1. D1 ................................................................................................ 38

a) *Plaintiffs Failed to Establish Possession of D1* .................. 38

b) *To the Extent Possessed, D1 Was Not Reasonably Protected and Was Generally Known* ................................. 39

c) *No Independent Economic Value of D1* .............................. 41

d) *No Acquisition, Use, or Disclosure of D1 by Apple* ............ 41

2. D3 ................................................................................................ 43

a) *Plaintiffs Failed to Establish Possession of D3* .................. 43

b) *To the Extent Possessed, D3 Was Not Reasonably Protected and Was Generally Known* ................................. 45

c) *No Independent Economic Value of D3* .............................. 47

d) *No Acquisition, Use, or Disclosure of D3 by Apple* ............ 47

3. D10 .............................................................................................. 49

a) *Plaintiffs Failed to Establish Possession of D10* ............... 49

b) *Publication of D10* ............................................................. 51

c) *No Independent Economic Value of D10* ............................ 51

C. Plaintiffs Have Not Shown Harm From Alleged Misappropriation ........ 52

D. The Accused Features Are Tiny Slivers of Apple's Quality-Control Testing and Internal Electrical Circuitry ................................................. 54

V. APPLE PATENTED NOVEL TECHNOLOGIES ........................................... 56

A. '095 and '390 Patents ............................................................................ 56

B.   '052 and '670 Patents.................................................................. 58

C.   '754 Patent................................................................................... 59

VI.  PATENTS PUT PLAINTIFFS ON NOTICE ABOUT DR. LAMEGO'S
     WORK BY 2016 ................................................................................... 60

VII. UNRELATED INTERACTIONS BETWEEN APPLE AND
     PLAINTIFFS ARE IRRELEVANT TO THE CLAMS AT ISSUE ................. 62

A.   Apple Is Not Alleged To Have Misappropriated Anything Through
     Projects Rover Or Everest............................................................ 62

B.   Plaintiffs Do Not Allege That Any Other Former Employee
     Misappropriated Anything ............................................................ 64

PROPOSED CONCLUSIONS OF LAW.......................................................... 65

I.   JURISDICTION, VENUE, AND TRIAL PROCESS ...................................... 65

II.  TRADE SECRET CLAIMS........................................................................ 66

A.   The Alleged Trade Secrets Do Not Qualify As Trade Secrets Under
     CUTSA And Were Not Improperly Acquired, Used, Or Disclosed........ 66

     1.   L4 – The Accused Black Foam Quality Control Test ................. 67

          a)   Possession, Ownership, and Particularity .......................... 67

          b)   Secrecy............................................................................. 68

          c)   Independent Economic Value From Secrecy ..................... 69

          d)   Reasonable Efforts To Maintain Secrecy........................... 70

          e)   Acquisition, Disclosure, and Use ...................................... 71

     2.   L5 – The Accused Short Circuit .................................................... 73

          a)   Possession, Ownership, and Particularity .......................... 73

          b)   Secrecy............................................................................. 74

          c)   Independent Economic Value............................................ 74

          d)   Reasonable Efforts to Maintain Secrecy........................... 75

          e)   Acquisition, Disclosure, and Use ...................................... 75

     3.   D1 – Unused Algorithm................................................................. 76

| | | | | |
|---|---|---|---|---|
| | | a) | *Possession and Ownership* | 76 |
| | | b) | *Secrecy* | 77 |
| | | c) | *Independent Economic Value* | 77 |
| | | d) | *Reasonable Efforts to Maintain Secrecy* | 78 |
| | | e) | *Acquisition, Disclosure, and Use* | 78 |
| | 4. | | D3 – Unused Algorithm | 79 |
| | | a) | *Possession and Ownership* | 79 |
| | | b) | *Secrecy* | 79 |
| | | c) | *Independent Economic Value* | 80 |
| | | d) | *Reasonable Efforts to Maintain Secrecy* | 80 |
| | | e) | *Acquisition, Disclosure, and Use* | 81 |
| | 5. | | D10 – Unused Algorithm | 81 |
| | | a) | *Possession and Ownership* | 81 |
| | | b) | *Secrecy* | 82 |
| | | c) | *Independent Economic Value* | 82 |
| | | d) | *Acquisition, Disclosure, and Use* | 82 |
| B. | | | Apple Did Not Have the Requisite Intent For Misappropriation | 83 |
| | 1. | | No Requisite Intent For Direct Misappropriation | 83 |
| | 2. | | No Requisite Intent For Indirect Misappropriation | 84 |
| C. | | | Plaintiffs Failed To Prove Harm | 85 |
| D. | | | Affirmative Defenses | 87 |
| | 1. | | Statute of Limitations | 87 |
| | 2. | | Waiver | 89 |
| | 3. | | Laches | 90 |
| E. | | | Remedies | 90 |
| | 1. | | Plaintiffs Are Not Entitled To Injunctive Relief | 91 |
| | | a) | *Plaintiffs' Injunction Request Is Barred By FRCP 37(c)(1)* | 91 |

b)    *The eBay Factors Do Not Support An Injunction* ............... 92

c)    *Injunction Scope* ................................................................. 95

2.    Plaintiffs Are Not Entitled To Attorneys' Fees or Costs .............. 96

3.    Apple Is Entitled To Attorneys' Fees ........................................... 97

III.    PATENT INVENTORSHIP AND OWNERSHIP CLAIMS ........................... 98

A.    '052 and '670 Patents (Inventorship and Ownership) ........................... 99

B.    '754 Patent (Ownership) ....................................................................... 100

C.    '095 and '390 Patents (Inventorship and Ownership) .......................... 100

CONCLUSION ................................................................................................ 100

| Table of Abbreviations | |
|---|---|
| CACI | Judicial Council of California Civil Jury Instructions (2024 Ed.) |
| CJI | Court's Jury Instructions (Dkt. 1715) |
| JTX | Joint Trial Exhibit |
| PMCLF | Plaintiffs' Memorandum of Contentions of Law and Fact (Dkt. 2175) |
| R50AO | Court's Rule 50(a) Order (Dkt. 1723) |
| R50BO | Court's Rule 50(b) Order (Dkt. 1901) |

| Docket Locations of Written Direct Examinations | |
|---|---|
| Kiani Direct | Dkts. 2288, 2348 |
| Diab Direct | Dkt. 2290 |
| Poeze Direct | Dkt. 2289 |
| Dalke Direct | Dkt. 2165-3 |
| Scruggs Direct | Dkt. 2292 |
| Muhsin Direct | Dkt. 2291, 2348 |

| Docket Locations of Written Direct Examinations | |
|---|---|
| Miller Direct | Dkt. 2165-7 |
| Hammarth Direct | Dkt. 2165-5 |
| Madisetti Direct | Dkt. 2385-4, 2348 |
| Kinrich Direct | Dkt. 2385-3 |
| Clarke Direct | Dkt. 2186 |
| Perica Direct | Dkt. 2232-10 |
| Waydo Direct | Dkt. 2295-5 |
| Hotelling Direct | Dkt. 2295-1 |
| Ness Direct | Dkt. 2295-2 |
| Sarrafzadeh Direct | Dkt. 2296 |
| Webster Direct | Dkt. 2363 |
| Land Direct | Dkt. 2295-3 |
| Block Direct | Dkt. 2295-4 |
| Warren Direct | Dkt. 2295-6 |

Apple respectfully submits the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT[1]

### I.   APPLE BEGAN WATCH DEVELOPMENT IN 2012

1.    Apple is a technology company based in California, known for creating iconic consumer devices including the iPod, iPhone, iPad, and Apple Watch.

2.    Apple designers and engineers came up with the idea for Apple Watch around January 2012, and Apple launched the first Watch, referred to as Series 0, in 2015.  Russell-Clarke Direct ¶ 15; 11/7 PM Tr. [Russell-Clarke] 147:23-148:5.  Apple Watch was designed with three basic goals:  (1) creating a product that people would enjoy wearing (e.g., visually appealing and uses high-quality materials), (2) allowing people to communicate electronically without having to use their phones (e.g., sending messages or receiving notifications), and (3) helping people attain health-and-wellness goals (e.g., measuring exercise).  Russell-Clarke Direct ¶ 16.  Beginning with Series 0, users have used Watch to communicate with others, receive notifications, manage health and wellness goals, and store photos and music.  *Id.*; Hotelling Direct ¶ 13.

### II.   APPLE MADE THE MAIN DESIGN DECISIONS FOR APPLE WATCH'S OPTICAL PPG SENSOR BY JANUARY 2014

3.    Before Apple Watch, Apple already had developed many types of sensors, including optical sensors, for its other products.  Land Direct ¶ 9.  Apple developed three optical sensors for Series 0, including an optical heart rate monitor.  Land Direct ¶ 10; Hotelling Direct ¶ 10.

4.    Between January 2013 and January 2014, Apple's industrial design and engineering teams worked on various designs for the optical heart rate monitor.  Land Direct ¶¶ 11-18; JTX-4667 at -767.  For example, the industrial design team proposed a

---

[1] To the extent any proposed finding of fact incorporates legal conclusions, Apple proposes them as conclusions of law.  To the extent any proposed conclusion of law incorporates distinct factual findings, Apple proposes them as findings of fact.

sensor design referred to internally as the "shower head." Russell-Clarke Direct ¶ 25; Ness Direct ¶ 14; 11/8 PM Tr. [Hotelling] 74:18-75:2; JTX-49 at -345 (displaying progression of sensor design prototypes), -352 (shower head diagram). Apple had the engineering capabilities to develop an optical heart-rate sensor. *E.g.*, JTX-316 at -707 (July 2013 email from Adrian Perica to Tim Cook noting with respect to "[n]on-invasive diagnostics" that "we internally understand how to be good at these engineering disciplines"). However, Apple engineers encountered challenges in developing a sensor package with the showerhead design. Russell-Clarke Direct ¶¶ 25-26; Ness Direct ¶ 14; 11/8 PM Tr. [Hotelling] 15:21-16:1. In September 2013, Bob Mansfield, Apple's former head of hardware engineering, described the shower head design as "a mess" because the engineering team was "going around in circles" trying to develop a sensor with this configuration. JTX-337 at -429-30; 11/8 PM Tr. [Hotelling] 74:18-24. The design and product development teams also determined it would be "exceptionally hard" to manufacture the "shower head" sensor, in part because it required drilling 50 metallic contact points into sapphire. Ness Direct ¶ 14. Apple ultimately moved to sensor designs with multiple windows. Block Direct ¶¶ 12-14.

5.    By December 19, 2013, over a month before Dr. Lamego started work at Apple, Apple had moved from a 3-Window design to the 4-Window design for the heart rate sensor that was ultimately used in Series 0. Land Direct ¶¶ 14-16; JTX-4682, JTX-4683 at -814-15. Apple completed the main design decisions regarding the 4-Window optical heart rate sensor by January 21, 2014. Land Direct ¶¶ 17-18; 11/8 PM Tr. [Hotelling] 79:9-16; JTX-4669 at -043; JTX-4425.01.

III.   **DR. LAMEGO WAS HIRED BY APPLE IN LATE JANUARY 2014, WORKED THERE FOR SIX MONTHS, AND, IN ACCORD WITH POLICIES AND EXPLICIT DIRECTIONS, DID NOT PROVIDE ANY PLAINTIFFS' CONFIDENTIAL INFORMATION TO APPLE**

6.    Apple hired Dr. Lamego to work as a senior advisor on biosensing projects, reporting to Steve Hotelling, starting January 27, 2014. Hotelling Direct ¶¶ 47, 49, 58.

7.    Although Dr. Lamego is a former employee of both Plaintiffs and Apple, it is undisputed that he has not been employed by either company for over a decade.

8.    Prior to working for any party, Dr. Lamego had significant technical knowledge, developed through his undergraduate and Master's degrees in electrical engineering, his teaching as a tenured assistant professor, and his Ph.D. from Stanford University in electrical engineering.  JTX-808 at -626.

9.    On October 2, 2013, Dr. Lamego sent an email to Apple CEO Tim Cook to express interest in working at Apple.  JTX-605 at -011-13.  When Mr. Cook receives these types of emails, he "scan[s] to kind of pick up what area they might fit in, and then I try to forward it to people that I think would look at them and assess them."  Dkt. 2402-3 [Cook Dep.] 73:18-74:18.

10.    Dr. Lamego's email reached Apple executive recruiter Denby Sellers, Steve Hotelling, former Masimo employee Dr. Michael O'Reilly, and others.  Dr. O'Reilly stated that Dr. Lamego "would be an incredible addition to the team," but "most of his knowledge (that would be directly applicable to what we are doing) may be considered confidential information of Cercacor or Masimo."  JTX-605 at -010.  Dr. O'Reilly's comment "was a good alert to be extremely careful."  11/8 PM Tr. [Hotelling] 49:12-22.  Apple ultimately concluded that Dr. Lamego—like most employees—could change jobs without using confidential information belonging to former employers.  Hotelling Direct ¶¶ 43-44; 11/8 PM Tr. [Hotelling] 76:20-77:22.

11.    Apple also considered whether recruiting Dr. Lamego would affect any potential business relationship with Plaintiffs, a prospect that Apple was internally considering at that time under the codename "Project Everest."  Hotelling Direct ¶¶ 37, 44; JTX-263 at -778.  Apple ultimately concluded that it could pursue the interview independent of Project Everest, as Dr. Lamego was free to interview and change jobs as he wished.  Hotelling Direct ¶ 44.

12.    During Dr. Lamego's interview process, Apple took steps—as it normally does—to ensure that its interviewers did not obtain confidential information from other

companies. Hotelling Direct ¶ 57 (Apple's interviewing practices). For example, in a November 19, 2013 email, Mr. Hotelling instructed the interview team to "[o]bviously please refrain from divulging any confidential project details, and, of course reinforce that we don't want to hear any confidential information related to his previous employers." JTX-4419 at -015. Dr. Lamego did not share any Masimo or Cercacor confidential information during the interview process, nor did anyone at Apple request such information. Hotelling Direct ¶ 46.

13. In joining Apple, Dr. Lamego took a step down in terms of title, but Apple expected him eventually to grow into a leadership role. Apple thus offered him a compensation package significantly higher than what is generally offered for a senior sensing scientist. Hotelling Direct ¶ 48. That package was consistent with compensation structures offered to others who have joined Apple from more senior positions in smaller companies, and was not to induce him to share Plaintiffs' confidential information. *Id.* ¶¶ 47-48; 11/8 PM Tr. [Hotelling] 57:23-58:15, 61:10-15; *see also* Dkt. 2402-3 [Cook Dep.] 132:15-17, 132:19-133:4 (explaining that it is fundamentally contrary to Apple's culture to hire someone to gain access to another company's confidential information). Apple had no interest in Plaintiff's confidential information, and hired Dr. Lamego for his general skill set. Hotelling Direct ¶ 47.

14. In a January 24, 2014 letter to Apple, Cercacor's lawyers (at Mr. Kiani's direction) raised concerns about Dr. Lamego's employment with Apple in light of his noncompete and confidentiality agreements with Plaintiffs. Kiani Direct ¶¶ 209-211; *see also* Hotelling Direct ¶ 54. The letter falsely accused Apple of hiring Dr. Lamego as a means to misappropriate trade secrets: "It is difficult to imagine any reason for this sequence of events other than Apple is attempting to gain access to, or at least the benefit of, Cercacor and Masimo's trade secrets." JTX-2937 at -093. The letter also sought to impose improper constraints on the scope of Dr. Lamego's work at Apple, stating— without any basis for doing so—that "we trust that Apple will employ Mr. Lamego in an area that does not involve healthcare technology, including mobile health applications

and the measurement of physiological information." *Id.* at -094.

15.    Cercacor's accusations that Apple intended to hire Dr. Lamego for trade secrets were false, and ignored both Apple's general policies against using other companies' proprietary information and Apple's specific intentions in hiring Dr. Lamego—which had nothing to do with gaining access to trade secrets.    While onboarding Dr. Lamego, Mr. Hotelling informed Dr. Lamego that he should not bring, rely upon, or use any confidential information from his prior employers.    Hotelling Direct ¶ 49.    Dr. Lamego also signed Apple's Intellectual Property Agreement, which provides the following under the heading "Confidential Proprietary Information":

> Information of Others. You agree that during the tenure of your employment by Apple and thereafter, you will not improperly use or disclose to Apple any confidential, proprietary, or secret information of your former employers or any other person. You further agree that you have not and, during your employment with Apple, will not bring any confidential, proprietary, or secret information of your former employer(s) or any other person(s) onto Apple property.

JTX-3044, at -604, -606; Hotelling Direct ¶ 51.

16.    Apple also provided Dr. Lamego with Apple's Business Conduct Policy, which provides:

> Third-Party Intellectual Property.    It is Apple's policy not to knowingly use the intellectual property of any third party without permission or legal right. If you are told or suspect that Apple may be infringing an intellectual property right, including patents, copyrights, trademarks, or trade secrets owned by a third party, you should contact the legal department.

JTX-4181 at -914; Hotelling Direct ¶ 52.

17.    Apple made clear to Dr. Lamego "multiple times, many times" that he was not to use any confidential information of other companies in his work at Apple and Dr. Lamego "abide[d] by that provision."  11/7 PM Tr. [Lamego] 129:7-130:16; *see also id.* 96:24-97:14 ("So they put me in the garage and said, 'Look, let's talk to Marcelo very

1    carefully, to make sure we don't expose ourselves to any risk.' I think they were very

2    careful.").

3          18.    The purpose of Apple's hiring Dr. Lamego, like any senior level engineer,

4    was to bring his general expertise to bear on certain Apple research and design projects,

5    in the hope that working at Apple would spark innovative contributions by Dr. Lamego

6    to those projects. To that end, on Dr. Lamego's first day at Apple, Mr. Hotelling briefed

7    him on Apple Watch so that Dr. Lamego could understand the state of the project and

8    begin integrating into the biosensing group. Hotelling Direct ¶¶ 59-61; JTX-4425.01.

9          19.    Dr. Lamego later met with engineers on the sensing team and across other

10   groups. In the process, he contributed to technical discussions and began proposing

11   ideas. Hotelling Direct ¶¶ 61-62; *see, e.g.*, JTX-3657; JTX-143.

12         20.    Several of Dr. Lamego's ideas were basic engineering concepts that he

13   thought might be useful for Watch. Hotelling Direct ¶¶ 63-65; Land Direct ¶ 84; JTX-

14   3657; JTX-143.

15         21.    Dr. Lamego also offered some innovative ideas that ultimately led to

16   patents. That Dr. Lamego made inventive contributions soon after employment was not

17   surprising—it is common for Apple engineers to come up with inventive ideas soon after

18   employment because they are quickly exposed to details of Apple's projects and come

19   in with fresh eyes to apply their knowledge to those projects. Hotelling Direct ¶ 70.

20         22.    Because Dr. Lamego was learning of existing Apple projects involving

21   numerous Apple engineers, some of his ideas were contributions to larger initiatives for

22   which Apple later filed patent applications naming Dr. Lamego as one of many co-

23   inventors. *See infra* § V.

24         23.    In the specific context of modulation/demodulation, Dr. Lamego offered

25   certain ideas that he alone sponsored. For example, Dr. Lamego worked on the ideas

26   described in U.S. Patent No. 10,219,754 ("'754 Patent") while at Apple. JTX-1262;

27   Hotelling Direct ¶¶ 75-76. The concepts in the '754 Patent are reflected in a MATLAB

28   script that Dr. Lamego wrote during his employment at Apple in 2014. JTX-880;

Hotelling Direct ¶¶ 77-78; *see infra* ¶¶ 268-270.

24.    Apple did not adopt Dr. Lamego's modulation/demodulation proposals. Sarrafzadeh Direct ¶ 32; Waydo Direct ¶¶ 42-49; 11/8 AM Tr. [Waydo] 81:22-25; 11/7 PM Tr. [Lamego] 134:20-135:17; *see also infra* ¶¶ 157, 177, 205.

25.    Dr. Lamego worked for Apple for just six months.  During that time, he struggled with not having a leadership position and with the challenge of adapting to Apple's culture of large-scale collaboration.  Hotelling Direct ¶¶ 79-80; JTX-4429.

