Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Sheila N. Swaroop (Bar No. 203476)
sheila.swaroop@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
Kendall M. Loebbaka (Bar No. 285908)
kendall.loebbaka@knobbe.com
Douglas B. Wentzel (Bar No. 313452)
douglas.wentzel@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Fax:(949) 760-9502

Adam B. Powell (Bar. No. 272725)          Brian C. Horne (Bar No. 205621)
adam.powell@knobbe.com                    brian.horne@knobbe.com
Daniel P. Hughes (Bar No. 299695)         Mark D. Kachner (Bar No. 234192)
daniel.hughes@knobbe.com                  mark.kachner@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP        KNOBBE, MARTENS, OLSON & BEAR, LLP
3579 Valley Centre Drive                  1925 Century Park East, Suite 400
San Diego, CA 92130                       Los Angeles, CA 90067
Phone: (858) 707-4000                     Phone: (310) 551-3450
Fax: (858) 707-4001                       Fax: (310) 551-3458

Attorneys for Masimo,
MASIMO CORPORATION and CERCACOR LABORATORIES, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Masimo,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>**OPENING POST-TRIAL BRIEF OF MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.**<br><br>Trial:           11/05/2024<br><br>Hon. James V. Selna |

**REDACTED VERSION FILED PURSUANT
TO ORDER OF THE COURT DATED 1/10/2025**

# TABLE OF CONTENTS

Page No.

I. INTRODUCTION ........................................................................................... 1

II. APPLE'S SEARCH FOR SENSOR TECHNOLOGY ................................. 3

    A.    Apple Coveted Masimo's Technology .................................................. 3

    B.    Apple Quickly Obtained Masimo's Technology From Lamego .......... 5

III. MASIMO PROVED ITS TRADE SECRET CLAIM ................................. 6

    A.    Masimo Took Reasonable Efforts To Protect Its Trade Secrets .......... 7

    B.    Masimo Proved Possession, Value, And Misuse Of L4 ...................... 7

        1.    Masimo Possessed L4 ............................................................... 7

        2.    L4 Derives Economic Value From Not Being Generally Known ........................................................................................ 9

            a.    Apple Applies The Wrong Legal Standard ..................... 9

            b.    Apple's "Science Projects" Are Irrelevant .................... 10

            c.    Apple's References Do Not Show L4 Was Generally Known ............................................................ 11

        3.    Apple Acquired, Used, And Disclosed L4 .............................. 12

    C.    Masimo Proved Possession, Value, And Misuse of L5 ..................... 14

        1.    Masimo Possessed L5 ............................................................. 14

        2.    L5 Derives Economic Value From Not Being Generally Known ...................................................................................... 15

        3.    Apple Acquired, Used, And Disclosed L5 .............................. 16

    D.    Apple Baselessly Accuses Masimo of Changing The Scope Of L4 Or L5 .......................................................................................... 18

        1.    Masimo Did Not Change The Scope Of L4 ............................ 19

        2.    Masimo Did Not Change The Scope Of L5 ............................ 20

# TABLE OF CONTENTS
## (cont'd)

Page No.

3.    The Court, As The Trier Of Fact, Decides Trade Secret Scope ........................................................................... 23

E.    Masimo Proved Possession, Value, And Misuse Of D1 .................... 24

    1.    Masimo Possessed D1 ................................................. 24

    2.    D1 Derives Economic Value From Not Being Generally Known ........................................................................ 26

    3.    Apple Acquired, Used, And Disclosed D1 .............................. 27

F.    Masimo Proved Possession, Value, And Misuse Of D3 .................... 28

    1.    Masimo Possessed D3 ................................................. 28

    2.    D3 Derives Economic Value From Not Being Generally Known ........................................................................ 29

    3.    Apple Acquired, Used, And Disclosed D3 .............................. 30

G.    Masimo Proved Possession, Value, And Misuse Of D10 .................. 31

    1.    Masimo Possessed D10 ............................................... 31

    2.    D10 Derives Economic Value From Not Being Generally Known ........................................................................ 32

    3.    Apple Acquired, Used, And Disclosed D10 ............................ 33

H.    Masimo Proved Additional Elements Of Misappropriation Under CUTSA ............................................................... 33

    1.    Employees Other Than Lamego Knew Or Should Have Known Their Knowledge Was Derived From Lamego .......... 33

    2.    Lamego Knew Or Should Have Known He Was Using And Disclosing Masimo's Trade Secrets ............................. 34

    3.    Apple Acquired Masimo's Trade Secrets Through Improper Means ..................................................... 36

I.    Masimo Proved Any Harm Or Unjust Enrichment Element ............. 36

    1.    Masimo Proved Harm .............................................. 37

**TABLE OF CONTENTS**
**(cont'd)**

Page No.

|  |  |  |  |  |
|---|---|---|---|---|
| | 2. | Masimo Proved Unjust Enrichment | | 37 |
| J. | | The Statute Of Limitations Does Not Bar Masimo's Claim | | 38 |
| | 1. | Masimo Had No Knowledge Or Reason To Suspect Misappropriation More Than Three Years Before Filing Suit | | 38 |
| | | a. | Masimo Presented Unrebutted Evidence On This Element | 38 |
| | | b. | Apple's Cited Evidence Does Not Show Otherwise | 39 |
| | 2. | A Reasonable Investigation Could Not Have Revealed Facts Sufficient To Justify Bringing Suit Before January 2017 | | 40 |
| K. | | Apple's Remaining Defenses Fail | | 41 |

IV. MASIMO PROVED ITS PATENT OWNERSHIP CLAIMS .......... 42

| A. | Lamego Made His Inventive Contributions While Under An Obligation To Assign Any Invention To Masimo | 42 |
| B. | Diab Made His Inventive Contributions While Under An Obligation To Assign Any Invention To Masimo | 44 |

V. MASIMO PROVED ITS PATENT INVENTORSHIP CLAIM .......... 44

VI. THE COURT SHOULD AWARD EQUITABLE REMEDIES .......... 46

| A. | The Court Should Enter Judgment Declaring That Apple Misappropriated | 46 |
| B. | The Court Should Enjoin Further Misappropriation | 46 |
| | 1. | An Injunction Is Warranted Under *eBay* | 46 |
| | 2. | The Court Should Enjoin Further Use Or Disclosure | 48 |
| | 3. | Apple's Waiver Argument Is Frivolous | 49 |
| C. | The Court Should Add Masimo as a Co-Owner of the Disputed Patents | 50 |

# TABLE OF CONTENTS
## (cont'd)

Page No.

D.    The Court Should Add Diab as an Inventor of the Disputed Patents ............................................................................. 51

E.    The Court Should Impose a Constructive Trust ................................ 51

F.    The Court Should Award Attorneys' Fees And Costs ....................... 51

# TABLE OF AUTHORITIES

**Page No(s).**

*A.O. Smith Corp. v. Petroleum Iron Works Co. of Ohio*,
    73 F.2d 531 (6th Cir. 1934) ........................................................................9

*Advanced Fluid Sys., Inc. v. Huber*,
    295 F. Supp. 3d 467 (M.D. Pa. 2018).......................................................34

*Alamar Biosciences Inc. v. Difco Lab'ys. Inc.*,
    1996 WL 648286 (E.D. Cal Feb. 27, 1996) ..............................................39

*Allergan, Inc. v. Merz Pharms., LLC*,
    2012 WL 781705 (C.D. Cal. Mar. 9, 2012) ...............................................33

*Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*,
    226 Cal. App. 4th 26 (2014) ........................................................15, 20, 21

*Am. Can Co. v. Mansukhani*,
    728 F.2d 818 (7th Cir. 1982) .......................................................................9

*Applied Med. Distrib. Corp. v. Jarrells*,
    100 Cal. App. 5th 556 (2024)...........................................................35, 36, 44

*Atl. Rsch. Mktg. Sys., Inc. v. Troy*,
    659 F.3d 1345 (Fed. Cir. 2011) ................................................................23

*Beech Aircraft Corp. v. EDO Corp.*,
    990 F.2d 1237 (Fed. Cir. 1993) ................................................................40

*Bianco v. Globus Med., Inc.*,
    2014 WL 5462388 (E.D. Tex. Oct. 27, 2014), *aff'd*,
    618 F. App'x 1032 (Fed. Cir. 2015) ...........................................................8

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
    2017 WL 2224838 (N.D. Cal. May 22, 2017)............................................20

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
    2018 WL 514923 (N.D. Cal. Jan. 23, 2018)...........................................9, 21

*Blue Gentian, LLC v. Tristar Prods., Inc.*,
    70 F. 4th 1351 (Fed. Cir. 2023) ................................................................42

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
    2013 WL 890126 (N.D. Cal. Jan. 23, 2013)..............................................45

**TABLE OF AUTHORITIES**
(*cont'd*)

Page No(s).

*Bus. Intelligence Servs., Inc. v. Hudson*,
    580 F. Supp. 1068 (S.D.N.Y. 1984) ...................................................20

*C&F Packing Co. v. IBP, Inc.*,
    224 F.3d 1296 (Fed. Cir. 2000) .......................................................23

*Cal. Ins. Guar. Ass'n v. Burwell*,
    227 F. Supp. 3d 1101 (C.D. Cal. 2017) ...........................................48

*Comet Techs. USA Inc. v. XP Power LLC*,
    2022 WL 4625149 (N.D. Cal. Sept. 30, 2022) ...........................45, 47

*DVD Copy Control Ass'n., Inc. v. Bunner*,
    31 Cal. 4th 864 (2003) .......................................................................6

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .............................................................45, 46, 47

*EnerTrode, Inc. v. Gen. Capacitor Co.*,
    2019 WL 1715170 (N.D. Cal. Apr. 17, 2019) ..................................22

*Equate Media, Inc. v. Suthar*,
    2024 WL 1217217 (C.D. Cal. Mar. 20, 2024) .............................45, 46

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*,
    2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) ...............................33

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal. 4th 797 (2005) .....................................................................39

*Garcia v. Lawn*,
    805 F.2d 1400 (9th Cir. 1986) .........................................................47

*Gen. Elec. Co. v. Sung*,
    843 F. Supp. 776 (D. Mass. 1994) ...................................................47

*Hays v. VDF Futureceuticals, Inc.*,
    2016 WL 5660395 (D. Haw. Sept. 28, 2016) ..................................37

*Imi-Tech, v. Gagliani*
    691 F. Supp. 214 (S.D. Cal. 1987) .....................................................9

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*,
    2016 WL 8849699 (C.D. Cal. June 8, 2016) ...................................22

# TABLE OF AUTHORITIES
*(cont'd)*

**Page No(s).**

*InteliClear, LLC v. ETC Global Holdings, Inc.*,
    978 F.3d 653 (9th Cir. 2020) .................................................................22

*Johnson v. City of Loma Linda*,
    24 Cal. 4th 61 (2000) ...........................................................................40

*Kaszuk v. Bakery & Confectionary Union & Indus. Int'l Pension Fund*,
    791 F.2d 548 (7th Cir. 1986) ...............................................................48

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470 (1974)................................................................................6

*Language Line Servs., Inc. v. Language Servs. Assocs., LLC*,
    2010 WL 2764714 (N.D. Cal. July 13, 2010) .....................................33

*Masimo Corp. v. True Wearables, Inc.*,
    2022 WL 17083396 (C.D. Cal. Nov. 7, 2022) .....................8, 9, 25, 26

*Mattel, Inc. v. MGA Ent., Inc.*,
    801 F. Supp. 2d 950 (C.D. Cal. 2011) .................................................50

*Monster Energy Co., v. Vital Pharms., Inc.*,
    2023 WL 8168854 (C.D. Cal. Oct. 6, 2023) ...........................45, 46, 50

*Navigation Holdings, LLC v. Molavi*,
    2020 WL 5074307 (N.D. Cal. Aug. 25, 2020) .....................................33

*Neural Magic, Inc. v. Meta Platforms, Inc.*,
    659 F. Supp. 3d 138 (D. Mass. 2023)..................................................23

*Rogers v. B. Braun Med., Inc.*,
    No. 98-cv-250-B (RBB), Dkt. 390, Dkt. 415
    (S.D. Cal. Sept. 13, 2004) ....................................................................50

*Samuels v. Mackell*,
    401 U.S. 66 (1971)...............................................................................44

*In re Sotera Wireless, Inc.*,
    No. 16-05968-LT11, Dkt. 1026 (S.D. Cal. Jul. 18, 2017).....................33

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
    750 F.2d 1552 (Fed. Cir. 1984) ...........................................................46

# TABLE OF AUTHORITIES
### (*cont'd*)

Page No(s).

*Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*,
   573 F.3d 1290 (Fed. Cir. 2009) ...................................................................42

*Universal Bldg. Maint. LLC v. Calcote*,
   2022 WL 18397628 (C.D. Cal. Nov. 7, 2022) .......................................46

*Vapor Point LLC v. Moorhead*,
   832 F.3d 1343 (Fed. Cir. 2016) ...........................................................42

*Vinyl Interactive, LLC v. Guarino*,
   2009 WL 1228695 (N.D. Cal. May 1, 2009).........................................46

*Waller v. Truck Ins. Exchange, Inc.*
   11 Cal. 4th 1 (1995)..............................................................................40

# OTHER AUTHORITIES

19 U.S.C. § 1337.................................................................................46

35 U.S.C. § 256..................................................................................49

Cal. Civ. Code § 2224........................................................................49

Cal. Civ. Code § 3425.2.....................................................................44

Cal. Civ. Code § 3426.1..................................................................*passim*

Cal. Civ. Code § 3426.4................................................................49, 50

Cal. Civ. Code § 3426.6......................................................................36

L.R. 11-6.1..........................................................................................51

L.R. 16-4.............................................................................................48

Fed. R. Civ. P. 54...............................................................................47

Plaintiffs Masimo Corporation ("Masimo Corp.") and Cercacor Laboratories, Inc. ("Cercacor") (collectively "Masimo") respectfully submit this Opening Post-Trial Brief with their Post-Trial Proposed Findings of Fact ("FF") and Conclusions of Law ("CL").