26.    Dr. Lamego voluntarily ended his work at Apple in July 2014.  Hotelling Direct ¶ 82.

27.    No Apple employee believed (or suspected) that Dr. Lamego shared any of Plaintiffs' confidential information during his brief employment at Apple—and in fact, he did not do so.  11/8 AM Tr. [Waydo] 84:8-13; 11/8 PM Tr. [Hotelling] 64:13-20; *id.* [Ness] 118:12-20; 11/7 PM Tr. [Lamego] 130:12-16.    Dr. Lamego testified unequivocally that he did "not share any confidential, proprietary or secret information from former employers or any other person with Apple." 11/7 PM Tr. [Lamego] 129:7-130:16; *id.* 136:5-13 (confirming same for Plaintiffs).  He further stated that he was taking care "to avoid IP conflicts."  JTX-3050 at -213; Hotelling Direct ¶ 67.  Every Apple employee who testified reaffirmed that Apple did not obtain or use any confidential Masimo or Cercacor confidential information.  Hotelling Direct ¶¶ 56, 83; Land Direct ¶¶ 83-84; Waydo Direct ¶¶ 60-61; Block Direct ¶¶ 16-17, 58; Ness Direct ¶ 7; Perica Direct ¶¶ 6, 19; Russell-Clarke Direct ¶ 30; 11/8 AM Tr. [Perica] 58:4-20; *id.* [Waydo] 83:17-84:13; 11/8 PM Tr. [Hotelling] 76:11-19; *id.* [Ness] 118:21-119:2.

## IV.    ALLEGED TRADE SECRETS

28.    Plaintiffs drafted the trade secrets at issue in this case after receiving discovery from Apple.  Dkt. 207 [Pls.' Decl.] ¶ 50; Dkt. 259-2 at Ex. A [Pls.' 10/9/20 2019.210 Statement]; Dkt. 647-2 at Ex. 2 (Pls.' 3/4/22 2019.210 Statement, redlined to show changes).  In addition, Mr. Kiani confirmed "plaintiffs used at least Apple patents and publication to develop their list of trade secrets."  11/5 AM Tr. [Kiani] 80:14-21.

Wilmer Cutler
Pickering Hale
and Dorr LLP

29.    The alleged trade secrets—which, as discussed in detail herein, are not actually trade secrets—relate to a few tiny slivers of various technologies related to PPG. At bottom, Plaintiffs' allegations relate to (1) a particular type of short circuit, (2) a specific use of black foam, and (3) a particular form of demodulation.

## A.    The Alleged Light Piping Trade Secrets

30.    Non-invasive optical sensors typically include light emitting diodes (LEDs) and photodetectors.  Warren Direct ¶ 16; 11/5 AM Tr. [Kiani] 82:4-7.  Physiological parameters (e.g., blood oxygen saturation levels) are measured by analyzing the light that is emitted by one or more LEDs that passes through tissue and is received by the photodetector.  Warren Direct ¶¶ 15-20; 11/5 AM Tr. [Kiani] 86:1-4.

31.    "Light piping" (also called "light shunting" or an "optical shunt") refers to extraneous light a photodetector receives that has not passed through tissue, which can affect accuracy (because the light provides no information about any measured physiological parameter).  Warren Direct ¶¶ 25-27; 11/5 AM Tr. [Kiani] 86:5-12.  Light piping can be avoided by designing non-invasive optical sensors such that a photodetector just receives emitted light that has passed through tissue.  Warren Direct ¶ 31; 11/5 AM Tr. [Kiani] 86:13-16.

### 1.    L4

32.    Plaintiffs have not presented any evidence that L4 is owned by Masimo, Cercacor, Willow, or any combination of them.  *E.g.*, 11/6 PM Tr. [Hammarth] 25:12-26:1 (Cercacor/Willow CFO unaware of any documents that would indicate whether Cercacor or Willow has any ownership interest in any of the alleged trade secrets).

#### a)    *Plaintiffs Never Possessed The Full Scope Of L4*

33.    ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



1

2    34.

3

4    35.

5

6

7

8    36.

9

10

11

12

13

14

15    37.

16

17

18    38.

19

20

21

22

23

24

25    39.

26

27    _____

28    [2] All emphases added unless otherwise noted.

Wilmer Cutler
Pickering Hale
and Dorr LLP

b) ██████████████████████████, *Was Well Known Before 2014*

40. █████████████████████████████████████

41.    JTX-3887, a textbook published in 1997 by John Webster ("Webster"), is a well-known resource in PPG sensing; Professor Warren has used it to teach his classes since 2000.  Warren Direct ¶ 29.  Webster teaches that an "[o]ptical shunt occurs when light from the LEDs reaches the photodiodes without passing through arterial blood" and that "[s]uch an optical shunt results in either erratic or stable but inaccurate measurements."  JTX-3887 at -688-89; Warren Direct ¶ 29.

42. ████████████████████████████████████████

43. ████████████████████████████████████████

44.    For example, JTX-3673, U.S. Patent No. 5,797,841 ("Delonzor"), was filed

1    in 1996, and issued in 1998 to Nellcor, Masimo's main competitor.  Kiani Direct ¶ 27

2    ("pulse oximetry was dominated by one company, called Nellcor"); JTX-3887 at -538

3    (Webster textbook describing Nellcor as "the market leader in pulse oximetry").

4          45.     Delonzor is titled "Shunt Barrier in Pulse Oximeter Sensor," and describes

5    two types of "shunted" light that can reach a photodetector (which it refers to as a "light

6    pipe"): (1) unwanted light that occurs "inside the sensor body," such as through a crack,

7    and (2) unwanted light that "exits the sensor itself, but reaches the detector without

8    passing through the finger," such as light that "can go around the side of the finger."

9    JTX-3673 at 1:51-64, Fig. 1 (showing "Prior Art"); 11/5 AM Tr. [Kiani] 104:23-105:2,

10   105:25-106:7 (admitting Delonzor shows it was "known as of March of 1996" that "light

11   piping" can occur "though a crack in the sensor" and that Nellcor also "knew about light

12   traveling around fingers" and "knew about light piping in 1996").

13         46.     Delonzor further explains that light piping can cause problems with respect

14   to sensor accuracy, and teaches using optical barriers, such as those made of black foam,

15   to reduce the amount of light piping.  JTX-3673 at 3:3-5 ("It has been found that shunted

16   light can significantly affect the accuracy of oxygen saturation readings using a pulse

17   oximeter.  Accordingly, there is a need to develop a barrier to such light to improve the

18   accuracy of pulse oximeter sensors."); *id.* at 6:35-44, Fig. 10 (describing barrier using

19   "foam or other resilient or compressible pad" that "will compress against the tip of the

20   finger, thus also blocking the air gap and preventing the shunting of light").

21         47.    █████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   ████████████████████████████████

28         48.     JTX-3778, U.S. Patent No. 8,265,724 ("Petersen"), is a Nellcor patent that

1  was filed in 2007, and issued in 2012, and discloses ████████████████████

2  ████████████████████████████████████████████████████████████████

3  ███████████████████████████. Warren Direct ¶¶ 41-47.

4       49.    Petersen discussed the problem of light piping, noting that "light shunting

5  may occur, wherein light transmitted from an emitter in the sensor may arrive at a

6  detector without first having traveled through the patient's tissue" and that "light

7  shunting … may lead to inaccurate measurements." JTX-3778 at 1:51-60; *id*. 4:64-5:5;

8  Warren Direct ¶ 42; 11/13 Tr. [Warren] 112:9-113:2.

9      50.   ███████████████████████████████████████████

10  ████████████████████████████████████████ Specifically, Petersen

11  taught using a "false finger … made of black foam or … plastic" that ███████████

12  ████████████████████████████████████████████████████████████████

13  ███████████████████████████████████████ JTX-3778 at

14  6:20-29 ("Specifically, the false tissue should absorb the light that impinges on it so that

15  any signal detected by the detector 20 may be attributed to shunting."); *id*. at Fig. 4

16  (███████████████████████████████████████████); Warren Direct ¶¶

17  43-46; 11/13 Tr. [Warren] 114:3-115:9. ██████████████████████████

18  ████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20      51.   █████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ██████████████████████████████████████████████

23      52.   ███████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████

53.   ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

54.   Webster taught that "[t]o minimize errors, the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through the tissue containing arterial blood," and noted "[t]his can be accomplished through thoughtful LED/photodiode placement," the use of "light impervious barriers [] placed between LEDs and the photodiodes in all areas where the emitted light could reach the photodiodes without passing through the tissue," "decreas[ing] the angle of incidence to the photodiode," and "coat[ing] the housing around the photodiode with a material that does not scatter or reflect light."   JTX-3887 at -583; Warren Direct ¶ 51; 11/13 Tr. [Warren] 116:6-11.

55.   ████████████████████████████████████
████████████████████████████████████   P-0164 is a pulse oximeter designed by Professor Warren's student in 2004, and JTX-3881 is an associated research poster.  Warren Direct ¶ 52; 11/13 Tr. [Warren] 107:17-109:20. ████
████████████████████████████████████████████
████████████████████████████████████

56.   ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

1 ██████████████████████████████████████████████████

2 ████████████████.

3     57.    Dr. Madisetti provided no response to the substance of Professor Warren's

4 opinions regarding the Petersen reference beyond asserting—incorrectly—that Dr.

5 Warren "does not opine that Petersen 2008 describes 'Element [b]' or 'Element 4[c].'"

6 Madisetti Direct ¶ 119; 11/7 AM Tr. [Madisetti] 19:6-20:13.  Professor Warren testified

7 that "Petersen … confirms … the entirety of L4, was generally known," and explained

8 where it discloses each aspect.  Warren Direct ¶¶ 41-50.  Dr. Madisetti also provided no

9 response with respect to any of the other references that Professor Warren discussed

10 beyond two tables with conclusory "NOs" and "Xs" to "show his disagreement."

11 Madisetti Direct ¶ 123; 11/7 AM Tr. [Madisetti] 19:6-20:13.

12     58.    ███████████████████████████████████████████

13 ██████████████████████████████████████████████████

14 ██████████████████████████████████████████████████

15 ██████████████████████████████████████████████████

16 ██████████████████████████████████████████████████

17 ██████████████████████████████████████████████████

18 ██████████████████████████████████████████████████

19 ██████████████████████████████████████████████████

20 ██████████████████████████████████████████████████

21 ██████████████████████████████████████████████████

22 ████████████████████████████████████

23     59.    ██████████████████████████████████████████

24 ██████████████████████████████████████████████████

25 ██████████████████████████████████████████████████

26 ██████████████████████████████████████████████████

27 ██████████████████████████████████████████████████

28 ██████████████████████████████████████████████████

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████.

7 60. ████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ██████████████████████

                   *c)*     *Plaintiffs Published L4*

61.    Masimo published numerous patents stating ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

62.    JTX-4637, U.S. Patent No. 5,782,757, was filed in 1995 and is assigned to Masimo. ████████████████████████████████████████ "the surface of the probe is specially constructed to minimize light piping effects," JTX-4637 at Abstract, (2) a "substrate [] constructed to minimize light piping," *id.* at 3:37-38, (3) "a flex pocket [that] reduces light piping," *id.* at 24:44-48, and (4) an "aperture [that] minimizes or prevents this light piping," *id.* at 26:40-43. ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

63.    JTX-4692, U.S. Patent No. 6,792,300, was filed in 2001, and is assigned to Masimo. It claims "[a] method of reducing light from at least one emitter which reaches a detector without non-reflectively passing through a medium" (i.e., light piping) by, *inter alia,* "including a light piping barrier with the disposable tape adapted to reduce

the light from the at least one emitter that reaches the detector without first being transmitted through the measurement site." JTX-4692, claim 1. ████████████

████████████████████████████████

████████████████████████

64.    JTX-3879, U.S. Patent No. 7,096,052, issued in 2006, and is assigned to Masimo.  It discloses using an "optical barrier [], protruding from [the] surface," and "noninvasively recess[ed] into the tissue such that light energy from the emitter of the first lens 108 is less likely to reach the second lens 110 without being attenuated by tissue of the measurement site." JTX-3879 at 3:50-58, Fig. 4; Warren Direct ¶¶ 59-60.

65.    JTX-3707, U.S. Patent No. 7,791,155, issued in 2010, and is assigned to Masimo. It discloses having the detector "housed in an enclosure so as to reduce light piping." JTX-3707 at 4:31-34; Warren Direct ¶¶ 61-62.

66.    ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████

### d)    *No Independent Economic Value of L4*

67.    Plaintiffs have failed to establish that L4 derives independent economic value from being secret.

68.    Plaintiffs did not offer any evidence establishing that L4 provides a distinct benefit or the time and resources that they devoted to developing L4 beyond conclusory statements.  *See* Madisetti Direct ¶¶ 115-127; Diab Direct ¶¶ 218-219, 239-241.  Dr. Madisetti relies on testimony from Mr. Kiani and Mr. Diab that merely restate the assertion that L4 is valuable because it is a secret from Plaintiffs' competitors.  Madisetti Direct ¶¶ 115-116.  Dr. Warren, however, demonstrated through testimony and analysis of publications that L4 was and is generally known, undermining even the threadbare basis of Plaintiffs' claims of value.  *See supra* ¶¶ 40-60.

e)    ██████████████████████ *As Described In L4 Before*

*Dr. Lamego Arrived, But* ████████████████████

████████████████ *As L4 Requires*

69.    Apple refers to the problem of light piping as "optical crosstalk." Block Direct ¶ 18 ("We refer to light that reaches the detector without passing through the body to collect a usable pulse signal as 'optical crosstalk.'"); Land Direct ¶ 28 (same).

70.    ████████████████████████████ long before developing Apple Watch. Land Direct ¶¶ 30-31, 40-41; Warren Direct ¶¶ 68-71. For example, in 2005, when Apple designed the optical proximity sensor to be used in the first iPhone, Apple added structures ██████████████████████████

█████████████████████ Land Direct ¶ 29.

71.    Black foam was known and used by Apple in many ways for many years before 2014, ████████████████ Land Direct ¶¶ 30-31, 35; 11/12 PM Tr. [Land] 27:6-12; *id.* [Block] 86:23-87:5.

72.    Apple knew early in the development of the optical heartrate sensor for Apple Watch that ██████████████████████████████

██████████████████ Land Direct ¶¶ 36-38; JTX-4677. Apple's design documents—including those predating Dr. Lamego's arrival—show that Apple designed the original Apple Watch with ██████████████████

████████████████ Land Direct ¶ 39; Block Direct ¶¶ 21, 28; 11/12 PM Tr. [Land] 27:13-28:20; 11/13 Tr. [Block] 13:6-12; JTX-1061 at § 2.1.

73.    Plaintiffs accuse Apple of misappropriating L4 ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

1

2

3

4

5

6    74.

7

8

9

10

11    75.    JTX-1061 is an Apple engineering requirement specification (ERS) last

12    revised on November 14, 2013—before Dr. Lamego's arrival.  JTX-1061 at -725; 11/13

13    Tr. [Block] 87:19-89:3.

14

15

16

17

18

19

20

21

22    76.

23

24                                                                11/12 PM Tr.

25    [Land] 30:1-11; Land Direct ¶¶ 41-42; Block Direct ¶ 24.

26    77.    As of November 2013,

27

28

1 

2       11/6 PM Tr. [Madisetti] 63:14-64:24,

3 70:4-73:12; 11/5 AM Tr. [Kiani] 81:8-83:1.

4 

5 

6 

7 

8 

9 

10      78.

11 

12      Land Direct ¶ 42; 11/12 PM Tr. [Land] 25:17-22 (Apple knew "

13 

14 

15 30:22-31:14

16       11/12 PM Tr. [Block] 92:14-24

17 

18      79.

19 

20                                                                .

21      80.

22 

23 

24 

25 

26 

27 

28



81.

82.    In any event, Dr. Lamego had nothing to do with

83.

84.

85. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

86. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

87.    This is consistent with the general understanding of engineers—as illustrated by a Masimo patent, which uses the term "photodiode detector shielding" to refer to "shield[ing] a photodiode detector from electromagnetic interference and ambient light."  JTX-3707 at 1.

88. ███████████████████████████████████
████████████████████████████████████████

89. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███

90. ███████████████████████████████████
████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ███

8     91.    The black foam quality control test is conducted at the manufacturing

9 facility and is only used to determine whether an assembled Apple Watch is defective

10 (i.e., a "lemon"). Land Direct ¶¶ 46-47; Block Direct ¶ 27; 11/8 PM Tr. [Ness] 113:17-

11 25; 11/12 PM Tr. [Land] 27:23-24, 32:16-20.

12     92.    The black foam quality control test is used on prototypes for the same

13 purpose: only to determine if they are defective, and not for the purpose of ████████

14 ████ 11/12 PM Tr. [Land] 21:13-19 ██████████████████████████

15 ██████████████████████████████ ."); 11/13 Tr. [Block] 9:12-10:3 ████████

16 ████████████████████████████████████████████████████

17 ██████████████████████████████████████████████

18     93.    The first-generation Apple Watch optical sensor included ████████

19 ████████████████████████████████████████████████████

20 Block Direct ¶ 28; Land Direct ¶¶ 37-39; JTX-1061 at -710. Dr. Lamego did not

21 contribute to the design of those ██████████ in the first-generation optical sensor,

22 which were already included in the ERS formal plan of record before Dr. Lamego joined

23 Apple. Land Direct ¶ 39; Block Direct ¶¶ 30, 40; 11/13 Tr. [Block] 13:16-18; JTX-1061

24 at -725. Nor did that ████████████████ ████████████████████████

25 ████████ Block Direct ¶¶ 29, 37, 40; Warren Direct ¶¶ 77-78; 11/13 Tr. [Block]

26 13:13-15.

27     94.   ████████████████████████████████████

28 ████████████████████████████████████████████████████

Wilmer Cutler
Pickering Hale
and Dorr LLP

1

2

3

4

5

6

7

8

9

10    95.

11

12

13

14

15

16

17

18

19

20

21

22    96.    In sum, L4 involves nothing more than long-known and basic concepts to

23    which Apple had been doing before Dr. Lamego joined

24    the company.

25

26

27    **2.    L5**

28    97.    Plaintiffs first identified L5 in this case in March 2022, when Plaintiffs

amended their list of trade secrets (more than two years after Plaintiffs filed this suit, and after years of receiving discovery from Apple).  Dkt. 259-2 at Ex. A; Dkt. 647-2 at Ex. 2.

98.    Plaintiffs have not presented any evidence that L5 is owned by Masimo, Cercacor, Willow, or any combination of them.





103.

104.

Wilmer Cutler
Pickering Hale
and Dorr LLP





110.

111.

112.

b) _____ *L5 and* _____
_____ *Are Generally Known*

113.

Wilmer Cutler
Pickering Hale
and Dorr LLP

1 ██████████████████████████████████████████████

2    114.   JTX-3808, a 1973 textbook titled "Light Emitting Diodes" by Forest Mims

3 has an entire section on "LEDs as Detectors" that describes ██████████████████

4 ████████████████████████████████    JTX-3808  at  -677

5 ("[S]emiconductor junctions sometimes are capable of both generating and detecting

6 light.  The LED is no exception, and ***it is possible to employ an LED to detect the output***

7 ***from a similar LED***."); Warren Direct ¶¶ 98, 100.

8    115.   JTX-4232, the Roedel reference, likewise shows ████████████████

9 ████████████████████████████    JTX-4232 at

10 -675 (████████████████  "photon recycling, i.e., photoluminescence generated

11 by the self-absorption of photons initially produced by a prior luminescence process");

12 Warren Direct ¶¶ 96, 99-100.

13    116.   Although Mims and Roedel are not specific to non-invasive, light-based

14 physiological sensors, the principles they published were generally known in that field

15 given the ubiquitous use of LEDs in such sensors.  Warren Direct ¶ 100.