# I. INTRODUCTION

Extensive evidence showed Apple sought Masimo's technology and decided it could gain such technology from Marcelo Lamego. Lamego told Apple's CEO, Tim Cook, that only Lamego could solve Apple's physiological monitoring problems based on his years of experience at Masimo. At trial, Lamego admitted he was offering Apple his "know how" even though it was very difficult for him to separate his own "know how" from what he learned at Masimo. Apple paid Lamego handsomely for his "specialized knowledge" of which Apple was "deeply in need." The knowledge Apple sought was not "general" in nature, as Apple argues. Lamego admitted that he was eager to show Apple that he was the "real deal" in sensor technology. So, he provided extensive information to many groups at Apple who repeatedly sought his help.

Apple knew Lamego was providing Masimo's trade secrets. Before Lamego even interviewed, Michael O'Reilly (Masimo's former CMO) warned Apple that Lamego's knowledge that was applicable to Apple was confidential to Masimo. Before Lamego started, Masimo warned Apple that Lamego knew Masimo's trade secrets. Yet Apple immediately placed the very talkative Lamego into the middle of multiple sensor design teams and readily accepted his many suggestions. Apple executives quickly determined Lamego posed a risk to Apple's confidential algorithms. So they devised a plan to shield Apple's algorithms from Lamego while continuing to use Lamego as a "consultant" to extract more information. Apple employees freely discussed and used Masimo's trade secrets even after he left. For example, long after Lamego left, Apple refused to remove the ███████████ as requested by a third-party supplier ███████████ because it came from ███████████ and solved the problem Lamego told Apple was critical.

At trial, Apple witnesses rotely denied using Masimo's trade secrets but offered virtually no counter evidence. For example, Apple witnesses claimed someone other

than Lamego suggested the "short circuit" and revised Apple's "black foam" test, but identified nobody. Apple's attorneys also insisted that Apple used the revised "black foam" test only in manufacturing to find "lemons," but Apple's senior engineer Block reluctantly conceded that Apple does use the ███████████.

Apple made no showing that it independently developed the trade secrets. Rather, Apple argued the trade secrets were "generally known." Apple relied on experts who had to spend hundreds of hours locating and cobbling together bits and pieces of publications to claim each trade secret was generally known. But the experts failed to identify all attributes of the trade secrets or explain how the bits and pieces would be combined. And they failed to establish that the publications themselves, much less the specific combinations of publications, were known generally.

Apple also claimed various Masimo technology in ██████. These patents came from ██████████ that Lamego gave to Apple in just a few months. For three of the patents, Apple admitted the claimed reflective surfaces and demodulation algorithms came solely from Lamego. And the evidence shows that the claimed subject matter for all of these patents came from Lamego's work at Masimo. He had an obligation to assign that subject matter to Masimo. Nothing supports Apple's assertion that Lamego first invented this subject matter during his short time at Apple.

Apple should be enjoined from continuing to use or disclose the trade secrets. Masimo would suffer irreparable injury absent an injunction. In contrast, Apple witnesses conceded Apple would suffer no hardship from having to stop using or disclosing the technology that Masimo contends is its trade secrets. The Court should also name Masimo as a co-owner of the disputed patents and order the PTO to correct inventorship on four of those patents by naming Mohamed Diab as an inventor.

## II.  APPLE'S SEARCH FOR SENSOR TECHNOLOGY

### A.  Apple Coveted Masimo's Technology

Joe Kiani founded Masimo in 1989 with the goal of solving problems the rest of the patient monitoring field thought were unsolvable. FF ¶4. Since then, Masimo has

become a world leader in non-invasive monitoring technology.  *Id.* ¶¶5-7.

In late 2012 and early 2013, Apple decided to pursue non-invasive monitoring and founded Project "Rover" to find a company to use as a "stepping stone" to develop such technology.  JTX-260 at -106; FF ¶¶211-16.[1]  Apple identified Masimo as the "standout" company and extensively tore down Masimo's products, which Apple referred to as the "golden reference" for accuracy.  FF ¶¶213-17, 220.

In March 2013, Adrian Perica (Apple's VP of Corporate Development) contacted Masimo to discuss a potential partnership.  JTX-559; FF ¶¶218-19.  After meeting with Masimo in May 2013, Apple executives discussed how impressed they were.  JTX-393 at -302; JTX-394 at -516 (Kiani was the "health/wellness leader we are looking for"); JTX-70 at -317 (Kiani had a "Steve Jobs" like reputation); FF ¶¶221, 228.  Apple even discussed acquiring Masimo.  JTX-394 at -517; FF ¶¶222-24.

In June 2013, Tim Cook (Apple's CEO) asked Perica if Apple was "finding any thought leaders" in the "Wellness/Medical monitoring" space and suggested "some of what we need can be done with smart recruiting instead of acquisition."  JTX-316 at -708; FF ¶222.  Perica responded that Apple was "the most clueless" in the field of "non-invasive diagnostics," that Kiani was the medical leader Apple needed, and that he was considering an acquisition.  JTX-316 at -707; FF ¶222.  Cook ultimately rejected the acquisition in favor of joint development.  JTX-317 at -808; FF ¶ 224.

In the summer of 2013, Apple executives decided Apple's sensor program for Apple Watch was "way behind," a "mess," and on path to "failure."  FF ¶234-35.  Apple began Project "Everest" on September 18 to discuss partnering with Masimo.  FF ¶236.

On October 1, Kiani declined to make Marcelo Lamego the CTO of Masimo Corp.  Kiani ¶200.  In response, Lamego emailed Cook early the next morning, touted his "10

---

[1] Trial exhibits are cited by JTX (e.g., "JTX-__").  Written direct testimony is cited by last name and paragraph (e.g., "Kiani ¶__").  Deposition designations are cited by the last name (and date if multiple days are designated) (e.g., "Han Depo at __").  Live testimony is cited by trial day and volume (e.g., "T3-2 at __" for day 3, volume 2).  Emphasis is added unless indicated otherwise.

years" at Masimo, and offered to help Apple solve the deceptive "patient problem." JTX-1719; FF ¶230.  At trial, Lamego testified he was offering Cook his "know-how" but admitted it was "very difficult" to separate his "personal" know how from what he learned at work.  T3-2 at 31:5-33:1; *id.* at 35:14-22 (Lamego claiming that only he could accomplish such a feat because he was "a real genius"); FF ¶231.

Cook forwarded Lamego's email internally the same morning he received it. FF ¶¶232-33.  When it reached Michael O'Reilly (Masimo's former Chief Medical Officer that Apple had hired a few months earlier), O'Reilly warned: most of Lamego's "knowledge (that would be directly applicable to what we are doing) may be considered confidential information of Cercacor or Masimo."  JTX-512 at -253; FF ¶233.

When Steve Hotelling saw Lamego's email, he recognized Apple could obtain Masimo's technology by recruiting Lamego and others.  FF ¶¶238-41.  On October 15, Hotelling discussed Lamego's Cook email, and O'Reilly's warning, with the lawyer responsible for Project Everest (David Tom).  JTX-5203 at -097-98; FF ¶238-39.  At that time, Apple's Project Everest presentation included several engagement options, including "[a]cquisition of Cercacor and/or Masimo."  JTX-1557 at -426; FF ¶238.  The next day, Hotelling "covered the topics" he "had in mind," and the presentation was changed to read "[a]cquisition of Cercacor and/or Masimo *(or people or assets)*."  *Compare* JTX-1557 at -409 (October 15 date) and -426 *with* JTX-263 at -759 (October 16 date) and -776; FF ¶239.  That same day, Hotelling discussed hiring Lamego with Apple's executive recruiter.  JTX-264; FF ¶240.  And, within 48 hours, Hotelling initiated (and later expedited) a confidential project to research the "next level down" of employees from Masimo.  JTX-5205; JTX-2127; FF ¶240.

Apple's "Project Rover" team (which included Hotelling) discussed Masimo at every meeting for months.  JTX-5202 at -515 to -518; FF ¶241.  Hotelling then interviewed Lamego on October 31.  Hotelling ¶45; FF ¶241.  The October 31 Rover update mentioned Lamego's interview. JTX-5202 at -515; FF ¶241.  After the interview, Project Rover never mentioned Masimo again.  JTX-5202 at -509 to -515; FF ¶241.

Hotelling recommended hiring Lamego to "accelerate" Apple's R&D efforts for Apple Watch.  JTX-265 at -567; FF ¶243.  Hotelling's boss agreed and gave Lamego an "exceptional offer" because of his "specialized experience that we are deeply in need of on current and future n27 [watch project] sensors."  JTX-265 at -567; FF ¶¶243-44; *see also* JTX-628 at -439 ("acquisition-like need for specialized capability" Apple did not have); JTX-295 at -923-24.  Apple then recruited the "next level down" at Masimo. JTX-2127; FF ¶247.  Apple hired numerous Masimo employees, including six that worked on the Apple Watch.  FF ¶247.  Apple hired people who freely discussed Masimo technology at their interview and declined to hire those who did not.  FF ¶248.

## B.    Apple Quickly Obtained Masimo's Technology From Lamego

When Lamego arrived, Apple immediately started seeking ideas from him.  FF ¶¶250-57.  Within four days, Lamego provided a detailed presentation.  JTX-2901 at -307; FF ¶250.  Apple requested Lamego's input on the very issue he promised Cook he could solve: making Apple's watch work on most people.  FF ¶253.  For example, ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " JTX-140 at -733. ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ JTX-140 at -728-32; FF ¶251. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ FF ¶252.

After one month at Apple, Lamego recommended 25 improvements to the Apple Watch.  FF ¶251.  As shown below, he listed all the asserted trade secrets:

JTX-143 at -568 (red boxes added).  Apple closely tracked its progress in implementing those ideas.  JTX-233 at -995; FF ¶254.  As explained below, Lamego followed up with detailed technical information for each trade secret at issue.  Lamego also submitted █ ███████████████ in just six months.  FF ¶252.  The five patents at issue in this trial came from those disclosures.  FF ¶254.

Eventually, Apple realized Lamego posed a risk even to ***Apple's*** confidential information, but Apple still wanted to keep obtaining information from Lamego.  JTX-15 at -009; FF ¶256.  Hotelling and Apple VP Myra Haggerty discussed how they could continue using Lamego as a "Consultant" while "keeping Lamego out of our detailed algs innovations …."  JTX-15 at -009; FF ¶256.  Haggerty explained "in case he leaves Apple" this "minimizes some risk to our algs innovations."  JTX-15 at -009; FF ¶256.  Lamego testified they "put [him] in the garage" but he kept "giving ideas and recommendations to various groups within the sensing units" because "they kept calling me."  T3-2 at 97:15-98:1; FF ¶257.

## III.  MASIMO PROVED ITS TRADE SECRET CLAIM

The "maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law."  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974).  "By sanctioning the acquisition, use, and disclosure of another's valuable, proprietary information by improper means, trade secret law minimizes the inevitable cost to the basic decency of society when one ... steals from another.'  In doing so, it recognizes that good faith and honest, fair dealing, is the very life and spirit of the commercial world."  *DVD Copy Control Ass'n., Inc. v. Bunner*, 31 Cal. 4th 864, 881 (2003) (quoting *Kewanee*, 416 U.S. at 493).

To prevail on its trade secret claim, Masimo must show by a preponderance of the evidence (1) possession of a trade secret, (2) reasonable efforts to maintain secrecy, (3) independent economic value, actual or potential, from the trade secret not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and (4) misappropriation.  Cal. Civ. Code § 3426.1.

Masimo first addresses an element common to all trade secrets: reasonable efforts to maintain secrecy. Masimo next addresses possession, value, and misuse of each trade secret. Masimo then explains the remaining issues common to all trade secrets.

## A.    Masimo Took Reasonable Efforts To Protect Its Trade Secrets

Masimo provided extensive evidence of its efforts to protect its trade secrets. Among other things, Masimo (1) enters confidentiality agreements with employees and customers, (2) has physical and electronic access restrictions, (3) has policies that require sensitive documents to be marked as such, (4) follows strict procedures for lab notebooks, (5) implements ongoing training on confidentiality, and (6) conducts exit interviews reminding outgoing employees about their obligations. FF ¶¶20-23.

Apple did not seriously dispute this element at trial. The Court asked whether the parties disputed this element and commented that Masimo appeared to have met its burden. T1-1 at 4:19-5:1. Apple stated it was not disputing this element except that it believed some publications showed that Masimo had published aspects of its trade secrets. *Id.* at 5:8-16. Masimo addresses those arguments below for each trade secret.

## B.    Masimo Proved Possession, Value, And Misuse Of L4

### 1.    Masimo Possessed L4

Masimo invested significant effort into identifying ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████ Lamego was heavily involved in

Masimo's ██████████████████████████. *Id.* ¶¶31-35.

Apple does not dispute that Masimo possessed most aspects of L4. Apple's expert

████████████████████████████████

Warren opined that the only aspect of L4 that Masimo did not possess was the ███

████████████████████████████████████████" Warren ¶57. But Masimo

showed it possessed ███████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████

L4 also includes two alternative options: █████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████." Masimo does not

accuse Apple of misappropriating the █████████████████ option. Thus, Masimo

need not prove possession of this option. *See Masimo Corp. v. True Wearables, Inc.*,

2022 WL 17083396, at *10 (C.D. Cal. Nov. 7, 2022). In *True Wearables*, the Court

considered a trade secret directed to techniques for determining pulse rate, oxygen

saturation, or perfusion index. *Id.* Masimo proved possession of pulse rate and oxygen

saturation, so the Court addressed misappropriation for those parameters only. *Id.*; *see

also Bianco v. Globus Med., Inc.*, 2014 WL 5462388, at *7 (E.D. Tex. Oct. 27, 2014),

*aff'd*, 618 F. App'x 1032 (Fed. Cir. 2015) ("not necessary" for jury to find "every

feature" plaintiff possessed to find core concept was a trade secret).