16    117.   Apple's engineers confirmed that they ████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████

22    118.   ████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████

28    119.   ████████████████████████████████████

1 ███████████████████████████████████████████████

2 ████████████████████████████████████████

3    120. ████████████████████████████████████

4 ███████████████████████████████████████████████

5 ██████████████    ████████████████████████████

6 ███████████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ███████████████████████████████████████████████

9 ███████████████████████████████████████████████

10 ███████████████████████████████████████████████

11 ███████████████████████████████████████████████

12 ████████████████████████████████████

13    121.  JTX-3887, Webster, taught in 1997 that "under reverse bias virtually no

14 current will flow," and that "while one LED is ON, the other LED is under reverse bias"

15 to ensure it will not emit light.  JTX-3887 at -564; Warren Direct ¶¶ 102-03.

16             *c)*    _Plaintiffs Did Not Keep_ ████████████████████

17                          _██████ Secret_

18    122. ████████████████████████████████████

19 ███████████████████████████████████████████████

20 █████████████████

21      ██  ██████████████████████████████████

22        ████████████████████████████████

23        ██████████████████

24   ██  ████████████

25    123.  In fact, Masimo published the L5 ████████████████████

26 ██████ in JTX-4233, U.S. Patent No. 7,764,982 ("'982 patent").  Warren Direct ¶¶ 121-

27

28

24; 11/13 Tr. [Warren] 94:12-96:18, 124:2-127:6.[3]

124.   Mr. Smith and Mr. Dalke are named inventors of the '982 patent, and a certificate of correction identifies Mr. Smith as the lead inventor.  JTX-4233 at -474.

125.   On March 1, 2006— ███████████████████████████████████████████
████████████████████████████████████████—Masimo filed the utility application for the '982 patent, Application No. 11/367,013, which first published on September 21, 2006 as U.S. Patent Application Publication No. 2006/0211924.  JTX-4233 at -474; JTX-1206 ['924 Application].

126.   The '013 utility application included numerous new disclosures missing from the earlier provisional applications.  *Compare* JTX-1206 at [0057], [0060], [0074]-[0076], [0090]-[0091], [0099]-[0108] *with* JTX-5195 (Provisional Patent Application 60/657596); JTX-5196 (Provisional Patent Application 60/657281); JTX-5197 (Provisional Patent Application 60/657268); JTX-5198 (Provisional Patent Application 60/657759).  Of relevance here, the '013 utility application added language stating: "In this manner, the resistor $R_2$ value can be read in a similar manner that LEDs 810 (FIG. 8) are activated.  The diode 4220 is oriented, e.g., anode to row and cathode to column as the LEDs ***so as to prevent parasitic currents from unwanted activation of LEDs 810 (FIG. 8)***."   JTX-1206 at [0116]; JTX-4233 at 16:39-43.  ███████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████

127.   ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████.

_____

[3] This patent was admitted as JTX-4233 and JTX-3003.  Apple cites JTX-4233 herein.

[4] ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

Wilmer Cutler
Pickering Hale
and Dorr LLP

1 [REDACTED]

2 [REDACTED]

3 [REDACTED]

4 [REDACTED]

5      128.   The '982 patent [REDACTED]

6 [REDACTED] JTX-4233 at Fig. 8; Warren Direct ¶ 124;

7 11/13 Tr. [Warren] 124:2-127:6. [REDACTED]

8 [REDACTED]

9 [REDACTED]

10 [REDACTED]

11 [REDACTED]

12      129.   [REDACTED]

13 [REDACTED]

14 [REDACTED]

15 [REDACTED]

16 [REDACTED]

17 [REDACTED]

18 [REDACTED].

19      *d)*      *No Independent Economic Value of L5*

20      130.   Plaintiffs have failed to establish that L5 derives independent economic

21 value from being secret (which it is not).

22      131.   Plaintiffs did not offer any evidence establishing that L5 provides a distinct

23 benefit or the time and resources that they devoted to developing L5 beyond conclusory

24 statements. [REDACTED]

25 [REDACTED]

26 [REDACTED]

27 [REDACTED]

28 Madisetti Direct ¶ 162.  This conclusory and unsupported opinion fails to recognize that

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████

6 132. ████████████████████████████████████████████

7 ██████████████████████████████████████████████████████

8 ██████████████████████████████████████████████████████

9 ██████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████

13 █████████████████████

14   *e)*   *Apple Did Not Have* ████████████████████████

15 ███████████████████████████████████████████████████

16 ██████████

17 133.   Even under Plaintiffs' theory that L5 is an actual trade secret, Apple did not

18 misappropriate L5 because ████████████████████████████████████████████

19 ██████████████████████████████████████████████████████

20 ███████████████████████████████████████

21 134. ████████████████████████████████████████████

22 ██████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████

25 █████████████████████████████████████████████

26 135.   In Series 0, Apple had used the Opal PCB to drive LEDs, which involved

27 "off-the-shelf" components ████████████████████████ Block Direct ¶ 42; Land

28 Direct ¶¶ 55, 60.



136.

137.

138.

139.

140.

141. ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

142. ███████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████

143. ███████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

144. ███████████████████████████████████████
████████████████████████████████████████████████████

[5] ████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████

1     ██████████████████████████████████████

2          145.   The final versions of the ERS for each of these Apple-designed ASICs—

3     the formal plan of record for those ASICs—████████████████████████████████████

4     ██████████████████████████████████████████████████████████████

5     ██████████████████████████████████████████████████████████████

6     ██████████████████████████████████████████████████████████████

7     ██████████████████████████████████████████████████████████████

8     ██████████████████████████████████████████████████████████████

9     ██████████████████████████████████████████████████████████████

10    ██████████████████████████████████

11         146.   Plaintiffs point to an internal email exchange, JTX-541, as alleged evidence

12    of misappropriation and disclosure of L5 to ████████. Madisetti Direct ¶¶ 142-45. But

13    JTX-541 ██████████████████████████████████████████████████████

14    ██████████████████████████████████████████████████████████████

15    ████████    A subsequent document from ████████ (JTX-1156) and the final ERS

16    further confirm (as did Apple engineers) ██████████████████████████████████

17    ██████████████████████████████████████████████████████████████

18    ██████████████████████████████████████████████████████████████

19    ██████████████████████████████████████████████████████████████

20    ██████████████████████████████████████████████████████████████

21    ██████████████

22         147.   ████████████████████████████████████████

23    ██████████████████████████████████████████████

24         148.   ████████████████████████████████████████

25    ██████████████████████████████████████████████████████████████

26    ██████████████████████████████████████████████████████████████

27    ██████████████████████████████████████████████████████████████

28    ██████████████████████████████████████████████████████████████

1 ██████████████████████████████████████████

2 ██████████████████████████████████████████

3 ████████████████████

4    149.  ██████████████████████████████████

5 ██████████████████████████████████████████

6 ██████████████████████████████████████████

7 ██████████████████████████████████████████

8 ██████████████████████████████████████████

9 ██████████████████████████████████████████

10 ██████████████████████████████████████████

11 ██████████████████████████████████████████

12 ████████████████████████████

13    150.  ████████████████████████████████████

14 ██████████████████████████████████████████

15 ██████████████████████████████████████████

16 ██████████████████████████████████████████

17 ██████████████████████████████████████████

18 ██████████████████████████████████████████

19 ██████████████████████████████████████████

20 ██████████████████████████████████████████

21 ██████████████████████████████████████████

22 ████████████████████████████████

23    151.  In  sum,  ███████████████████████████

24 ██████████████████████████████████████████

25 ██████████████████████████████████████████

26 ██████████████████████████████████████████

27 ██████████████████████████████████████████

28 ██████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████

3 152. ████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ██████████████████████████

## B.    The Alleged Demodulation Trade Secrets

153.    Demodulation is a concept that has been in use for over 120 years, including in AM/FM radio.  Madisetti Direct ¶¶ 35-38.

154.    Plaintiffs allegedly developed D1, D3, and D10, but they failed to demonstrate possession of them.  Plaintiffs have not identified a single document before the case began that describes D1, D3, or D10.  *E.g.*, 11/5 AM Tr. [Kiani] 93:14-20; 11/5 PM Tr. [Diab] 42:18-23; *id.* [Poeze] 112:3-14.  Even when selectively picking excerpts from unrelated documents and source code, Plaintiffs' possession analysis is still missing key elements.  *E.g.*, Sarrafzadeh Direct ¶¶ 41-54, 101-10, 150-64; 11/12 AM Tr. [Sarrafzadeh] 60:11-63:19, 73:24-76:10, 84:24-90:18.

155.    If possessed, Plaintiffs have not taken steps to maintain the secrecy of the alleged secrets.  Plaintiffs published the same information in their patent publications, rendering it generally known.  Sarrafzadeh Direct ¶¶ 55-75, 111-27; 11/12 AM Tr. [Sarrafzadeh] 44:7-45:12, 46:9-13, 63:20-67:3, 68:11-70:20, 76:11-81:5, 82:24-84:20.

156.    Plaintiffs also failed to show Apple misappropriated D1, D3, and D10, or that Plaintiffs were harmed or Apple benefitted from any alleged misappropriation.  Sarrafzadeh Direct ¶¶ 76-96, 128-45, 165-75; 11/12 AM Tr. [Sarrafzadeh] 55:16-56:3, 70:21-73:19, 81:6-84:20, 86:10-19.

157.    None of the alleged D secrets or any demodulation proposal by Dr. Lamego is used in any model of Apple Watch.  Sarrafzadeh Direct ¶¶ 16, 28, 32; 11/7 AM Tr. [Madisetti] 58:20-59:13, 60:19-21.  Apple's engineers evaluated Dr. Lamego's proposal

and determined it was not suitable for Apple Watch because it was too complex, inflexible, and would require too much power.  Land Direct ¶ 79; Waydo Direct ¶¶ 41, 46, 49; Hotelling Direct ¶ 68; Sarrafzadeh Direct ¶¶ 32, 89, 140; Dkt. 2266 [Kanaris Dep.] 51:4-52:6, 67:19-21, 68:1-69:5.  Instead, Apple uses "dark channel subtraction" or "DCS", that Apple developed before Dr. Lamego joined Apple.  Land Direct ¶¶ 76-79, Waydo Direct ¶¶ 21-39, 42; Sarrafzadeh Direct ¶¶ 28-32; 11/7 AM Tr. [Madisetti] 58:20-59:7, 60:19-21; 11/7 PM Tr. [Lamego] 135:9-17; 11/8 AM Tr. [Waydo] 68:3-5.

### 1.    D1

158.   Plaintiffs presented no evidence that D1 is owned by Masimo, Cercacor, Willow, or any combination of them.  *E.g.*, 11/6 PM Tr. [Hammarth] 25:12-26:1.

#### a)    *Plaintiffs Failed to Establish Possession of D1*

159.   Plaintiffs have not shown possession of D1.  Sarrafzadeh Direct ¶¶ 41-54; 11/12 AM Tr. [Sarrafzadeh] 60:11-63:19.  To the extent Plaintiffs attempt to show possession of D1, Plaintiffs published that same information (both before and after Dr. Lamego joined Apple).  Sarrafzadeh Direct ¶¶ 55-75; 11/12 AM Tr. [Sarrafzadeh] 63:20-70:20.  Dr. Madisetti did not identify D1 in any of Plaintiffs' prelitigation documents or identify any product or code that practices D1 in full.  *Id*.

160.   ████████████████████████████████████████████

161.   Dr. Madisetti cites evidence conflating demodulation with demultiplexing, but those are distinct concepts that are not interchangeable.  Sarrafzadeh Direct ¶¶ 23, 46, 50; 11/12 AM Tr. [Sarrafzadeh] 61:4-62:8, 62:20-63:15.  Multiplexing and

demultiplexing are signal processing techniques for combining and separating different signals. Sarrafzadeh Direct ¶ 24. By contrast, modulation and demodulation are techniques for encoding information from a signal of interest onto a carrier signal (modulation) and then recovering the information so the signal of interest can be used. *Id.* ¶ 20; 1/12 AM Tr. Sarrafzadeh 56:4-24 (explaining demodulation and demultiplexing are "fundamentally and orthogonally different"). The demodulation evidence Dr. Madisetti cites cannot support possession of D1's demultiplexing requirement.

162.  At trial, Plaintiffs introduced the cover pages for two source code files into evidence, JTX-5199.1 and JTX-5200.1. Neither Mr. Poeze nor Dr. Madisetti cited these exhibits in their direct testimony as purportedly showing the demultiplexing steps in D1. Mr. Poeze briefly addressed these files in his redirect testimony, but failed to link them to any of the alleged demodulation secrets. 11/6 AM Tr. [Poeze] 27:18-31:3.

163.  █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

b)  <u>*To the Extent Possessed, D1 Was Not Reasonably Protected and Was Generally Known*</u>

164.  In any event, to the extent Plaintiffs possessed D1, it was published, not

kept secret, and generally known.

165.   For example, JTX-3584, U.S. Patent No. 9,861,305 ("Weber 2018") disclosed D1.   Sarrafzadeh Direct ¶¶ 69-71; 11/12 AM Tr. [Sarrafzadeh] 64:14-67:3, 70:7-20.

166.   Weber 2018 is a Masimo patent in the field of light-based physiological sensors.   Sarrafzadeh Direct ¶ 67; JTX-3584 at 1:25-29.

167.   Dr. Madisetti did not dispute that Weber 2018 alone discloses D1. Madisetti Direct ¶ 202 (noting only that Weber 2018 issued after the purported misappropriation).   11/12 AM Tr. [Sarrafzadeh] 65:25-66:3.

168.   If Plaintiffs possessed D1, then they did not treat it as a trade secret due to their publication of D1 in Weber 2018—which published before Apple published the ████████████████, and before Apple introduced the Blood Oxygen feature in Apple Watch Series 6 in 2020.

169.   If possessed by Plaintiffs, D1 was also disclosed in JTX-3581, U.S. Patent No. 7,003,338 ("Weber 2005"), another Masimo patent in the field of light-based physiological sensors.

170.   ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

171.   ████████████████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████

      *c)*     *No Independent Economic Value of D1*

172.   Plaintiffs have failed to establish that D1 derives independent economic value from being secret.

173.   Plaintiffs did not offer any evidence of the time and resources they devoted to developing D1 (or any alleged demodulation trade secret) specifically beyond conclusory statements.  Sarrafzadeh Direct ¶ 90.  Nor did Plaintiffs offer any evidence establishing that D1 (or any of the other alleged demodulation trade secrets) provides a distinct benefit, such as clinical studies or testing data comparing performance of products with and without the alleged demodulation secrets.  *Id.* ¶ 91; Kiani Direct ¶ 137; Diab Direct ¶ 238; Poeze Direct ¶ 17.

174.   The source code for Plaintiffs' products that Dr. Madisetti relied upon ████████████████████ does not contain D1.  Sarrafzadeh Direct ¶ 53.

175.   ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

      *d)*     *No Acquisition, Use, or Disclosure of D1 by Apple*

176.   Plaintiffs failed to establish that Dr. Lamego conveyed D1 to Apple.

177.   Several documents that Plaintiffs cite in an attempt to demonstrate that Dr. Lamego disclosed D1 to other Apple employees (JTX-142; JTX-143; JTX-14) ████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

1

2

3     178.

4

5

6

7

8

9     179.

10

11

12

13

14

15     180.

16

17

18

19

20

21

22

23

24

25     _____

26     [6] Dr. Madisetti also cited JTX-852, JTX-853, and JTX-855, but gave no substantive
27     reason why these documents prove acquisition, use, or disclosure of D1.  Sarrafzadeh

28

181. 

182. Apple does not use D1 (or any demodulation proposal from Dr. Lamego) in Apple Watch, and Plaintiffs' expert conceded this point. Madisetti Direct ¶¶ 194, 205

### 2.    *D3*

183. Plaintiffs presented no evidence that D3 is owned by Masimo, Cercacor, Willow, or any combination of them. *E.g.*, 11/6 PM Tr. [Hammarth] 25:12-26:1.

#### a)    *Plaintiffs Failed to Establish Possession of D3*

184. Plaintiffs failed to establish possession of the entirety of D3. Sarrafzadeh Direct ¶¶ 101-10; 11/12 AM Tr. [Sarrafzadeh] 73:24-76:10. To the extent Plaintiffs can demonstrate possession of D3, Plaintiffs made that same information publicly available

---

[7] This patent was admitted as JTX-1262 and JTX-795. Apple uses JTX-1262 herein.

1    through their patents before Dr. Lamego joined Apple.  Sarrafzadeh Direct ¶¶ 111-27;

2    11/12 AM Tr. [Sarrafzadeh] 43:1-46:13, 76:11-81:5.

3        185.

7        186.

15       187.

23       188.

Wilmer Cutler
Pickering Hale
and Dorr LLP

1    189.    █████████████████████████████████████████

2    █████████████████████████████████████████████████████

3    █████████████████████████████████████████████████████

4    █████████████████████████████████████████████████████

5    ████████████████████████████████████

6    190.    █████████████████████████████████████████

7    █████████████████████████████████████████████████████

8    █████████████████████████████████████████████████████

9    ████████████████████████████████████

10    191.    █████████████████████████████████████████

11    █████████████████████████████████████████████████████

12    █████████████████████████████████████████████████████

13    █████████████████████████████████████████████████████

14    █████████████████████████████████████████████████████

15    █████████████████████████████████████████████████████

16    █████████████████████████████████████████████████████

17    █████████████████████████████████████████████████████

18    █████████████████████████████████████████████████████

19    █████████████████████████████████████████████████████

20    █████████████████████████████████████████████████████

21    █████████████████████████████████████████████████████

22    ██████████████████████████████████████████████

23            b)      *To the Extent Possessed, D3 Was Not Reasonably Protected*

24                    *and Was Generally Known*

25        192.    To the extent it was possessed by Plaintiffs, D3 was generally known prior

26    to 2014 based on Plaintiffs' own publications.

27        193.    █████████████████████████████████████████

28    █████████████████████████████████████████████████████



194.

195.

1 ████████████████████████████████████████████████

2 ████████████████████████████████████

3 196. ████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████

### c)      No Independent Economic Value of D3

197.   Plaintiffs have failed to establish that D3 derives independent economic value from being secret.  Plaintiffs have not offered any evidence concerning the time and resources they purportedly devoted to developing D3 (or any alleged demodulation trade secret) specifically beyond conclusory statements.  Sarrafzadeh Direct ¶¶ 136, 142.

198.   Nor have Plaintiffs offered any evidence establishing that D3 (or any of the other demodulation trade secrets) provides a distinct benefit, such as clinical studies or testing data comparing performance of products with and without the alleged demodulation secrets.  Sarrafzadeh Direct ¶¶ 137-40; *see* Kiani Direct ¶ 137; Diab Direct ¶ 238; Poeze Direct ¶ 17.

### d)      No Acquisition, Use, or Disclosure of D3 by Apple

199.   Plaintiffs have failed to establish that Dr. Lamego conveyed D3 to Apple.

200.   Dr. Lamego developed a technique shown in a ██████████████████

██████████████████████████████████  ██████████████████████

████████████████████████████████████████████████

██████████████.  This technique was based on well-known concepts he learned in his undergraduate education—not upon Plaintiffs' alleged trade secrets.  Sarrafzadeh Direct ¶¶ 129, 134, 169, 172; 11/7 PM Tr. [Lamego] 134:24-135:11.

201.  Dr. Madisetti contends that JTX-847, in combination with JTX-880, discloses the entirety of D3.  Madisetti Direct ¶¶ 212-13.  It does not.  Sarrafzadeh Direct ¶¶ 129, 169.

202. 

203.

204.

205. ████ Apple uses DCS instead. *See supra* ¶ 157; Madisetti Direct ¶ 227 (only asserting Apple "explored" D3); Hotelling Direct ¶ 68; Land Direct ¶¶ 74-79; Waydo Direct ¶¶ 39-42, 49, 56; Sarrafzadeh Direct ¶¶ 16, 28, 32, 133, 140; 11/7 AM Tr. [Madisetti] 58:20-59:13, 60:19-21; 11/12 AM Tr. [Sarrafzadeh] 55:16-21, 57:8-22, 92:7-23.

206.