### 2.   L4 Derives Economic Value From Not Being Generally Known

Masimo kept L4 confidential and carefully guarded it. FF ¶105. Masimo marks

its ███████████████████ "Confidential and Proprietary." JTX-937; FF ¶105. L4

also provides significant economic value to Masimo. FF ¶¶106-09. L4 enables

Masimo's products to deliver superior accuracy. Diab ¶219; Kiani ¶141; FF ¶107. L4

also provides Masimo with a competitive advantage because competing products exhibit

████████████████████████████indicating that competitors do not appreciate

███████████████████████████. Diab ¶219; Kiani ¶142; FF ¶108. Apple

largely does not dispute these facts. Instead, it raises other flawed arguments.

### a.   <u>Apple Applies The Wrong Legal Standard</u>

Apple does not identify any publication disclosing all of L4, but asserts that L4 is generally known because one could discover L4 by reviewing various references. Madisetti ¶¶117-20; FF ¶110.  But such an analysis does not show that a trade secret is ***generally known***.  In *True Wearables*, this Court "held, and the Federal Circuit affirmed, that a publication does not mean the subject matter is generally known under CUTSA." *True Wearables*, 2022 WL 17083396, at *20 (final decision after affirmance of preliminary injunction).  Moreover, identifying publications disclosing only parts of L4 does not render the trade secret generally known.

Apple's approach improperly treats L4 as if it were a patent claim and attempts to show the subject matter was disclosed or rendered obvious by the prior art.  But "it is ***not*** required that a trade secret be patentably nonobvious or novel." *Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 231 (S.D. Cal. 1987) (insufficient to show trade secret were "known in the prior art"); *see also BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 514923, at *3-4 (N.D. Cal. Jan. 23, 2018) ("novelty, in the patent law sense, is not required for a trade secret").  Whether "others might have discovered" the information is not relevant because "'obviousness' is not the benchmark." *Am. Can Co. v. Mansukhani*, 728 F.2d 818, 819 (7th Cir. 1982).  As the Sixth Circuit explained: "Facts of great value may, like the lost purse upon the highway, lie long unnoticed upon the public commons.  Hundreds pass them by, till one more observant than the rest makes discovery." *A.O. Smith Corp. v. Petroleum Iron Works Co. of Ohio*, 73 F.2d 531, 539 (6th Cir. 1934).

At most, Apple's approach could support part of a "readily ascertainable" defense. The "readily ascertainable" defense considers whether information was "available in trade journals, reference books, or published materials."  West's Ann. Cal. Civ. Code § 3426.1 (1984 Legislative Committee Comments).  But this Court previously held that Apple could not prevail on such a defense because Apple did not actually ascertain the trade secrets from the references on which it relies.  Dkt. 1284 at 3-5.

**b.    Apple's "Science Projects" Are Irrelevant**

At trial, Apple attempted to show L4 was generally known by cross examining Masimo witnesses on black foam or fingers, flashlights, and what Apple called a "fifth grade science project."  T1-1 at 81:23-87:17; T1-2 at 27:7-29:14; T2-2 at 62:22-74:11; T3-1 at 68:2-72:18.  But Apple's cross examination, and Madisetti's redirect, actually demonstrated that L4 was not generally known.

L4 recites, in part, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮  But during cross examination, Apple attorneys repeatedly ▮▮▮▮▮

Similarly, during Apple's "fifth grade science project" Apple placed ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See id.* at 69:8-20.  Madisetti identified ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the test was ineffective.  *Id.* at 69:8-20; 70:11-19.  In contrast, Masimo and Apple use ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Apple's flashlights and science projects do not show L4 is generally known.

**c.    Apple's References Do Not Show L4 Was Generally Known**

At trial, Apple also argued that L4 is generally known based on references found by Apple's expert.  But Apple's argument is fundamentally flawed.

***First***, Apple concedes all but one reference does not disclose ▮▮▮▮▮ ▮▮▮▮▮.  Instead, Apple argues the references disclose ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  T6-1 at 82:17-83:2.  But such an analysis does not show a trade secret is ***generally known***.  *Supra* §III. B.2.a.  Moreover,

-10-

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1    the one reference Apple claims discloses ███████ (Petersen) does not disclose L4.  FF

2    ¶¶114-23.  Petersen describes a technique to determine software calibration values.

3    JTX-3778 at FIG. 4, 6:7-17; FF ¶¶115-22.  It does not disclose ███████████████

4    █████████████████████████████████████████ T3-1 at 74:19-75:15;

5    FF ¶¶116, 121-22.  Rather, it teaches calibration values eliminate light piping so

6    █████████████ are *not* necessary.  Petersen therefore cannot show L4 is generally

7    known.  T3-1 (Madisetti) at 74:19-79:7; FF ¶¶115-22.

8         *Second*, Apple failed to show any of the references are well known.  FF ¶111.

9    Indeed, Warren reviewed the trade secrets and then spent hundreds of hours searching

10   for the references.  T6-1 (Warren) at 29:1-12, 33:19-34:3; FF ¶112.  Warren's approach

11   essentially mirrors a patentability analysis where the art is presumed to be known, but

12   such analysis is irrelevant here as discussed above.  *Supra* §III. B.2.a.  And the amount

13   of time he spent to locate the references (with the benefit of knowing the trade secret)

14   shows L4 is not known *generally*.  *See* FF ¶112.

15        *Third*, Warren asserted Masimo failed to preserve the secrecy of L4 based on two

16   Masimo patents.  FF ¶¶135, 138.  But Apple does not even allege that those patents

17   disclose ██████████████████████.  T6-1 (Warren) at 81:25-82:8, 85:7-24;

18   FF ¶¶133, 137.  Because these patents do not disclose at least that aspect of L4, they also

19   do not show any failure to maintain L4's secrecy.  FF ¶¶135, 138.

20        **3.    Apple Acquired, Used, And Disclosed L4**

21        Before Lamego's arrival, Apple used a ███████████████████████████

22   ████████████████████████████████████████████████.  JTX-

23   1061 at -717-18 (Figure 2); FF ¶267.  Shortly after Lamego arrived, Lamego provided

24   his list of 25 improvements, which specifically included "███████████████" and

25   "███████."  JTX-143 at -568; FF ¶263.  Apple then ████████████████████

26   █████████████████████████████████████████████████████████

27   ███████████████████████.  FF ¶¶272-73.

28



JTX-1064 at -859; FF ¶¶272-73.  That "███████████████████████████████

███████████    *Compare* JTX-1064 at -859 *with* JTX-1045; FF ¶273.  ████████

████████████████████████████████████████████████████████████████████████

████████████████    as explained below.  FF ¶¶276-95.

At trial, Apple argued it did not misappropriate L4 for three reasons.  ***First***, Apple witnesses speculated that Lamego's "███████████████" recommendation related to a physical structure to reduce electromagnetic interference, not ████████.  FF ¶265.  But Apple never explained how such a structure would relate to Lamego's recommendation to "████████."  FF ¶265.   And Warren conceded he based his speculation on a Diab patent, even though a ***Lamego*** patent used the word "shield" to refer to a structure that could ████████████████████████  T6-1 at 44:23-45:24; JTX-3766 at 32:37-47; FF ¶266.

***Second***, Apple argued Lamego did not suggest the change to the "████████" test, but never explained who suggested it.  FF ¶¶278, 284.  And Land admitted he could not rule out that Lamego might have given the unidentified employee the idea.  T5-2 at 20-21; FF ¶284.  Moreover, the contemporaneous evidence points to Lamego.  Lamego was included on an email and presentation proposing ████████ and assigned a task about ████.  JTX-1063; FF ¶274.  Lamego was also involved in designing the ████████████████ ████████████████████.  JTX-45 (attaching JTX-46); FF ¶275. Lamego also hired and worked with Dr. Guocheng Shao, who was assigned to create a specification for a ████████ ████████████████████████████  T5-2 (Block) at 56:2-22; JTX-1066 at -836; FF ¶¶285-86.

1    ***Third***, Apple argued the ███████ was used only during "manufacturing" and

2    not during design.  *See* Land ¶¶40-41; Block ¶¶23, 37.  But Apple used the ███████

3    during development ████████████████████████.  JTX-1064 at -860; JTX-

4    194 at -747; FF ¶¶282-83, 294.  Apple used the ████████████████████

5    ████████████.  JTX-1064 at -859; FF ¶¶282, 287-94.  The test identified that

6    "████████████████████████████████.  JTX-1064 at -

7    859; FF ¶282.  Apple then fixed the issue by ████████████████████

8    ██████████████████████.  JTX-1064 at -860; FF ¶284.  Indeed,

9    after a dramatic pause, Block admitted ███████ was not used only in manufacturing as

10   Apple repeatedly represented.  T5-2 at 60:4-14; FF ¶288.

11   Apple has since tested every Apple Watch using ████████████████

12   ██████████████████.  T5-2 (Land) at 42:21-43:1; FF ¶¶276-77.

13   For example, in the Series 4 and 5 Watches, Apple added ████████████████

14   ████████████████████████.  FF ¶283.  For

15   Series 6, Apple recognized the new blood oxygen feature ████████████████

16   ██████████████████ isolation.  JTX-1078 at -632; FF ¶¶292-

17   93, 295-97.  Apple then ████████████████████████████

18   ████████████ to ████████████████  JTX-1078 at -632; FF ¶294.  Apple

19   used the ████████████████████.  FF ¶295.  Every Apple Watch

20   since Series 6 has included this design.  Madisetti ¶103; FF ¶294.

21   **C.    Masimo Proved Possession, Value, And Misuse of L5**

22   **1.    Masimo Possessed L5**

23   Masimo spent years attempting to ████████████████████████

24   ████ FF ¶¶46-49.  In August 2005, Masimo engineers discovered ████████████

25   ████████.  JTX-702 at -215; FF ¶49.  ████████████████████████

26   ████████████████████████████████████████████████.

27   JTX-703 at -058; Dalke ¶66; FF ¶49.  ████████████████████████

28   ████████████████  Dalke ¶66; FF ¶¶49-52.  Dalke and Smith then ████████

-13-

1   ████████████.  FF ¶52.  Dalke explained his notebook entries and schematics

2   showing ████████████████████████████████████

3   ██████████████████████.  FF ¶¶52-53.  Masimo implemented ████████

4   ████████████████████  FF ¶53.

5       At trial, Apple did not dispute that Masimo discovered the problem and developed

6   solutions.  Apple instead argued that Masimo had developed only certain solutions.  *See*

7   Warren ¶¶105-25.  But, as discussed below, L5 does not require a particular solution.

8   L5 concerns recognizing a problem and that ████████████████████ can solve

9   the problem.  That Masimo implemented only certain solutions is immaterial.

10      Masimo also developed ████████████████████ that Apple used.  In

11  November 2003, Dalke ████████████████████████████.  Dalke ¶27;

12  JTX-827 at -679; FF ¶47.  At the time, Dalke did not know ████████████████

13  ████████  FF ¶47.  However, after he discovered the problem, he later understood that

14  ████████████████████████.  Dalke ¶87; FF ¶53.  Apple implemented this

15  solution.  FF ¶¶300-04, 316-18.

### 2.   L5 Derives Economic Value From Not Being Generally Known

17      Masimo invested significant time and resources to discover L5.  FF ¶142.  The

18  engineers spent years investigating and Dalke was "mind-blown" when he learned ████

19  ████████████████████████  Dalke ¶67; FF ¶142.  After the discovery,

20  Masimo kept L5 confidential and carefully guarded that knowledge.  FF ¶143.  L5

21  provided more accurate measurements, which enabled Masimo's multi-wavelength

22  rainbow technology.  Diab ¶¶228, 239-40, 242; FF ¶144.  After two decades, Masimo's

23  competitors still have been unable to replicate rainbow.  Diab ¶228; FF ¶145.

24  Additionally, multiple Apple and ████████ Ph.D. engineers were not aware of L5 until

25  Lamego revealed it.  Madisetti ¶162; JTX-541 at -581; FF ¶¶146, 148.  That these

26  experienced engineers were unaware of the problem shows it was not generally known.

27      At trial, Apple attempted to trivialize L5 by cross examining Masimo's expert on

28  a product called "Snap Circuits," a children's toy with simple circuits to light LEDs.

T3-1 at 41:16-43:18. But that example focused solely on how to implement a solution assuming knowledge of the problem.

Warren also opined that various publications show L5 was generally known. Again, attempting to show a trade secret is "published" does not show a trade secret is generally known. *Supra* §III.B.2.a. And Warren's attempt to combine multiple references is contrary to law. FF ¶149. As the California Court of Appeal explained, trade secrets cannot be examined "bit by bit with the further requirement that [plaintiff] demonstrate protectability of its elements or some of them rather than the protectability of the [trade secret] as a whole." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal. App. 4th 26, 47 (2014). That is because, "even if some or all of the elements of [plaintiff's] design were in the public domain and thus unprotectable, the combination was a protectable trade secret if it was secret and had independent economic value." *Id.*

Warren also again failed to analyze whether any of the references are known ***generally***. FF ¶150. Instead, after viewing the L5 description, he spent hundreds of hours searching for the references. T6-1 (Warren) at 29:1-12, 33:19-34:3; FF ¶150.

Apple argues a Masimo patent (Dalke 2006) discloses L5 entirely. Warren ¶¶120, 123. Warren relies on Dalke 2006's description of "activation of unwanted LEDs" and "parasitic currents." Warren ¶¶123-25; FF ¶165. But these descriptions do not mention ██████████████████████████████████. Warren ¶123; FF ¶165. Further, those descriptions come from a provisional patent application filed five months ***before*** Masimo discovered the L5 problem. *Compare* JTX-5195 at -991 (Mar. 1, 2005) *with* Dalke ¶¶74-79 (Aug. 2, 2005). These descriptions relate to other circuit issues but do not disclose the L5 problem that Masimo discovered later. Dalke ¶¶89-92; FF ¶¶165-167. Moreover, Dalke 2006 does not disclose a complete circuit. Dalke ¶¶93-95; T2-1 (Dalke) at 52-53, 57-58; FF ¶168. It instead shows a simplified diagram of only LEDs and switches. JTX-3003 (JTX-4233) at FIG. 8; FF ¶168. Thus Dalke 2006 does not disclose L5. FF ¶168.