Wilmer Cutler
Pickering Hale
and Dorr LLP

1 ████████████████████████████████████████████████████████

2 ██████████████████████████████████████████

### 3.   D10

207.   Plaintiffs have not presented any evidence that D10 is owned by Masimo, Cercacor, Willow, or any combination of them.  *See, e.g.*, 11/6 PM Tr. [Hammarth] 25:12-26:1

#### a)   *Plaintiffs Failed to Establish Possession of D10*

208.   Plaintiffs failed to establish possession of D10.

209.   ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

210.   ██████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

211.   ██████████████████████████████████████████████
██████████████████████████████████████████████

212.   ██████████████████████████████████████████████
██████████████████████.

213.   ██████████████████████████████████████████████
████████████████████████████████████████████████████████



214.

215.

216.

217.   Plaintiffs likewise have failed to show they possessed

218.   Plaintiffs also have not established that Dr. Lamego invented D10 while at Cercacor.   Sarrafzadeh  Direct  ¶¶ 166-67.

219. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

220. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

### b)    *Publication of D10*

221.    Plaintiffs' then-CEO Joe Kiani conceded that D10 is no longer a secret, as it has ██████████████████████. 11/5 AM Tr. [Kiani] 114:3:-23; 4/6/23 AM Tr. [Kiani] 110:14-16; 4/11/23 PM Tr. 8:18-19 (Court holding it was "established by the record" that D10 is not a secret).[9]

222.    Plaintiffs allege that Apple ████████████████████████████

████████████████████████████████████████████

████████████████████

### c)    *No Independent Economic Value of D10*

223.    Plaintiffs have not shown that D10 has independent economic value.

224.    Dr. Madisetti alleges that D10 is valuable because ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[9] Plaintiffs claim that ███████████ also discloses D1 and D3, but they did not prove this at trial. *See supra* ███████████████████████████ o longer have been trade secrets after the ██████████████████████ (if they ever were), for the same reason th ██████████████ a trade secret.

55:16-21, 86:10-19, 92:7-13.

225.    Again, as with the other alleged demodulation trade secrets, Apple has never used D10 in any Apple product.  Sarrafzadeh Direct ¶¶ 170-71; 11/12 AM Tr. [Sarrafzadeh] 55:16-21, 86:10-19; 92:7-13.

**C.    Plaintiffs Have Not Shown Harm From Alleged Misappropriation**

226.    Plaintiffs have failed to adduce any evidence of harm stemming from the alleged misappropriation.  The speculative harms Plaintiffs do allege have no nexus to the alleged misappropriation.

227.    There is no evidence of economic harm to Plaintiffs connected to what Plaintiffs contend was Apple's misappropriation.

228.    Plaintiffs have failed to show that they lost sales of any Masimo or Cercacor product due to Apple's alleged misappropriation.  There is no allegation of such harm to Cercacor.  11/6 PM Tr. [Hammarth] 34:3-5 ("Q. You don't claim that Willow or Cercacor lost business as a result of Apple releasing Apple Watch; correct?  A. I don't believe so."), 34:6-13 (agreeing no "analysis of Willow or Cercacor losing business as a result of Apple's release of Apple Watch").

229.    Plaintiffs have failed to adduce evidence in support of their claim that Masimo "experienced a reduction in demand for its technology when Apple introduced the blood oxygen feature."  Dkt. 2218-1 (Plaintiffs' FOF-COL) ¶ 327.  Plaintiffs rely entirely on two paragraphs of Mr. Kiani's direct for that contention—one of which was stricken by the Court; the other is conclusory and uncorroborated.  Dkt. 2288 (Court's rulings) ¶¶ 217-18 (sustaining objection).  Plaintiffs failed to even identify any Masimo products in competition with Apple Watch when Apple released its Blood Oxygen feature in 2020.

230.    Masimo's own W1 watch was not sold until late 2021 (in a limited release), and not sold to the general public until August 2022—long after the release of nearly all the accused products, including the Series 6 that introduced Blood Oxygen in 2020.  11/5 PM Tr. [Kiani] 18:2-19:6; *id.* 20:17-21:11; *id.* 36:9-37:5; 11/6 AM Tr. [Scruggs] 71:16-

21; Madisetti Direct ¶ 16; *see also* JTX-785. Plaintiffs have not identified any evidence of sales of the W1 or harm to those sales.

231. Plaintiffs provided insufficient evidence from which to conclude Masimo's W1 even practices any alleged trade secret. Plaintiffs' only evidence is Dr. Madisetti's conclusory say-so, uncorroborated by any documents or testimony, that the W1 allegedly "uses Trade Secrets D1 and L5." Madisetti Direct ¶ 16.

232. Plaintiffs' only witness to testify regarding direct involvement in the development of the Masimo W1, Stephen Scruggs, was not aware of any alleged trade secret and never had access to them. Scruggs Direct ¶ 3; 11/6 AM Tr. [Scruggs] 69:22-70:2, 71:22-72:5 ("Q. Now, you understand the plaintiffs in this case are claiming that multiple alleged trade secrets have been misappropriated, correct? A. Yes. I'm not familiar with which trade secrets, but I understand this case is about trade secrets."); *id.* 72:16-22; *id.* 73:3-74:3 (confirming Plaintiffs never identified Mr. Scruggs as having access to the alleged trade secrets). Plaintiffs introduced no evidence that Masimo's Freedom watch product has even been launched or that it uses any alleged trade secret.

233. Similarly, Plaintiffs identified no evidence that Masimo's health module practices any alleged trade secret. Dkt. 2348 at 2 (finding Plaintiffs failed to identify evidence or testimony linking the health module supplied to a third party with the health module used in the W1 watch). Even if they had, Plaintiffs adduced no evidence that they lost sales of the health module as a result of the alleged misappropriation.

234. Further, Plaintiffs did not tie their allegations that Masimo was harmed by the introduction of Apple's Blood Oxygen feature to the alleged trade secrets themselves, which are (1) not alleged to be used in Apple Watch (D1, D3, and D5), or (2) alleged to have been used in connection with Apple Watch for *years* before the Blood Oxygen feature was introduced (L4, L5). There is accordingly no evidence suggesting the purported misappropriation caused any sales or profits connected to Apple's Blood Oxygen feature specifically, and therefore no evidence of any harm to Plaintiffs from those sales is attributable to the alleged trade secrets. *E.g.*, 11/7 AM Tr. [Kinrich]

114:12-115:22 ("I have not analyzed the causation from the trade secrets themselves.");
Webster Direct ¶¶ 11-21.

235.   Plaintiffs also failed to show that the alleged misappropriation harmed
Plaintiffs' innovation process.  PMCLF (Dkt. 1676) ¶ 76.  Plaintiffs only offered Mr.
Kiani's conclusory say-so on that issue.  *E.g.*, Kiani Direct ¶ 223 ("Lamego's behavior
is already having a chilling effect on our company's innovation.").  But that testimony
is belied by Plaintiffs' own patent activity in recent years: Plaintiffs have over 2,000
patent applications currently pending with the U.S. Patent and Trademark Office.  11/5
AM Tr. [Kiani] 113:5-8.  No Masimo, Cercacor, or Willow engineer testified regarding
any supposed chilling effect, much less a chilling effect caused by Apple's alleged
misappropriation.  To the contrary, Mr. Diab was unaware what the specific allegations
in the case even were, and just recently read the alleged trade secrets for the first time.
11/5 PM Tr. [Diab] 42:9-23.

236.   Plaintiffs did not identify any evidence of harm resulting from Apple's
alleged use, disclosure, or destruction of the alleged D1, D3, or D10 trade secrets.
Plaintiffs did not dispute that Apple does not use D1, D3, or D10 in any Apple product.
There is no evidence to suggest any future use or disclosure either; to the contrary, the
evidence confirmed Apple that has no intent to use Dr. Lamego's rejected demodulation
proposal in any future Watch product.  Waydo Direct ¶ 49; 11/8 AM Tr. [Waydo] 81:22-
82:4; *id.* 83:17-23; Land Direct ¶ 79.

237.   Plaintiffs conceded that D10 ███████████████████████████.  11/5
AM Tr. [Kiani] 95:18-96:8.  Plaintiffs identified no evidence that anyone has ever ████
██████████████████████████████████████████████.  Sarrafzadeh
Direct ¶¶ 170-71, 174.  There cannot be future harm from disclosure of information that
has already been made public.

## D.   The Accused Features Are Tiny Slivers of Apple's Quality-Control Testing and Internal Electrical Circuitry

238.   The PPG sensor used for measuring heart rate and blood oxygen in Apple

Watch is one among hundreds of features, functions, and applications.  Hotelling Direct ¶ 9; Russell-Clarke Direct ¶ 16; 11/7 PM Tr. [Russell-Clarke] 152:11-18.

239.   There is no connection at all between the alleged demodulation secrets and Apple Watch; there is no dispute that the alleged demodulation secrets have never been used in any Apple Watch.  Madisetti Direct ¶¶ 205 (D1), 227 (D3), 258 (D10); 11/7 AM Tr. [Madisetti] 58:20-59:7, 60:19-21; 11/7 AM Tr. [Kinrich] 114:12-17; Webster Direct ¶¶ 11-15.  There is also no evidence that Apple's implementation of DCS was changed or benefited in any way from evaluating Dr. Lamego's proposal.

240.   ███████████████████████████████████████████████████████████████████████████████████████████████████████

241.   ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

242.   Plaintiffs have adduced no evidence showing a material connection between the accused quality control test or short circuit to the Blood Oxygen feature.  Both purported secrets were allegedly used by Apple for years before the Blood Oxygen feature was even introduced.

243.   There is no evidence that ████████████████████████ ██████████████████████ improved the accuracy of the optical health sensor in Apple Watch, generally, or of the Blood Oxygen feature (which was not introduced until years later), specifically.  ███████████████████████████████████████████, and Apple "did not observe any changes to the performance of the optical sensor

between Series 0 and Series 1 ████████████████████████.”  Block Direct ¶ 47; *see also* Land Direct ¶ 61 ████████████████

████████████████████████████████████████████

████████████████.”).

244.  There is no evidence that Apple's purported misappropriation of L4 or L5 caused any profits attributable to the Blood Oxygen feature (or otherwise).  11/7 AM Tr. [Kinrich] 114:12-115:10 (admitting no causation analysis or attribution of Blood Oxygen profits to any feature); Webster Direct ¶¶ 11-14, 16-20.

## V.    APPLE PATENTED NOVEL TECHNOLOGIES

245.  Dr. Lamego's work at Apple was short and, with respect to the alleged trade secrets, did not result in any contributions to the actual design and operation of Apple Watch.  But Apple's patent portfolio is not coextensive with its products, and Dr. Lamego did suggest various ideas that led to several patents.

### A.    '095 and '390 Patents

246.  U.S. Patent Nos. 9,952,095 ("'095 patent"), JTX-1268, and 11,009,390 ("'390 patent"), JTX-1269, are both titled "Methods and Systems for Modulation and Demodulation of Optical Signals," and they both list Dr. Lamego and Mr. Hotelling as inventors.   Generally, the patents are directed to signal processing methods for optical sensors that can estimate or determine a physiological parameter of a user.  JTX-1268, JTX-1269.

247.  The '095 patent and '390 patent issued on April 24, 2018 and May 18, 2021, respectively.  JTX-1268; JTX-1269.

248.  There is no evidence that Dr. Lamego or Mr. Diab invented the subject matter claimed in the '095 and '390 patents while employed by Masimo or Cercacor. Mr. Hotelling and Dr. Lamego collaborated on the ideas disclosed in these inventions during Dr. Lamego's employment at Apple.  Hotelling Direct ¶ 74.  As one example, the block diagrams in Figure 4 of both the '095 and '390 patents are reflected in Apple's brainstorming   sessions   summarized   in   JTX-3657.      Hotelling   Direct   ¶¶ 72-78;

Sarrafzadeh Direct ¶ 200.

249.  There is no evidence that Mr. Diab contributed anything to the '095 and '390 patents.  Mr. Diab did not even mention either patent in his direct testimony.  *See generally,* Diab Direct.

250.  Dr. Madisetti testified that Mr. Diab made inventive contributions to the '095 and '390 patents based on disclosures in U.S. Patent No. 5,632,272 ("'272 patent"), which was issued in 1997, and lists six named inventors including Mr. Diab, JTX-1267, and U.S. Patent Publication No. 2006/0211924 ("'924 publication"), which was published in 2006 and lists five named inventors including Mr. Diab, JTX-1206.

251.  Because the '272 patent and '924 publication issued several years prior to the '095 and '390 patents, the information would have been known by a skilled artisan before the '095 and '390 patents were conceived.  Sarrafzadeh Direct ¶ 197; 11/12 AM Tr. [Sarrafzadeh] 91:20-92:6.

252.  Moreover, there is no evidence that Mr. Diab himself (as opposed to one of the other named inventors) conceived of any of the claim limitations that Dr. Madisetti relies upon.  Sarrafzadeh Direct ¶ 198

253.  The only concepts from the '272 patent and '924 publication that Dr. Madisetti asserts Mr. Diab invented are well-known aspects of a physiological sensor, such as use of LEDs and photodiodes, a high-pass filter, transimpedance amplifier, programmable gain amplifier, and analog-to-digital converters.  Sarrafzadeh Direct ¶ 199.  Mr. Diab concedes that these constitute only basic building blocks of a pulse oximeter.  Diab Direct § V.

254.  Nor is there any evidence that Mr. Diab communicated with Dr. Lamego or Mr. Hotelling regarding the concepts in the '095 patent or the '390 patent during the period in which those concepts were being developed.  Sarrafzadeh Direct ¶ 198.  Mr. Diab himself provided no affirmative testimony that he was in fact an inventor of the ideas in the '095 patent or the '390 patent.  *Id.* ¶¶ 194-95; *see generally* Diab Direct.

Wilmer Cutler
Pickering Hale
and Dorr LLP

### B.    '052 and '670 Patents

255.    U.S. Patent No. 10,078,052 ("'052 patent") and U.S. Patent No. 10,247,670 ("'670 patent") issued on September 18, 2018, and April 2, 2019, respectively.  JTX-1239; JTX-1241.

256.    The named inventors on the '052 and '670 patents are Trevor Ness, Chin San Han, David Nazzaro, Marcelo Lamego, Naoto Matsuyuki, and Wolf Oetting.  JTX-1239; JTX-1241.

257.    As noted in the Abstracts, the inventions in these patents are directed to "[a] reflective coating, surface, or surface finish [that] can be applied adjacent to the area to which light is emitted and/or through which light exits in order to increase the light collected by the light detector.  The reflective coating can be oriented so as to reflect light back into the object."  JTX-1239; JTX-1241.

258.    At a high level, the patents describe ways in which Apple used reflective treatment on the back of Apple Watch to improve the accuracy of the heart rate sensor.  Ness Direct ¶ 20.

259.    The named inventors conceived of the claimed inventions of the '052 and '670 patents at Apple in February 2014, during work on Apple Watch.  Ness Direct ¶¶ 20, 31; Warren Direct ¶ 158; *see also* JTX-40, JTX-45 (email chains).  At that time, Mr. Ness and his team were working on the optical heart sensor and trying to improve accuracy by increasing the signal and reducing the noise.  Ness Direct ¶ 31.

260.    Dr. Lamego contributed an initial idea to use reflectivity on the back of Apple Watch, although he did not provide any specific input on how to implement that idea. *Id.* ¶ 26; 11/13 Tr. [Warren] 100:18-25.  In other words, Dr. Lamego's contribution was to apply the known idea of reflectivity to a new device: the Apple Watch.  Warren Direct ¶ 164.

261.    Even though Mr. Ness was the team leader, he had very limited contact with Dr. Lamego and only ever interacted with him on two occasions.  Ness Direct ¶ 46.

262.    Mr. Ness never heard of Mohamed Diab before this litigation.  Ness Direct

¶ 29; 11/8 PM Tr. [Ness] 124:6-7.

263.    Mr. Diab did not contribute anything to the '052 patent or the '670 patent. 11/8 PM Tr. [Ness] 123:24-124:5.

264.    Nor did Mr. Diab ever communicate with the named inventors of the '052 and '670 patents, or any other Apple employee, regarding the concepts in the '052 patent or the '670 patent during the period in which the concepts were being developed.  Ness Direct ¶¶ 19-39; Warren Direct ¶ 158.

265.    Mr. Diab does not claim to be an inventor of the '052 or '670 patents. Warren Direct ¶ 159; 11/7 AM Tr. [Madisetti] 64:15-23 (agreeing Plaintiffs' only support for inventorship is his opinion).  Mr. Diab did not even mention the patents on which he is alleged to be an inventor in his direct testimony.  *See generally* Diab Direct.

266.    At best, the evidence reflects that Dr. Lamego and Mr. Diab discussed high-level concepts regarding reflectivity.  However, those basic concepts were known in the prior art (including as a result of Masimo's TF-I reflectance sensor, released in 2003, which Dr. Madisetti contended embodies those concepts) a decade before the August 2014 priority date of the '052 and '670 patents.  Warren Direct ¶¶ 161-62; 11/13 Tr. [Warren] 100:2-17; Diab Direct ¶ 208; Madisetti Direct ¶¶ 277-83.

267.    Finally, there is no evidence that Dr. Lamego or Mr. Diab developed the subject matter claimed in the '052 patent or the '670 patent while employed by Plaintiffs. As discussed above, Dr. Lamego's contribution to the patents was predicated on his knowledge of Apple Watch, and thus logically could not have been developed while Dr. Lamego was still employed at Masimo.  Warren Direct ¶ 164.

C.    '754 Patent

268.    Dr. Lamego is a named inventor on U.S. Patent No. 10,219,754, titled "Methods and Systems for Modulation and Demodulation of Optical Signals" ("'754 patent"), which issued on March 5, 2019.  JTX-1262.

269.    The '754 patent reflects work that Dr. Lamego did while he was employed by Apple.  For example, Figure 7 of the patent contains the same subject material that

appears in an internal Apple presentation.  JTX-1262 at -164; JTX-3657; Hotelling Direct ¶ 76.  Other concepts in the '754 patent are shown in a MATLAB script authored by Dr. Lamego while employed at Apple in 2014.  JTX-880; Hotelling Direct ¶ 77; Sarrafzadeh Direct ¶¶ 183-87.  Dr. Lamego developed the demodulation technique that appears in claim 1 of the '754 patent to overcome a specific challenge posed by Apple Watch.  Sarrafzadeh Direct ¶ 186.

270.    There is no evidence that Dr. Lamego or any Apple employee communicated with any of Plaintiffs' employees about the concepts in the '754 patent. Sarrafzadeh Direct ¶¶ 182-88; Madisetti Direct ¶¶ 267-72.

271.    Plaintiffs previously alleged that Mr. Poeze, a former Cercacor employee, was a co-inventor of D10.  *E.g.*, Dkt. 1430 (2023 PMCLF) at 43.  However, at the April 2023 trial, Mr. Poeze testified that he was not aware of anything that would make him a co-inventor of the '754 patent.  4/7/23 AM Tr. [Poeze] 113:15-25.  Plaintiffs then abandoned that theory, dropped their inventorship claim, and changed the theory of their remaining ownership claim to allege only that Dr. Lamego invented the concepts in the '754 patent while employed at Cercacor.  PMCLF (Dkt. 1676) at 26-27.  However, Plaintiffs did not present any evidence to support that allegation; specifically, they failed to identify any contemporaneous documentation of Dr. Lamego inventing D10 while in their employ.  11/12 AM Tr. [Sarrafzadeh] 91:5-19.

272.    While Plaintiffs assert that the ███████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████  *See supra* ¶¶ 210-214, 216-218.

## VI.    PATENTS PUT PLAINTIFFS ON NOTICE ABOUT DR. LAMEGO'S WORK BY 2016

273.    Joe Kiani, CEO of Cercacor/Willow and (until 2024) Masimo, has long expressed misplaced suspicion about whether Apple was using Plaintiffs' alleged trade secrets.  In January 2014, shortly before Dr. Lamego joined Apple, Plaintiffs sent a letter accusing Apple of hiring Dr. Lamego to misappropriate trade secrets.  *See supra* ¶ 14;

Kiani Direct ¶¶ 209-11; JTX-2937.  Mr. Kiani "directed that a letter be sent to Apple" because he "viewed Apple as potentially dangerous because they had expressed an interest in Masimo and Cercacor's technology in the past and had recruited several of [Plaintiffs'] employees in a short period."  Kiani Direct ¶ 209.  Mr. Kiani also heard from Dr. Lamego's friend, Christiano Dalvi, that Apple "had asked [Dr. Lamego] to do something that would compete with [Plaintiffs]."  Kiani Direct ¶ 212.