At trial, Warren opined that Dalke 2006 shows Masimo failed to keep L5 secret.

Warren ¶¶121-25; FF ¶170.  But because Dalke 2006 does not disclose L5, it cannot show that Masimo somehow failed to maintain L5's secrecy.  FF ¶170.

### 3.    Apple Acquired, Used, And Disclosed L5

Lamego's list of 25 improvements that he provided in his first month specifically recommended "█████████████████████████████████."  JTX-143 at -568; FF ¶300.  Lamego explained that Apple needed to ████████████████████ ████████████████████████████."  JTX-184 at -173; FF ¶301.  Apple followed that recommendation.  During Lamego's time at Apple, an engineer wrote ████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████."  JTX-184 at -173; Land ¶52; FF ¶302.  This Apple engineer used the precise phrase from Dalke's notebook to describe the LED "████████████████" and attributes this proposed change to Lamego.  *Compare* JTX-184 at -173 *with* JTX-702 at -215 (emitters ███████████████ FF ¶302.  And additional evidence shows that Lamego proposed █████████████████████████, as Apple argues.  T3-1 at 85:3-86:14, 87:5-25; FF ¶¶300-310.

Lamego made his suggestion too late for use in Series 0, but Apple implemented it in all later watches.  FF ¶¶314-18.  Apple documents explain the "status" of Series 0 (N27) was "████████████████████" and the "target" for the Series 1 (N127) was "████████████████."  JTX-185 at -824; FF ¶305.  The performance improvement for this change was "Eliminate ████████████████."  JTX-185 at -824; FF ¶305.  These entries identify the L5 ████████████████████ ██████████████████████████).  Madisetti ¶140; FF ¶305.

Apple also disclosed L5 to ████████.  Madisetti ¶¶142-46; T3-1 (Madisetti) at 87:5-88:4; FF ¶¶310, 312.  Apple engineer Shui reported: ██████████████████ ████████████████████████████ JTX-541 at -583; FF ¶¶307-08.  He "agree[d] with the reasoning" and asked for approval to ████████████.  JTX-541 at -581; FF ¶308.  Apple engineer Zheng replied:

████████████████████████████████████████████

Therefore, we need ████████ …

JTX-541 at -581; FF ¶309.  Shui responded, ████████████████

██████████████████████████████████.”  JTX-541 at -581; FF ¶310.

████████ did not remove the L5 solution.  Madisetti ¶146; JTX-1156 at -527; FF ¶310.

This demonstrates that Apple used and disclosed L5 (and that Lamego was the source

of L5 for Apple and ████████  FF ¶¶310, 312.

At trial, Apple argued it did not misappropriate L5 for three reasons.  ***First***, Apple

argued it solved a different problem (████████) rather than ████████████

████████████.  FF ¶311.  But Apple's documents explain these problems are the

same.  JTX-185 at -824; FF ¶311.  Apple prevents ████████████████

████████████.  FF ¶311.  Indeed, as discussed above, an

Apple engineering document explains that Apple wanted to ████████████

████████████  JTX-185 at -824; FF ¶305.  Apple argued the

████████ emails related to ████ LEDs and not ████████  FF ¶311. But Apple

used ████ and ████ to describe the same situation.  JTX-5212 at -935 ("

████████"); T6-1 (Warren) at 57:25-58:22; FF ¶311.

***Second***, Apple argued it ████████████ simply as an engineering best

practice.  FF ¶313.  But Apple was unable to provide any example of Apple ████

████████████ before Lamego.  FF ¶313.  Block testified he could

not provide any such example because he was not sure if that was a trade secret from his

prior company.  T5-2 (Block) at 73:2-9; FF ¶313.  Indeed, the pre-Lamego Series 0

design left ████████.  JTX-185 at -824; FF ¶313.

***Third***, Apple argued Lamego suggested ████████ and Apple

ultimately implemented ████████.  T6-1 (Warren) at 127:16-20.  But

Lamego suggested ████████ generally, without specifying ████████.

-17-

████████████████████

JTX-143 at -568; JTX-185 at -824; FF ¶¶300-01, 304-05, 309.  And the communications with ███████ demonstrate that either solution would address the same problem.  T6-1 (Warren) at 64:20-67:4; FF ¶309.  Further, as explained, L5 concerns ███████ █████████████████████████████████████████████████  Thus, the particular way Apple ███████████████ is immaterial.

**D.    Apple Baselessly Accuses Masimo of Changing The Scope Of L4 Or L5**

During trial, Apple filed a brief arguing Masimo improperly attempted to narrow L4 and broaden L5.  Dkt. 2345.  Apple's arguments are inconsistent and wrong.  Apple argues L4 ***cannot*** be limited to Masimo's particular ███████████ but L5 ***must*** be limited to Masimo's particular solution.  *Compare id.* at 10 (arguing L4 cannot be rewritten to require "███████" or "███████") *with id.* at 14 (arguing L5 must be rewritten to require a ███████████████████████████).  Apple also fails to show Masimo sought to change the scope of either L4 or L5.  Masimo showed misappropriation of both L4 and L5 as written.  *Supra* §§III.B.3, III.C.3.  Regardless, to the extent it is necessary, the Court may rely on factual evidence presented at trial to interpret the scope of Masimo's trade secrets.  *Infra* §III.D.3.

**1.    Masimo Did Not Change The Scope Of L4**

Apple argues Masimo's witnesses "conceded" L4 was generally known and tried to narrow L4 to avoid that concession.  Dkt. 2345 at 6.  Apple is wrong on both points.

***First***, Masimo's witnesses did not concede L4 was generally known.  Apple relies on its own questions simply reading from various documents and asking Kiani and Diab "do you see that, sir?"  T1-1 at 109:1-9; T1-2 at 52:1-7, 55:11-18 (same).  A witness agreeing that an attorney accurately read the text of document hardly concedes a trade secret was generally known.  Apple similarly quotes its own question to Kiani that Nellcor may have been aware of light piping.  Dkt. 2346 at 6.  Light piping in general is not L4.  And Kiani made no such concession.  T1-1 at 103:18-25, 105:20-24.

Moreover, Kiani, Diab, and Madisetti each explained why L4 was ***not*** generally known.  *See, e.g.*, T1-1 at 104:13-22, 110:18-20 (Kiani explaining that Nellcor patent

1  did not disclose ███████████ and Nellcor was not ███████████

2  ███████████████████████ T1-2 at 52:8-22 (Diab

3  explaining a patent did not disclose ██████████████ and was

4  just one of millions of patents); T2-2 at 80:6-13 (Madisetti explaining Apple's example

5  did not include ██████████████████████████).

6       ***Second***, Masimo's witnesses did not attempt to change the scope of L4.  Apple

7  relies on testimony from Kiani and Diab that explained how Masimo implements L4.

8  *See, e.g.*, T1-1 at 109:24-110:3; T1-2 at 60.  Apple argues Kiani sought to add a

9  requirement that L4 provides ██████████.  Dkt. 2345 at 7.  But that testimony

10 said nothing about L4.  Rather, Kiani explained ███████████████████

11 █████████████████████████████ T1-1 at

12 108:1-5.  Madisetti disagreed with Apple's attempt to "put a period" in the middle of the

13 trade secret and omit critical parts.  T2-2 at 75:9-76:2 ████████████

14 ████████████████████████████████████

15 ████████████████████████████

16       Accordingly, Apple is wrong to argue Masimo tried to narrow ████████

17 ████████████████████████████████████

18 Dkt. 2345 at 9-10.  L4 requires "███████████████████

19 ████████████████████" Dkt. 2251 at 3.  Both Masimo and Apple use ████

20 ████████████████████.  *Compare* JTX-1045

21 *with* JTX-1064 at -859; FF ¶273.  Dr. Madisetti explained that ██████████

22 ████████████████████████████████████

23 ████████████████████.  T2-2 at 75:24-76:13.  In particular, ██

24 ████████████████████████████████████

25 ██████████████████.  T3-1 at 26:16-27:14.  Rather, ████████

26 ████████████████████████████████.  T3-1

27 at 26:20-27:1, 27:3-8.  Thus, Masimo is not attempting to change L4.

28

████████████████████████████████

## 2. **Masimo Did Not Change The Scope Of L5**

Apple argues Masimo is changing its prior position that L5 was limited to a particular solution to now argue L5 covers "all possible solutions." Dkt. 2345 at 10. Apple claims Masimo is doing so to try to cover Apple's "short circuit." *Id*. As support, Apple quotes Masimo's prior brief stating: "L5 does not recite every possible means of ███████████████████████████████████████████████." Dkt. 2345 at 11 (citing and quoting Dkt. 1812 at 7).

Masimo's prior brief was correct. L5 does ***not recite*** ███████████████ ████████████████████████████ Rather, as Masimo explained in its prior brief, L5 concerns ██████████████████████████████████████████████████████ Dkt. 1812 at 7. Because L5 is not limited to █████████████████, Masimo did not have to rewrite it to sweep in Apple's ███████████████.

Moreover, Apple omits context to Masimo's prior brief. Masimo was responding to Apple's assertion that Masimo did not have possession of L5. Dkt. 1812 at 6. Apple was arguing Masimo had to possess "every possible means of ██████████████ ██████████████████████████." *Id*. Masimo obviously need not possess every solution when the trade secret is not limited to a particular solution.

As Masimo's prior brief explained, knowledge of problems can be protected as a trade secret. *Bus. Intel. Servs., Inc. v. Hudson*, 580 F. Supp. 1068, 1072 (S.D.N.Y. 1984) ("[P]roblems arising in the course of client relations[] are also protectible as a trade secret")). Indeed, trade secrets can "fall into a continuum, from something as high level as a general idea, down to mid-level concepts for developing and implementing the general idea, and finally ending at the granular information such as source code and algorithms that would consummate what had started as a general idea." *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2017 WL 2224838, at *2 (N.D. Cal. May 22, 2017) (citing *Altavion*, 226 Cal. App. 4th 26).

In *Altavion*, the defendant did not take the plaintiff's specific source code solution, but used the plaintiff's "design concepts" to solve the problem. 226 Cal. App. 4th at 56.

1   The plaintiff prevailed without having to show it possessed every possible solution

2   encompassed by the design concepts. *Id.* at 51-52, 65. This Court previously cited

3   *BladeRoom* and *Altavion* in rejecting Apple's argument that trade secrets are limited to

4   "how" an "idea or conceptualization" is used. Dkt. 1283 at 14. The Court held L5 can

5   be protected as "an idea and not a fully developed product ...." *Id.* at 15.

6        Apple argues that, after the April 2023 trial, the Court "accepted" Masimo's

7   "representation" that L5 "does not claim every solution" to the problem. Dkt. 2345 at

8   11. Apple distorts the Court's opinion. Again, the Court was discussing possession.

9   Dkt. 1901 at 7-8. Apple quotes from the paragraph where the Court distinguished L5

10  from the defective trade secrets in *Waymo*. *See id.* at 8. The Court explained that *Waymo*

11  addressed a trade secret that covered "problems well known in the industry" whereas L5

12  was directed to "a problem unknown in the industry...." *Id.* The Court explained:

> L5 comprises knowledge concerning what causes the errors, and the ability
> to reduce the errors ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to prevent the
> problem. Unlike <u>Waymo</u>, this case does not involve laying claim to "broad
> swaths of solutions" to "general competing considerations and engineering
> trade-offs" that are **problems well known in the industry**. 2017 WL
> 2123560, at *7. Rather, it (1) it identifies **a problem unknown in the
> industry** and (2) comprises the knowledge that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮ will fix it; it does not claim every solution to this problem.

19  *Id.* The Court correctly tied L5 to recognizing ▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* And the Court correctly recognized L5

21  does not "claim every solution to this problem." *Id.* L5 mentions no particular solution.[2]

22       Apple asserts Madisetti took the "remarkable" position that L5 is not limited to a

23  particular solution. Dkt. 2345 at 12. But Madisetti is correct. Masimo has always

24  maintained that L5 concerns recognizing a problem and the knowledge that ▮▮▮▮

25

26  ─────────────────────
   [2] Of course, writing L5 as an "idea" rather than limited to a particular solution means
27  that Masimo cannot distinguish "generally known" references by focusing on Masimo's
   particular solutions. But, as explained above, Masimo has shown the "idea" recited in
28  L5—not a particular solution to the idea—is not generally known. *Supra* §§III.C.2.

████████████████████████████. Thus, Apple would not misappropriate L5 merely by using a "short circuit" in any context. It uses L5 by recognizing the specific problem recited in L5 and ███████████████ to solve that problem. Regardless, the record demonstrates that Masimo *did* possess the "short circuit" solution to the problem recited in L5. *Supra* §III.C.1.

### 3.   The Court, As The Trier Of Fact, Decides Trade Secret Scope

Apple's mid-trial brief also argued the fact finder cannot determine trade secret scope. Dkt. 2345 at 2-3. As support, Apple argued that Masimo agreed to a jury instruction for the April 2023 trial that Masimo's § 2019.210 disclosures were the "controlling" definitions. Dkt. 2345 at 4 (citing Dkt. 1715 at 27). But the jury instruction recognized the § 2019.210 disclosures may need interpretation. Indeed, it explained "non-lawyer witnesses, such as an engineer, may testify about the Asserted Trade Secret's *scope and meaning*" and "you must decide the facts based on evidence presented through the witnesses, not the arguments of counsel." Dkt. 1715 at 27:15-20.