274.  Before releasing any product, Plaintiffs have a practice of actively monitoring patent filings of other companies for related patents, including between 2014 and 2019.  Kiani Direct ¶ 132; 11/5 PM Tr. [Kiani] 13:20-14:2.

275.  On March 3, 2016, the '052 patent application was published.  JTX-1239.  Dr. Lamego was a named inventor on the '052 patent.  *Id.*  The '052 application covers technology usable for "a wearable fitness device … positioned against the skin of a user's wrist" to "obtain therefrom certain physiological data about the user such as heart rate, … blood oxygenation, … and so on."  JTX-1239 at 8.

276.  Mr. Kiani thus does not dispute "that documents linking Dr. Lamego to physiological sensors at Apple were public as of 2016."  11/5 PM Tr. [Kiani] 16:10-15.  This information sufficed to put Plaintiffs on notice because their January 2014 letter had asserted that if Apple "employ[ed] Mr. Lamego in an area … involv[ing] healthcare technology, including … the measurement of physiological information," it would necessarily encroach upon "Cercacor and Masimo's trade secrets."  JTX-2937 at 1-2.

277.  Had Plaintiffs taken the reasonable investigative step of monitoring patent filings for Dr. Lamego's name, they would have been alerted to the existence of the '052 application when it published in March 2016.

278.  Plaintiffs also would have been alerted through their practice of actively monitoring public patent filings for applications.  Mr. Kiani attempted to suggest Plaintiffs' freedom to operate searches would not have included wearables, but by his own admission, Plaintiffs "were working on wearable[s] … going back to 2014[.]"  *Id.* at 14:13-21; Kiani Direct ¶¶ 97-99.

# VII. UNRELATED INTERACTIONS BETWEEN APPLE AND PLAINTIFFS ARE IRRELEVANT TO THE CLAMS AT ISSUE

## A. Apple Is Not Alleged To Have Misappropriated Anything Through Projects Rover Or Everest

279.    In late summer/early fall 2012, the Apple Watch product development team asked Apple's corporate development team to survey other companies in the health, wellness, and medical space.  Perica Direct ¶ 7; Hotelling Direct ¶¶ 28-29.  Such "landscape reviews" involve analyzing an industry through publicly available information like research reports, web searches, or news articles.  Perica Direct ¶ 8.  This particular landscape review was referred to internally as "Project Rover," and encompassed analyzing approximately one hundred companies.  *Id.* ¶ 12; JTX-4355.01 at -540-54; 11/8 PM Tr. [Hotelling] 16:2-12.  The basic idea was to see whether any of those companies would be suitable for partnership or even acquisition, to bolster Apple's health-and-wellness capabilities, including for Apple Watch development.  Hotelling Direct ¶ 28; *see also* Perica Direct ¶¶ 7, 11.

280.    Apple began meeting with the Project Rover companies in November 2012, ultimately meeting with 28 healthcare, wellness, and medical device companies.  Perica Direct ¶¶ 15, 32; JTX-4360.01 at -948-50.  Apple did not ultimately enter into a business relationship with any of the companies it met with for Project Rover.  Perica Direct ¶ 33; Hotelling Direct ¶ 31.  Apple concluded that none of the companies was a good fit.  11/8 Tr. PM [Hotelling] 16:13-17; Hotelling Direct ¶ 31; Perica Direct ¶¶ 15, 30, 33.

281.    Apple identified Masimo and Cercacor as part of project Rover.  Perica Direct ¶ 14; Hotelling Direct ¶ 29; JTX-4355.01 at -546.  Apple and Masimo had a single meeting on May 3, 2013 that was introductory in nature and lasted about two to three hours.  Perica Direct ¶ 19; Hotelling Direct ¶ 30.

282.    As Plaintiffs admit, no trade secret information was discussed during the May 2013 meeting; nor do Plaintiffs contend that Apple obtained any of Plaintiffs' confidential information directly from Plaintiffs, either at the May 2013 meeting or

1    otherwise.  Perica Direct ¶¶ 19, 21; Hotelling Direct ¶ 30; Land Direct ¶ 19; Kiani Direct

2    ¶ 177; 11/5 PM Tr. [Kiani] 17:6-8 ("Q Sir, you're not here to say that trade secrets were

3    part of that discussion; correct?  A That is correct."); 11/8 AM Tr. [Perica] 50:13-20;

4    11/8 Tr. PM [Hotelling] 75:3-14.

5       283.   There was also no discussion at the May 2013 meeting about entering into

6    any contractual or other business arrangement.  Perica Direct ¶ 24.

7       284.   After the May 2013 meeting, members of Apple's corporate development

8    team briefly contemplated acquiring Masimo because—at the time—Apple was

9    evaluating whether to add medical features to Apple Watch.   Perica Direct ¶ 25.

10   However, Apple did not formulate an offer to acquire Masimo, or make any substantial

11   steps toward doing so.  To the contrary, Apple's consideration of Masimo was limited

12   to a few internal emails; Apple did not undertake any due diligence, conduct an internal

13   valuation analysis, go through regulatory reviews, seek approval from the audit or

14   finance committees of its board of directors, or make an offer—all steps that Apple

15   would typically take before making an offer to acquire a public company of Masimo's

16   size.  11/8 AM Tr. [Perica] 54:3-18.  Moreover, Apple CEO Tim Cook did not recall

17   discussing an acquisition of Masimo, which suggests that "it wasn't in anything that was

18   talked about seriously."  Dkt. 2402-3 [Cook Dep.] 41:12-20, 51:12-18.

19      285.   Apple's corporate development team ultimately decided not to pursue an

20   acquisition of Masimo for two related reasons: (1) Masimo did not appear to have the

21   kind of technology that could be used consistent with the space and power constraints

22   of a consumer product like Apple Watch, Perica Direct ¶ 30, and (2) Apple decided to

23   continue its focus on consumer health and wellness rather than entering the medical

24   space, and Apple executives decided that integrating a medical device company as large

25   as Masimo would be a significant distraction to Apple's engineering, sales, finance, legal

26   and integration teams, id. ¶ 30; Dkt. 2402-3 [Cook Dep.] 48:10-18 ("I'm pushing us in

27   a direction of wellness, because my view was that Apple should be in the 'B-to-C'

28   business to consumer, like we are in all of our other products, essentially … We do our

best work when you -- we talk directly to the person who uses a product."); 11/8 AM Tr. [Perica] 51:22-52:8.

286.    In fall 2013, others at Apple briefly considered the potential for a collaboration with Masimo and/or Cercacor, codenamed "Project Everest." Hotelling Direct ¶ 37.   Project Everest likewise never progressed meaningfully because Apple concluded that a collaboration would not be feasible given Masimo's and Cercacor's focus on medical devices.  *Id.*; 11/8 PM Tr. [Hotelling] 75:20-76:7.  Apple never met with Masimo as part of Project Everest.  Hotelling Direct ¶ 37; 11/8 PM Tr. [Hotelling] 75:20-76:7; *see also* Dkt. 2266 [Tom Dep.] 29:2-11, 29:19-21, 30:1-6.

## B.    Plaintiffs Do Not Allege That Any Other Former Employee Misappropriated Anything

287.    The record shows that over the course of a decade, Apple has hired roughly several dozen employees who previously worked at Masimo or Cercacor; Apple hired them as part of its normal hiring process, in which Apple hires individuals based on general talent and expertise.  *E.g.*, Hotelling Direct ¶¶ 55, 57; JTX-1786.1 at 27 (chart identifying employees who worked at Masimo or Cercacor prior to working at Apple).

288.    The hiring of these other employees is irrelevant to Plaintiffs' allegations of misappropriation.  As Mr. Kiani admitted, no employee "other than Dr. Lamego is even alleged to have done anything improper."  11/5/24 Trial Tr. PM [Kiani] at 34:21-25; *see also* Hotelling Direct ¶ 56; 11/8/24 Trial Tr. PM [Hotelling] at 83:9-84:6.

289.    Other than Dr. Lamego, none of Apple's employees who previously worked at Masimo or Cercacor worked on the design of Apple Watch's optical sensor or any PPG hardware or algorithm at issue in this case.  Hotelling Direct ¶ 56; 11/8 PM Tr. [Hotelling] 83:9-84:6; *see also* 11/5 AM Tr. [Kiani] 129:9-14 (testifying that, with respect to other former Masimo or Cercacor engineers currently at Apple, Plaintiffs "don't have the same issue as we do with Marcelo Lamego").

290.    Apple did not hire any of these employees as part of any improper effort to learn Plaintiffs' confidential information.  Hotelling Direct ¶ 55; Dkt. 2402-3 [Cook

Dep.] 132:15-133:4 ("Q Have you ever hired someone to gain access to another company's confidential information?  A No. … Of course not. … [W]e don't want people copying us, and therefore we respect what other people have as well.").

**291.**  Regardless of when they joined Apple, all these employees were required to sign Apple's Intellectual Property Agreement, JTX-3044, and were informed of Apple's Business Conduct Policy, JTX-4181.  Hotelling Direct ¶ 57.

## PROPOSED CONCLUSIONS OF LAW

### I.    JURISDICTION, VENUE, AND TRIAL PROCESS

**292.**  The Court has subject matter jurisdiction under 28 U.S.C. § 1338(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367, at least because the inventorship claims arise under federal patent law, 35 U.S.C. § 256, and the claims under the California Uniform Trade Secrets Act (CUTSA), Ca. Civ. Code § 3426 *et seq.*, and the claims for declaratory judgment of ownership are related to the inventorship claims and form part of the same case or controversy.  This Court also has federal question and patent law jurisdiction pursuant to Plaintiffs' bifurcated patent infringement claims.

**293.**  The Court has personal jurisdiction over the parties and venue is proper under 28 U.S.C. §§ 1391(d) and 1400 because Apple is incorporated in California.

**294.**  Following the original jury trial, Plaintiffs requested a bench trial after voluntarily waiving the right to seek reasonable royalty and exemplary (i.e., punitive) damages, Dkt. 2098 at 2; Dkt. 2100 at 6, and to appeal this Court's prior ruling striking their lost profits theory, Dkt. 2143-6 at 32; 10/28/24 Hr'g Tr. 10-11.  Plaintiffs also waived the right to seek unjust enrichment.  Dkt. 2177-1 at 7 n.12; Dkt. 2133.  Based on those waivers, the Court held that the remaining issues should be tried to the Court.[10]

**295.**  Plaintiffs now seek only a permanent injunction, attorneys' fees, and post-

---

[10] Apple maintains its objections to the Court's decision to order a bench trial.  Dkt. 2159 at 21 n.9.  Moreover, although the Court resolved many of the parties' legal disputes when issuing its jury instructions at the April 2023 trial (Dkt. 1715) and although Apple has already preserved its prior objections to those instructions, Apple restates its objections to the definitive legal rulings this Court made in issuing those instructions, Dkt. 1676.

judgment interest on any fee award.

## II.  TRADE SECRET CLAIMS

296.   To establish misappropriation under CUTSA, Plaintiffs must prove by a preponderance of the evidence "(1) the existence and ownership of a trade secret and (2) misappropriation of the trade secret."   Dkt. 1275 at 3 (citing Cal. Civ. Code § 3426.1); CACI 4400-4401.   Plaintiffs must also establish that Apple's "actions damaged" them.  *See Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003); CACI 4401; CJI-19.

297.   "In order to qualify as a trade secret, the information 'must be secret, and must not be of public knowledge or of a general knowledge in the trade or business.'" *DVD Copy Control Ass'n., Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004); Dkt. 1275 at 7.  Plaintiffs must also show that the alleged secret "derives independent economic value, actual or potential, ***from*** not being generally known to the public or to other persons who can obtain economic value from its disclosure or use," and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Dkt. 1275 at 4 (citing Cal. Civ. Code § 3426.1(d)) (emphasis added); CACI 4402; CJI-21.

298.   To establish misappropriation, Plaintiffs must show for each alleged trade secret that Apple acquired, used, or disclosed the alleged trade secret either (1) by using improper means to learn of the alleged secret (here, called "direct misappropriation") or (2) by knowing or having had reason to know that Apple gained access to the purported secret through improper means (here, called "indirect misappropriation").  Dkt. 1275 at 9 (citing Cal. Civ. Code § 3426.1(a)-(b)); CACI 4405-07.

299.   Plaintiffs failed to meet their burden to prove that L4, L5, D1, D3, or D10 is actually a trade secret, or that Apple misappropriated any alleged trade secret.

### A.    The Alleged Trade Secrets Do Not Qualify As Trade Secrets Under CUTSA And Were Not Improperly Acquired, Used, Or Disclosed.

### 1. *L4 – The Accused Black Foam Quality Control Test*[11]

#### a) *Possession, Ownership, and Particularity*

300. To prove trade secret misappropriation, Plaintiffs must prove that they developed the full scope of the alleged secret, or otherwise lawfully possessed it, before the alleged misappropriation. *See Jasmine Networks, Inc. v. Superior Ct.*, 180 Cal. App. 4th 980, 997-1000 (2009); *DTM Rsch., L.L.C. v. AT&T Corp.*, 245 F.3d 327, 331 (4th Cir. 2001); CJI-20. Plaintiffs should not be allowed to prove possession based only on the alleged secret inventor's say-so. *Cf. Ruling Meng v. Ching-Wu "Paul" Chu*, 643 F. App'x 990, 994 (Fed. Cir. 2016) (patent inventorship testimony must be corroborated).[12]

301. Plaintiffs failed to prove ███████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████ *See supra* ¶¶ 33-39.[13] Plaintiffs cannot prove possession of L4 by showing only partial possession. CJI at 26, 33 (Court holding Plaintiffs must "establish that [each] Asserted Trade Secret as a whole was entitled to protection").

302. Nor can Plaintiffs prove possession by unilaterally narrowing L4 ████████████████████████, years after the close of fact discovery, after Apple prepared its trial defense to the broader articulation of L4, and without seeking to amend their prior identification of the alleged trade secrets under Cal. Code Civ. P. § 2019.210.[14]

303. Plaintiffs' inconsistency on whether L4 ███████████████████████

---

[11] Because the same legal standards apply to all five alleged trade secrets, this document states the relevant legal rule only once in this section. Unless otherwise noted, the same legal standard applies to all later analysis of that element for the other alleged secrets.

[12] Although the Court rejected at summary judgment Apple's position that Plaintiffs must identify a pre-litigation document that clearly describes the alleged trade secrets (Dkt. 1283 at 3-4), Apple reasserts its prior position here, Dkts. 1101, 1249. Even if that ruling remains operative, Plaintiffs cannot rely on *ipse dixit* testimony to establish possession.

[13] The Court held at the April 2023 trial that Dr. Madisetti had not disclosed an opinion on this issue, 4/11/23 PM Tr. 5:17-7:20; 4/12/23 PM Tr. 15:8-16:5, and Dr. Madisetti conceded exactly that at the October 2024 retrial, *see supra* ¶ 35.

[14] The defendant in *Masimo Corp. v. True Wearables, Inc.*, 2022 WL 17083396 (C.D. Cal. Nov. 7, 2022), did not object to Plaintiffs' partial possession theory in that case. The Court is not aware of precedent approving an objected-to partial possession theory.

an independent basis to deny relief, as a trade secret plaintiff must "describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) (summary judgment on inadequate particularity); *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal. App. 4th 26, 43 (2014) (same).  This is because "[w]ithout particularity (pre-trial and at trial), there is an inadequate basis for a fair adjudication of what information was actually used by the defendants." *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 F. App'x 701, 712 (Fed. Cir. 2021) (JMOL on reasonable particularity); *see Altavion*, 226 Cal. App. 4th at 45 (particularity must be established "at trial").  Just as in patent law, Plaintiffs cannot treat their alleged secrets like a "nose of wax" to be "twisted one way" or the other depending on Plaintiffs' strategic needs. *CommScope Techs., LLC v. Dali Wireless, Inc.*, 10 F.4th 1289, 1299 (Fed. Cir. 2021).

304.    Masimo and Cercacor also must also show that each entity "owned the trade secret." *E.g.*, *AMN Healthcare Inc. v. Aya Healthcare Services, Inc.*, 28 Cal. App. 5th 923, 942 (2018).[15]  Plaintiffs have failed to present any evidence establishing whether Masimo, Cercacor, or Willow, or some combination of them, owns L4.

### b)    *Secrecy*

305.    To constitute a trade secret, information "must not have been generally known to the public or to people who could obtain value from knowing it." *AMN Healthcare*, 28 Cal. App. 5th at 943 n.8 (quoting CACI No. 4403); *see also DVD Copy Control Assn.*, 116 Cal. App. 4th at 251; Cal. Civ. Code § 3426.1(d)(1).

306.    "Generally, publication of information in a patent or a patent application makes it generally known to the public as of the date of publication and so eliminates any trade secrecy." CJI-22; *see, e.g.*, *Masimo Corp. v. True Wearables, Inc.*, 2022 WL 205485, at *3 (Fed. Cir. Jan. 24, 2022) ("[I]nformation 'disclosed in a patent' is

---

[15] The Court previously rejected Apple's position that Plaintiffs must prove ownership by both Plaintiffs.  Dkt. 1283 at 3-4.  Apple reasserts it here for preservation.  *E.g.*, Dkt. 1101 at 17-18; Dkt. 1500-1 at 89 n.38.

'generally known to the public' for purposes of the CUTSA.").

307. Plaintiffs failed to meet their burden to prove that core elements in L4 were not generally known.

308. Plaintiffs principally rely on Dr. Madisetti to carry their burden to prove that L4 was not generally known, but cannot properly do so because he failed to conduct any "survey of literature or other research" and appears to have "consciously refrained … from educating himself on the universe of literature in the relevant time frame or even determining … what others in the industry generally knew." *Atmel Corp. v. Info. Storage Devices, Inc.*, 189 F.R.D. 410, 416 (N.D. Cal. 1999).

309. The Court has already rejected Plaintiffs' contention that a trade secret is generally known only if disclosed as a whole in a single reference. Dkt. 1284 at 5-6; *see also True Wearables*, 2022 WL 17083396, at *10, *12 (concluding purported secret was generally known after considering it in discrete "elements" and based on disclosures in multiple references). That argument also is irreconcilable with Plaintiff's attempt to show possession of the alleged secrets by relying on information spread over multiple documents/products. *See supra* ¶¶ 106, 111 (L5); 160, 162-163 (D1); 186-187, 190 (D3); 209-220 (D10).

310. What Plaintiffs claim to possess of L4 is generally known in view of JTX-3778 (Petersen) alone, and also in view of JTX-3673 (Delonzor), JTX-3887 (Webster) and P-0164/JTX-3881 (student project). *See supra* ¶¶ 44-59. Plaintiffs' own patents (JTX-1207, JTX-3879, JTX-3707, JTX-3694) further confirm L4 is generally known. *See supra* ¶¶ 61-66.

### c) *Independent Economic Value From Secrecy*

311. A trade secret must "[d]erive[] independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use," Cal. Civ. Code § 3426.1(d)(1), which means the "information must be sufficiently valuable … to afford … a substantial business advantage" over competitors. *Altavion*, 226 Cal. App. 4th at 62.

312.    Plaintiffs have not met their burden to prove that L4 provides Plaintiffs with a competitive advantage by virtue of its alleged secrecy.

313.    Plaintiffs' failure to prove that L4 was not generally known necessarily means they also failed to prove that L4 had any value from not being generally known.

314.    Plaintiffs also failed to prove what advantage they obtained over competitors by supposedly keeping L4 confidential, including by failing to present any non-conclusory "evidence tending to show how difficult it would have been for [Apple] or another [company] to discover the relevant information" allegedly kept secret. *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 569-70 (2007); *Altavion*, 226 Cal. App. 4th at 62; *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1253 (N.D. Cal. 1995).