This instruction was correct. In *InteliClear, LLC v. ETC Global Holdings, Inc*., 978 F.3d 653 (9th Cir. 2020), the district court held the plaintiff failed to describe a trade secret because it "expanded upon" and "described specific features" not recited in the trade secret definition. *Id.* at 658-59. The Ninth Circuit reversed, explaining "a jury properly instructed can make the determination of what trade secrets exist, before addressing other elements of the claim." *Id.* at 660; *see also EnerTrode, Inc. v. Gen. Capacitor Co.*, 2019 WL 1715170, at *2 (N.D. Cal. Apr. 17, 2019) (explaining that parties may "dispute the scope of the trade secret" to the jury); *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, 2016 WL 8849699, at *14 (C.D. Cal. June 8, 2016) ("It is for the jury to determine the scope of the trade secrets here…."); Dkt. 1898 at 5 ("[T]he Court agrees that disputes concerning the scope of a trade secret are factual questions to be resolved by a jury."). Thus, the fact finder (now this Court) determines trade secret scope.

Accordingly, Masimo is not seeking to change the scope of L4 and L5. In contrast, Apple is trying to change the scope of L4 from "██████████████████

█████████" to "██████████████████████████." Likewise, Apple is trying to change the scope of L5 to require using particular solutions implemented by Masimo. Apple—not Masimo—is seeking to change the scope of L4 and L5.

## E.  Masimo Proved Possession, Value, And Misuse Of D1

### 1.  Masimo Possessed D1

In Masimo's products, multiple LEDs are quickly turned on and off in a repeating cycle called a modulation cycle. FF ¶56. After that modulated light passes through tissue, a detector outputs one signal corresponding to the intensity of all light it measures over time. *Id.* ¶56. The products then demodulate and demultiplex that detector signal. *Id.* ¶57. Demodulation isolates the data corresponding to when the LEDs are on. *Id.* Demultiplexing separates that isolated data into data sets corresponding to each LED. *Id.* Masimo uses a ██████████████████████████████████████ ██████████████████. *Id.* ¶¶60-61. Masimo engineers spent nearly a decade developing such techniques, including D1. Diab ¶121.

D1 ███████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████         ██████████████████ ██████████. Lamego supervised Cercacor implementing D1 in ██████, explained it to Poeze, and instructed Poeze on how to implement it. Poeze ¶¶17, 59, 66; FF ¶71.

At trial, Apple faulted Masimo for not showing possession with a single document but combining "various documents and source code." Sarrafzadeh ¶¶40, 54. But the Court already rejected Apple's single-document argument as "unsupported by legal authority." Dkt. 1283 at 13. Indeed, possession is routinely shown using combinations of testimony and/or documents. *See, e.g.*, *C&F Packing Co. v. IBP, Inc.*, 224 F.3d 1296, 1302 (Fed. Cir. 2000) (testimony of two people); *Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011) (testimony of two people and prototype); *Neural*

1  *Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 172 (D. Mass. 2023)

2  (testimony combined with "documentation and source code").

3         Sarrafzadeh opined that Masimo did not show possession of two portions of D1:

4  ██████████████████████████████████████████████████████████████████

5  ████████████████████████████████  But Sarrafzadeh simultaneously

6  opined that Masimo disclosed D1 in its entirety.  T5-1 at 12:3-18; Sarrafzadeh ¶¶55-75.

7  Sarrafzadeh could not explain the apparent contradiction, rendering his opinions

8  nonsensical.  Regardless, Masimo demonstrated it possessed both portions of D1.

9         ***First***, Masimo possessed ████████████████████████████████

10  ██████████████████████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████████████

13         ***Second***, Masimo possessed ██████████████████████████████

14  ██████████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████████████

20  ████████████  ████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25         Sarrafzadeh opined that ██████████████████████████████████████

26  ████████████████████████████████████████████.  But ██████████████████

27  ██████████████████████████████████████████████████████████████████

28  ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████

2 ████████████████████████████████████████.

### 2. D1 Derives Economic Value From Not Being Generally Known

Masimo kept D1 confidential and carefully guarded it.  FF ¶174.  D1 improves accuracy ████████████████████████████.  Diab ¶¶155, 177, 238; FF ¶¶176-77.  That improvement enables Masimo to ████████████████████ ████████████████████████████ Diab ¶¶175-76; FF ¶¶175-76.  D1 also ██████ ████████████████████████████████████████ Diab ¶156; FF ¶176.  D1 therefore provides significant economic value to Masimo.  Diab ¶238; FF ¶¶175-178.  Further, Apple was not aware of D1 before Lamego and recognized the value of D1 by ██████ Madisetti ¶¶192, 194; FF ¶¶177-78, 338-41.

At trial, Apple largely did not dispute these facts.  Instead, Sarrafzadeh opined that D1 is generally known based on a variety of references.  Those opinions fail for numerous reasons.  *First*, Sarrafzadeh combines references together in an attempt to show one could discover D1.  Sarrafzadeh ¶¶59-72; FF ¶179.  That does not show D1 is generally known.  *Supra* §III.B.2.a.  And Sarrafzadeh conceded the disclosures of references must be specifically linked together but never made such a showing or provided any reason to combine them.  T5-1 at 40:21-42:9, 59:13-17; FF ¶180.

*Second*, Sarrafzadeh failed to analyze whether any of the references are known *generally*.  FF ¶181.  Indeed, Sarrafzadeh never attempted to show the information was so well known as to become known generally.  *Id.*  As this Court held—and the Federal Circuit affirmed—mere publication "does not mean the subject matter is generally known under CUTSA."  *Masimo*, 2022 WL 17083396, at *20.

*Third*, Apple's disconnected references fail to disclose numerous aspects of D1.  FF ¶182.  Weber 2005 lacks ████████████████████████.  JTX-3581 at FIG. 4, 6:64-14:31; FF ¶183.  Weber 2018 cannot show D1 was generally known because it did not publish until four years *after* Apple misappropriated D1.  JTX-3584; FF ¶189.  Regardless, Sarrafzadeh conceded that Weber 2018 does not disclose a

1　███████████. T5-1 at 14:7-23; FF ¶184.

2　　　　Sarrafzadeh also relied on his testing of Pronto.  T5-1 at 63:25-64:6.  But his

3　testing was incomplete because it did not address all aspects of D1.  T5-1 at 17:5-11;

4　FF ¶¶186-87.  Further, Sarrafzadeh could not explain basic details of his test.  FF ¶188.

5　And his tests failed to show the █████████ were generally known because

6　(1) the test was performed with the benefit of D1 and confidential Pronto schematics,

7　(2) the test required pages of code to manipulate values, (3) no evidence exists of anyone

8　else conducting such testing, and (4) the test did ████████████. *Id.*

9　　　　Sarrafzadeh also relied on Weber 2005, Weber 2018, and his Pronto testing to

10　opine that Masimo did not take reasonable steps to maintain D1 as secret.  Sarrafzadeh

11　¶¶57-60.  That opinion fails because those references do not disclose D1.  FF ¶¶183-89.

12　　　　**3.**　　**Apple Acquired, Used, And Disclosed D1**

13　　　　Within a month of joining Apple in 2014, Lamego worked on "████████

14　███████████████████" for the optical sensor of N27 (Watch Series 0).

15　JTX-142 at -664; FF ¶320.  Lamego's list of 25 improvements that he provided a month

16　after starting specifically identified "████████████████████

17　███" as "HIGH" priority issues.  JTX-143 at -568; FF ¶319.

18　　　　In March 2014, Lamego created a presentation disclosing the ██████████

19　██████████ of D1.  JTX-154 at -674; FF ¶321.  Lamego told Apple engineers

20　the "████████" he proposed needed "█████████████████

21　███████████████  Lamego sent "matlab templates describing the

22　demodulation technique" and discussed D1 with them.  FF ¶322.  In May 2014, Lamego

23　emailed a computer script that implements D1.  JTX-851 at -415-16; FF ¶323.  That

24　script performed the ███████████████████████

25　█████████████████████ JTX-851 at -415-16; FF

26　¶323.  Thus, Lamego disclosed all████████████████████

27　███████████  FF ¶323.

28　　　　Lamego disclosed D1 in the patent submission for ██████████, which lists

-26-

████████████████████████

Lamego as the sole inventor. JTX-795; FF ¶324. T█████████████████████

██████████████████████████████████████████████████████

████████████████████████. JTX-795 at FIGS. 9-10; FF ¶324.

At trial, Apple argued no single Apple document disclosed all of D1. *See* Sarrafzadeh ¶¶79-83. Apple has provided no authority suggesting that is required. Regardless, █████████████████████████████ each disclosed all of D1. JTX-795; JTX-851; FF ¶¶321-24.

Apple also argues it did not misappropriate any of the D trade secrets because they are not in the Apple Watch. But Apple misappropriated by ███████████ ██████████████████████████████████████████████. FF ¶¶319-24, 338-41.

**F.     Masimo Proved Possession, Value, And Misuse Of D3**

**1.     Masimo Possessed D3**

Masimo ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

Lamego  explained ██████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████

At trial, Apple argued that Masimo had not shown possession by asserting that Masimo was not allowed to rely on multiple pages even in a ***single*** document: the Poeze notebook. Sarrahzadeh ¶106; T5-1 at 76:5-10. Not surprisingly, Apple has no legal support for such a proposition. Instead, it relied on a policy argument that Masimo should not be allowed to rely on multiple pages from Poeze's notebook if Apple cannot

rely on multiple different references to show generally known. Sarrafzadeh ¶¶101-10. But Poeze's notebook is a single source. *See* JTX-832. And, as discussed, plaintiffs routinely rely on multiple sources of evidence to show possession. *Supra* §III.E.1. Using multiple documents from one company to show a historical fact (the company knew certain information) is different than asserting a hypothetical person could learn information if they had reviewed and combined documents from many sources.

Sarrafzadeh opined that ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

### 2. D3 Derives Economic Value From Not Being Generally Known

Masimo kept D3 confidential and carefully guarded it. FF ¶190. D3 ██████

████████████████████████████████████████████ Diab ¶153; Poeze ¶¶32-34; FF ¶191. D3's sequence ████████████████████

██████████████████████. Diab ¶154; FF ¶191. D3 gives Masimo a competitive advantage by ██████████████████████████████, providing a significant economic value to Masimo. Diab ¶¶153-55; FF ¶¶191-92. Further, Apple was not aware of D3 before obtaining it from Lamego and recognized the value of D3 ████████. FF ¶¶177-78, 338-41.

At trial, Apple did not dispute D3's economic value to Masimo but Sarrafzadeh opined that D3 is generally known based on a variety of references. But those opinions fail for numerous reasons. *First*, Sarrafzadeh again improperly combines references

together and fails to provide any reason to combine them.   Sarrafzadeh ¶¶114-24; FF ¶¶194-95.  This is insufficient.  *Supra* §III.B.2.a.  ***Second***, Sarrafzadeh again failed to analyze whether any of Apple's references are known ***generally***.  FF ¶196.

***Third***, Apple's references fail to disclose many aspects of D3.  *Id.* ¶197.  Poeze 2011 does not disclose ███████████████████████████████████████ FF ¶198.  Sarrafzadeh raised two new opinions at trial, but neither shows Poeze 2011 discloses D3.  FF ¶¶199-202.  Further, Weber 2005 has ████████████████ ██████████ and thus lacks "████████████████████████████." JTX-3581 at FIG. 4, 8:42-60; FF ¶203.  Apple does not allege Weber 2005's single stage is "████ ████████████." T5-1 at 46:3-5; FF ¶203.  Lamego 2011 has only ██████████ ███████████████ and thus lacks D3's "████████████." JTX-3571 at FIG. 8, ¶¶71-72, 65; FF ¶204-06.  Sarrafzadeh also does not opine that Lamego 2011 discloses demodulation.  T5-1 at 46:6-8; FF ¶204.

### 3.   Apple Acquired, Used, And Disclosed D3

In March 2014, Lamego provided Apple with ████████████████████ ██████████████████████ JTX-880, FF ¶325.  MATLAB is used to write scripts for simulating math functions.  FF ¶325.  Lamego's script performs D3.  JTX-880; FF ¶326.
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
███████████████ ██████████████ ███████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████ ███████████████ █████████████████████████████████████
█████████████████████████████████████████████████████████████
███████████████████████████  Thus, this script includes the full D3 ████████. Madisetti ¶213; FF ¶¶326-28.

Lamego also disclosed D3 in a presentation with a slide titled in part "per Marcelo's Original Proposal."  JTX-154 at -673; FF ¶329.  This slide shows Lamego

███████████████████████████████████████████████

disclosed ████████████ D3 ████████████. JTX-154 at -673; Madisetti ¶214; FF ¶329. It also has ████████████████████████████████████

████. JTX-154 at -673; Madisetti ¶216; FF ¶330.

Lamego also disclosed D3 ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████. Therefore, Lamego and Apple

disclosed D3 ████████████. FF ¶331, 338.

At trial, Apple argued it did not misappropriate D3 because no single Apple document disclosed all of D3. T5-1 at 81:6-15. As discussed, that is not required. Regardless, Apple is wrong because Lamego's MATLAB script discloses all of D3 except an optional requirement. JTX-880 at -125; Madisetti ¶213; FF ¶328. And ███ ████████████ discloses D3 ████████████████████. JTX-795 (JTX-1262) at FIG. 7, 9:24-10:1; FF ¶331. Sarrafzadeh opined ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████.

**G.    Masimo Proved Possession, Value, And Misuse Of D10**

**1.    Masimo Possessed D10**

D10 is ████████████████████████████████████████

████████████████████████████████. Lamego supervised developing ███

████████████████ at Cercacor. Poeze ¶66; FF ¶91. Poeze, ████████████████, confirmed

████████████ uses D10. Poeze ¶65; FF ¶90. Madisetti agrees. Madisetti ¶249; FF ¶104.

At trial, Sarrafzadeh opined that Madisetti had not shown ████████████████



1    ████ implemented D10. Sarrafzadeh ¶163; T5-1 at 85:8-15. *First*, Sarrafzadeh critiques

2    Madisetti for relying on different ██████████. Sarrafzadeh ¶151. But Madisetti

3    explained how ████████████ operated together. Madisetti ¶¶ 232-249; FF ¶¶93-

4    96, 98-101, 103. And Poeze confirmed ████████████████████████████████

5    ████████████████████████████████.