315.    Others, including Apple, could and did develop the portion of L4 Plaintiffs say was not generally known. *See supra* ¶¶ 40-60.  Given this evidence that it was not difficult to develop L4, Plaintiffs' circumstantial evidence (e.g., regarding resources invested and precautions taken to preserve secrecy) is insufficient.  "[I]t is not true that evidence of 'some' helpfulness or usefulness … compel[s] a finding of independent economic value." *Yield Dynamics,* 154 Cal. App. 4th at 564, 567.  For example, "airplanes need wings to fly, but that does not mean that all wing designs have independent economic value." *Id.*

### d)    <u>Reasonable Efforts To Maintain Secrecy</u>

316.    To constitute a trade secret, information must be "subject to reasonable efforts to maintain its secrecy." Dkt. 1275 at 7; Cal. Civ. Code § 3426.1(d)(2); *Mattel, Inc. v. MGA Entm't, Inc.*, 2011 WL 3420571, at *6 (C.D. Cal. Aug. 4, 2011).

317.    Plaintiffs failed to take reasonable efforts to keep L4 (as they possessed it) a secret, as confirmed by Plaintiffs' own patents (JTX-1207, JTX-3879, JTX-3707, JTX-3694) that disclose the concepts recited in L4. *See supra* ¶¶ 61-66.  A plaintiff's decision to "disclos[e] … a trade secret in a patent application extinguishes the information's trade secret status." *Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020).

1

　　　　　　　　　　*e)* 　　*Acquisition, Disclosure, and Use*

2

　　318.　Plaintiffs cannot prove direct misappropriation of L4, *see infra* COL

3

§ II.B.1, or that Apple had the requisite mental state to indirectly misappropriate L4, *see*

4

*infra* COL § II.B.2.

5

　　319.　Plaintiffs have not alleged (much less presented evidence) that Apple has

6

disclosed L4 to third parties. *See infra* ¶ 73.

7

　　320.　Plaintiffs may not rely on an acquisition theory of misappropriation because

8

they failed to identify any acquisition-only theory of harm. Rather, their theories have

9

been grounded in Apple's alleged use or disclosure of the purported trade secrets and

10

"[t]hese theories reference acquisition only insofar as it forms a logical prerequisite to

11

use" or disclosure. *Waymo LLC v. Uber Techs., Inc.*, 2018 WL 466510, at *3 (N.D. Cal.

12

Jan. 18, 2018); *see, e.g.*, Directions for Use, CACI 4405.

13

　　321.　Plaintiffs failed to prove that Apple engaged in any conduct that amounts

14

to misappropriation-by-use. Plaintiffs failed to prove that Apple obtained "knowledge

15

of [L4] … through a person who owed a duty to [Masimo or Cercacor]," the necessary

16

predicate for misappropriation-by-use liability here. Cal. Civ. Code § 3426.1(b)(2)(iii).

17

　　322.　Plaintiffs failed to meet their burden to show that Apple obtained L4

18

through Dr. Lamego. ███████████████████████████████████████

19

███████████████████████████████████████████████████████

20

███████████████████████████████████████████████████████

21

█████████████████████████

22

　　323.　Even under Plaintiffs' theory that JTX-143 and/or JTX-1063 show that Dr.

23

Lamego disclosed the ███████████████████████████ L4 to Apple, Plaintiffs

24

have failed to meet their burden to show that Dr. Lamego ████████████████████

25

███████████████████████████████████████████████████████

26

　　324.　Plaintiffs cannot speculate that Dr. Lamego would inevitably have used L4

27

in his work at Apple, as California has rejected the "doctrine of inevitable disclosure."

28

*FLIR Systems, Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1277 (2009); *see U.S. Legal*

Wilmer Cutler
Pickering Hale
and Dorr LLP

1  *Support, Inc. v. Hofioni*, 2013 WL 6844756, at *7 n.8 (E.D. Cal. Dec. 20, 2013).

2      325.   Even under their theory that Dr. Lamego conveyed L4 and Apple used it,

3  Plaintiffs failed to meet their burden to prove that Apple did not independently derive

4  any aspect of L4.   "[I]ndependent derivation … directly refutes the element of use

5  through improper means." *Sargent Fletcher*, 110 Cal. App. 4th at 1670, 1675.

6      326. ███████████████████████████████████████████████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████

12 ███████████████████████████████████████████████████████

13 ███████████████████████████████████████████████████████

14 ███████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████

16 ███████████████████████████████████████████████████████

17 ████████████

18      327. ██████████████████████████████████████████████

19 ███████████████████████████████████████████████████████

20 ██████████████████████████████████████████████

21      328. ██████████████████████████████████████████████

22 ███████████████████████████████████████████████████████

23 ██████████████████████████████████████████████.

24      329.   Plaintiffs have not proven that any modifications made to Apple Watch

25 were "substantially derived" from anything conveyed by Dr. Lamego. *SkinMedica*, *Inc.*

26 *v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012); *Bladeroom Grp. Ltd. v.*

27 *Facebook, Inc.*, 2018 WL 514923, at *8-9 (N.D. Cal. Jan. 23, 2018).

28

### 2. *L5 – The Accused Short Circuit*

#### a) *Possession, Ownership, and Particularity*

330. Plaintiffs did not meet their burden to prove that they possessed the full scope of L5, and so cannot prove misappropriation of L5. *See supra* ¶¶ 99-112.

331. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

332. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

333. Plaintiffs' decision to define L5 broadly, and untethered to what Plaintiffs actually possessed, deprives L5 of the sufficient particularity needed to distinguish the alleged trade secret from "matters … of special knowledge of those persons … skilled in the trade." *Imax*, 152 F.3d at 1164-65. This is an independent basis to dismiss L5, as a plaintiff cannot permissibly "claim[] broad swaths of solutions to general competing considerations … rather than the single, specific solution adopted by" the plaintiff. *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017). This Court previously declined to grant JMOL on the issue of particularity because Plaintiffs had represented—inconsistent with their trial position—that L5 does "***not*** claim every solution" ████████████████████████████████. R50AO at 10.

334. Plaintiffs failed to present evidence sufficient to establish whether L5 was

owned by Masimo, Cercacor, Willow, or some combination of them. *See supra* ¶ 98.

b)  *Secrecy*

335.  Plaintiffs have failed to meet their burden to prove that L5 was not generally known.

336.  Plaintiffs' principal evidence of alleged secrecy came from Dr. Madisetti, but he failed to conduct the affirmative inquiry required by *Atmel*, so his testimony is legally insufficient. *See* Madisetti Direct ¶¶117-27, 163-70, 197-204, 218-26, 254-56.

337.  In any event, L5 was generally known based on (1) JTX-3808 (Mims), ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

338.  That Plaintiffs' own patent (JTX-4233) published L5—i.e., ███████████
████████████████████████████████████████████████████ "so as to prevent parasitic currents from unwanted activation of LEDs"—confirming it was generally known and that Plaintiffs made no reasonable efforts to keep it secret, a fact corroborated by Mr. Smith himself. *See supra* ¶¶ 122-129.

c)  *Independent Economic Value*

339.  Plaintiffs' failure to prove that L5 is not generally known necessarily means that L5 lacks any independent economic value for not being generally known.

340.  In any event, Plaintiffs have not met their burden to show establish that L5 provides Plaintiffs with a competitive advantage by virtue of its alleged secrecy. *See supra* ¶¶ 130-132. ██████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

1    ████████████████████████████████████████████████████

2    ████████████████████████████████████████████████████

3    ████████████████████████████████████.

### d)    *Reasonable Efforts to Maintain Secrecy*

341.    Including because they ████████████████████████████████████ ████████ in patents (JTX-4233, JTX-1206), Plaintiffs failed to meet their burden to show that they took reasonable efforts to keep L5 as they possessed it secret.    Indeed, Mr. Smith expressly testified that Plaintiffs made no effort to keep the sole L5 solution they possessed secret. *See supra* ¶ 122.

### e)    *Acquisition, Disclosure, and Use*

342.    Plaintiffs cannot prove direct misappropriation of L5, *see infra* COL § II.B.1, or that Apple had the requisite mental state to indirectly misappropriate L5, *see infra* COL § II.B.2.

343.    Plaintiffs failed to prove any viable theory of misappropriation-by-acquisition, including by not articulating any theory of harm arising from the alleged acquisition of L5. *See supra* ¶ 133.

344.    Plaintiffs failed to prove that Apple disclosed L5 to anyone.    The communications with ████████ that Plaintiffs cite do not address ████████████ ████████████████████████████████.

345.    Plaintiffs failed to prove that Apple engaged in any conduct amounting to misappropriation-by-use.

346.    Plaintiffs failed to prove that Apple acquired knowledge of L5 from Dr. Lamego—██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████.

1 ████████████████████████████████

2    347.   Plaintiffs failed to prove that Apple used L5. ████████████████

3 ███████████████████████████████████████████

4 ███████████████████████████████████████████

5 ███████████████████████████████████████████

6 ███████████████████████████████████████████

7 ███████████████████████████████████████████

8 ███████████████████████████████████████████

9    348.   Plaintiffs failed to prove that Apple implemented Dr. Lamego's proposal,

10 ███████████████████████████████████████████

11 ███████████████████████████████████████████

12 ███████████████████████████████████████████

13    349.   Plaintiffs failed to prove that ████████████████████

14 ███████████████████████████████████████████

15 ███████████████████████████████████████████

16 ███████████████████████████████████████████

17 ███████████████████

18    **3.    D1 – Unused Algorithm**

19       a)    *Possession and Ownership*

20    350.   Plaintiffs did not meet their burden to prove that they possessed the full

21 scope of D1, and so cannot prove misappropriation of D1. *See supra* ¶¶ 159-163.

22    351.   Plaintiffs showed at most that they only possessed part of D1, which is

23 insufficient to prove possession. *See supra* ¶¶ 159-163 (no evidence showing possession

24 ██████████████████████████).

25    352.   Plaintiffs' attempt to prove possession of D1 by pointing to elements of D1

26 that are scattered over unrelated documents, products, and source code is incompatible

27 with Plaintiffs' position that an alleged secret is not generally known unless a single

28 reference, as a whole, discloses the entire secret. *E.g.*, Dkt. 1174 at 8-9.

353.   Plaintiffs failed to prove whether Masimo, Cercacor, Willow, or some combination of them owns D1.  *See supra* ¶ 158.  In particular, Plaintiffs' evidence of possession rests in part on products and work product by Mr. Poeze—a former Cercacor employee—without establishing a connection to Masimo or Willow.

b)     *Secrecy*

354.   Plaintiffs failed to meet their burden to prove that D1 is not generally known.

355.   Plaintiffs' principal evidence regarding alleged secrecy came from Dr. Madisetti, but he failed to conduct the affirmative inquiry required by *Atmel*, so his testimony on this issue is legally insufficient.  *See supra* ¶¶ 164-171.

356.   To the extent possessed, the Court concludes that D1 was generally known based on Weber 2018 (JTX-3584), a Masimo patent.  *See supra* ¶¶ 165-168.

357.   In addition, D1 was generally known because Weber 2005 (JTX-3581), a Masimo patent, and Masimo's Pronto device—taken together—disclosed the entirety of D1.  *See supra* ¶¶ 169-171.   This Court has rejected Plaintiffs' argument that a combination of references cannot render an alleged trade secret generally known.  Dkt 1284 at 5-6.

358.   ███████████████████████████████████

c)     *Independent Economic Value*

359.   Plaintiffs' failure to prove that D1 is not generally known necessarily means that D1 lacks any independent economic value for not being generally known.

360.   Plaintiffs have not met their burden to establish that D1 provides them with a competitive advantage by virtue of its alleged secrecy.  At most, Plaintiffs established that engineers spent time developing demodulation techniques, but Plaintiffs have failed to tie that general expenditure of time specifically to D1.

361.   The lack of economic value in D1 is further demonstrated by the undisputed evidence that no Apple Watch model has ever used Plaintiffs' alleged demodulation secrets, including D1, and that Apple has continued to use the different, independently

developed DCS demodulation technique in Apple Watch. *See supra* ¶¶ 205, 236, 239.

362.   Plaintiffs also failed to establish that any of their products practices D1, further demonstrating lack of economic value. *See supra* ¶¶ 175, 231-233.

363.   There is no evidence that the ███████████████████████ D1 has been licensed, practiced, or asserted. *See supra* ¶¶ 221 fn. 9, 224.

> ### d)   *Reasonable Efforts to Maintain Secrecy*

364.   Plaintiffs did not take reasonable efforts to keep D1 secret, as confirmed by

███████████████████████████████████████████████████

███████████████████████████████████████████████████

> ### e)   *Acquisition, Disclosure, and Use*

365.   Plaintiffs cannot establish misappropriation of D1 because they failed to prove that Apple directly misappropriated D1, *see infra* COL § II.B.1, or that Apple had the requisite mental state to indirectly misappropriate D1, *see infra* COL § II.B.2.

366.   Plaintiffs have failed to provide any viable theory under which Apple could be liable for misappropriation-by-acquisition, including because Plaintiffs have not offered any harm theory arising from the alleged acquisition of D1. *See supra* ¶ 178. Plaintiffs failed to prove Apple acquired knowledge of D1 from Dr. Lamego, as none of Plaintiffs' cited documents shows that Dr. Lamego disclosed D1 to Apple. *See supra* ¶¶ 176-182.

367.   Plaintiffs failed to prove that Apple disclosed D1, ███████████████ ████████████. *See supra* ¶ 181.

368.   Plaintiffs failed to prove that Apple used D1 in any way, including in any Apple Watch model—all use a different double-sided DCS modulation technique that Apple independently developed and used ***before*** Apple hired Dr. Lamego. *See supra* ¶ 157.   That independently developed DCS algorithm was not "substantially derived" from, nor influenced by, Dr. Lamego or D1. *SkinMedica*, 869 F. Supp. 2d at 1197; *Bladeroom*, 2018 WL 514923, at *8-9.

369.   Plaintiffs failed to prove that Apple used D1 as "negative know-how." "[A]

defendant might *use* a negative know-how trade secret by taking its lesson to *avoid* developing apparently fruitless technology." *Waymo*, 2018 WL 466510, at *2. But mere possession and development of a different, successful technology is not use of a negative know-how trade secret—which requires that "undisclosed proprietary information regarding the relative strengths and weaknesses of various formulations … were used to develop products closely resembling the plaintiff's technology." *Proofpoint, Inc. v. Vade Secure, Inc.*, 2022 WL 17869223, at *3 (N.D. Cal. Dec. 22, 2022).

370.  Here, the undisputed evidence establishes ████████████████ ████████████████████████████████████████████ Apple then proceeded to evaluate—and reject—his proposal. *See supra* ¶ 236. Thus, even under Plaintiffs' theory that D1 was Plaintiffs' trade secret and Dr. Lamego conveyed it to Apple, Apple did not "*avoid* developing apparently fruitless technology." *Waymo*, 2018 WL 466510, at *2. Apple instead wasted time evaluating and rejecting Lamego's proposal as a potential replacement for the unrelated DCS techniques Apple was already using and continued to use after rejecting Dr. Lamego's proposal. *See supra* ¶¶ 157, 236.[16]

### 4.    *D3 – Unused Algorithm*

#### a)    <u>Possession and Ownership</u>

371.  Plaintiffs did not meet their burden to prove that they possessed the full scope of D3. *See supra* ¶¶ 184-191.

372.  Plaintiffs failed to prove whether Masimo, Cercacor, Willow, or some combination of them owned D3. *See supra* ¶ 183. As with D1, Plaintiffs rely on a Cercacor product and work by a Cercacor employee (Dr. Poeze), *supra* ¶ 186, but present no evidence that Masimo (or Willow) owned or lawfully possessed D3.

#### b)    <u>Secrecy</u>

373.  Plaintiffs failed to meet their burden to prove that D3 was not generally known.

---

[16] The same applies to Plaintiffs' assertion that Apple "used" D3 and D10. As with D1, the other alleged demodulation trade secrets wasted time, rather than saving it.

374.   Plaintiffs' principal evidence regarding alleged secrecy came from Dr. Madisetti, but he failed to conduct the affirmative inquiry required by *Atmel*, so his testimony on this issue is legally insufficient.  *See* Madisetti Direct ¶¶ 218-26.

375.   Even under Plaintiffs' theory that they partially possessed D3, the portion they possessed is disclosed in JTX-3584 (Poeze 2011), either alone or in conjunction with JTX-3581 (Weber 2005) and JTX-3571 (Lamego 2011).  *See supra* ¶¶ 192-196.

376.   ████████████████████████████████

### c)    *Independent Economic Value*

377.   Plaintiffs' failure to prove that D3 is not generally known necessarily means that D3 lacks any independent economic value for not being generally known.

378.   Plaintiffs have not met their burden to prove that D3 provides Plaintiffs with a competitive advantage by virtue of its alleged secrecy.  At most, Plaintiffs' evidence establishes that engineers spent time developing demodulation techniques, but Plaintiffs have failed to tie that evidence to D3, specifically.  *See supra* ¶¶ 197-198.

379.   The lack of economic value in D3 is further demonstrated by the undisputed evidence that no Apple Watch model has ever used Plaintiffs' alleged demodulation secrets, including D3, and that Apple has continued to use its different, independently developed DCS demodulation technique.  *See supra* ¶¶ 205, 236, 239.

380.   Plaintiffs failed to establish that any of their products practices D3, further demonstrating a lack of economic value.  *See supra*, ¶¶ 231-233.

381.   There is also no evidence that the '754 patent allegedly containing D3 has been licensed, practiced, or asserted.  *See supra* ¶¶ 221 fn. 9, 224.

### d)    *Reasonable Efforts to Maintain Secrecy*

382.   Plaintiffs did not take reasonable efforts to keep D3 secret, as confirmed by their publication of the version of D3 they possess in JTX-3583 (Poeze 2011), alone or in view of JTX-3581 (Weber 2005) and JTX-3571 (Lamego 2011).  *See supra* ¶¶ 192-196.

e)    *Acquisition, Disclosure, and Use*

383.    Plaintiffs cannot prove misappropriation of D3 because they failed to prove that Apple directly misappropriated D3, *see infra* COL § II.B.1, or that Apple had the requisite mental state to indirectly misappropriate D3, *see infra* COL § II.B.2.

384.    Plaintiffs have not advanced any viable theory that Apple is liable under CUTSA for misappropriation by acquisition, including by adducing no facts proving that Plaintiffs suffered any harm due to any purported acquisition of D3 by Apple.  *See infra* COL § II.C.  Plaintiffs failed to prove that Apple acquired knowledge of D3 from Dr. Lamego, as none of Plaintiffs' cited documents shows that Dr. Lamego disclosed D3 to Apple, as none (individually or collectively) contains D3. *See supra* ¶¶ 199-204.

385.    Plaintiffs failed to prove that Apple disclosed D3 in ███████████ or elsewhere.  *See supra* ¶ 206.

386.    Plaintiffs failed to prove that Apple used D3 in any way, including in any Apple Watch model—all use a different double-sided DCS modulation technique that Apple independently developed and used **before** hiring Dr. Lamego.  *See supra* ¶¶ 157, 236.   That independently-developed DCS algorithm was not "substantially derived" from, nor influenced by, Dr. Lamego or D3.  *SkinMedica*, 869 F. Supp. 2d at 1197; *Bladeroom*, 2018 WL 514923, at *8-9.

387.    Plaintiffs failed to prove that Apple used D3 as "negative know-how." *See supra* ¶ 369.

### 5.    *D10 – Unused Algorithm*

a)    *Possession and Ownership*

388.    Plaintiffs did not meet their burden to prove that they possessed the full scope of D10.  *See supra* ¶¶ 208-220.

389.    Plaintiffs failed to prove whether Masimo, Cercacor, Willow, or some combination of them owned D10.  *See supra* ¶ 207.  Plaintiffs' possession evidence is based on a product developed at Cercacor—Plaintiffs present no evidence that Masimo (or Willow) owned or lawfully possessed D10, or that D10 was developed at Cercacor

with a duty to assign to Masimo (or Willow).  *See supra* ¶ 210.