6        *Second*, Sarrafzadeh opined that Madisetti ██████████████████████████

7    ████████████. Sarrafzadeh ¶154. But ████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████.

11       *Third*, Sarrafzadeh opined that Madisetti did not show ████████████.

12   Sarrafzadeh ¶¶156, 158. But Madisetti explained that ████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████

16   ██████████████████████.

17       *Fourth*, Sarrafzadeh opined that Madisetti did not show D10's ████████████

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████.

21   **2.    D10 Derives Economic Value From Not Being Generally Known**

22       Masimo kept D10 confidential and carefully guarded it. ████████ uses D10 to

23   improve measurements in difficult conditions, which gives Masimo a competitive

24   advantage. FF ¶207. Apple was not aware of D10 before obtaining it from Lamego,

25   and Apple recognized the value of D10 by ████████████████████████. Madisetti

26   ¶254; FF ¶¶209-10. ████████████████████████████████████████████████

27   ██████████████—a higher standard than required for trade secret protection. JTX-795; FF

28   ¶210. Thus, Apple did not even argue D10 is generally known. FF ¶209.

### 3.    Apple Acquired, Used, And Disclosed D10

█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

At trial, Apple argued Lamego invented D10 at Apple. Sarrafzadeh ¶166. But the timing of the disclosure and similarity to the ███████████████ show otherwise. FF ¶¶335-37. Apple never explains how Lamego independently developed in a few short months the same ███████████████ that he had developed at Masimo over years.

## H.    Masimo Proved Additional Elements Of Misappropriation Under CUTSA

Apple incorrectly argues that Masimo must show Apple knew or should have had reason to know "that Apple gained access to the purported secret through improper means." Dkt. 2159 at 3. Masimo proved misappropriation under multiple theories, only some of which require acquisition through improper means.

### 1.    Employees Other Than Lamego Knew Or Should Have Known Their Knowledge Was Derived From Lamego

Masimo can establish misappropriation if an Apple employee other than Lamego used the trade secret knowing or having reason to know his or her knowledge was derived from a person who owed a duty to maintain secrecy (i.e., Lamego). Cal. Civ. Code § 3426.1(b)(2)(B)(iii); *see also* CACI No. 4407. That is what happened here.

Apple does not dispute that Lamego owed a duty to keep Masimo's trade secrets confidential. FF ¶15. Nor does it dispute that Apple employees, including Hotelling and O'Reilly, knew of that duty. FF ¶¶233, 238, 249; JTX-2937 (Masimo letter to Apple attaching Lamego confidentiality agreement). Apple disputes only whether its employees knew or should have known Lamego was disclosing trade secrets. But Apple took extensive efforts to obtain Masimo's trade secrets, including by actively seeking Masimo's information from Lamego despite several warnings. *Supra* §II. Lamego's email to Cook alerted Hotelling that Apple could obtain Masimo's technology without

-32-

partnering with Masimo. *Id.* And, after Hotelling determined that Lamego was likely to disclose trade secrets, he insulated ***Apple's*** trade secrets but continued to use Lamego as a "consultant" to obtain Masimo's trade secrets. *Id.* Thus, Apple is liable for misappropriation under Cal. Civ. Code § 3426.1(b)(2)(B)(iii).

### 2. Lamego Knew Or Should Have Known He Was Using And Disclosing Masimo's Trade Secrets

Masimo can also show misappropriation by an Apple employee (i.e., Lamego) who learned of the trade secrets through proper means (as a Masimo employee) but then improperly used or disclosed them. Cal. Civ. Code § 3426.1(b)(2)(B)(ii). Courts in this district recognize that a corporate defendant "may be liable for the [individual employee's] misappropriation of trade secrets under the doctrine of respondent superior." *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013) (collecting cases and acknowledging "California and federal courts have allowed vicarious liability claims under the [C]UTSA"); *Allergan, Inc. v. Merz Pharms., LLC*, 2012 WL 781705, at *12 ¶65 (C.D. Cal. Mar. 9, 2012) (holding corporate defendant misappropriated trade secrets through individual defendants' acts).

Other district courts in California reach the same conclusion. *Language Line Servs., Inc. v. Language Servs. Assocs., LLC*, 2010 WL 2764714, at *4 (N.D. Cal. July 13, 2010) (rejecting corporate defendant's "contention that it cannot be liable for the acts of [individual employee defendants] because their actions violated [corporate defendant's] policies and were not known to [corporate defendant's] executives"); *Navigation Holdings, LLC v. Molavi*, 2020 WL 5074307, at *3 (N.D. Cal. Aug. 25, 2020) ("Whether an employer is vicariously liable turns on whether the employee's trade secret misappropriation 'was committed within the scope of employment.'"); *In re Sotera Wireless, Inc.*, No. 16-05968-LT11, Dkt. 1026 at 95 ¶394 (S.D. Cal. Jul. 18, 2017) (imposing liability even though "others at [the company] did not know about these actions because corporate defendant was responsible under *respondeat superior*").

Other courts also recognize "[t]he near unanimous consensus of federal and state

courts holds that the Uniform Trade Secrets Act" on which CUTSA is based, "does contemplate vicarious liability when state law otherwise provides the cause of action." *Advanced Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 486 n.5 (M.D. Pa. 2018). In denying Apple's motion to dismiss, this Court similarly held that "Plaintiffs have stated a theory of misappropriation based on respondeat superior as to all relevant trade secrets." Dkt. 361 at 9. *Id.* at 10-11.[3]

Here, Lamego knew or had reason to know that his knowledge of Masimo's trade secrets was acquired under circumstances giving rise to a duty to maintain secrecy and limit use. *See* Cal. Civ. Code § 3426.1(b)(2)(B)(ii); JTX-810; JTX-769; JTX-2233; FF ¶¶15, 370, 372-74. He also was acting within the scope of his employment when he used Masimo's trade secrets to benefit Apple, including to improve the Apple Watch's performance. FF ¶¶249-57; *id.* §II.F. Lamego did so to fulfill his promise to Cook to help Apple solve its health technology problems and become "the number one brand in the medical, fitness and wellness device market." JTX-1719 at -061-62. And he admitted he wanted to show Apple he was the "real deal." T3-2 at 58:8-59:5.

At trial, Apple relied on Lamego's bare denial and statement that he did not take Masimo's trade secrets. Such testimony is not credible because Lamego admitted it is "very difficult" to separate his "personal" know how from what he learned at work. FF ¶231; T3-2 at 31:5-33:1. And he admitted the Court found he misappropriated Masimo's trade secrets at True Wearables. T3-2 at 125:7-125:16-25. Thus, Apple is liable for Lamego's misappropriation under Cal. Civ. Code § 3426.1(b)(2)(B)(ii).

### 3.  Apple Acquired Masimo's Trade Secrets Through Improper Means

Masimo can also show misappropriation by showing Apple knew or had reason to know that it used improper means to acquire the trade secrets. *See* Cal. Civ. Code

---

[3] After the first trial, the Court declined to include respondeat superior "as it relates to the jury instructions and verdict form and does not intend to revisit it for any future trial." Dkt. 1901 at 18, n. 7. In view of the controlling law above, the Court should follow the correct decision it reached when denying the motion to dismiss after full briefing, not the decision it reached during the charge conference.

§ 3426.1(b)(1).  Through at least Hotelling, Apple used financial incentives to obtain trade secrets from Lamego.  JTX-265 at -567 ("exceptional" offer); FF ¶¶243-45.  This constitutes the improper means of inducing a breach of duty to maintain secrecy (Cal. Civ. Code § 3426.1(a)) because Apple knew Lamego owed confidentiality obligations to Masimo.  JTX-512 at -253; JTX-2937; FF ¶¶233, 238, 249.

Apple then further misappropriated Masimo's trade secrets whenever it used or disclosed the information that it had obtained through improper means.  *See* Cal. Civ. Code § 3426.1(b)(2)(A).  As discussed, Apple used each trade secret and disclosed each trade secret to employees within Apple.  Apple also disclosed L5 to ████ and disclosed D1, D3, and D10 in the '754 Patent.

## I.    **Masimo Proved Any Harm Or Unjust Enrichment Element**

Before trial, Apple argued Masimo must prove harm as an element of trade secret misappropriation.  Dkt. 2178-1 at 7, n.13 (citing Dkt. 1501 at 207).  The Court rejected Apple's argument when it instructed the jury in 2023.  April 26, 2023 (Vol. 1) Trial Tr. at 38:9-19.  That instruction was correct because CUTSA does not require proof of harm.  Cal. Civ. Code § 3426.1.  Instead, misappropriation consists of "only two elements: (1) existence of a trade secret, and (2) improper acquisition, use, or disclosure of that trade secret."  *Applied Med. Distrib. Corp. v. Jarrells*, 100 Cal. App. 5th 556, 572 (2024).  Once misappropriation is established, courts have statutory authority to impose remedies including an injunction.  *Id.* (the *Applied* court rejecting same argument Apple raised and distinguishing several of Apple's cases).

Regardless, Masimo proved both harm and unjust enrichment.

### 1.    **Masimo Proved Harm**

Masimo depends on strong trade secret protection to secure its competitive advantage.  FF ¶¶109, 145, 393-94.  Apple's misappropriation harms that competitive advantage and forces Masimo to compete against technologies incorporating Masimo's own trade secrets.  FF ¶¶393-94, 396.  Those trade secrets help reduce signal noise, which benefits Apple's heart rate and blood oxygen features.  Kiani ¶¶139-42 (L4), 137

(D1, D3, D10); Diab 218-19 (L4), 228 (L5), 157, 175-77 (D1, D3, D10); FF ¶376.

Allowing Apple to continue using and benefiting from Masimo's trade secrets would enable Apple to unfairly compete with Masimo. Even though Masimo's commercial technology is still superior to Apple's today (FF ¶¶18, 107-08, 147, 392, 399-401), the public will presume Apple's pulse oximetry feature is "as good as it gets." Kiani ¶217. Masimo should not have to compete against one of the world's largest technology companies with the added benefit provided by Masimo's trade secrets.

Masimo's ability to sell its technology (either in its own watch or in a module to OEMs) is harmed when Masimo must compete with Apple's products improved by Masimo's trade secrets. FF ¶¶18-19, 376-79, 392, 394, 396. Masimo engineers also rely on collaborating confidentially to solve the most difficult problems in noninvasive patient monitoring. FF ¶393. Apple's misappropriation chills such collaboration. *Id*.

## 2. <u>Masimo Proved Unjust Enrichment</u>

Masimo proved Apple was unjustly enriched because Apple contended harm is an element of misappropriation and Apple agreed unjust enrichment could satisfy any such harm requirement. Dkt. 1501 at 82-84 (citing CACI 4401). However, Masimo is not seeking, and the Court should not award, monetary relief for unjust enrichment.

Each of Masimo's trade secrets help reduce signal noise, which is critical to calculating blood oxygen. *Supra* §III.I.1. Apple made significant profits selling watches with the blood oxygen feature. Kinrich ¶72; FF ¶¶381-84. Blood oxygen was a top feature and customers paid a premium for the Series 6 and Series 7 Watches over the Series SE that lacked this feature. Kinrich ¶¶62, 66, 72; FF ¶381-82. Apple Watch sales significantly slowed in January 2024 when Apple had to disable the blood oxygen feature, thus confirming the importance of that feature. Kinrich ¶73; FF ¶¶385-88.

## J. <u>The Statute Of Limitations Does Not Bar Masimo's Claim</u>

"An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ. Code § 3426.6. As this Court explained, "'[w]hen [1] there

is reason to suspect that a trade secret has been misappropriated, and [2] a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation.'"  Dkt. 60 at 5 (quoting *Hays v. VDF Futureceuticals, Inc.*, 2016 WL 5660395, at *3 (D. Haw. Sept. 28, 2016)); Dkt. 606 at 3.

For purposes of this brief, Masimo assumes it bears the burden on both elements.[4] The evidence does not support Apple on either the suspicion or investigation element.

### 1.  <u>Masimo Had No Knowledge Or Reason To Suspect Misappropriation More Than Three Years Before Filing Suit</u>

#### a.  <u>Masimo Presented Unrebutted Evidence On This Element</u>

Masimo did not know or have reason to suspect Apple misappropriated any trade secret more than three years before suit (i.e., January 2017).  Lamego was obligated to keep trade secrets confidential.  FF ¶¶15.  Lamego assured Kiani that he would not even be involved in competitive technology at Apple.  Kiani ¶¶206-07; FF ¶373.  Cristiano Dalvi, a friend of Lamego and former Cercacor employee, confirmed Lamego's representations.  Kiani ¶212; FF ¶374.  Dalvi told Kiani that, just as Lamego promised, Lamego "left Apple because they had asked him to do something that would compete with us, and he did not want to do that because it was not consistent with his character."  Kiani ¶212; FF ¶374.  Kiani believed Dalvi.  Kiani ¶212; FF ¶374.  Kiani testified Masimo first learned of Apple's misappropriation in late 2019 after seeing Apple patents that contained Masimo's trade secrets.  Kiani ¶221; FF ¶375.  This unrebutted evidence showed Masimo had no reason to suspect misappropriation before late 2019.

The same is true for each trade secret.  With respect to L4, the record contains no evidence that Apple published ███████████████████████.  Apple ████████ ████████████████████████████████ beginning with Series 4.  FF 283.  Thus, the earliest Masimo could have had reason to suspect Apple misappropriated L4

---

[4] Masimo preserves for any appeal its position that Apple has the burden of proof on all aspects of the statute-of-limitations defense.  *See* Dkt. 1657 at 1-2.

was when Apple released the Series 4 in September 2018—just over one year before Masimo filed suit.  Madisetti ¶¶102-13.

With respect to L5, Masimo learned of Apple's misappropriation in discovery and then added a claim on this trade secret to the case.  *See* Dkt. 650 at 4; Dkt. 669.  The evidence of misappropriation included confidential Apple emails and technical documents that were not available before discovery. *See, e.g.*, JTX-181; JTX-184; JTX-185; JTX-541.  Thus, the earliest Masimo could have had reason to suspect Apple misappropriated L5 was after filing suit.