### b)    *Secrecy*

390.   As Mr. Kiani testified during the April 2023 trial, D10 has not been a secret at least since ███████████████████████  *See supra* ¶ 221.

### c)    *Independent Economic Value*

391.   Plaintiffs presented no direct or circumstantial evidence sufficient to prove that D10 has independent economic value by virtue of secrecy, as with D1 and D3.  For example, there is no evidence that D10 is used in Watch or any other product (including in any of Plaintiffs' products), or that the ███████████████████ D10 has been licensed, practiced, or asserted.  *See supra* ¶¶ 223-225.

### d)    *Acquisition, Disclosure, and Use*

392.   Plaintiffs cannot prove misappropriation of D10 because they have failed to prove that Apple directly misappropriated D10, *see infra* COL § II.B.1, or had the requisite mental state to have indirectly misappropriated D10, *see infra* COL § II.B.2.

393.   Plaintiffs failed to prove that Apple improperly acquired D10 (and thus cannot prove Apple improperly used or disclosed D10) because Plaintiffs did not prove that Dr. Lamego invented D10—or was otherwise exposed to D10—while employed at Cercacor.  *See supra* ¶¶ 209, 218.  Rather, Dr. Lamego independently developed the techniques in the MATLAB script (JTX-846, JTX-880) that formed the basis for the ███████████████████ as an Apple employee.  *Id.* ¶¶ 219-220.

394.   Plaintiffs failed to prove that Apple has used D10 in any way, including in any Apple Watch model—all use a different double-sided DCS technique that Apple independently developed and used ***before*** Apple hired Dr. Lamego.  *See supra* ¶¶ 157, 236.

395.   Plaintiffs did not prove that Apple Watch ███████████████████ ██████ or that any demodulation technique actually used in Apple Watch was substantially derived from D10.  *Supra* ¶¶ 157, 236; *SkinMedica*, 869 F. Supp. 2d at 1197; *Bladeroom*, 2018 WL 514923, at *8-9.

Wilmer Cutler
Pickering Hale
and Dorr LLP

396.   Plaintiffs failed to prove that Apple used D10 as "negative know-how."

**B.    Apple Did Not Have the Requisite Intent For Misappropriation**

    *1.    No Requisite Intent For Direct Misappropriation*

397.   Plaintiffs failed to establish that Apple used improper means to directly acquire knowledge of the alleged trade secrets from Plaintiffs, including in view of Mr. Kiani's admission that Plaintiffs did not provide Apple with any trade secrets at the only direct meeting he had with Apple (in May 2013).  *See supra* ¶ 282; *see also* Cal. Civ. Code § 3426.1(b)(2)(A).

398.   Plaintiffs failed to establish that Apple acquired the purported trade secrets through bribery.  The mere act of "recruiting or hiring employees from another company, including from a competitor, does not on its own constitute improper means."  CJI at 43; Dkt. 1469 at 3.  Plaintiffs failed to prove that Apple satisfied the elements of the crime of bribery—i.e., that Apple paid a ***current*** employee of Plaintiffs to hurt Plaintiffs' interests (as opposed to providing Dr. Lamego a compensation package upon hiring), or that Apple had specific intent to injure or defraud.  *See People v. Riley*, 240 Cal. App. 4th 1152, 1160-63 (2015) (discussing Penal Code § 641.3).

399.   Plaintiffs also failed to establish that Apple obtained any alleged trade secret through theft or misrepresentation.  Both crimes require a showing of "fraudulent intent" (among many other things).  *See, e.g.*, *People v. Miller*, 81 Cal. App. 4th 1427, 1440-41 (2000) (theft); *Manderville v. PCG&S Grp., Inc.*, 146 Cal. App. 4th 1486, 1498 (2007) (misrepresentation).  Here, there is no evidence that Apple even "knew or should have known" that Dr. Lamego's technical proposals breached any duty he owed to Plaintiffs, much less that any Apple employee had fraudulent intent to induce Dr. Lamego to disclose Plaintiffs' alleged trade secrets.  In fact, the record shows just the opposite—that Apple employees took repeated steps to ensure that Dr. Lamego did not share confidential information from prior employers.  *See supra* ¶¶ 15-17.

400.   Plaintiffs' assertion that Apple has direct liability for inducing Dr. Lamego to breach a duty of confidentiality fails for a similar reason—intentional inducement

requires that a defendant "intended to induce its breach," *see Little v. Amber Hotel Co.*, 202 Cal. App. 4th 280, 291 (2011), and no such evidence exists here. *See supra* ¶¶ 13-17.

401.   Plaintiffs cannot show as a matter of law that Apple is vicariously liable for direct misappropriation by Dr. Lamego under the doctrine of *respondeat superior*.  This Court reiterates that Apple is correct that "it is not appropriate … to impute an agent's knowledge of a secret to the principal" at least where the agent "did not inform other employees of plaintiffs' concept."  R50AO at 3; *accord Carr v. AutoNation Inc.*, 2018 WL 288018, at *2 (E.D. Cal. Jan. 4, 2018); *see also Cisco Sys., Inc. v. Chung*, 2023 WL 2622155, at *12 (N.D. Cal. Mar. 22, 2023) (vicarious liability in the trade secret context does not extend to the intent requirement).  This approach properly reflects the agency law rule that "where the principal must have actual knowledge" under the applicable standard of liability, the uncommunicated knowledge of an agent is not imputed to the principal.  *See Herman v. Los Angeles Cnty. Metro. Transp. Auth.*, 71 Cal. App. 4th 819, 828 n.7 (1999); *see also* 2B Cal. Jur. 3d Agency § 104 (similar).

402.   Although Plaintiffs have repeatedly requested reconsideration of this ruling, this Court "does not intend to revisit it."  R50BO at 18 n.7.  In any event, were this Court to consider the doctrine, Plaintiffs have not met their burden to prove that Dr. Lamego had the requisite intent.

### 2.   *No Requisite Intent For Indirect Misappropriation*

403.   Plaintiffs failed to prove that Apple had the required state of mind for indirect misappropriation—i.e., that before the asserted acquisition, use, or disclosure occurred, someone at Apple knew or had reason to know that Apple had improperly obtained an alleged trade secret from Plaintiffs through Dr. Lamego.  R50AO at 3; CJI-31; *see also California Police Activities League v. California Police Youth Charities, Inc.*, 2009 WL 537091, at *3 (N.D. Cal. Mar. 3, 2009).

404.   As discussed, Plaintiffs cannot prove the requisite "known or should have known" standard based on Dr. Lamego's knowledge that information he provided to

other Apple employees was acquired through improper means. R50AO at 3. Nor can Plaintiffs logically rely on the mere fact that Apple hired Dr. Lamego away, given California's policy in favor of employee mobility. *Hooked Media Grp., Inc. v. Apple Inc.*, 55 Cal. App. 5th 323, 332 (2020). Apple took multiple affirmative steps to prevent Dr. Lamego from using or disclosing any confidential information from a former employer, including explaining its policy (which Dr. Lamego signed) that prevented Dr. Lamego from using or disclosing any confidential information from a former employer. *See supra* ¶ 15. Dr. Lamego "affirmatively stated" to his colleagues at Apple "that he was taking care to avoid intellectual property conflicts." *Id.* ¶ 27; JTX-3050 at 2.

### C.     Plaintiffs Failed To Prove Harm

405. Having failed to prove any misappropriation, Plaintiffs necessarily failed to prove that the purported misappropriation caused them harm. But even under Plaintiffs' theories of misappropriation, Plaintiffs do not begin to show the alleged misappropriation caused them any harm. *See supra* ¶¶ 226-237.

406. Plaintiffs' failure to show harm is fatal to their claim under CUTSA, which requires Plaintiffs to prove that Apple's alleged "acquisition, use, or disclosure of the trade secret was a substantial factor in causing the[m] … harm." *AMN Healthcare*, 28 Cal. App. 5th at 942. This requirement applies even where the plaintiff is not seeking damages for an "actual loss" suffered. *See Unilogic Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 626 (1992).[17]

407. Plaintiffs have shown no harm caused by the alleged misappropriation.

408. Plaintiffs have not alleged Apple disclosed L4, and thus cannot show that they were harmed by any such disclosure. PMCLF at 7-8 (no theory of L4 disclosure).

409. Plaintiffs have not articulated any theory by which Apple's purported disclosure of L5 (to ███████) caused them any harm.

---

[17] Apple acknowledges that this Court's jury instructions did not require Plaintiffs to show harm to establish liability. However, this Court appears to have reached that result because Plaintiffs were seeking a reasonable royalty. Dkt. 1500-1 at 206 (Plaintiffs arguing that reasonable royalty could be awarded without proving harm). Plaintiffs have since waived their claim for royalties. *See supra* ¶ 294.

410. Plaintiffs have not presented any evidence that they were harmed by Apple's alleged disclosure of D1, D3, and D10 ███████████. For example, Plaintiffs have not presented any evidence that ████████████████ changed their business or their overall industry.

411. Plaintiffs have not presented any evidence that Apple's alleged use of L4 and L5 harmed Plaintiffs in any way such as through, e.g., lost sales. *See supra* ¶¶ 227-234.

412. Plaintiffs concede that Apple Watch does not incorporate D1, D3, or D10, and they have not presented any evidence that Apple's supposed use of D1, D3, or D10 in research and development harmed Plaintiffs in any way. *See supra* ¶¶ 235-236. According to Plaintiffs, Apple's knowledge of the DCS algorithm led it to use what Plaintiffs contend is a less accurate algorithm. Dkt. 2218-1 ¶ 326 (alleging "potential future use of D1, D3 and D10 in an Apple Watch, would improve the accuracy").

413. Plaintiffs have failed to substantiate claims that the alleged misappropriation had any chilling effect on innovation at Masimo; claims that are belied by Masimo's own patent filings. *See supra* ¶ 235.

414. To the extent Plaintiffs argue they were harmed by Apple's alleged misappropriation because—due to the misappropriation—Apple did not enter into a business arrangement with Plaintiffs in 2013, this Court has already barred Plaintiffs from relying on that theory as a discovery sanction. Dkt. 1283 at 6-8. In any event, Plaintiffs have not identified any causal link between Apple's purported use of the alleged trade secrets and Apple's decision not to go into business with Masimo.

415. Although Plaintiffs waived any claim to unjust enrichment, they contend that Apple was unjustly enriched because the alleged trade secrets supposedly allowed Apple to create Apple Watch's Blood Oxygen feature. Plaintiffs identify no authority that permits a party to replace the *AMN/Unilogic* requirement to show harm (i.e., a detriment to the plaintiff) with a showing of unjust enrichment (i.e., a benefit to the defendant). In any event, Plaintiffs have not identified any causal link between Blood

Oxygen and any of these alleged trade secrets. *See supra* ¶ 234.

416.   Plaintiffs offer no evidence connecting D1, D3, and D10—which are indisputably not used—or L5, which has allegedly been used since the Series 1—to the Blood Oxygen feature or its profits.  Rather, Apple considered and rejected proposals from Dr. Lamego to replace solutions Apple had already implemented; if anything, Dr. Lamego's rejected proposals *cost* Apple time.

417.   Plaintiffs' sole link between L4 and Blood Oxygen—███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ ██████████████████████████████

████████████████████████████████████.  *See supra* ¶ 95.  At best, Plaintiffs' L4 theory asks this Court to draw "inferences … from [the] circumstances [that] are consistent with [Plaintiffs'] theory," which is insufficient to establish causation.  *See Bowman v. Wyatt*, 186 Cal. App. 4th 286, 312-13 (2010).

### D.   Affirmative Defenses[18]

#### 1.   *Statute of Limitations*

418.   The Court held after the first trial "that [L4, L5, D1, D3, and D10] are related for purposes of the statute of limitations" (R50BO at 19), and thus "as soon as Plaintiffs were (or should have been) on notice of Lamego's alleged misappropriation, the statute of limitations began to run for the technical trade secrets."  *Id.*; *accord Cypress Semiconductor Corp. v. Superior Court*, 163 Cal. App. 4th 575, 584 (2008).

419.   The Court also "adopt[ed] the parties' agreement" that "since the alleged misappropriation derives from Lamego, Apple has met prong (1) [of the statute of limitations defense]"—i.e., "proving that any alleged misappropriation first occurred before January 9, 2017."  R50BO at 17, 19.  The Court expressly stated that this ruling would apply to "any future trial," R50BO at 17; *see also* Dkt. 2177-1 at 14.

---

[18] Apple acknowledges the Court's prior rulings on its unclean hands (Dkt. 1526, Dkt. 1900 at 5), and readily ascertainable defenses. Dkt. 1284.  Accordingly, Apple does not re-raise those issues here, but preserves the full scope of those defenses for appeal.

420.   "Since it is undisputed that the alleged misappropriation of trade secrets [in 2014] took place outside the limitations period," Plaintiffs "have the burden of proving the facts necessary to toll the statute," *Gabriel Techs. Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1003 (S.D. Cal. 2012)—i.e., that the alleged misappropriation was not "discovered or by the exercise of reasonable diligence should have been discovered" before January 9, 2017, Cal. Civ. Code § 3426.6.

421.   "Under California's discovery rule, suspicion of wrongdoing will trigger the statute of limitations.  Consequently, 'when there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation.'"  *Gabriel Techs.*, 857 F. Supp. 2d at 1003 (citation omitted).  California courts "do not take a hypertechnical approach to the application of the discovery rule" in § 3426.6.  *Cypress Semiconductor Corp.*, 163 Cal. App. 4th at 586.  "Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, [courts] look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." *Id.*

422.   Plaintiffs have not met their burden to show that they lacked "reason to suspect … misappropriat[ion]" under circumstances where "a reasonable investigation would produce facts sufficient to confirm this suspicion." Dkt. 606 at 3.

423.   To the contrary, the record shows that Plaintiffs had sufficient "suspicion of wrongdoing"—under their own misplaced theory of misappropriation—at least by January 2014.  At that time, Plaintiffs sent Apple a letter stating "[i]t is difficult to imagine any reason [for Apple to hire Lamego] other than Apple … attempting to gain access to … Cercacor and Masimo's trade secrets" and that "Apple [would] … misus[e] our intellectual property through Lamego."  *See supra* ¶ 14.  Indeed, Mr. Kiani's summary of the letter's thesis—i.e., that "Apple had already approached Masimo about a possible collaboration but had abandoned these discussions without explaining why

and was targeting Masimo and Cercacor personnel for hiring," Kiani Direct ¶ 210—also describes Plaintiffs' theory of the case here.

424.   As this Court has previously suggested, Mr. Kiani's testimony that he was informed by Cristano Dalvi in the summer of June 2014 that Dr. Lamego left Apple to avoid competing with Plaintiffs (which Plaintiffs' January 2014 letter asserted would necessitate trade secret misappropriation) supports the conclusion that Plaintiffs had a suspicion of wrongdoing prior to the statute of limitations period.  Dkt. 2348 at 2.

425.   Plaintiffs also failed to prove that a reasonable investigation could not have confirmed the essential factual basis for their CUTSA claim before January 9, 2017.  The simple investigative step of monitoring for Dr. Lamego's name in patent filings would have made Plaintiffs aware of the '052 patent application on or about March 3, 2016, and that application (which listed Dr. Lamego as an inventor) expressly disclosed that Dr. Lamego had worked on technology that Plaintiffs in January 2014 had insisted would necessarily implicate their alleged trade secrets.  Mr. Kiani also testified that Plaintiffs routinely made such searches before "launching a product" and that Plaintiffs were "working on a wearable product" as early as 2014.  *See supra* ¶¶ 274-278.

426.   Accordingly, Plaintiffs' trade secret misappropriation claim is time-barred under Cal. Civ. Code § 3426.6.

### *2.     Waiver*

427. Plaintiffs' misappropriation claims and associated requests for relief have been waived.  A plaintiff waives any right to obtain relief when it "knowing[ly] or intelligent[ly]" engages in "conduct … so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008) (emphasis omitted).

428. Apple proved by clear and convincing evidence that Plaintiffs waived their right to obtain relief for the alleged misappropriation because they did nothing for nearly six years to follow up on their January 2014 warning letter to Apple, despite being put on notice of key facts upon which they eventually sued.  *See supra* ¶¶ 273-278.

429. Plaintiffs' waiver was knowing and intelligent. They are sophisticated and experienced litigants in intellectual property cases, and they have been continually advised on these issues by their counsel. *See, e.g., supra* ¶ 14. *See Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988) (plaintiff has a duty to timely file once it could have learned facts sufficient to justify a misappropriation claim).

### 3.    *Laches*

430.   Laches is an available defense to a CUTSA claim seeking equitable relief, such as an injunction and attorneys' fees. *See, e.g.*, *Whittaker Corp. v. Execuair Corp.*, 1980 WL 787350, at *2 (C.D. Cal. Mar. 21, 1980).

431.   Laches bars relief where a plaintiff "unreasonabl[y] delay[ed]" filing suit or did not diligently pursue its claim and either (1) the plaintiff "acquiesce[d] in the act about which [it] complains" or (2) "prejudice to the defendant result[ed] from the delay." *Johnson v. Loma Linda*, 24 Cal. 4th 61, 68 (2000).

432.   Here, had Plaintiffs exercised reasonable diligence, they would have known of their claims by no later than March 2016. *See supra* ¶¶ 274-277. They did not file this suit until January 9, 2020. That delay was unreasonable.

433.   Plaintiffs acquiesced in Apple's accused conduct through "extended inactivity" with respect to their CUTSA claim and "lengthy gaps in [their] contacts with [Apple]." *Pacific Hills Homeowners Assn. v. Prun*, 160 Cal. App. 4th 1557, 1565 (2008). In addition, Plaintiffs' delay was prejudicial to Apple, as it created "evidentiary prejudice" that unfairly harmed Apple's presentation at trial, *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952, 955 (9th Cir. 2001), and because "because [Apple] continued engaging in its existing practices," *Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984).

434.   Laches precludes Plaintiffs from obtaining an injunction or attorneys' fees.

### E.    Remedies

435.   Plaintiffs have not established that Apple should be liable for trade secret misappropriation. But even if they had done so, they have not established that they are

entitled to a remedy for that misappropriation because they have voluntarily waived most forms of relief and have not established an entitlement to the remainder.

436.    Under CUTSA, Plaintiffs have expressly waived the right to seek an unjust enrichment award, punitive damages, and a reasonable royalty.  *See supra* ¶ 294. Plaintiffs' lost profits theory was struck, and Plaintiffs have since voluntarily waived the right to appeal that decision, effectively foregoing lost profits.  *Id.*

437.    Four years into this litigation that Plaintiffs previously asserted was worth billions of dollars, the only remedies Plaintiffs seek are an injunction and attorneys' fees. This Court holds that they are entitled to neither.

### 1.    *Plaintiffs Are Not Entitled To Injunctive Relief*

#### a)    *Plaintiffs' Injunction Request Is Barred By FRCP 37(c)(1)*

438.    FRCP 37(c)(1) bars Plaintiffs from pursuing an injunction because they did not timely disclose what injunctive relief they would seek, articulate a theory upon which they would be entitled to such relief, or disclose any facts relevant to the factors that would need to be evaluated in any injunction analysis.

439.    Before Plaintiffs' October 30, 2024 Proposed Findings of Fact and Conclusions of Law, Plaintiffs had provided no meaningful information about the basis for any claim for injunctive relief or the scope of the relief that would be sought.

440.    In particular, Plaintiffs have never provided a substantive response to Apple's Interrogatory No. 17, which asked Plaintiffs to "[s]tate ***in detail*** all factual and legal bases for Your contention that You are entitled to any relief in this case, including … injunctive relief." Dkt. 2181-2 at 5.  Since that interrogatory was first served in 2020, Plaintiffs have supplemented it twelve times—most recently in July 2024—and have never identified their purported basis for seeking an injunction. *Id.* at 6, 13, 21.