With respect to D1, D3, and D10, these trade secrets ███████████████████ are also non-public.  Apple requested ██████████████████████ ████████████████████████████████████████. Dkt. 2281.  Thus, the earliest Masimo could have had reason to suspect Apple misappropriated D1, D3, or D10 was in March of 2019—less than one year before Masimo filed suit.  JTX-1262.

### b.    Apple's Cited Evidence Does Not Show Otherwise

Apple cited two events as supposedly showing Masimo suspected misappropriation more than three years before Masimo filed suit.  *First*, Apple argues Masimo's 2014 warning letter shows Masimo was "suspicious" of Apple.  Dkt. 1655-1 at 21-22.  But Masimo sent the letter on January 24, 2014—just three days after Lamego left Cercacor and *before* Lamego began working at Apple.  *See* JTX-2937.  For this reason, the Court found the letter insufficient.  Dkt. 606 at 3, 7 (explaining "a suspicion that [trade secrets] theoretically *could* be shared provides an insufficient basis for filing a trade secret misappropriation claim").  Moreover, the letter cautioned Apple *not* to misappropriate Masimo's trade secrets and to "direct Mr. Lamego to honor his obligations to all of his prior employers."  JTX-2937 at -094.  The letter shows Masimo's efforts to protect its trade secrets—not a suspicion that Apple already took trade secrets.

*Second*, Apple argues Masimo should have suspected misappropriation based on the '052 Patent when its underlying patent application published in 2016.  Dkt. 1655-1 at 22.  But neither Masimo nor Apple contends the '052 Patent discloses any trade secret.

Thus, the '052 Patent could not have made Masimo suspicious that any trade secret "has been misappropriated" as required for the statute of limitations.  Dkt. 60 at 6.

Apple also fails to show Masimo actually knew about the '052 Patent more than three years before filing suit.  Apple argues Masimo must have known about the '052 Patent in December 2018 because outside counsel listed it in an Information Disclosure Statement.  Dkt. 2158-1 at 16.  Nothing supports Apple's speculation.  Regardless, December 2018 is only thirteen months before Masimo sued.  And the evidence showed Masimo did not know about the '052 Patent until October 2019.

### 2.    A Reasonable Investigation Could Not Have Revealed Facts Sufficient To Justify Bringing Suit Before January 2017

Apple's defense also fails for a second independent reason: a reasonable investigation before January 2017 would not have revealed facts sufficient to bring suit. As discussed, the facts necessary to bring suit were not available until September 2018 (L4), March 2019 (D1, D3, D10), or after Masimo filed suit (L5).  *Supra* §III.J.1.

Apple ignored this required element at trial.  As a result, the record contains no evidence of public information available before January 2017 that would have been sufficient to bring suit as to *any* trade secret.  Because "facts necessary to the claim [were] unavailable to [Masimo], the limitations period [was] tolled until the facts [became] available" in 2018 or 2019.  *See Alamar Biosciences Inc. v. Difco Lab'ys. Inc.*, 1996 WL 648286, at *3 (E.D. Cal. Feb. 27, 1996).

This reasonable investigation requirement makes sense.  As the California Court of Appeal explained, "[i]t would be contrary to public policy to require plaintiffs to file a lawsuit 'at a time when the evidence available to them failed to indicate a cause of action.'"  *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 815 (2005).  That would expose plaintiffs to "sanctions for filing a cause of action without any factual support" and subject them to challenges "for failure to specify supporting facts."  *Id.* (rejecting defense).  Indeed, Apple argued Masimo had no basis for suit ***even in January 2020***.  *See, e.g.*, Dkt. 121 at 16-17; Dkt. 241 at 24-25; Dkt. 312 at 17, n.8.  Any

investigation before 2017 would not have revealed facts sufficient for Masimo to sue.

## K.    **Apple's Remaining Defenses Fail**

Apple preserved only three defenses: statute of limitations, laches, and waiver. Dkt. 2177-1 at 13-14; Dkt. 1483 at 9-10; Dkt. 1724 at 19.  The parties agreed, and the Court held, that laches and waiver can apply only to trade secret claims that are untimely under the statute of limitations.  Dkt. 1900 at 4.  Thus, Apple's laches and waiver defenses fail for the reasons described above. *Supra* § III.J.

Laches and waiver also fail for other reasons.  For example, Apple presented no evidence of acquiescence by Masimo or prejudice to Apple, as required for laches. *See Johnson v. City of Loma Linda*, 24 Cal. 4th 61, 68 (2000).  And Apple presented no evidence of Masimo intentionally relinquishing a known right, as required for waiver. *Waller v. Truck Ins. Exchange, Inc*. 11 Cal. 4th 1, 31 (1995)).

## IV.  <u>MASIMO PROVED ITS PATENT OWNERSHIP CLAIMS</u>

To prove Masimo has an ownership interest in a disputed patent, Masimo must show, by a preponderance of the evidence, that at least one inventor of that patent did one or both of the following: (1) assigned to Masimo his interest in the subject matter claimed in the patent; or (2) made his inventive contribution to the subject matter claimed in the patent at a time and under conditions that created an obligation to assign to Masimo his rights in such inventions. *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248-49 (Fed. Cir. 1993).

Masimo can prevail on ownership in one of two ways.  First, Masimo can show Lamego (a named inventor) was obligated to assign his rights in the subject matter of at least one claim to Masimo when he first contributed to that invention at Masimo. *Infra* §IV.A.  Second, Masimo can show Diab (if added as an inventor) was also obligated to assign his rights in the subject matter of at least one claim to Masimo when he first contributed to that invention at Masimo. *Infra* IV.B.

A.  **Lamego Made His Inventive Contributions While Under An Obligation To Assign Any Invention To Masimo**

**The '052 and '670 Patents**: The '052 and '670 Patents claim reflective surfaces in sensors.  JTX-1239; JTX-1241; Madisetti ¶261; FF ¶343.  Lamego learned of this subject matter at Masimo.  Madisetti ¶¶261, 273-95; FF ¶¶344-50.  For example, Lamego was named an inventor on Masimo patent applications about reflectors and reflective layers, including the '924 and '040 publications.  JTX-1206; JTX-1207; FF ¶350.  The parties' experts agree those publications disclose each element of Claim 1 of the '052 and '670 Patents.  Madisetti ¶¶285-92; Warren ¶¶153-65; FF ¶349-50.

Warren opined the elements of Claim 1 of both the '052 and '670 Patents were known except for the "reflector" limitations.  Warren ¶160; FF ¶351.  And Apple engineer Ness testified Lamego contributed the "idea to use reflectivity on the back [sensor side] of the Apple Watch."  Ness ¶26; JTX-47; JTX-48; FF ¶351.  Ness explained no one thought of that before Lamego disclosed it during a February 2014 brainstorming session a few weeks after Lamego started.  T4-2 at 102:19-104:9; Warren ¶158; Ness ¶¶31-33; JTX-47; JTX-48; FF ¶351.  Apple then included Lamego's reflectivity idea in a patent application that led to these patents.  T4-2 at 106:14-22; JTX-48; FF ¶351.

The timing and content of Lamego's disclosures show at least Claim 1 of the '052 and '670 Patents describes Lamego's work at Masimo rather than anything he did at Apple.  Madisetti ¶¶273-95; JTX-1910 at -669; JTX-1227 at -574; JTX-777; JTX-1206; JTX-1207; FF ¶¶348-54.  Apple argues Lamego invented this subject matter at Apple because it was for use on the Apple Watch.  Warren ¶158.  But Claim 1 of the '052 Patent and Claim 1 of the '670 Patent are not limited to a watch.  T4-2 at 106:23-110:3; FF ¶343.  Rather, they are directed to other electronic devices.  FF ¶343.  Lamego was obligated to assign that subject matter to Masimo, so Masimo should be a co-owner of the '052 and '670 Patents.  Madisetti ¶¶295, 264; JTX-810; JTX-769; FF ¶352.

**The '095 and '390 Patents**: The '095 and '390 Patents claim analog-front-end circuitry for optical sensors.  JTX-1268; JTX-1269; Madisetti ¶262; Hotelling ¶74;

FF ¶356. Lamego learned of this subject matter while employed by Masimo. Madisetti ¶¶297-304; JTX-1267; JTX-1206; FF ¶¶357-62. The content of the analog-front-end circuitry in those claims of the '095 and '390 Patents is nearly identical to what Diab taught Lamego at Masimo. Madisetti ¶¶303-04; JTX-1267; JTX-1206; FF ¶¶357-64.

Sarrafzadeh opined that Lamego's work with others at Apple resulted in the '095 and '390 Patents because Hotelling testified it is "common for engineers to come up with inventive ideas soon after employment" at Apple. Sarrafzadeh ¶200; Hotelling ¶¶70, 72-78. But that is not evidence at all. It is pure conjecture. Because Lamego merely repeated his earlier work at Masimo, Masimo should be a co-owner of the '095 and '390 Patents. Madisetti ¶¶305, 264; JTX-810; JTX-769; FF ¶¶362-64.

**The '754 Patent**: Lamego created the subject matter recited in Claim 1 of the '754 Patent at Cercacor, ██████████████████████████████████████ ███████████████████████████████████████. Lamego had an obligation to assign that subject matter to Masimo and Masimo should be a co-owner of the '754 Patent. Madisetti ¶¶267, 264; JTX-810; JTX-769; FF ¶¶365-69.

## B.    Diab Made His Inventive Contributions While Under An Obligation To Assign Any Invention To Masimo

Diab agreed to assign Masimo all rights to inventions conceived while employed by Masimo. Madisetti ¶264; Diab ¶77; JTX-2981.1; JTX-1673 at -684-87. Diab should be named an inventor on the '052, '670, '095, and '390 Patents, as discussed below. *Infra* §VV. Adding Diab as an inventor thus makes Masimo a co-owner of these patents.

## V.    MASIMO PROVED ITS PATENT INVENTORSHIP CLAIM

Masimo can prove inventorship by showing at least one of its employees made a substantial contribution to conception of at least one limitation of a claim. *See* Dkt. 1548 at 259-262; *Vapor Point LLC v. Moorhead*, 832 F.3d 1343, 1348-49 (Fed. Cir. 2016) ("All inventors, even those who contribute to only one claim or one aspect of one claim of a patent, must be listed on that patent."). Where the patentee relied on aspects invented by the unnamed inventor to establish patentability, the patentee cannot dispute

those aspects are substantial contributions to the overall scope of the claims. *See Blue Gentian, LLC v. Tristar Prods., Inc.,* 70 F. 4th 1351, 1360 (Fed. Cir. 2023).

For the four patents where inventorship is at issue, Apple argues Diab cannot be a coinventor because coinventors must work together through joint behavior. Dkt. 2159 at 5, 15. The Court rejected this position. Dkt. 1715 at 51. As the Federal Circuit explained, "inventors need not work physically together or contemporaneously to be joint inventors; nor must each inventor contribute equally or to each claim of the patent." *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*, 573 F.3d 1290, 1298, 1299 (Fed. Cir. 2009). This is especially true here where Lamego left Masimo and filed patent applications with his new employer. To the extent some communication between inventors was required, Lamego and Diab communicated at Masimo.

**The '052 and '670 Patents**: The '052 and '670 Patents claim using reflective surfaces. *Supra* §IV.AIV. A. In the 1990s, Diab designed reflective surfaces to improve pulse oximetry sensor performance. Diab ¶¶213-17, 229; Madisetti ¶274; FF ¶¶353-54. Diab recorded that work in his lab notebooks, including increasing signal using a mirror. Diab ¶229; JTX-1227 at -574; JTX-1910 at -669; FF ¶¶353-54. Masimo also used a reflective surface in the TF-I sensor it released in 2003. Diab ¶¶208, 216-17; JTX-777; FF ¶¶344-45. That TF-I sensor includes the features Apple later claimed in Claim 1 of the '052 and '670 Patents. Madisetti ¶¶277-83; Warren ¶163; FF ¶¶344-47.

Apple concedes Lamego contributed using "reflectivity on the back of the Apple Watch." Ness ¶26; JTX-40; FF ¶351. But Diab taught Lamego about using reflective surfaces on sensors. Diab ¶¶230, 198-200, 139; T1-2 at 106:25-107:21; FF ¶¶353-55. Therefore, Claim 1 of these patents recite Diab's earlier work at Masimo. Madisetti ¶¶273-95; FF ¶355. Diab should be added as an inventor of both patents. Madisetti ¶296; FF ¶355.

**The '095 and '390 Patents**: The '095 and '390 Patents claim analog-front-end circuitry for an optical sensor. *Supra* §IV.A. In the early 1990s, Diab designed analog front ends for Masimo's optical sensors. Diab ¶¶92-119; FF ¶357. Diab explained some

of that work resulted in U.S. Patent No. 5,632,272 ("the '272 patent"), on which he is an inventor.  Diab ¶¶92-119; JTX-1267; FF ¶¶357-58.  The '272 patent discloses all elements of Claim 17 of the '095 Patent and Claim 1 of the '390 Patent.  Madisetti ¶¶297-305; FF ¶¶358-61.  Madisetti explained how every element is included in the system of FIGS. 11-12 of the '272 patent.  Madisetti ¶¶299-304; FF ¶361.

Diab taught the subject matter of the '272 patent to Lamego.  Diab ¶¶139-42; Madisetti ¶¶297-304; FF ¶¶357, 362.  By 2006, Diab and Lamego were named inventors on a patent application with a similar disclosure.  Madisetti ¶¶303-04; JTX-1206; FF ¶363.  Thus, the '095 and '390 Patents describe and claim Diab's earlier work at Masimo.  Madisetti ¶¶304-05; FF ¶¶361-62.  Diab should be added as an inventor of both patents.  Madisetti ¶306; T1-2 at 107:14-18; FF ¶362.