441.    Nor was information about Plaintiffs' proposed injunction provided in other documents.  For example, Plaintiffs' October 15, 2024 Memorandum of Contentions of Fact and Law describes relief sought, but makes no mention of an injunction request.  Plaintiffs' other filings that refer to an injunction do so only in

1    passing and without explanation. *E.g.*, Dkt. 296-1 at 132 (complaint).

2        442.   Plaintiffs' failure to provide discovery about their request for injunctive

3    relief means that the request "is untimely and should be excluded under Rule 37(c)(1)."

4    Dkt. 1526 at 1 (excluding part of Apple's unclean hands defense).

5        443.   "[N]either of the[] exceptions" to Rule 37(c)(1)—substantial justification

6    or harmlessness—"applies here."  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259

7    F.3d 1101, 1106 (9th Cir. 2001).

8        444.   Plaintiffs have not shown that their decision to provide no details regarding

9    their request for injunctive relief throughout four years of litigation was justified.

10       445.   Plaintiffs have also not met their burden to show harmlessness, nor could

11   they.  Plaintiffs' failure to disclose anything about the sole meaningful remedy left in

12   the case deprived Apple of the opportunity to take discovery on Plaintiffs' theories of

13   irreparable harm and precluded Apple from obtaining opinions from their expert

14   witnesses on any aspect of Plaintiffs' claim for injunctive relief.

15       446.   At the October 28, 2024 pretrial conference, Plaintiffs suggested for the

16   first time that they had preserved their right to seek a permanent injunction because they

17   filed a motion for a preliminary injunction in August 2020.  10/28/24 Tr. 19; Dkt. 116.

18   But the motion provides no guidance regarding Plaintiffs' current theories, as it was

19   based on an alleged trade secret no longer at issue and sought narrow relief regarding

20   advance notice of publication (Dkt. 206 at 3), untethered to the current broad requests.

21   Dkt. 2218-1 at 116 (Plaintiffs' current requested injunctive relief).

22       447.   Plaintiffs' request for injunctive relief is stricken under Rule 37(c)(1).

23                    *b)*    <u>*The eBay Factors Do Not Support An Injunction*</u>

24       448.   Even if Plaintiffs had proven liability and their request for an injunction

25   were not barred by Rule 37(c)(1), this Court would hold that no injunction is appropriate.

26       449.   This Court has previously held that the test laid out in *eBay Inc. v.*

27   *MercExchange, LLC*, 547 U.S. 388 (2006), governs whether to award a permanent

28   injunction in an "action for trade secret misappropriation under CUTSA."  *True*

*Wearables*, 2022 WL 17083396, at \*30.

450. Under *eBay*, "a plaintiff seeking a permanent injunction must … demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." 547 U.S. at 391. All four *eBay* factors weigh against an injunction here.

451. First, Plaintiffs have not proven any coherent theory of harm, irreparable or otherwise, resulting from Apple's alleged misappropriation. *See supra* ¶¶ 226-237.

452. To the extent that Plaintiffs assert that they are entitled to a presumption of irreparable harm upon a finding of liability, the Ninth Circuit has rejected this argument. *See Citcon USA, LLC v. RiverPay Inc.*, 2022 WL 287563, at \*2 (9th Cir. Jan. 31, 2022) ("Citcon's argument, which is essentially that injunctive relief automatically flows from a successful trade secret misappropriation claim, is untenable.").

453. Moreover, irreparable harm may not be based on speculative injury[.]" *San Miguel Pure Foods Co., Inc. v. Ramar Intern. Corp.*, 625 Fed. Appx. 322, 327 (9th Cir. 2015) (reversing grant of a permanent injunction because "district court's finding of irreparable harm was based on the speculation that 'Ramar would effectively lose control over the Magnolia brand,' not that it actually had") (emphasis in original); see *also Herb Reed Enterprises, LLC v. Fla. Ent. Mgt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (observing in trademark context "actual irreparable harm must be demonstrated to obtain a permanent injunction"). Plaintiffs' alleged harms are entirely speculative, and they have failed to show that irreparable harm absent injunctive relief is 'likely,' not merely 'possible.'" *AK Futures LLC v. Smoke Tokes LLC*, 2024 WL 4720883, at \*7 (C.D. Cal. Sept. 24, 2024) (Selna, J.) (denying preliminary injunction).

454. Second, Plaintiffs are precluded from receiving an injunction because they have not shown "that remedies available at law… are inadequate." *eBay*, 547 U.S. at

391.  To the contrary, Plaintiffs have long acknowledged that any injury they allege to have suffered from Apple's purported misappropriation is compensable via money— whether through a reasonable royalty or lost profits—and any purported benefit to Apple is redressable through an award for unjust enrichment.  Plaintiffs have provided detailed calculations for each potential form of relief at various points in this case, seeking many billions of dollars.  Such remedies are not inadequate; rather, Plaintiffs have simply chosen to forfeit them.

455.  CUTSA's injunction provision is not meant to be invoked in such a situation.  Rather, it is reserved for cases "(1) where pecuniary compensation would not afford adequate relief or (2) where ascertaining adequate compensation would be extremely difficult."  *Robert L. Cloud & Associates, Inc.*, *v. Mikesell*, 69 Cal. App. 4th 1141, 1150 (1999).  Neither condition applies here

456.  Indeed, that Plaintiffs have "voluntarily chose[n] to forego a legal remedy does not mean that 'no adequate legal remedy' exists."  *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1130, 1129-30 (9th Cir. 2024).  To the contrary, as the Supreme Court has long held, "where an adequate remedy at law exists, 'the party seeking redress must pursue it.'"  *Parker v. Winipiseogee Lake Cotton & Woollen Co.*, 67 U.S. 545, 551 (1862).  A party "cannot bolster its case for equitable relief by abandoning its request for … damages."  *TD Bank N.A. v. Hill*, 928 F.3d 259, 282-83 (3d Cir. 2019); *accord Asphalt Trader Ltd. v. Beall*, 2024 WL 698313, at *9 (10th Cir. Feb. 21, 2024) ("Plaintiffs cannot artificially adjust their damages this way to claim that they have no adequate remedy at law and must resort to an equitable claim"); *Bennett*, 118 F.4th at 1129-30 ("relinquishment of what would otherwise be an legal adequate remedy … should not suffice for purposes of" establishing right to injunction).

457.  Third, Plaintiffs have failed to establish that the balance of the equities favor an injunction.  Because Plaintiffs have identified no cognizable harm caused by Apple's purported misappropriation, there is nothing to balance against.  In any event, an injunction of the breadth Plaintiffs are seeking would limit Apple's ability to sell the

accused Watches with myriad features that have no connection to the alleged trade secrets and harm Apple's position in the marketplace. *See supra* ¶¶ 238-244. In sum, Plaintiffs' position is that a small set of tiny slivers of technology (only one even assertedly in Apple Watch, the one accused short circuit out of millions of electrical circuits) justifies an injunction against the entire Apple Watch and the many features on which the marketplace depends. That is not consistent with *eBay*'s equitable framework.

458. Finally, Plaintiffs have not established that the public interest favors an injunction. An injunction of the breadth Plaintiffs are seeking could well "disrupt related third-party businesses, such as [Apple's] suppliers." *Fractus, S.A. v. Samsung Electronics Co.*, 876 F. Supp. 2d 802, 854 (E.D. Tex. 2012). Moreover, the public has a strong interest in continued access to the many health and wellness features in the accused Watches with no connections to Plaintiffs' allegations. *See supra* ¶¶ 2, 238.

459. Thus, this Court denies Plaintiffs' request for a permanent injunction.

### c) *Injunction Scope*

460. Even if this Court were to find an injunction were appropriate, Plaintiffs have not established a right to anything more than a narrow injunction focused on the alleged trade secrets rather than Apple Watch itself.

461. As in *True Wearables*, it "is undisputed that [Apple Watch] was designed with many [non-trade secret] components and Plaintiffs have not shown why they should acquire the non-protected aspects of the" Apple Watch. 2022 WL 17083396, at *31. As detailed above, Apple Watch includes myriad health, wellness, and communication features that lack even arguable connection to the alleged trade secrets at issue in this case. *See supra* ¶¶ 2, 238.

462. Accordingly, this Court follows the normal approach that "[m]isappropriation of a process, formula or other trade secret matter used in the manufacture or preparation of a product is … sanctioned by a restraint on the use of the process, formula or other trade secret" rather than a broader injunction on the product in which it is used. 4 *Miligrim on Trade Secrets* § 15.02. This approach will ensure that

1   the injunction "is narrowly tailored to protect Plaintiffs' interest without providing a
2   windfall to Plaintiffs." *True Wearables*, 2022 WL 17083396, at *31.

3       463.   Moreover, the injunction cannot encompass D10 even if Apple is found to
4   have misappropriated that alleged secret.  This is because CUTSA provides that "an
5   injunction shall be terminated when the trade secret has ceased to exist," Cal. Civ. Code
6   § 3426.2(a), and Mr. Kiani conceded during the April 2023 trial that D10 is "not a trade
7   secret anymore" because it was ▮▮▮▮▮▮▮▮▮▮▮, 4/6/23 AM Tr. 110.  This
8   Court agreed with Mr. Kiani, noting the fact that D10 is not a secret was a "point…
9   established by the record." 4/11/23 PM Tr. 8:18-19.

10      464.   While an injunction "may be continued for an additional period of time in
11  order to eliminate commercial advantage that otherwise would be derived from the
12  misappropriation," Cal. Civ. Code § 3426.2(a), this exception is inapplicable.  Plaintiffs
13  have not proven that Apple obtained *any* "commercial advantage" from the information
14  identified by D10.  It is undisputed that Apple does not use, and has never used, D10 in
15  Apple Watch.  Sarrafzadeh Direct ¶ 175.

16      465.   For similar reasons, the injunction cannot encompass D1 or D3 because D1
17  is fully disclosed in a Masimo patent that issued in 2018 ("Weber 2018"), *supra* ¶ 164,
18  and—accepting Plaintiffs' position—the ▮▮▮▮▮▮▮ D1 and D3, *id.* ¶ 221 n.
19  9.  As with D10, the Cal. Civ. Code § 3426.2(a) commercial advantage exception is
20  inapplicable, because it is undisputed that Apple does not use and has never used D1 or
21  D3 in Apple Watch.

22              **2.    Plaintiffs Are Not Entitled To Attorneys' Fees or Costs**

23      466.   Plaintiffs did not establish by "clear and convincing evidence" that Apple
24  willfully and maliciously misappropriated any alleged trade secret.  *Vacco Indus. v. Van
25  Den Berg*, 5 Cal. App. 4th 34, 54 (1992); *see also* R50AO at 19 ("The Court has ruled
26  already that willfulness and [maliciousness] under CUTSA must be proven by clear and
27  convincing evidence.").

28      467.   Plaintiffs did not preserve their request for costs under CUTSA, since their

1  operative complaint seeks only attorneys' fees, but not costs, under CUTSA, whereas
2  they sought fees and costs arising from their patent claims.  Dkt. 296-1 at 132.

3      468.  Plaintiffs' failure to prove that Apple intentionally misappropriated means
4  *a fortiori* they failed to prove willful and malicious misappropriation.  *See In re Lopez*,
5  378 F. App'x 610, 612 (9th Cir. 2010); *Ajaxo Inc. v. E\*Trade Grp. Inc.*, 135 Cal. App.
6  4th 21, 66 (2005).

7      469.  Even if there had been evidence proving that Apple had intent sufficient for
8  CUTSA liability, the record provides no basis from which "malice [by Apple] may be
9  proven either expressly by direct evidence probative of the existence of hatred or ill-
10  will, or by implication from indirect evidence."  *Ajaxo*, 135 Cal. App. 4th at 66-67.

11      470.  There is no evidence from which to infer that Apple's hiring of Dr. Lamego
12  "intended … to cause injury to [Plaintiffs]" or that this was "[d]espicable[,] … vile and
13  wretched."  *Ajaxo*, 135 Cal. App. 4th at 66.  Apple took affirmative steps to avoid
14  disclosure of others' confidential information by Dr. Lamego.  *See supra* ¶¶ 15-17.

15      471.  Finally, even if this Court had found that Apple engaged in willful and
16  malicious behavior, it would still exercise its discretion to deny attorneys' fees and costs
17  in this case.  "[A]ttorney's fees are not automatic," and just as in *True Wearables*,
18  Plaintiffs have once against "drove the trajectory of this case in a manner that required
19  both parties to spend a significant amount on attorneys' fees as they prepared for trial."
20  2022 WL 17083396, at *33.

21      472.  In the over four "years after the case was filed, … Plaintiffs ha[ve] whittled
22  their intellectual property case down to a handful of trade secrets," have dropped claims
23  for tens of billions of dollars of monetary relief, and "demand[ed] a bench trial over
24  [Apple's] objection."  *True Wearables*, 2022 WL 17083396, at *33.  "Against this
25  backdrop, the Court finds it would be inequitable to award Plaintiffs attorneys' fees in a
26  trade secrets case they seemingly protracted for years."  *Id.*

          **3.**    **Apple Is Entitled To Attorneys' Fees**

28      473.  Apple is entitled to attorneys' fees on Plaintiffs' CUTSA claims under Cal.

1    Civ. Code § 3426.4, which "authorizes attorneys' fees when 'a claim of
2    misappropriation is made in bad faith.'" *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d
3    1059, 1071 (9th Cir. 2016).  Attorneys' fees "may be proper even if the claim is not
4    frivolous" and even if the claim "superficially appear[s] to have merit." *Id.*  The test is
5    whether the plaintiffs' claim is objectively specious and whether the plaintiff had
6    "subjective bad faith in bringing or maintaining the claim.'" *Id.*

7        474.    Here, Plaintiffs here spent half a decade litigating a CUTSA claim that
8    initially involved dozens of alleged trade secrets.  Of the ten alleged secrets Plaintiffs
9    ultimately brought to trial, this Court has already found that no reasonable jury could
10   have found liability on five.  Moreover—on the eve of the retrial—Plaintiffs forfeited
11   their requests for monetary relief that they once claimed was worth billions and told this
12   Court during opening statements to "forget about money.  It was a diversion." 11/5 AM
13   Tr. [Opening] 30:22-23.  Finally, as explained above, Plaintiffs have failed to state a
14   viable trade secret claim for numerous reasons, including because they lack possession
15   of any of the five remaining alleged trade secrets.  In short, Plaintiffs' trade secret claim
16   is clearly meritless and its method of litigating that claim "raises an inference of
17   subjective bad faith," including "the intention of causing unnecessary delay" and a
18   "purpose of harassing [Apple]." *Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.*,
19   95 Cal. App. 4th 1249, 1263 (2002).

20   **III.    PATENT INVENTORSHIP AND OWNERSHIP CLAIMS**

21       475.    Plaintiffs have failed to "meet the heavy burden" to prove by clear and
22   convincing evidence that one or more of their employees made a significant contribution
23   to at least one claim of any of the patents at issue, and thus have failed to prove their
24   claim seeking to correct inventorship. *See Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d
25   1352, 1358-59 (Fed. Cir. 2004) ("Contributions to realizing an invention may not
26   amount to a contribution to conception if they merely explain what was 'then state of
27   the art'" or "if they are too far removed from the real-world realization of an
28   invention."); *Board of Education ex rel. Board of Trustees Florida State Univ. v. Am.*

Wilmer Cutler
Pickering Hale
and Dorr LLP

*Bioscience Inc.*, 333 F.3d 1330, 1337 (Fed. Cir. 2003); CJI-41; *see also* Fed. Cir. Bar Assoc., Model Patent Jury Instr. § 4.3d (2020).  This Court cannot rely solely on the alleged co-inventor's testimony, which "must be corroborated."  *Ruling Meng*, 643 F. App'x at 994.

476.    To succeed on their inventorship claims, Plaintiffs must prove that each disputed patent claims a "joint invention"—i.e., "the product of collaboration" among the putative co-inventors, who were "working together to solve the problem addressed." *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009); *accord Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 & n.2 (Fed. Cir. 1998); *Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1372-73 (Fed. Cir. 2020).[19]

477.    Because Plaintiffs have not shown by clear and convincing evidence that Mr. Diab was a co-inventor of any of the '095, '390, '052 or '670 patents, they cannot claim co-ownership of the patents based on his work.  *See supra* ¶¶ 246-254 ('095 and '390 patents), 262-267 ('052 and '670 patents).  Nor can they establish ownership of any of the disputed Apple patents from Dr. Lamego's work:  there is no evidence that Dr. Lamego invented the claimed concepts while employed by Masimo or Cercacor, so the relevant work was not subject to any contractual obligation for Dr. Lamego to assign Plaintiffs ownership of that work.  *See Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993).

A.    **'052 and '670 Patents (Inventorship and Ownership)**

478.    Plaintiffs have not established by clear and convincing evidence that Mr. Diab should have been named as a co-inventor of either the '052 or '670 patents, as he did not collaborate with the named co-inventors and, at most, communicated concepts already known in the prior art, and in any event, Apple employees independently developed the claimed inventions while working at Apple.  *See supra* ¶¶ 255-267.

---

[19] Apple acknowledges that this Court did not adopt this formulation of the collaborative enterprise requirement in its 2023 jury instructions.  CJI-41.

Wilmer Cutler
Pickering Hale
and Dorr LLP

479.   Because Plaintiffs have not established Mr. Diab co-invented either patent, they cannot claim co-ownership of the patents based on his work.

480.   Nor did Plaintiffs prove ownership based on Dr. Lamego's work, since there is no evidence that he did any work while in Plaintiffs' employ that relates to his specific contribution to the '052 and '670 patents—i.e., using reflectivity on the back of a smartwatch—because there is no evidence that Dr. Lamego ever worked on any wrist-worn device while at Masimo or Cercacor.  *See supra* ¶ 477.

## B.    '754 Patent (Ownership)

481.   Plaintiffs failed to prove their claim for a declaratory judgment amending ownership of the '754 patent because Plaintiffs did not show that Dr. Lamego invented the concepts in the '754 patent while employed at Cercacor.  *See supra* ¶¶ 268-272.

## C.    '095 and '390 Patents (Inventorship and Ownership)

482.   Plaintiffs have failed to prove by clear and convincing evidence that Mr. Diab should be added as a co-inventor of the '095 and '390 patents as he did not collaborate with the named co-inventors and, at most, communicated concepts already known in the prior art, and in any event, Apple employees independently developed the claimed invention while working at Apple.  *See supra* ¶¶ 246-254.

483.   Because Plaintiffs have not shown by clear and convincing evidence that Mr. Diab was a co-inventor of either patent, they cannot claim co-ownership based on his work.  Plaintiffs also fail to establish ownership based on Dr. Lamego's work, because the evidence proves that Dr. Lamego invented the concepts he contributed while collaborating with Mr. Hotelling, as an Apple employee.  *See supra* ¶ 477.

## CONCLUSION

484.   The Court grants judgment under Rule 52 in Apple's favor on Plaintiffs' claims for misappropriation of trade secrets (Claim 13), correction of inventorship (Claims 14-16, 28), and declaratory judgment of patent ownership (Claims 20-23, 26). Plaintiffs' claim for attorneys' fees is denied as moot.  Apple may file a motion for attorney's fees within three weeks of this order.

1  **IT IS SO ORDERED.**

2

3  Date: _____        By: _____

4                                              Honorable James V. Selna
                                               United States District Judge
5

6

7  Dated:  December 19, 2024        Respectfully submitted,

8

9                                    MARK D. SELWYN
10                                   JOSEPH J. MUELLER
                                     AMY K. WIGMORE
11                                   JOSHUA H. LERNER
                                     SARAH R. FRAZIER
12                                   NORA Q.E. PASSAMANECK
                                     THOMAS G. SPRANKLING
13                                   WILMER CUTLER PICKERING HALE AND
                                     DORR LLP
14
15                                   BRIAN A. ROSENTHAL
16                                   GIBSON, DUNN & CRUTCHER LLP

17                                   KENNETH G. PARKER
18                                   HAYNES AND BOONE, LLP

19

20

21                                   By:  */s/ Mark D. Selwyn*_____
22                                        Mark D. Selwyn

23                                   *Attorneys for Defendant Apple Inc.*
24

25

26

27

28