Apple's experts fault Diab for previously testifying he did not know whether he qualified as an inventor.  Warren ¶159; Sarrafzadeh ¶¶194-96.  But Diab merely explained he had no opinion on that legal issue, as he "leave[s] that to the lawyers."  Diab ¶80; T1-2 at 107:8-14.  As shown above, Diab should be added an inventor regardless of Diab's knowledge of the legal definition of an inventor.  Indeed, Diab explained he is at least as much of an inventor as Lamego.  T1-2 at 107:14-18; FF ¶362.

## VI.  THE COURT SHOULD AWARD EQUITABLE REMEDIES

### A.  The Court Should Enter Judgment Declaring That Apple Misappropriated

This Court's equity jurisdiction allows for declaratory relief "on the basis of traditional equitable principles." *Samuels v. Mackell*, 401 U.S. 66, 70 (1971).  The Court should declare each claim for which Apple is liable.  For example, the Court should enter declaratory judgment that Apple misappropriated L4, L5, D1, D3, and D10.  *Supra* §III.

### B.  The Court Should Enjoin Further Misappropriation

#### 1.  An Injunction Is Warranted Under *eBay*

Under CUTSA, Courts should enjoin "actual or threatened misappropriation" of trade secrets.  Cal. Civ. Code § 3425.2(a); *Applied Med.*, 100 Cal. App. 5th at 573.  To obtain an injunction, the plaintiff must show: (1) irreparable injury; (2) inadequate

remedies at law; (3) the balance of hardships supports an injunction; and (4) an injunction would not disserve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see Equate Media, Inc. v. Suthar*, 2024 WL 1217217, at *3 (C.D. Cal. Mar. 20, 2024) (applying *eBay* to California trade secret claim). Masimo addresses each factor below.

**Factor 1 – Irreparable Injury:** "A finding of misappropriation is generally adequate for a finding of irreparable injury in trade secret cases." *Equate Media*, 2024 WL 1217217, at *3 (quoting *Monster Energy Co., v. Vital Pharms., Inc.*, 2023 WL 8168854, at *18 (C.D. Cal. Oct. 6, 2023) and *Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 4625149, at *2 (N.D. Cal. Sept. 30, 2022)). Loss of competitive advantage also demonstrates irreparable harm. *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013).

Apple's misappropriation caused irreparable injury. FF ¶¶389-90, 393, 396. Masimo lost competitive advantage from Apple's misappropriation. *Id.* Allowing Apple to continue using and benefiting from Masimo's trade secrets would allow Apple to unfairly compete with Masimo. Even though Masimo's technology is still superior to Apple's (FF ¶¶18, 107-08, 147, 392, 399-401), the public will presume Apple's pulse oximetry feature is "as good as it gets." Kiani ¶217. Masimo should not have to compete against one of the world's largest technology companies with the added benefit provided by Masimo's trade secrets. FF ¶¶393-94, 396.

Further, Apple's theft harmed Masimo's innovation process by chilling open engineering collaboration. FF ¶¶393, 399. Allowing Apple to continue using Masimo's trade secrets will further irreparably harm Masimo's ability to collaborate and develop new life-saving technologies. *Id.* Apple has already disclosed Masimo's trade secrets to others (JTX-541 at -581-83; JTX-1156 at -527), and Masimo faces further risk of dissemination, which could destroy the trade secrets (FF ¶390).

**Factor 2 – Inadequate Remedies at Law:** No remedy at law could compensate Masimo for Apple's continued misappropriation. *Equate Media*, 2024 WL 1217217, at

*3; *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1565 (Fed. Cir. 1984) (injunctions "designed to prevent future infringement, and damages are awarded as compensation for past infringement."); *Universal Bldg. Maint. LLC v. Calcote*, 2022 WL 18397628, at *6 (C.D. Cal. Nov. 7, 2022) ("Monetary damages are inadequate because without equitable relief, [defendant] can still possess and use the confidential information."). Apple's misuse of Masimo's trade secrets will continue unless enjoined.

**Factor 3 – Balance of Hardships:** An injunction would benefit Masimo by stopping ongoing harm. In contrast, restraining Apple from unlawful conduct imposes no hardship. *Equate Media*, 2024 WL 1217217, at *3; *see also Monster Energy*, 2023 WL 8168854, at *18 (permanent injunction restraining a defendant from further misappropriation "would not work any hardship on [the defendant], which has no right to use the information in the first place.") (quoting *Vinyl Interactive, LLC v. Guarino*, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009)). Apple offered no evidence of hardship. FF ¶398. Indeed, Apple witnesses confirmed Apple would suffer no hardship if enjoined from using the black-foam test, the short circuit, or Lamego's demodulation techniques. T4-1 (Waydo) at 82:1-8; T4-2 (Hotelling) at 95:10-14; T5-2 (Block) at 81-83; FF ¶398. The balance of hardships supports an injunction.

**Factor 4 – Public Interest:** "[T]he public has a strong interest in ensuring trade secrets are protected." *Equate Media*, 2024 WL 1217217, at *3 (quoting *Comet Techs.*, 2022 WL 4625149, at *5); *see also Monster Energy*, 2023 WL 8168854, at *18 ("[T]he public interest favors the vindication of intellectual property rights.") (collecting cases). The public has a strong interest in encouraging innovative medical device companies, like Masimo, to invest in life-saving technology. JTX-2801; Kiani ¶89; FF ¶399. The public has no interest in permitting Apple to continue using Masimo's trade secrets. FF ¶¶400-01. The ITC considered public interest when evaluating Apple's infringement of Masimo's patents and barred Apple from importing watches with the blood oxygen feature until Masimo's patents expire. 19 U.S.C. § 1337(d); FF ¶¶385, 401. Similarly, Apple should be enjoined from using Masimo's trade secrets for any purpose, including

improving Apple's heart rate and blood oxygen features.

Accordingly, each *eBay* factor supports an injunction.

### 2.    The Court Should Enjoin Further Use Or Disclosure

The Court should enjoin further use and disclosure of Masimo's trade secrets. L4 and L5 are inextricably linked to Apple's sensor design. The Court should enjoin Apple from making or selling Apple Watches that embody L4 or L5. *Comet Techs.*, 2022 WL 4625149, at *4 (enjoining defendant from making or selling any product derived from misappropriated trade secrets); *Gen. Elec. Co. v. Sung*, 843 F. Supp. 776, 779 (D. Mass. 1994) (enjoining defendant from producing products derived from using misappropriated trade secrets). The Court should also enjoin Apple from further using or disclosing D1, D3, and D10, including testing the D1, D3, and D10 algorithms, adding them to the Apple Watch, using them to benchmark Apple's designs, or further disclosing them in patent applications.

The Court should also order Apple to destroy information concerning Masimo's trade secrets. Should Apple attempt to remove the trade secrets in a redesigned Apple Watch, the Court should order Apple to make detailed representations about the redesign. The Court should also order limited discovery sufficient to allow Masimo to audit whether that redesign complies with the injunction. *See Comet Techs.*, 2022 WL 4625149, at *5 (allowing audit right to ensure injunction compliance). Apple's confidentiality would be protected by the existing Protective Order.

### 3.    Apple's Waiver Argument Is Frivolous

In the 2023 and 2024 Pretrial Conference Orders, the parties agreed the Court would decide "[w]hether to enjoin Apple from further misappropriation." Dkt. 1483 at 15; Dkt. 2157-1 at 17. Masimo's August 2024 Notice of Issues to be Tried also included a "permanent injunction." Dkt. 2098 at 1. Masimo sought injunctive relief in its pleadings, Dkt. 1 at 61, Dkt. 296 at 132, and sought a preliminary injunction, Dkt. 116.

Regardless, "courts of equity have broad discretion in shaping remedies." *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir. 1986). Rule 54(c) provides:

1
2
3

> A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.

4
5
6
7
8

"Rule 54(c) has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved." *Kaszuk v. Bakery & Confectionary Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 559 (7th Cir. 1986) (quoting and citing numerous authorities); *see Cal. Ins. Guar. Ass'n v. Burwell*, 227 F. Supp. 3d 1101, 1116 (C.D. Cal. 2017).

9
10
11
12
13
14
15

Apple argues Masimo waived injunctive relief for two reasons. ***First,*** Apple argues Masimo failed to disclose injunctive relief in its Memorandum of Contentions of Fact and Law. Dkt. 2220 at 3. But the local rule states that memorandum is for disclosing "Claims and Defenses," the associated elements, and the key evidence in support of their claims. *See* L.R. 16-4. The local rule does not mention remedies. Instead, the pretrial conference order includes requested remedies, and there ***both*** parties agreed Masimo sought an injunction. Dkt. 2157-1 at 17.

16
17
18
19
20
21
22
23
24
25
26
27

***Second,*** Apple incorrectly argues Masimo failed to provide a "meaningful response" to Interrogatory No. 17 on injunctive relief. Dkt. 2220 at 3. In its responses, Masimo explained it was seeking "equitable relief in the form of an injunction against further misappropriation …." Dkt. 2181-2 at 13. Masimo listed six individuals with supporting factual information. *Id.* at 9. Masimo described supporting facts, including how Apple's misappropriation "harmed Masimo's long-term business plan to sell non-invasive physiological parameter measurement devices to consumers." *Id.* at 10. Masimo explained how Apple used Masimo's trade secrets to unfairly compete, "harmed Masimo" from selling "non-invasive physiological parameter measurement devices to consumers," and harmed Masimo's "market opportunity." *Id.* at 10-11, 15-17. Masimo also designated Kiani as its 30(b)(6) witness on injunctive relief, but Apple asked Kiani no questions on injunctive relief. Apple's waiver argument lacks merit.

28

## C.    The Court Should Add Masimo as a Co-Owner of the Disputed Patents

When Lamego contributed to the conception of the '052, '670, '095, '754, and '390 Patents, he was obligated to assign that subject matter to Masimo. *Supra* §IV.A; FF ¶¶351-52, 364, 366, 369. This is sufficient to correct ownership of these patents.

When Diab conceived of the subject matter of the '052, '670, '095, and '390 Patents, he was obligated to assign that subject matter to Masimo. *Supra* §IV.B; FF ¶¶20, 345, 353-55, 357, 362; JTX-2981.1. This is also sufficient to correct ownership of these patents regardless of the Court's patent ownership decision as to Lamego.

## D.    The Court Should Add Diab as an Inventor of the Disputed Patents

Masimo proved that Diab is an inventor on the '052, '670, '095, and '390 Patents. *Supra* §V; FF ¶345, 353-55, 357, 362. Thus, the Court should order the PTO to correct inventorship of these patents to add Diab as an inventor. FF ¶345, 353-55, 357, 362; *see* 35 U.S.C. § 256 (court may order PTO to correct inventorship).

## E.    The Court Should Impose a Constructive Trust

Because Apple obtained patents claiming inventions based on Masimo's inventions, Apple is an involuntary trustee of those patents and applications, for Masimo's benefit. Cal. Civ. Code § 2224; *see supra* §IV; FF ¶¶351-52, 364, 366, 369. Thus, the Court should order Apple to serve as an involuntary trustee for the '052, '670, '095, '390, and '754 Patents. FF ¶¶351-52, 364, 366, 369.

## F.    The Court Should Award Attorneys' Fees And Costs[5]

As explained above, Apple coveted Masimo's technology and put in motion a plan to obtain it. *Supra* §II. Apple recognized it needed Masimo's technology to succeed in the health space. *Id.* It ultimately decided it could obtain that technology from Lamego instead of partnering with Masimo. *Id.* It then immediately sought

---

[5] Attorneys' fees and costs are the only financial awards that Masimo seeks for its CUTSA claim. The Court need not and should not award any money for Apple's unjust enrichment. Masimo continues to seek monetary relief through other claims, including its now-bifurcated patent infringement claims.

Lamego's input and used him as a "consultant" to help as many groups as possible. *Id.* After realizing that Lamego may disclose *Apple's* confidential information, Apple devised a plan to insulate him from Apple's confidential information while continuing to extract as much Masimo information from him as possible. *Id.* Apple's conduct constitutes willful and malicious misappropriation. Cal. Civ. Code § 3426.4.

Accordingly, the Court should award Masimo attorneys' fees and costs. Cal. Civ. Code § 3426.4; *Monster Energy*, 2023 WL 8168854, at *21. Attorneys' fees are justified because Apple is well-funded, earned significant profits from its misappropriation, and its acts undermine legitimate competition and innovation. *See Mattel, Inc. v. MGA Ent., Inc.*, 801 F. Supp. 2d 950, 956 (C.D. Cal. 2011) (defendants "profits from its acts of misappropriation far exceeded the costs [plaintiff] incurred in prosecuting this lawsuit, and any incentive to misappropriators must be eradicated through the award of fees…"). Apple's scheme to target Masimo employees for their knowledge of Masimo's trade secrets also supports an award of attorneys' fees. *See Rogers v. B. Braun Med., Inc.*, Civ. No. 98-cv-250-B (RBB), Dkt. 390 at 12, Dkt. 415 (S.D. Cal. Sept. 13, 2004).

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: December 19, 2024      By: */s/ Adam B. Powell*

Joseph R. Re
Stephen C. Jensen
Sheila N. Swaroop
Brian C. Horne
Brian C. Claassen
Mark D. Kachner
Adam B. Powell
Kendall M. Loebbaka
Daniel P. Hughes
Douglas B. Wentzel

Attorneys for Masimo
MASIMO CORPORATION and
CERCACOR LABORATORIES, INC.

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs' Masimo Corp. and Cercacor Laboratories, Inc., certifies that this brief contains 50 pages, which [choose one]:

_ complies with the word limit of L.R. 11-6.1.

X complies with the page limit set by court order dated 11/26/2024.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  December 19, 2024          By: */s/ Adam B. Powell*
                                        Joseph R. Re
                                        Stephen C. Jensen
                                        Sheila N. Swaroop
                                        Brian C. Horne
                                        Brian C. Claassen
                                        Mark D. Kachner
                                        Adam B. Powell
                                        Kendall M. Loebbaka
                                        Daniel P. Hughes
                                        Douglas B. Wentzel

                                        Attorneys for Plaintiffs
                                        MASIMO CORPORATION and
                                        CERCACOR LABORATORIES, INC.