# EXHIBIT 1

Filed: July 28, 2021

Filed on behalf of:
Patent Owner Masimo Corporation
By: Joseph R. Re (Reg. No. 31,291)
Jarom D. Kesler (Reg. No. 57,046)
Joshua J. Stowell (Reg. No. 64,096)
Stephen W. Larson (Reg. No. 69,133)
Jacob L. Peterson (Reg. No. 65,096)
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Tel.: (949) 760-0404
Fax: (949) 760-9502
E-mail: AppleIPR2020-1523-703@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

Case IPR2020-01523
U.S. Patent 8,457,703

**PATENT OWNER RESPONSE**

# TABLE OF CONTENTS

**Page No.**


I. INTRODUCTION .......... 1

II. MASIMO'S PIONEERING TECHNOLOGY .......... 5

A. The '703 Patent .......... 5

B. Introduction To The Independent Claims .......... 12

C. Prosecution Of The '703 Patent .......... 14

III. PETITIONER'S REFERENCES .......... 15

IV. LEVEL OF ORDINARY SKILL IN THE ART .......... 16

V. LEGAL STANDARDS .......... 17

VI. CLAIM CONSTRUCTION .......... 19

A. "Reducing/Reduce Activation Of An Attached Sensor" .......... 19

B. "Processing Characteristics" .......... 21

1. Petitioner Failed To Construe "Processing Characteristics" .......... 21

2. Construction Of "Processing Characteristics" .......... 23

VII. GROUND 1A FAILS TO DEMONSTRATE OBVIOUSNESS .......... 27

A. Overview Of Diab .......... 27

B. Overview Of Amano .......... 28

C. Petitioner Fails to Show That A POSITA Would Have Modified Diab To Operate At Lower And Higher Power Consumption Levels Based On Amano .......... 29

# TABLE OF CONTENTS
**(*cont'd*)**

**Page No.**


1. Overview Of The Deficiencies In Petitioner's Argument ....30

2. A POSITA Would Not "Suspend And Not Execute" Diab's Motion Artifact Suppression Module ....33

3. A POSITA Would Not Have Been Motivated To Combine Diab And Amano ....41

4. Petitioner Fails To Show That Suspension Of Diab's Motion Artifact Suppression Module Would Result In Lower Power Consumption Levels ....45

D. Diab And Amano Do Not Disclose Or Suggest Comparing "Processing Characteristics To A Predetermined Threshold" ....48

E. Diab And Amano Do Not Disclose Or Suggest Reducing An Amount Of Processing By A Signal Processor ....52

VIII. GROUND 1B FAILS TO DEMONSTRATE OBVIOUSNESS ....55

IX. GROUND 1C FAILS TO DEMONSTRATE OBVIOUSNESS ....56

A. Ground 1C Fails For The Same Reasons As Ground 1A ....57

B. Overview Of Turcott ....57

C. Petitioner Fails To Show That Turcott Discloses Or Suggests "Reducing/Reduce Activation Of An Attached Sensor" In Combination With The Other Claim Limitations ....60

# TABLE OF CONTENTS
**(*cont'd*)**

**Page No.**


D. A POSITA Would Not Have Been Motivated To Combine Diab, Amano, And Turcott To Arrive At The Claimed Inventions....61

X. GROUNDS 2A-2C FAIL TO DEMONSTRATE OBVIOUSNESS....67

XI. GROUNDS 3A-3B FAIL TO SHOW OBVIOUSNESS....69

A. Petitioner Fails To Show That Amano Discloses Determining Measurement Values For One Or More Physiological Parameters....69

1. Petitioner Fails To Address All Elements In Limitation 9[c]....70

2. Amano Does Not Determine Measurement Values....71

B. Petitioner Admits That Amano Does Not Compare "Processing Characteristics" To A Predetermined Threshold....73

C. Petitioner Fails To Show That Turcott Discloses Or Suggests "Reducing/Reduce Activation Of An Attached Sensor" In Combination With The Other Claim Limitations....75

XII. CONCLUSION....79

## TABLE OF AUTHORITIES

**Page No(s).**

*Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016) ....................20

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) ....................18

*Harmonic Inc. v. Avid Tech., Inc.*,
815 F.3d 1356 (Fed. Cir. 2016) ....................17, 18, 51, 71

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ....................18

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................18

*In re Magnum Oil Tools, Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ....................17, 18

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) ....................19

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ....................18

*OrthoPediatrics Corp. v. K2M, Inc.*,
Case IPR2018-01548, Paper 9 (March 1, 2019)....................21, 23

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................24

*Schering Corp. v. Geneva Pharms., Inc.*,
339 F.3d 1373 (Fed. Cir. 2003) ....................51

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
655 F.3d 1364 (Fed. Cir. 2011) ....................18

## TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

## OTHER AUTHORITIES

37 C.F.R. § 42.65 ........................................ 18, 51

37 C.F.R. § 42.100 ........................................ 24

## EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 2001 | Expert Declaration of Vijay K. Madisetti Ph.D. |
| 2002 | Curriculum Vitae of Vijay K. Madisetti Ph.D. |
| 2003 | Excerpts from the deposition transcript of Brian Anthony, Ph.D. |
| 2004 | U.S. Patent No. 5,827,969 to Lee et al. |
| 2005 | U.S. Patent No. 6,402,690 to Rhee et al. |

## I. INTRODUCTION

Masimo's U.S. Patent No. 8,457,703 ("'703 patent") discloses and claims innovative and nonobvious approaches to managing the power consumption of a low-power patient monitor. Masimo's innovative monitor controls power consumption by intermittently changing the number of input samples received and processed by the monitor's processor while continuously maintaining monitoring capability. By intermittently reducing the number of input samples received and processed based on characteristics of the optically detected signal, Masimo's claimed monitor can reduce power consumption. The '703 patent discloses several methods of determining when and how to change the number of input samples. One method intermittently changes activation of an attached sensor by, for example, changing the duty cycle of current supplied to the sensor LEDs. These changes can be triggered by the quality of the optical signal or physiological measurements determined from the optical signal. Driving the LEDs at a lower duty cycle consumes less power than driving the LEDs at a higher duty cycle. Importantly, the '703 patent's monitor intermittently changes the number of input samples during operation so that a clinician can continuously receive current patient information despite changes in monitor power consumption.

Petitioner identifies eight grounds in the Petition based on four prior art references: Diab (Ex. 1007), Amano (Ex. 1004), Turcott (Ex. 1006), and Edgar

(Ex. 1005). Every claim in the ’703 patent requires operating a patient monitor at “a lower power consumption level” and “a higher power consumption level.” In Grounds 1A-1C and 2A-2C, Petitioner argues that Diab, in combination with Amano or the “general knowledge” of a person of ordinary skill in the art (“POSITA”), renders these power-consumption-level limitations obvious. Petitioner concedes that Diab does not disclose operating its patient monitor at lower and higher power consumption levels. Therefore, Petitioner argues that Amano or the “general knowledge of a POSITA” would have motivated a POSITA to modify Diab by suspending and not executing Diab’s motion artifact suppression module 580 [blue] when motion is not detected.




FIG. 20

However, Diab’s oximeter relies on the motion artifact suppression module to generate two outputs: the heart rate and clean plethysmograph waveform

(highlighted yellow above). Petitioner focuses exclusively, and incorrectly, on the heart rate determination in arguing that a POSITA would have been motivated to "suspend and not execute" Diab's motion artifact suppression module. Petitioner ignores the generation of the clean plethysmograph waveform, which requires ***continuous*** operation of the motion artifact suppression module even when there is no motion. A POSITA would not have been motivated to "suspend and not execute" the module because doing so would have eliminated the critical clean plethysmograph waveform and compromised the utility of the oximeter.

Diab also discloses that its processing actually speeds up (i.e., processes more data and thus uses more power) when there is no motion. This additional processing and power consumption when there is no motion directly contradicts Petitioner's arguments. For at least these reasons, Grounds 1A-1C and 2A-2C do not render the challenged claims unpatentable.

In Grounds 3A-3B, Petitioner argues that Amano, alone or in combination with Turcott, renders the challenged claims unpatentable. However, Petitioner fails to show how Amano or Turcott satisfy each claim limitation. Every challenged claim requires the patient monitor to continuously operate at a lower power consumption level to "determine measurement values for one or more physiological parameters of a patient." Yet, in Grounds 3A-3B, Petitioner never

addresses whether Amano and Turcott disclose the "measurement values for one or more physiological parameters" required by the claims.

Moreover, the embodiments of Amano relied on by Petitioner in Grounds 3A-3B do not "determine measurement values for one or more physiological parameters of a patient." Amano describes "a pulse wave examination apparatus" that qualitatively characterizes a patient's pulse condition based on "classifications of Chinese medicine." Specifically, Amano's apparatus determines only a general condition of the user ("Ping mai," "Hua mai," and "Xuan mai"). Petitioner fails to show that Amano's apparatus determines any measurement values for one or more physiological parameters. Thus, Petitioner has not shown Amano discloses all of the claim limitations.

Every challenged claim also requires the patient monitor to compare "processing characteristics to a predetermined threshold." The '703 patent requires that the "processing characteristics" be determined from a signal received from the sensor's optical detector. Amano does not disclose this limitation. Unlike the inventions in the '703 patent, Amano determines the processing characteristics from a signal received from a separate acceleration sensor. Amano does not determine the processing characteristics from a signal received from an optical detector. For at least these reasons, Grounds 3A-3B do not render the challenged claims unpatentable.

Petitioner has failed to demonstrate that the asserted references render the challenged claims unpatentable. Masimo, therefore, respectfully requests that the Board affirm the patentability of the challenged claims.

## II. MASIMO'S PIONEERING TECHNOLOGY

Masimo is a global medical device technology company that develops and manufactures innovative patient monitoring technologies, medical devices, and a wide array of sensors. Masimo was founded in 1989 as a garage start-up and went on to revolutionize non-invasive patient monitoring by solving long-standing and difficult problems facing the industry. Today, Masimo is a publicly traded company that employs over 6,300 people worldwide, with annual revenues of over $1.1 billion. A host of manufacturers use Masimo's technology, including Philips, Atom, Mindray North America, GE Medical, Spacelabs, and Zoll.

### A. The '703 Patent

Masimo's '703 patent describes novel approaches for reducing the power consumption of patient monitors, such as pulse oximeters. Pulse oximeters are devices that are widely used for monitoring the oxygen saturation level of a patient's arterial blood. (Ex. 1001, 1:18-35.) Conventional pulse oximeters include a sensor that has red and infrared LEDs and a photodiode detector. (*Id.*) In operation, the LEDs project light into the patient's tissue. (*Id.*) The photodiode detects the emitted light as it emerges from the tissue. (*Id.*) A signal processor, in

communication with the sensor, calculates physiological measurements, including oxygen saturation and pulse rate, based on the detected light. (*Id.* at 1:38-47.) A monitor then displays the calculated measurements to the clinician. (*Id.*)

The ’703 patent discloses that patient monitors, such as pulse oximeters, are increasingly utilized in portable, battery-operated applications. (*Id.*, 1:55-56.) For example, a patient may require a portable pulse oximeter during emergency transport between hospital wards. (*Id.*, 1:56-59.) Pulse oximeters are also increasingly implemented as “plug-in modules for multiparameter patient monitors having a restricted power budget.” (*Id.*, 1:59-61.) The expanded use of pulse oximeters created “an increasing demand for lower power and higher performance pulse oximeters.” (*Id.*, 1:61-63.)

The ’703 patent explains that POSITAs attempted to meet the long-felt need for lower power patient monitors by developing monitors having a “sleep mode.” (*Id.*, 1:63-2:16.) In sleep mode, the monitor’s processor powers down, except perhaps for a portion of memory. (*Id.*) The monitor enters the sleep mode if it does not detect a significant change in a particular physiological measurement for a predetermined period of time. (*Id.*) A monitor operating in sleep mode periodically checks the physiological measurements of the patient based on an internal timer to determine whether to wake up (i.e., power up the monitor’s processor). (*Id.*)

While monitors utilizing a sleep mode reduce power consumption, the ’703 patent identifies a number of disadvantages of using sleep-mode techniques during patient monitoring, particularly in the case of pulse oximetry. (*Id.*, 2:17-28.) When functioning in the sleep mode, the monitor is inactive and may miss critical patient events, such as oxygen desaturation. (*Id.*) The ’703 patent explains that earlier efforts to account for this disadvantage failed. The patent explains, “[T]here is a trade-off between shorter but more frequent sleep periods to avoid a missed event and the increased processing overhead to power-up after each sleep period.” (*Id.*)

Conventional monitors operating in sleep mode had other disadvantages. For example, the monitors would not reflect the time of the last active measurement, which obfuscated the current state of the patient. (*Id.*) Additionally, the sleep-mode oximeters use only output parameters, such as oxygen saturation, to determine whether to operate in active or sleep mode. (*Id.*) The oximeters do not use internal parameters, such as signal quality, to set the operation status. (*Id.*) The failure to account for internal parameters resulted in inaccurate or unclear outputs. (*Id.*) For all of these reasons, sleep-mode monitors did not address the long-felt need for patient monitors that use lower power, but remain in active mode, rather than sleep mode.

The inventions described in the ’703 patent do not suffer from the disadvantages of sleep-mode monitors. The inventive patient monitors modify

power consumption by effectively increasing or decreasing the number of input samples received and processed by the monitor. (*Id.*, 6:9-24.) "Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal quality periods or when critical measurements are necessary." (*Id.*, 6:11-15.) By adjusting the samples received and processed, the monitor can "regulates power consumption to satisfy a predetermined power target, to minimize power consumption, or to simply reduce power consumption." (*Id.*, 6:16-18.)

The monitor determines whether to increase or decrease sample processing by evaluating physiological measurements and/or signal statistics. (*Id.*, 6:28-44; *see also id.*, 5:11-27 (describing system operation).) Physiological measurements include, but are not limited to, oxygen saturation, pulse rate, and plethysmograph. (*Id.*, 5:13-16.) Signal statistics include, but are not limited to, signal strength, noise, and motion artifacts. (*Id.*, 5:16-17.) Thus, the disclosed patient monitors advantageously control power consumption based on output parameters, such as physiological measurements, and/or internal parameters, such as signal statistics. (*Id.*, 5:24-27.)

In a preferred embodiment, a patient monitor increases or decreases the input samples by changing the duty cycle of the current supplied by the monitor's drivers to the LEDs. (*Id.*, 6:56-7:14.) In a conventional patient monitor, the duty

cycle used to drive the LEDs is constant during monitoring. (*Id.*) However, a constant duty cycle can result in significant power consumption because the LED drivers "require a significant portion of the overall pulse oximeter power budget." (*Id.*) The '703 patent discloses that "[i]ntermittently reducing the drive current duty cycle can advantageously reduce power dissipation without compromising signal integrity." (*Id.*.) Thus, in a preferred embodiment, the '703 patent discloses intermittently reducing the duty cycle of the LED drivers from 25% to about 3.125%. (*Id.*, 7:4-8, Fig. 5.)

In addition to changing the duty cycle, the '703 patent discloses that the patient monitor may have a "data off" period where the LEDs are turned off for longer than one drive cycle. (*Id.*, 7:8-12.) A "data off" state differs from sleep mode for several reasons, including that the processors are not powered down in the "data off" state. (*See e.g.,* 2:1-16, 7:8-14 (describing sleep mode and data off).) The "data off" state may be used in addition to high and low duty cycles to manage the power consumption of the monitor. (*Id.*, 8:4-46, Fig. 8.) Figure 8[1] below shows the power consumption of the monitor during the high duty cycle state [red], low duty cycle state [green], and data off state. (*Id.*)

[1] Color and labels have been added to figures unless otherwise noted.




FIG. 8

(*Id.*)

The ’703 patent discloses other methods to increase or decrease the samples received and processed. For example, the monitor can vary the number of data blocks processed by the processor. (*Id.*, 6:2-8.) Figures 7A-B (below) “illustrate data blocks 700, which are processed by post processor 430.” (*Id.*, 7:40-41, Figs. 7A-B.) As shown in Figure 7A below, each data block has n samples 702 of the pre-processor output. (*Id.*, 7:41-45.)




FIG. 7A

Each data block has a relative time shift 706 from the preceding data block creating an overlap 708 between two adjacent data blocks 710, 720. (*Id.*, 7:51-60.) "The greater the overlap 708, i.e. the smaller the time shift 706, the more data blocks there are to process in the post-processor 430 (FIG. 4), with a corresponding greater power consumption." (*Id.*, 7:55-58.) The '703 patent discloses that the "overlap 708 between successive data blocks 710, 720 may vary from n-1 samples to no samples, i.e. no overlap." (*Id.*, 7:58-60.)

Figure 7B (below) shows "there may be a sample gap 756 or negative overlap, i.e. samples between data blocks that are not processed by the post-processor, allowing further post-processor power savings." (*Id.*, 7:60-63.)




FIG. 7B

In operation, a patient event, such as poor oxygen saturation, may trigger the monitor to increase the samples received and processed, such as by moving from a low duty cycle or data off state to a high duty cycle. (*Id.*, 8:47-61, Fig. 9.) Conversely, if the monitor is in a high duty cycle state and neither an event nor low signal quality occurs, the monitor may transition to a low duty cycle to conserve power. (*Id.*, 9:1-13.) Thus, Masimo's inventive patient monitor quickly adapts during adverse patient events or upon signal quality issues and, therefore, solves many of the long-felt and unmet problems associated with conventional monitors that operate in a sleep mode. (Ex. 2001, ¶30.)

**B. <u>Introduction To The Independent Claims</u>**

The '703 patent has six independent claims. Claims 1, 9, and 12 describe methods of managing power consumption by (a) reducing activation of an attached sensor, (b) reducing an amount of processing by a signal processor, or (c) including an override condition, respectively. Claims 15, 20, and 22 describe patient

monitors configured to manage power consumption using similar techniques as the method claims. Claim 1 is illustrative (but not representative) of some relevant features claimed in the ’703 patent. Petitioner adopted a numbering system for the claim limitations in the Petition. (*See e.g.*, Pet., 40-43.) Masimo has adopted Petitioner’s numbering system in this Response for ease of reference. Claim 1 recites:

**[1p]** A method of managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor, the method comprising:

**[1a]** driving one or more light sources configured to emit light into tissue of a monitored patient;

**[1b]** receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue;

**[1c]** continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;

**[1d]** comparing processing characteristics to a predetermined threshold; and,

**[1e]** when said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level,

**[1f]** wherein said continuously operating at said lower power consumption level comprises reducing activation of an attached sensor,

**[1g]** said sensor positioning said light sources and said detectors proximate said tissue.

## C. Prosecution Of The '703 Patent

During prosecution, the Examiner rejected the pending claims over Swedlow (Ex. 1009), a patent that described a conventional "sleep mode" pulse oximeter. (Ex. 1002, 65-68, 90-93; *see e.g.,* Ex. 1009, 4:27-31 ("The present invention applies to a diagnostic device which enters a sleep mode while a patient is stable.").) Masimo distinguished Swedlow by identifying the language in the pending claims requiring the continuous determination of measurement values, and the description in the specification distinguishing the inventions in the '703 patent from "sleep mode" pulse oximeters. (*Id.,* 90-93.)

Masimo subsequently conducted an interview with the Examiner during which two additional references were discussed: Lee (Ex. 2004) and Rhee (Ex. 2005). (Ex. 1002, 108.) The Examiner agreed with Masimo that Lee and Rhee did "not specifically teach the reducing activation/duty cycle/on-off stages of the energy source(s) during operating the sensor." (*Id*., 117-118.) The Examiner also found the "prior art does not teach or suggest 'said continuously operating at said lower power consumption level comprises reducing activation of an attached

sensor', 'said continuously operating at said lower power consumption level comprises reducing an amount of processing by a signal processor', or 'said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level, wherein said processing characteristics include an override condition', in combination with the other elements/steps." (*Id*., 118.)

## III. PETITIONER'S REFERENCES

Petitioner's unpatentability grounds rely on four references: Diab (Ex. 1007), Amano (Ex. 1004), Turcott (Ex. 1006), and Edgar (Ex. 1005). Petitioner states, "None of these references were cited in any office action by the examiner during prosecution." (Pet. 4.) However, Petitioner does not disclose that the Examiner considered Diab during prosecution:

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,533,511 | A | 7/1996 | Kaspari et al. |
| 5,561,275 | A | 10/1996 | Savage et al. |
| 5,562,002 | A | 10/1996 | Lalin |
| 5,590,649 | A | 1/1997 | Caro et al. |
| 5,602,924 | A | 2/1997 | Durand et al. |
| 5,632,272 | A | 5/1997 | Diab et al. |
| 5,638,816 | A | 6/1997 | Kiani-Azarbayjany et al. |
| 5,638,818 | A | 6/1997 | Diab et al. |

(Ex. 1001, page 2.)

As discussed herein, all of Petitioner's references operate differently than the claimed methods and patient monitors and do not disclose or suggest the claimed inventions.

## IV. LEVEL OF ORDINARY SKILL IN THE ART

Petitioner argues a POSITA "would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies or a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." (Pet. 5; Ex. 1003, ¶33.) Petitioner's declarant adds that a "POSITA would have been someone with a working knowledge of physiological monitoring technologies." (Ex. 1003, ¶33.)

Petitioner's asserted level of skill is inconsistent with its declarant's opinion regarding the relevant field. Petitioner's declarant states, "The '703 patent and the prior art references discussed herein are all from the field of non-invasive optical biosensors." (Ex. 1003, ¶16.) Petitioner's declarant confirmed during cross-examination that this statement accurately characterizes the relevant field. (Ex. 2003, 23:1-20.) Yet, as shown above and acknowledged by Petitioner's declarant, Petitioner's definition of POSITA does not require any experience with non-

invasive optical biosensors and, thus, does not describe the level of skill ***in the art***. (Ex. 2003, 85:16-86:4, 96:8-13.)

However, even under a lower standard where a POSITA has a working knowledge of physiological monitoring technologies, Petitioner has failed to show that the asserted grounds render the challenged claims obvious. Thus, for this proceeding, Masimo applies the asserted level of skill identified in the Petition. (Ex. 2001, ¶22.)

## V. LEGAL STANDARDS

"In an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016). The Board is not "free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR." *In re Magnum Oil Tools, Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016). "The petitioner must instead articulate specific reasoning, based on evidence of record," as set out in its petition "to support the legal conclusion of obviousness." *Id.* at 1380. The Board "must base its decision on arguments that were advanced by a party." *Id.* at 1381. The Board cannot "decide unpatentability theories never presented by the petitioner." *Id.*

To prevail on any obviousness ground, a petitioner may not simply identify individual claim components—it must show why a "skilled artisan, with no

knowledge of the claimed invention, would have selected these components for combination in the manner claimed." *In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000). The petitioner must support even simple modifications to a reference with some motivation to make the change. *See In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984).

In addition, a petitioner cannot rely on "mere conclusory statements." *Magnum Oil*, 829 F.3d at 1380. Rather, the petitioner must set forth "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007) (internal citation omitted). Similarly, a petitioner cannot simply rely on an expert's unsubstantiated and conclusory opinions. *See* 37 C.F.R. § 42.65 ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *Harmonic*, 815 F.3d at 1363 (Affirming that the petitioner failed to establish obviousness where expert testimony "add[ed] nothing beyond the conclusory statements in [the] petition.").

An appropriate obviousness inquiry cannot involve even a "hint of hindsight." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011). A petitioner may not "simply retrace[] the path of the inventor with hindsight, discount[] the number and complexity of the alternatives, and conclude[] that the invention . . . was obvious." *Ortho-McNeil Pharm., Inc. v. Mylan Labs.,*

*Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008). Likewise, "[c]are must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) (internal quotations omitted).

## VI. CLAIM CONSTRUCTION

### A. "Reducing/Reduce Activation Of An Attached Sensor"

Independent claims 1 and 15 require "reducing/reduce activation of an attached sensor." Petitioner initially construes this term in the "Claim Construction" section of the Petition to mean "'reducing the duty cycle of an emitter driver output to the sensor' or 'entering a data off state for a time period in which the emitter drivers are turned off.'" (Pet. 6 (citing Ex. 1003, ¶36).) Petitioner later argues that "operating the LEDs of Diab with a reduced duty cycle reduces the activation of the LEDs ***under the proper construction*** of reducing activation." (Pet. 42-43 (emphasis added).) On cross-examination, Petitioner's declarant confirmed that the definition in the "Claim Construction" section of the Petition is the "proper construction." (Ex. 2003, 115:12-116:4.) Masimo agrees that the proper construction of "reducing/reduce activation of an attached sensor" encompasses "reducing the duty cycle of an emitter driver output to the sensor." (Ex. 2001, ¶38.)

Masimo does not offer an opinion regarding whether "reducing/reduce activation of an attached sensor" also encompasses "entering a data off state for a time period in which the emitter drivers are turned off." (Ex. 2001, ¶39.) Petitioner has not argued that any reference satisfies the "reducing/reduce activation of an attached sensor" by "entering a data off state for a time period in which the emitter drivers are turned off." (*Id.*) Therefore, this portion of Petitioner's construction is irrelevant to the current IPR and the Board does not need to address this portion of the construction to resolve the disputes herein. *See e.g., Eon Corp. IP Holdings v. Silver Spring Networks, Inc.,* 815 F.3d 1314, 1319 (Fed. Cir. 2016) ("Thus, a district court's duty at the claim construction stage is, simply, the one that we described in *O2 Micro* and many times before: to resolve a dispute about claim scope that has been raised by the parties.").

Petitioner also argues that Diab and Turcott meet the "reducing activation of an attached sensor" limitation under a different construction that is ***not*** identified in Petitioner's "Claim Construction" section of the Petition. (Pet. 6-7, 42-43.) In Ground 1C, Petitioner argues that "under a ***broader construction*** of 'reducing activation,' a reduced drive current means that the amount of current used to activate the LEDs is reduced, leading to reduced activation of the LEDs." (*Id.*, 43 (emphasis added).) Petitioner does not identify any evidence to support this construction. Petitioner merely cites one paragraph of its declarant's declaration

that largely repeats the Petition and does not identify any supporting evidence. (*Id.* (citing Ex. 1003, ¶86).)

Moreover, the "broader construction" is inconsistent with the intrinsic record. (Ex. 2001, ¶41.) The claims require a reduction in activation, and a POSITA would not have understood reducing LED drive current to be a reduction in activation because the LED would be active (or on) for the same amount of time despite the change in current. (*Id.*) Additionally, during prosecution, the Examiner concluded a reference that adjusts the LED level/intensity (i.e., adjusts current) "does not specifically teach the reducing activation/duty cycle/on-off stages of the energy source(s) during operating the sensor." (*Id.*; Ex. 1002, 117-118.)

## B. "Processing Characteristics"

### 1. Petitioner Failed To Construe "Processing Characteristics"

The Board's rules "place an affirmative burden on petitioners to 'set forth: … How the challenged claim is to be construed.'" *OrthoPediatrics Corp. v. K2M, Inc.,* Case IPR2018-01548, Paper 9, at 10 (March 1, 2019) (quoting 37 C.F.R. § 42.104(b)(3)). "This burden continues by requiring petitioners to adequately explain 'how the ***construed*** claim is unpatentable.'" *Id.* (quoting 37 C.F.R. § 42.104(b)(4)) (emphasis in original).

Petitioner did not construe "processing characteristics," which appears in every independent claim. (*See* Pet. 6 (claim construction section).) Yet, in Ground

3A, Petitioner acknowledges that "processing characteristics" is subject to more than one construction and admits that the construction affects whether the identified references render the claims obvious. (*Id.*, 50-51.) Petitioner argues that Diab and Amano (Ground 1A) render the claims obvious "under a ***limiting interpretation*** requiring 'processing characteristics' to be obtained from a signal provided by a photodetector.'" (Pet. 50 (emphasis added); Ex. 1003, ¶97; Ex. 2003, 121:17-122:21.) In contrast, Petitioner argues, "Amano [Grounds 3A-3B] teaches these limitations based on an ***alternative non-limiting interpretation*** of 'processing characteristics' that is met by Amano's acceleration sensor output." (Ex. 1003, ¶98 (emphasis added); Pet. 51; Ex. 2003, 133:1-9.)

Petitioner never states whether the "limiting" or "alternative non-limiting" interpretation is the proper construction of "processing characteristics" (i.e., the meaning the term would have to a POSITA in July 2001 based on the intrinsic record). In support of its competing constructions, Petitioner exclusively cites the declaration of its declarant. (*See* Pet. 50-51 (citing Ex. 1003, ¶¶97-98).) The declaration largely repeats the Petition. (*Compare* Pet. 50-51 with Ex. 1003, ¶¶97-98.) During cross-examination, Petitioner's declarant admitted he had not formed an opinion regarding the correct construction. (*See e.g.,* Ex. 2003, 126:13-127:5 ("Didn't need to construe sort of a specific definition of processing characteristics highlighting that there is a subset of a broader set of processing

characteristics."), 130:12-131:4 ("Wasn't necessary to inform my opinions to highlight which one is the correct one.").)

The Board should not permit Petitioner to introduce belated evidence on reply regarding the correct construction of "processing characteristics" when Petitioner stymied discovery regarding the correct meaning of the term during the deposition of Petitioner's declarant. Here, Petitioner acknowledged that "processing characteristics" was subject to multiple constructions that affect the obviousness analysis and yet opted not to construe the term. *See e.g., OrthoPediatrics,* Case IPR2018-01548, Paper 9, at 10 ("the Petition fails to identify how the challenged claims are to be construed and applied to the prior art"). Moreover, Petitioner relied exclusively on its declarant to support the constructions, but the declarant never formed an opinion regarding the proper construction. (*See* Pet. 50-51 (citing Ex. 1003, ¶¶97-98); Ex. 2003, 126:13-127:5, 130:12-131:4.) Permitting Petitioner to belatedly submit new evidence on reply would prejudice Masimo because discovery is complete and Masimo has submitted this Response.

### 2. <u>Construction Of "Processing Characteristics"</u>

The Board should construe "processing characteristics" to require that the processing characteristics are determined from a signal received from one or more detectors configured to detect light. (Ex. 2001, ¶44.) Masimo's construction is

similar to Petitioner's "limiting interpretation" construction. (Pet. 50.) Masimo's construction is the plain and ordinary meaning "processing characteristics" would have had to a POSITA in July 2001 based on the intrinsic record. (37 C.F.R. § 42.100(b); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); Ex. 2001, ¶¶43-47.)

The claims of the '703 patent support this construction. *Phillips,* 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms"). Method claims 1, 9, and 12 require "receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue." (Ex. 1001, 11:37-39, 12:10-12, 12:34-36.) Similarly, apparatus claims 15, 20, and 22 require "an input configured to receive at least one signal responsive to light detected after attenuation by body tissue of a patient by a noninvasive sensor." (*Id.*, 12:56-58, 13:19-21, 14:9-11.)

All of the claims also require "comparing processing characteristics to a predetermined threshold" and, "when said processing characteristics pass said threshold," "transitioning to continuously operating … at a higher power consumption level." (*Id.*, 11:43-47, 12:16-20, 12:40-44, 12:62-66, 13:25-14:1, 14:15-19.) A POSITA would have understood that the processing characteristics are determined from the signal received from the detector because (1) the signal received from the detector is the only signal referenced in the claims, (2) all data

processing in the claims depends on the signal from the detector, and (3) as discussed herein, the specification consistently describes determining the processing characteristics from the signal received form the detector. (Ex. 2001, ¶46.)

The specification further confirms that the processing characteristics are determined from a signal received from one or more detectors. (*Id.*, ¶47.) Figure 4 (below) shows details "regarding the sensor interface 320, the signal processor 340 and the sampling controller 360." (Ex. 1001, 5:28-30.) As shown, the detector front-end 490 [green] (i.e., detector) provides a "conditioned and digitized input signal 322 [red line] to the signal processor 340":




FIG. 4

(*Id.*, 5:35-38, Fig. 4.) The "signal processor 340 has a pre-processor 410 [blue] and a post processor 430 [purple]." (*Id.*, 5:40-41.) The "post processor 430 calculates the physiological measurements 342 and the signal statistics 344, which are output to a signal status calculator 450." (*Id.*, 5:46-48.) The physiological measurement and signal statistics are examples of processing characteristics, which are determined from the signal received from the detector. (Ex. 2001, ¶47.) The '703 patent does not include any embodiments where a physiological sensor signal is not received from the detector (i.e., detector front-end). (*Id.*)

For these reasons, the Board should construe "processing characteristics" to require that the processing characteristics are determined from a signal received from one or more detectors configured to detect light. (Ex. 2001, ¶¶43-49.)

## VII. GROUND 1A FAILS TO DEMONSTRATE OBVIOUSNESS

In Ground 1A, Petitioner argues that Diab in combination with Amano renders claims 9-10, 12-14, 20, and 22-24 obvious. (Pet. 3.) However, Petitioner fails to show that Diab and Amano disclose or suggest at least two limitations of independent claims 9, 12, 20, and 22: (1) operating at "a lower power consumption level" and "a higher power consumption level," and (2) "comparing processing characteristics to a predetermined threshold." (Ex. 2001, ¶¶50-51, 63-83.) Petitioner also fails to show that a POSITA would have been motivated to combine Diab with Amano. (*Id.*) For at least these reasons, Petitioner has not met its burden of demonstrating that Ground 1A renders the identified claims unpatentable. (*Id.*)

### A. Overview Of Diab

As noted above, Diab was cited during prosecution of the '703 patent. (Ex. 1001, page 2.) Diab does not disclose methods of reducing the power consumption of a patient monitor by intermittently reducing activation of an attached sensor, reducing an amount of processing by a signal processor, or including an override condition as claimed. (Ex. 2001, ¶53.) Rather, Diab discloses methods of isolating

a primary or secondary signal portion from a composite measured signal using signal-processing techniques. (Ex. 1007, 3:16-21, 8:65-9:4, Figs. 4-5.)

Diab explains that composite measured signals, such as those obtained through physiological monitoring, generally include a desired signal (e.g., primary signal) and noise (e.g., secondary signal). (*Id.*, 1:31-35, 2:4-15.) Diab discloses that conventional filtering techniques are often ineffective in isolating the desired signal from the noise due to an overlap in the frequency spectrum between the primary and secondary signals. (*Id.*, 1:44-56.) Thus, Diab discloses a correlation canceller capable of isolating the desired signal or noise from a composite signal. (*Id.*, 3:16-21, 8:65-9:4, Figs. 4-5.)

**B. <u>Overview Of Amano</u>**

Amano describes "a pulse wave examination apparatus which can judge the pulse condition objectively and accurately." (Ex. 1004, 3:20-23.) Amano explains that "typical forms of pulse waveforms by the classification of Chinese medicine" include Ping mai, Hua mai, and Xuan mai. (*Id.*, 1:41-2:12, Figs. 45A-45C.) Ping mai "is the pulse condition of a normal man in good health." (*Id.*, 1:47-49, Fig. 45A.) Hua mai "is the pulse condition of a man who shows an abnormality in his blood stream condition." (*Id.*, 1:52-54, Fig. 45B.) Xua mai "is the pulse condition of a man whose blood vessel wall tension has increased." (*Id.*, 1:64-66, Fig. 46B.)

Amano's pulse wave examination apparatus utilizes different hardware and techniques to monitor a patient than those disclosed and claimed in the '703 patent. (*See, id.*, Fig. 1.) For example, Amano's apparatus detects motion using an acceleration sensor. (*Id.*, 21:9-12, 35:25-27, 40:65-41:3.) This is different from the '703 patent in which the patient monitor uses signal processing techniques to detect motion from the signal received from an optical detector. (Ex. 1001, 6:25-41, Fig. 4.)

Amano's apparatus also provides different outputs than the inventions disclosed and claimed in the '703 patent. Amano's apparatus provides the pulse condition to a notifying section, which outputs the pulse condition by display or voice. (Ex. 1004, 23:4-9.) The output of the notifying section is a qualitative classification that "displays the characters 'Hua mai, Ping mai, Xuan mai' or symbols, e.g., icons," which allow the doctor to recognize the pulse condition. (*Id.*)

### C. <u>Petitioner Fails to Show That A POSITA Would Have Modified Diab To Operate At Lower And Higher Power Consumption Levels Based On Amano</u>

Independent claims 9, 12, 20, and 22 require (1) operating a patient monitor "at a lower power consumption level to determine measurement values for one or more physiological parameters of (a/said) patient," and (2) "transitioning to continuously operating … at a higher power consumption level."

In Ground 1A (claim 9), Petitioner argues that Diab combined with Amano renders these power consumption limitations obvious. (*See* Pet. 14-18 (analyzing Limitation 9[c]), 20 (analyzing Limitation 9[e]).) Petitioner exclusively relies on its analysis of claim 9 to show that Diab and Amano render these same limitations obvious in independent claims 12, 20, and 22. (Pet. 22-23, 26-28.) Thus, Masimo responds to Petitioner's analysis of claim 9 below, but the response also applies to claims 12, 20, and 22.

1. **<u>Overview Of The Deficiencies In Petitioner's Argument</u>**

Petitioner's arguments regarding the lower and higher power limitations focus on Diab's pulse rate calculation module 410. (Pet. 14-18, 21-22.) As shown below, the module 410 [red] generates two outputs, a pulse (or heart) rate and a clean plethysmograph waveform [both highlighted yellow]:




(Ex. 1007, Fig. 14; *see also id.,* Fig. 20.)

Diab "illustrates a block diagram of the operations of the pulse rate calculation module [410]" in Figure 20. (*Id.*, 8:16-17.) As shown below, the module 410 includes a "motion artifact suppression module 580":




*FIG. 20*

(*Id.*, 47:30-38, Fig. 20.) Diab discloses, "If motion is not detected, spectral estimation on the signals is carried out directly without motion artifact suppression." (*Id.*, 47:52-54.) Conversely, Diab states, "In the case of motion, motion artifacts are suppressed using the motion artifact suppression module 580." (*Id.*, 47:55-56.)

Petitioner's arguments regarding the lower and higher power limitations depend on a misunderstanding of this disclosure in Diab. First, Petitioner argues this disclosure "teaches not executing the motion artifact suppression module 580 if motion is not detected." (Pet. 17.) This is not true. Diab merely discloses that

"spectral estimation on the signals is carried out directly without motion artifact suppression" to calculate the heart rate when motion is not detected. (Ex. 1007, 47:52-54; Ex. 2001, ¶¶53-59, 65-69.) The continuous operation of the motion artifact suppression module is still necessary to generate the clean plethysmograph waveform. (*Id.*) This is why Diab ***never*** discloses "suspend[ing] and not execut[ing]" the motion artifact suppression module. (*Id.*) Petitioner incorrectly ignores the clean plethysmograph waveform in its analysis.

Second, Petitioner argues that "it would have also been obvious to suspend and not execute the operations of Diab's motion artifact suppression module 580 if motion is not detected based on Amano's teaching of suspending 'the operations of … body movement component eliminating section' 'when no body movement is present.'" (Pet. 17 (quoting Ex. 1004, 21:65-22:6).) Again, this is not true. As explained herein, the continuous operation of the motion artifact suppression module is necessary to generate the clean plethysmograph waveform. (*Infra* VII.A.2.) A POSITA would ***not*** have found it obvious to "suspend and not execute" the module because doing so would have also suspended generation of the clean plethysmograph waveform, a critical patient monitoring tool. (Ex. 2001, ¶¶53-59, 65-73.) Moreover, Amano would not have motivated a POSITA to "suspend and not execute" the module because a POSITA would have understood

that Amano and Diab disclose different systems with different processing algorithms that are not directly applicable to each other. (*Id.*)

Because Petitioner fails to address the continuous operation of the motion artifact suppression module, Petitioner never demonstrates that Diab's oximeter operates at a lower and higher power consumption level under its actual operating conditions. Moreover, even if a POSITA would have been motivated to "suspend and not execute" Diab's motion artifact suppression module, Petitioner still fails to show that the oximeter would have had a lower power consumption level. (Ex. 2001, ¶¶74-78.) As discussed herein, Petitioner fails to account for and address several processing operations that would have increased power consumption, not lowered it. (*Id.*)

Thus, for all of these reasons, and as explained below, Petitioner fails to show that Diab and Amano render claims 9-10, 12-14, 20, and 22-24 obvious.

### 2. A POSITA Would Not "Suspend And Not Execute" Diab's Motion Artifact Suppression Module

A POSITA would not have been motivated to "suspend and not execute" Diab's motion artifact suppression module 580 because the module is necessary to generate the clean plethysmograph waveform, which is critical to patient monitoring. (Ex. 2001, ¶¶53-59, 65-73.) As shown below, Diab's pulse rate calculation module 410 generates a heart rate [red lines] and a clean plethysmograph waveform [blue lines] through ***different*** processing paths:




FIG. 20

(Ex. 1007, 49:29-32, 50:27-29, Fig. 20; *see also id*., 39:25-30, Fig. 14; Ex. 2001, ¶53.) For example, the module 410 determines the heart rate by applying "spectral estimation" (586 or 588), "spectrum analysis" (590), "slew rate limiting" (592), and "output filter" (594) to the infrared and red signals. (Ex. 1007*,* 47:30-50:29, Fig. 20.) The pulse rate calculation module 410 ***does not*** use these same modules to process the infrared and red signals to generate the clean plethysmograph waveform. (*Id.*) Consequently, the heart rate processing path is not indicative or representative of the clean plethysmograph waveform processing path. (Ex. 2001, ¶53.)

Diab discloses that generating the clean plethysmograph waveform requires continuous operation of the motion artifact suppression module 580. (Ex. 2001,

¶¶57-59.) Diab states that the "infrared and red sample packets, the saturation value and the output of the motion status module are provided to the motion artifact suppression module 580," as illustrated by the blue lines:




FIG. 20

(Ex. 1007, 47:47-49, Figs. 20-21.)

Figure 21 (below), which is "a block diagram of the operations of the motion artifact suppression module of FIG. 20," illustrates that the motion artifact suppression module 580 uses the infrared *and* red packets to generate the clean plethysmograph waveform (highlighted yellow):




*FIG. 21*

(*Id.*, 49:14-32, Fig. 21.) For example, the "reference generator 582" subtracts the red and infrared signals from each other after multiplying by the arterial saturation ratio. (*See* Ex. 1007, 42:60-43:7 (describing operation of reference generator), 48:49-53 (stating that "reference generator 582" is the same as the corresponding module in saturation transform reference processor 530).)

Similarly, the "DC removal" [green] and "bandpass filter" [purple] modules process the infrared and red packets to generate the clean plethysmograph waveform:




FIG. 21

(*Id.*, Fig. 21.) If this processing did not occur, the oximeter could not derive the clean plethysmograph waveform from infrared and red packets and output it for presentation to a clinician. (*Id.*; *see also id.*, 5:59-60.) Importantly, Diab never discloses, and Petitioner never argues, that Diab's oximeter generates the clean plethysmograph waveform without the motion artifact suppression module 580. (Ex. 2001, ¶¶57-59, 65-66.)

Petitioner simply ignores the clean plethysmograph waveform in its analysis. (*See e.g.,* Pet. 14-18, 21-22.) For example, Petitioner's figure below focuses exclusively on the processing paths for the "heart rate determination":




(Pet. 16 (annotations in original; yellow highlighting added).) As shown and argued by Petitioner, the detection of motion affects the signal (green or purple) used by the spectrum analysis module 590 to determine the heart rate. (Ex. 1007, Figs. 20-21.) However, the detection of motion ***does not*** affect the signals used to generate the clean plethysmograph waveform. (Ex. 2001, ¶¶53-54, 65-66.) As shown above, there is only one processing path for the clean plethysmograph waveform, and the signals always go through the motion artifact suppression module 580. (*Id.*)

Petitioner argues that Diab's statement, "[i]f motion is not detected, ***spectral estimation*** on the signals is carried out directly without motion artifact suppression," allegedly "teaches not executing the motion artifact suppression

module 580 if motion is not detected." (Pet. 17-18 (quoting Ex. 1007, 47:52-56) (emphasis added).) That is incorrect. The statement merely confirms that motion affects the heart rate determination. (Ex. 2001, ¶¶53-54, 65-66.) As shown in Figure 20 (below), "spectral estimation" [purple] applies to only the heart rate processing path [red lines]:




FIG. 20

(Ex. 1007, Fig. 20; Ex. 2001, ¶¶53-54, 65-66.) "Spectral estimation" is not part of the clean plethysmograph waveform processing path [blue lines]. (Ex. 2001, ¶¶53-54, 65-66.) Thus, Petitioner's contention that carrying out "spectral estimation" without motion artifact suppression means that the motion artifact suppression module is not executed is incorrect. (*Id.*)

When cross-examined regarding this problem with Petitioner's arguments, Petitioner's declarant speculated that the phrase "spectral estimation" could refer to

some unlabeled or mislabeled process occurring in the motion artifact suppression module 580 that is suspended when motion is not detected. (Ex. 2003, 69:7-74:19.) Petitioner's declarant identified the "bandpass filter" as a module that may carry out "spectral estimation." (*Id.*)

However, this speculative argument is inconsistent with Diab's specification. (Ex. 2001, ¶67.) First, the specification uses "spectral estimation" and "bandpass filter" to refer to different modules, strongly suggesting that the modules are not the same and do not perform the same functions. (*See e.g.,* Ex. 1007, Figs. 20-21; Ex. 2001, ¶67.)

Second, Diab expressly describes the "spectral estimation" and "bandpass filter" modules and confirms the modules do not perform the same function. (Ex. 2001, ¶67.) Diab states, "the spectral estimation comprises a Chirp Z transform that provides a frequency spectrum of heart rate information." (Ex. 1007, 48:14-33.) In contrast, the bandpass filter "removes a portion of the secondary signal which is outside the known bandwidth of interest." (*Id.*, 4:59-64; *see also* 41:3-16, 48:6-13.) Thus, a POSITA would not have understood Diab's use of "spectral estimation" to refer to processes occurring in the motion artifact suppression module, including the "bandpass filter." (Ex. 2001, ¶67.)

For the above reasons, a POSITA would ***not*** have found it "obvious to suspend and not execute the operations of Diab's motion artifact suppression

module 580 if motion is not detected" because doing so would prevent generation and presentation of the clean plethysmograph waveform. (Pet. 17; Ex. 2001, ¶¶53-59, 65-69.) Petitioner has not argued, or offered any evidence, that power consumption concerns would have motivated a POSITA to eliminate the clean plethysmograph waveform. (*Id.*) For this reason, Petitioner has failed to show that Ground 1A renders the claims obvious. (*Id.*)

### 3. <u>A POSITA Would Not Have Been Motivated To Combine Diab And Amano</u>

A POSITA also would not have been motivated to combine Diab and Amano due to the differences in the systems. (Ex. 2001, ¶¶70-73.) Diab and Amano disclose different processing algorithms that result in different outputs that are not directly applicable to each other. (*Id.*) For example, Diab, as discussed herein, produces multiple patient-monitoring outputs, including a heart rate and clean plethysmograph waveform. (*See e.g.,* Ex. 1007, Fig. 14 (identifying outputs).) The same is not true for the embodiments in Amano relied upon by Petitioner. (*See e.g.,* Pet. 8-9 (citing Ex. 1004, 21:3-57, 40:23-24).) Amano's apparatus detailed in Figure 1 produces a single output, a qualitative description of the patient's pulse condition as "Hua mai, Ping mai, [or] Xuan mai." (Ex. 1004, 23:5-9.)

Moreover, unlike Diab, Amano's apparatus is specifically designed to "suspend and not execute" certain modules when no motion is detected. (Ex. 2001,

¶¶61-62, 71.) Amano includes "a judging section 22" [green] that "determines whether body movement is present or not":

FIG. 1




(*Id.*, 21:57-60, Fig. 1.) When the judging section 22 determines "that no body movement is present, the operations of the waveform treating section 21 [yellow]

and body movement component eliminating section 30 [yellow] are suspended." (*Id.*, 21:60-22:2.) Thus, Amano is designed to suspend certain modules. (*Id.*; Ex. 2001, ¶¶61-62, 71.) Diab is not. (*Id.*) As discussed herein, Diab's motion artifacts suppression module cannot be suspended because it generates the clean plethysmograph waveform. (*Supra* VII.A, C.)

Also, unlike Diab, Amano's apparatus relies on an additional sensor, an acceleration sensor, to determine the presence of motion. (Ex. 2001, ¶¶61, 72.) Amano's apparatus includes a "body movement detecting section 20" [blue], which comprises "***an acceleration sensor*** and detects the body movement of a subject":

FIG. 1




(*Id.*, 21:9-12, Fig. 1 (emphasis added).) Diab does not include an acceleration sensor to supply movement signals and instead identifies motion using detected light. (*See e.g.,* Ex. 1007, 47:50-54, Fig. 20 (detecting motion by comparing peak widths).)

For all of these reasons, a POSITA would not have had a reasonable expectation of success in combining Amano's disclosure to suspend specific modules with Diab's oximeter in view of all these differences. (Ex. 2001, ¶73.) A POSITA would have at least understood that Amano's disclosure of suspending its "body movement component eliminating section" is not applicable to Diab's motion artifact suppression module because each module has different processing responsibilities. (*Id.*; *see also supra* VII.A, VII.C (explaining why Diab's motion artifact suppression module cannot be suspended).)

For these reasons, a POSITA would not have been motivated to combine Diab with Amano and would not have reasonably expected the combination to be successful. (Ex. 2001, ¶¶70-73.)

#### 4. **Petitioner Fails To Show That Suspension Of Diab's Motion Artifact Suppression Module Would Result In Lower Power Consumption Levels**

Even if a POSITA would have been motivated to "suspend and not execute" Diab's motion artifact suppression module, Petitioner still fails to show that suspending the module would result in a lower power consumption level. (Ex. 2001, ¶¶74-78.) Petitioner and its declarant simply assume that Diab's oximeter would consume less power by suspending the motion artifact suppression module because Amano's apparatus consumes less power when it suspends specific modules. (Pet. 17-18; Ex. 1003, ¶55.) However, again, Petitioner fails to account

for the differences between Diab and Amano, and the unique aspects of Diab's oximeter. (Ex. 2001, ¶¶74-78.)

Diab's pulse rate calculation module 410 includes a motion status module 584 that signals whether motion has been detected. (Ex. 1007, 47:50-54.) As shown below, the signal generated by the motion status module 584 [green] becomes an input (*see* red line) to the spectrum analysis module 590 [orange] and the output filter 594 [pink]:



FIG. 20

(*Id.*, Fig. 20.) The spectrum analysis module 590 and output filter 594 operate ***differently*** depending on whether motion is detected. (*Id.*, 50:8-14, 50:21-29.) Petitioner does not address these differences.

With respect to the output filter 594, Diab discloses that "[i]f motion is large, this filter is slowed down, if there is little or no motion, this filter can sample much

faster and still maintain a clean value." (Ex. 1007, 50:23-27.) A POSITA would have recognized that a module that samples "much faster" will process more data and ***increase*** the power consumption level. (Ex. 2001, ¶76.) This higher power consumption level when no motion is detected directly contradicts Petitioner's argument that Diab's oximeter will operate at a lower power consumption level when no motion is detected. (*Id.*; Pet. 14-18.)

Similarly, the spectrum analysis module 590 operates differently depending on the motion status. (Ex. 2001, ¶77.) Diab states, "In the case of motion, the spectrum analysis module 590 selects the peak in the spectrum with the highest amplitude, because the motion artifact suppression module 580 attenuates all other frequencies to a value below the actual heart rate peak." (Ex. 1007, 50:8-12.) Conversely, in "the case of no motion, the spectrum analysis module selects the first harmonic in the spectrum as the heart rate as described above." (*Id.*, 50:12-14; *see also* 38:14-33 (describing selection of first harmonic).) A POSITA would have understood that the algorithms utilized by Diab when "no motion" is detected could consume more power than the algorithms utilized by Diab when motion is detected. (Ex. 2001, ¶77.)

Thus, Petitioner's assumption that suspension of Diab's motion artifact suppression module will necessarily lower the power consumption level is

incorrect. (*Id.*, ¶¶74-78.) For this additional reason, Petitioner fails to show that Ground 1A renders the claims obvious.

## D. <u>Diab And Amano Do Not Disclose Or Suggest Comparing "Processing Characteristics To A Predetermined Threshold"</u>

Again, Petitioner's analysis of this limitation is confined to claim 9. (*See* Pet. 18-20 (analyzing Limitation 9[d]).) Petitioner relies on its analysis in claim 9 to argue that independent claims 12, 20, and 22 also meet this limitation. (*Id.*, 23, 27-28.) Thus, Masimo responds to Petitioner's analysis of claim 9 below, but the response applies equally to claims 12, 20, and 22.

Limitation 9[d] requires "comparing processing characteristics to a predetermined threshold." (Pet. 18; *see also id.,* Pet. 23, 27-28 (same limitation in other independent claims).) Petitioner fails to demonstrate how Diab expressly or inherently discloses this limitation. (Ex. 2001, ¶¶79-84.)

Diab's heart rate module 410 uses the "average peak width value" as an "input to a motion status module 584 [red]":




FIG. 20

(Ex. 1007, 47:43-47, Fig. 20.) Diab discloses, "if the peaks are wide, this is taken as an indication of motion." (*Id.*, 47:51-52; *see also id.*, 46:53-55 ("The width of the peaks provides some indication of motion by the patient – wider peaks indicating motion.").) However, Diab does not disclose how the oximeter determines whether peaks are "wide." (Ex. 2001, ¶¶55, 80.)

Petitioner argues that a "POSITA would have understood that in order to determine whether the peaks are 'wide,' the 'average peak width value' would be compared to a width value above which the peaks are considered 'wide' (a threshold)." (Pet., 19-20 (quoting Ex. 1007, 47:50-56).) Thus, Petitioner argues that Diab discloses Limitation 9[d], although Petitioner fails to articulate whether the disclosure is express or inherent. (*Id.*; *see also* Ex. 1003, ¶56 ("the signal processor compares processing characteristics to a predetermined threshold"), ¶57

("Diab teaches comparing processing characteristics…to a predetermined threshold….").) Petitioner never argues that Diab renders Limitation 9[d] obvious. Petitioner's argument that Diab discloses this limitation, either expressly or inherently, fails for two reasons.

First, Petitioner fails to show that Diab expressly discloses this limitation. In fact, Petitioner entirely overlooks that independent claims 9, 12, 20, and 22 require a "***predetermined*** threshold." The Petition does not identify how Diab allegedly satisfies the "predetermined" requirement. In fact, Petitioner does not even use the word "predetermined" in analyzing Limitation 9[d], aside from quoting the claim language. (Pet. 18-20.) Petitioner's conclusion highlights this omission and states, "the 'average peak width value' would be compared to a width value above which the peaks are considered 'wide' (*a* ***threshold***)." (*Id.*, 19-20 (emphasis added).)

Petitioner's declarant largely copies the Petition in addressing this limitation. (Ex. 1003 ¶¶56-57.) However, Petitioner's declarant includes a final conclusory sentence stating, "Accordingly, Diab teaches comparing processing characteristics ("average peak width value") to a predetermined threshold (a value corresponding to 'wider peaks indicating motion')." (*Id.* ¶57 (emphasis added).) Petitioner's declarant cites a small section of Diab as allegedly supporting this conclusion. (*Id.* (citing Ex. 1007, 47:50-56).) However, the cited section does not use the word predetermined and Petitioner's declarant does not explain how the section teaches

a "predetermined threshold." (Ex. 1003, ¶57.) Thus, the declarant's unsubstantiated and conclusory opinion is insufficient to meet Petitioner's burden to show that Diab describes a "predetermined threshold." *See* 37 C.F.R. § 42.65; *Harmonic*, 815 F.3d at 1363.

Second, Petitioner has failed to show that Diab inherently teaches the "predetermined" limitation. Petitioner never demonstrates, or even argues, that Diab ***necessarily*** compares the average peak width to a predetermined threshold. *See Schering Corp. v. Geneva Pharms., Inc.,* 339 F.3d 1373, 1377 (Fed. Cir. 2003) (inherency requires a showing that the limitation is "necessarily present" in the art).

Moreover, even if Petitioner had made a *prima facie* case for inherency, a POSITA would not have understood Diab's oximeter to "necessarily" compare the average peak width to a predetermined threshold. (Pet. 19-20; Ex. 2001, ¶83.) Rather, a POSITA would have understood that Diab's oximeter could evaluate the peak width by comparing each new peak to an average of the most recent peak widths. (Ex. 2001, ¶83.) Alternatively, a POSITA would have understood that the oximeter could compare each new peak to the most recent peak width to determine whether the new peak is "wide." (*Id.*) Notably, other modules in Diab's oximeter operate by comparing new data points to recent data points including, for example,

the "clip and smooth filter." (Ex. 1007, 46:61-63 ("the clip and smooth filter 566 takes each new saturation value and compares it to the current saturation value").)

For these reasons, Petitioner has failed to meet its burden to demonstrate that Diab discloses, either expressly or inherently, "comparing processing characteristics to a predetermined threshold."

### E. Diab And Amano Do Not Disclose Or Suggest Reducing An Amount Of Processing By A Signal Processor

Petitioner also failed to show that Diab and Amano disclose "continuously operating at said lower power consumption level comprises reducing an amount of processing by a signal processor." (Ex. 2001, ¶¶85-90.) Petitioner argues that "performing 'spectral estimation on the signals … directly without motion artifact suppression' includes reducing an amount of processing because the signal processor process less data (only infrared samples) and 'without motion artifact suppression.'" (Pet. 22.) Petitioner is incorrect for two reasons.

First, Petitioner's argument relies on the faulty premise that a POSITA would have been motivated to "suspend and not execute" Diab's motion artifact suppression module and that the oximeter would process "only infrared samples." (*Id.*, 21.) As demonstrated herein, Diab's motion artifact suppression module operates continuously to generate the clean plethysmograph waveform and a POSITA would not have been motivated to "suspend and not execute" it. (*Supra* VII.A, VII.C.)

Second, even if the motion artifact suppression module were suspended, as Petitioner argues, a POSITA still would have understood that Diab's oximeter may process ***more*** data when no motion is detected. (Ex. 2001, ¶¶87-90.) The motion status module 584 signals whether the oximeter has detected motion. (Ex. 1007, 47:50-54.) As shown below, the signal generated by the motion status module 584 is an input (*see* red line) to the spectrum analysis module 590 [orange] and the output filter 594 [pink]:




FIG. 20

(*Id.*, Fig. 20.)

With respect to the output filter 594, Diab discloses that "[i]f motion is large, this filter is slowed down, if there is little or no motion, this filter can sample much faster and still maintain a clean value." (Ex. 1007, 50:23-27.) A POSITA would have recognized that a module that samples "much faster" processes ***more*** data.

(Ex. 2001, ¶88.) This increase in processing when no motion is detected directly contradicts Petitioner's assertion that Diab's oximeter will process less data when no motion is detected. (*Id.*)

Similarly, the spectrum analysis module 590 operates differently depending on the motion status. Diab states, "In the case of motion, the spectrum analysis module 590 selects the peak in the spectrum with the highest amplitude, because the motion artifact suppression module 580 attenuates all other frequencies to a value below the actual heart rate peak." (Ex. 1007, 50:8-12.) "In the case of no motion, the spectrum analysis module selects the first harmonic in the spectrum as the heart rate as described above." (Ex. 1007, 50:12-14; *see also* 38:14-33 (describing selection of first harmonic).) A POSITA would have understood that the algorithms utilized by Diab when "no motion" is detected could consume more power than the algorithms utilized by Diab when motion is detected. (Ex. 2001, ¶89.) Again, this contradicts Petitioner's arguments.

For all of these reasons, a POSITA would not have found it obvious that Diab processes less data when no motion is detected. (Ex. 2001, ¶90.) Consequently, Petitioner fails to demonstrate that Ground 1A renders the challenged claims unpatentable.

## VIII. GROUND 1B FAILS TO DEMONSTRATE OBVIOUSNESS

In Ground 1B, Petitioner argues that the combination of Diab, Amano, and Edgar renders dependent claims 11 and 21 obvious. (Pet. 3.) Petitioner argues that Edgar satisfies the additional limitations of claims 11 and 21. Petitioner does not argue that Edgar satisfies any limitations in independent claims 9, 12, 20, and 22. Therefore, Ground 1B fails to render claims 11 and 21 unpatentable for at least the same reasons as Ground 1A.

Moreover, a POSITA would not have been motivated to combine Edgar with Diab. Edgar discloses methods of "processing measured signals to remove unwanted signal components caused by noise and especially noise caused by motion artifacts." (Ex. 1005, 1:15-18.) Edgar specifically purports to address a need in the art for "a method, apparatus and system to eliminate motion-induced noise artifacts from light signals, that is relatively simple computationally, and that does not require more than one sensor." (*Id.*, 5:1-4.)

Notably, Edgar argues that Diab does not satisfy this need and expressly distinguishes Diab. Edgar argues, "U.S. Pat. No[]. … 5,632,272 … to Diab, disclose[s] methods and apparatuses for removing motion artifacts using adaptive noise cancellation techniques" that require two or more measured signals. (*Id.*, 3:60-64.) Edgar argues that the "Diab et al. approach appears to require the use of both measured input signals to generate a noise reference signal," and suggests that

the Edgar's inventions provide an advantage over Diab's approach. (*Id.*, 4:4-6, 5:1-4.)

Thus, because Edgar distinguishes Diab's approach to cancelling noise, a POSITA would not have been motivated to combine Edgar with Diab, as Petitioner argues in Grounds 1B and 2B. (Ex. 2001, ¶¶91-93.)

## IX. <u>GROUND 1C FAILS TO DEMONSTRATE OBVIOUSNESS</u>

In Ground 1C, Petitioner argues that the combination of Diab, Amano, and Turcott render claims 1-7 and 15-18 obvious. (Pet. 3.) Independent claims 1 and 15 include similar limitations as the claims discussed in Ground 1A, except for their final limitation (Limitations 1[f] and 15[e]). Limitations 1[f] and 15[e] require "reducing/reduce activation of an attached sensor." Petitioner argues that Turcott discloses this limitation. (Pet. 41-42, 46.) Petitioner does not allege that Turcott satisfies any other limitations in independent claims 1 and 15. (*Id.*) Consequently, Ground 1C fails to show obviousness for many of the same reasons as Ground 1A.

Moreover, Petitioner failed to show that Diab, Amano, and Turcott disclose or suggest "reducing/reduce activation of an attached sensor." (Ex. 2001, ¶¶101-104.) Petitioner also failed to show that a POSITA would have been motivated to combine Diab, Amano, and Turcott. (*Id.*) For all of these reasons, Petitioner failed to meet its burden to show that Ground 1C renders claims 1-7 and 15-18 obvious.

## A. Ground 1C Fails For The Same Reasons As Ground 1A

Like independent claims 9, 12, 20, and 22 discussed in Ground 1A, independent claims 1 and 15 require (1) operating a patient monitor "at a lower power consumption level to determine measurement values for one or more physiological parameters of (a/said) patient," and (2) "transitioning to continuously operating … at a higher power consumption level." Petitioner does not make any new arguments regarding these limitations in Ground 1C. (Pet. 41, 46.) Rather, Petitioner simply refers back to its arguments in Ground 1A. (*Id.*) Therefore, Ground 1C fails to render these limitations obvious for the same reasons as Ground 1A. (*Supra* VII.C.)

Similarly, independent claims 1 and 15 also require "comparing processing characteristics to a predetermined threshold." Again, Petitioner does not make any new arguments regarding this limitation in Ground 1C. (Pet. 41, 46.) Petitioner simply refers back to its arguments in Ground 1A. (*Id.*) Therefore, Ground 1C fails to render this limitation obvious for the same reasons as Ground 1A. (*Supra* VII.D.)

## B. Overview Of Turcott

Turcott addresses a different medical problem than the '703 patent and fails to disclose the '703 patent's claimed inventions. (Ex. 2001, ¶96.) Turcott discloses an invasive "implantable monitoring device" for "monitoring the status of a patient

with a chronic disease such as heart failure using heart and lung sounds." (Ex. 1006, 1:13-16.) Turcott explains that physicians have difficulty preventing heart failure because the disease progresses quickly and the physicians lack timely information. (*Id.*, 1:19-52.) Thus, Turcott proposes invasively implanting a device in the patient's chest that can detect the sounds made by the patient's heart and lungs and relay that information to the physician several times a day. (*Id.*, 6:58-730.) Turcott asserts that changes in the sounds made by the heart and lungs can signal a medical problem. (*Id.*)

Turcott's device is sized and shaped to be invasively implanted within a tissue pocket in the patient. (*Id.*, 8:65-9:4, 14:11-12.) The device includes a diaphragm, or other component, that can sense acoustic signals (i.e., sounds of the heart or lungs) at different time intervals. (*Id.*, 6:58-17, 9:49-52.) The device calculates the energy of the acoustic signal at each time and compares the energies to determine whether the condition of the patient has deteriorated. (*Id.*)

The device includes an antenna that allows the device to transmit data to an external telemetry unit. (*Id.*, 12:65-13:13:46.)




Fig. 6

(*Id.*, Fig. 6.)

In one embodiment, the implantable device also includes a "light source 26 and detector 28, preferably LEDs and photodiode, respectively." (*Id.*, 9:28-29.) "The source and detector are preferably placed on the side of the device that, following implantation, faces the chest wall." (*Id.*, 9:35-37.) The source and detector are "used for both vascular plethysmography and for measuring the oxygen saturation of arterial hemoglobin." (*Id.*, 9:30-32.)

### C. <u>Petitioner Fails To Show That Turcott Discloses Or Suggests "Reducing/Reduce Activation Of An Attached Sensor" In Combination With The Other Claim Limitations</u>

Claim 1 requires operating at lower and higher power consumption levels "wherein continuously operating at said lower power consumption level comprises reducing activation of an attached sensor." Similarly, claim 15 requires, operating at lower and higher power consumption levels "wherein processors reduce activation of an attached sensor." Diab discloses operating its emitters at only a constant duty cycle (i.e., a 25% duty cycle). (Ex. 1007, 36:6-15.) Thus, Petitioner argues that Turcott would have motivated a POSITA to modify Diab and Amano to render these limitations obvious. (Pet. 41-42, 46.) Petitioner is incorrect.

Turcott does not disclose or suggest reducing the activation of a sensor during monitoring to lower power consumption levels as disclosed in the '703 patent. (Ex. 2001, ¶¶42, 101-104.) Rather, Turcott suggests operating a light source according to a constant low duty cycle. (*Id.*) For example, Turcott states, "[t]o conserve energy, the source is preferably driven with ***a low duty cycle*** pulse train." (Ex. 1006, 11:51-52 (emphasis added); Ex. 2001, ¶101.) Turcott never discusses intermittently operating the patient monitor at different duty cycles. (Ex. 2001, ¶¶42, 102.)

Similarly, Turcott states, "[t]he optical power generated by the source is adjusted to optimize the signal to noise ratio and to minimize power consumption."

(Ex. 1006, 11:54-57.) Turcott continues "[t]his can be done by adjusting the drive current, the frequency of the pulse train, the pulse duration, or the duty cycle of the pulse train." (*Id.*, 11:57-59.) A POSITA would have understood that Turcott does not disclose or enable making these adjustments in real-time during patient monitoring. (Ex. 2001, ¶¶42, 103.) For example, Turcott does not identify any conditions during patient monitoring that would trigger a reduction in the duty cycle. (*Id.*) Turcott also does not disclose the hardware and software necessary to make the real-time adjustments. (*Id.*) Thus, rather than disclosing reducing activation of a sensor during patient monitoring, a POSITA would have understood Turcott to suggest selecting the parameters once during product design or setup. (*Id.*)

For these reasons, Petitioner has failed to show that Diab, Amano, and Turcott disclose this limitation. (*Id.*, ¶104.)

## D. A POSITA Would Not Have Been Motivated To Combine Diab, Amano, And Turcott To Arrive At The Claimed Inventions

Petitioner fails to explain why Turcott would have motivated a POSITA to ***reduce*** activation of Diab's sensors during monitoring. (Ex. 2001, ¶¶105-114.) Petitioner argues that a "POSITA would have been motivated to implement Turcott's teachings … in Diab's oximeter (as supplemented with Amano's teachings) to further minimize power consumption of the combined device." (Pet. 39; *see also* Ex. 1003, ¶¶81-82 (also identifying a motivation to "minimize power

consumption").) However, as described herein, Petitioner's explanation does not provide a motivation to reduce activation of Diab's sensor.

First, if a POSITA merely wanted to "minimize power consumption" of a patient monitor, the POSITA would have set the activation of the sensor at a single level associated with a low power consumption. (Ex. 2001, ¶106.) The POSITA would have had no motivation to ever increase the activation of the sensor and operate the patient monitor at a higher power consumption level, as required by claims 1 and 15. (*Id.*) Operating Diab's sensor at a constant power consumption level would have been consistent with Diab's disclosure, which only describes Diab's emitters as operating at a constant 25% duty cycle. (Ex. 1007, 36:6-15.) Petitioner never identifies any motivation for a POSITA to intermittently reduce activation of Diab's sensor during patient monitoring. (Ex. 2001, ¶106.)

Second, a POSITA would have been ***discouraged*** from reducing activation of Diab's sensor, as argued by Petitioner, without proper patient and signal protections in place. (*Id.,* ¶107.) The '703 patent discloses that patient monitors may need to increase activation of the sensor during "low signal quality periods or when critical measurements are necessary" because a sensor operating at a reduced activation level may be more likely to miss important events. (Ex. 1001, 6:9-24; Ex. 2001, ¶107.) Consequently, the '703 patent describes methods to trigger the monitor to increase sensor activation during these critical times. (*Id.*) Diab and

Turcott do not include a feedback loop whereby physiological measurements or signal statistics are used to adjust the sensor activation level. (*Id.*) Moreover, Petitioner does not propose modifying Diab or Turcott to include such a feedback loop.

Petitioner also suggests that Turcott would have motivated a POSITA to reduce Diab's emitter drive current. (Pet. 42.) As discussed in the claim construction section, reducing drive current is not "reducing activation of an attached sensor" as required by the claims. (*Supra* VI.A.) Moreover, a POSITA would not have been motivated to reduce Diab's emitter drive current. (Ex. 2001, ¶108.) Diab discloses "changing the emitter drive current can alter the emitter wavelength, which in turn affects the end result in oximetry calculations." (Ex. 1007, 37:22-24.) Consequently, Diab states, "it would be advantageous to fix the emitter drive current for all patients." (*Id.*, 37:24-26.) Based on this disclosure, a POSITA would not have been motivated to reduce Diab's drive current because doing so could disadvantageously affect the oximeter readings. (Ex. 2001, ¶108.) For these reasons, a POSITA would not have been motivated to reduce activation of Diab's sensor based on Turcott. (*Id.*)

Third, Turcott is not from the same field as Diab according to Petitioner's declarant. Petitioner's declarant states, "The '703 patent and the prior art references discussed herein are all from the field of non-invasive optical

biosensors." (Ex. 1003, ¶16.) Petitioner's declarant confirmed during cross-examination that this statement accurately characterizes the relevant field. (Ex. 2003, 23:1-20.)

However, Turcott describes an ***invasive*** "implantable monitoring device" for "monitoring the status of a patient with a chronic disease such as heart failure using heart and lung sounds." (Ex. 1006, 1:13-16.) Turcott's device is sized and shaped to be implanted within a tissue pocket in the patient. (*Id.*, 8:65-9:4, 14:11-12; *see also* Ex. 2003, 26:10-16 (testifying that device implanted "under the skin would generally not be considered a non-invasive biosensor as it is invading the skin").) Based on this difference, a POSITA would have understood that Turcott does not disclose adjusting the activation level of its sensors in real-time, but rather discloses operating the invasive implantable device at a constant low duty cycle to prolong the life of the device. (Ex. 2001, ¶¶109-110.) A POSITA would have appreciated that the patient would need to undergo surgery every time the device ran out of power. (*Id.*) Consequently, a POSITA would have been discouraged from ever running the invasive implantable device at a higher power consumption level, as required by the challenged claims, because that would reduce the life of the device. (*Id.*; *see also* Ex. 1001, 6:64-66 (disclosing that the emitter drivers "require a significant portion of the overall pulse oximeter power budget").)

Fourth, Petitioner fails to explain how the combination of Turcott, Diab, and Amano would operate to adjust activation of Diab's sensors "when the oximeter is operating at the lower power consumption level." (Pet. 42; Ex. 2001, ¶¶111-113.) In Ground 1A (claim 9), Petitioner identifies the "lower power consumption level" as the period when Diab's oximeter detects no motion and has allegedly "suspend[ed] and not execut[ed]" the motion artifact suppression module. (Pet. 17-18, 20.) In Ground 1C, Petitioner argues a "POSITA would have recognized that the predictable modification of Diab … as suggested by Turcott would include implementing the oximeter's signal processor to reduce the drive current or the duty cycle of the pulse train of the LEDs when the oximeter is operating at the lower power consumption level, further minimizing power consumption." (*Id.*, 42.) However, in order for Diab's oximeter to reduce activation of Diab's sensors at the lower power consumption level (i.e., during a period of no motion), the oximeter must send the motion status signal to control the emitter drivers and the emitter drivers must be capable of changing the duty cycle of supplied current between different non-zero duty cycles. (Ex. 2001, ¶¶111-113.) If the motion status signal is not provided to control the emitter drivers, the oximeter cannot synchronize the lower power consumption level (i.e., the detection of no motion) with a corresponding reduction in sensor activation. (*Id.*) If the emitter drivers are incapable of changing the duty cycle of supplied current between different non-

zero duty cycles, Diab's oximeter is unable to operate the emitters at different non-zero duty cycles. (*Id.*) As explained herein, Diab does not provide the motion status signal to control the emitter drivers and also does not describe that the emitter drivers are capable of changing the duty cycle of supplied current between different non-zero duty cycles, and Petitioner does not suggest any modifications to Diab to facilitate this process and different capability. (*Id.*)

As shown in Diab's Figure 20, the motion status 584 [green] is used as an input only in the pulse rate determination module 410:




FIG. 20

(Ex. 1007, 47:30-38, 47:50-54, 47:63-65, Fig. 20.) Diab never discloses that the motion status is used as an input to any other modules, and particularly not as in input to control the emitter drivers. (Ex. 2001, ¶112.) Thus, a POSITA would have recognized that Diab's oximeter could not synchronize the detection of no motion

(and the alleged suspension of the motion artifact suppression module) with a reduction in the activation of an attached sensor without modifications to Diab's hardware and/or software. (*Id.*)

Petitioner does not propose any modifications to Diab's hardware and/or software to address these deficiencies. (*See e.g.,* Pet. 41-43.) Therefore, Petitioner has failed to meet its burden of demonstrating a POSITA would have been motivated to combine Turcott, Diab, and Amano to reduce activation of an attached sensor, much less that a POSITA would have had a reasonable expectation of success in so doing. (Ex. 2001, ¶113.)

For all the above reasons, a POSITA would not have been motivated to combine Diab, Amano, and Turcott to arrive at the claimed inventions. (Ex. 2001, ¶¶105-114.)

## X. GROUNDS 2A-2C FAIL TO DEMONSTRATE OBVIOUSNESS

In Grounds 2A-2C, Petitioner replaces Amano in Grounds 1A-1C with "the General Knowledge of a POSITA (GK-POSITA)." Thus, in Ground 2A, Petitioner argues that the combination of Diab and the GK-POSITA renders claims 9-10, 12-14, 20, and 22-24 obvious. (Pet. 3.) In Ground 2B, Petitioner argues that the combination of Diab, GK-POSITA, and Edgar renders dependent claims 11 and 21 obvious. (*Id.*) In Ground 2C, Petitioner argues that Diab, GK-POSITA, and Turcott render claims 1-7 and 15-18 obvious. (*Id.*)

Grounds 2A-2C fail to show obviousness for the same reasons as Grounds 1A-1C. (Ex. 2001, ¶¶115-119.) For example, in Grounds 2A-2C Petitioner repeats the argument from Ground 1A that "a POSITA would have found it obvious that Diab's oximeter likewise reduces power consumption by not performing motion artifact suppression when no motion is detected." (Pet. 47.) However, as explained in Ground 1A, Diab never suspends the motion artifact suppression module and a POSITA would not have been motivated to do so. (*Supra* VII.A, VII.C.)

Similarly, Petitioner repeats the argument from Ground 1A that a "POSITA would have further understood that Diab's oximeter reduces the amount of processing by the signal processor when motion is not detected by processing less data (only infrared samples) and 'without motion artifact suppression,' thereby reducing the power consumed the processor." (Pet. 48.) Again, as explained in Ground 1A, Diab does not operate at a lower power level or process less data when motion is not detected. (*Supra* VII.A, VII.C.)

Moreover, Petitioner does not address many of the limitations missing from Diab and Amano, including "comparing processing characteristics to a predetermined threshold" and "reducing/reduce activation of an attached sensor." (*Supra* VII.D, IX.B-C.) Nor does Petitioner address the motivation to combine Diab, the "general knowledge of a POSITA," and Turcott and particularly does not

address the many reasons a POSITA would not have been motivated to combine Diab and Turcott. (*Supra* VII.A, IX.D.)

For these many reasons, Petitioner has failed to show that Grounds 2A-2C render the challenged claims unpatentable.

## XI. GROUNDS 3A-3B FAIL TO SHOW OBVIOUSNESS

In Grounds 3A-3B, Petitioner argues that Amano renders claims 1-3, 9-10, 12-17, 20, and 22-24 obvious. (Pet. 3.) However, Petitioner fails to show that Amano discloses or suggests at least two limitations of independent claims 1, 9, 12, 15, 20, and 22: (1) determining "measurement values for one or more physiological parameters of a patient" and (2) "comparing processing characteristics to a predetermined threshold." (Ex. 2001, ¶121.) Petitioner also fails to show that the combination of Amano and Turcott in Ground 3B discloses or suggests "reducing activation of an attached sensor." (*Id.*) For at least these reasons, Petitioner has not met its burden of demonstrating that Grounds 3A-3B renders the identified claims unpatentable. (*Id.*)

### A. Petitioner Fails To Show That Amano Discloses Determining Measurement Values For One Or More Physiological Parameters

The challenged claims all require continuously operating "at a lower power consumption level to determine measurement values for one or more physiological parameters of said patient" (identified by Petitioner as Limitation 9[c]). Petitioner purportedly addresses this limitation in claim 9, and then relies on its claim 9

analysis for claims 12, 20, and 22. (*See e.g.,* Pet. 54-55 (addressing "Limitation 9[c]"), *id.*, 59, 62-63, 66, 69 (relying on "Limitation 9[c]").) Consequently, Masimo focuses its response on Petitioner's discussion of claim 9, although the response applies to all of the independent claims.

### 1. <u>Petitioner Fails To Address All Elements In Limitation 9[c]</u>

Petitioner fails to address two elements of Limitation 9[c]: (1) "measurement values" and (2) "physiological parameters of a patient." (*See* Pet. 54-55, 59, 62-63, 66, 69.) Petitioner never explains with specificity how Amano discloses these limitations or renders them obvious. (*Id.*) In fact, Petitioner never uses the words "measurement values" or "physiological parameters" when addressing Limitation 9[c]. (*Id.*)

Petitioner's supporting declaration does not help. In discussing Limitation 9[c], Petitioner cites two paragraphs of the declaration. (Pet. 54-55 (citing Ex. 1003, ¶¶104-105.) While the declaration cites the claim language and, therefore, uses the words "measurement values" and "physiological parameters," the declaration is otherwise the same as the Petition. (*Compare* Pet. 54-55 *with* Ex. 1003, ¶¶104-105.) The declaration never explains with any specificity how Amano discloses "measurement values" or "physiological parameters."

Thus, because Petitioner fails to address two claim elements, it has not met its burden "to show with particularity why the patent it challenges is unpatentable."

*Harmonic*, 815 F.3d at 1363. Consequently, Grounds 3A-3B cannot render the claims obvious.

### 2. Amano Does Not Determine Measurement Values

Petitioner argues that the embodiment in Figure 1 of Amano satisfies Limitation 9[c]. (Pet. 54-55.) Below is an annotated version of Figure 1 prepared by Petitioner:




APPLE-1004, Detail of FIG. 1 (annotated)

(*Id.*, 55.)

As explained herein, Figure 1 depicts "a pulse wave examination apparatus which can judge the pulse condition objectively and accurately." (Ex. 1004, 3:20-23.) Consistent with this description, the embodiment in Figure 1 provides a single output through the notifying section 80 that qualitatively describes the patient's pulse condition according to classifications from Chinese medicine. (*Id.*, 1:39-45, 23:5-9.) Amano states, "For instance, the notifying section 80 displays the characters 'Hua mai, Ping mai, Xuan mai' or symbols, e.g., icons." (*Id.*, 23:5-7.) Notably, Amano does not disclose that the notifying section displays any measurement values. (Ex. 2001, ¶¶124-127.)

Amano confirms that Hua mai, Ping mai, and Xuan mai are not measurement values but qualitative classifications of the patient's condition. Amano defines "Ping mai" as "the pulse condition of a normal man in good health." (Ex. 1004, 1:46-48.) "Hua mai … is the pulse condition of a man who shows an abnormality in his blood stream condition." (*Id.*, 1:51-53.) "Xuan mai … is the pulse condition of a man whose blood vessel wall tension has increased." (*Id.*, 1:64-66.)

Thus, because Amano does not "determine measurement values for one or more physiological parameters," Grounds 3A-3B cannot render the claims obvious for this additional reason. (Ex. 2001, ¶¶124-127.)

**B. <u>Petitioner Admits That Amano Does Not Compare "Processing Characteristics" To A Predetermined Threshold</u>**

Petitioner admits that Amano does not compare processing characteristics to a predetermined threshold under the proper construction of "processing characteristics." (Pet. 50-51.) As explained in the claim construction section, the proper construction of "processing characteristics" requires that the processing characteristics are determined from a signal received from one or more detectors configured to detect light. (*Supra* VI.B.2.) Petitioner admits that Amano does not determine the processing characteristics from a signal received from one or more detectors configured to detect light. (Pet. 50-51.) Rather, Amano receives the processing characteristics from an acceleration sensor, which is a different component than the detector that detects light. (*See e.g.,* Pet. 50; Ex. 1004, 21:9-12.)

The only comparison to a threshold that Petitioner identifies in Amano happens in the judging section 22 [green]:

F I G. 1




(Pet. 55-56; Ex. 1004, 21:58-63, Fig. 1.) The "judging section determines whether body movement is present or not, based on the body movement waveform TH, to yield a control signal C." (Ex. 1004, 21:58-63, Fig. 1.) The "judgment section 22 makes a judgment by comparing a threshold value with the body movement waveform TH." (*Id.*) However, as Amano repeatedly states, and Petitioner admits, the body movement waveform TH, which Petitioner identifies as the "processing

characteristics," is received from an "acceleration sensor," not a detector configured to detect light. (*Id.*, 21:9-12, 35:25-27, 40:65-41:3; Pet. 50.)

Thus, there is no dispute that Grounds 3A-3B cannot render the claims obvious under the proper construction of "processing characteristics." (Ex. 2001, ¶¶128-129.)

### C. <u>Petitioner Fails To Show That Turcott Discloses Or Suggests "Reducing/Reduce Activation Of An Attached Sensor" In Combination With The Other Claim Limitations</u>

In Ground 3B, Petitioner argues that the combination of Amano and Turcott renders claims 1-3 and 15-17 obvious. (Pet. 3.) However, as discussed in Ground 1C, Turcott does not disclose or suggest reducing the activation of a sensor during monitoring to lower power consumption levels as disclosed in the '703 patent. (*Supra* IX.B-C.) Thus, Amano and Turcott cannot render the above-identified claims obvious.

Moreover, Petitioner fails to adequately explain why Turcott would have motivated a POSITA to ***reduce*** activation of Amano's sensor during monitoring. (Ex. 2001, ¶¶131-136.) Petitioner argues that a "POSITA would have been motivated to implement Turcott's teachings of reducing the duty cycle to lower power consumption in a pulse oximeter in combination with Amano's pulse wave examination apparatus to further minimize power consumption." (Pet. 65.) However, as discussed herein, the desire to minimize power consumption would

have motivated a POSITA to operate Amano's sensor at a ***constant*** low duty cycle. (Ex. 2001, ¶131.) Petitioner has not identified any motivation to intermittently reduce activation of Amano's sensor during monitoring and alternate between lower and higher power consumption levels. (*Id.*)

Moreover, a POSITA would have been discouraged from reducing activation of Amano's sensor without the proper protections in place. The '703 patent recognizes that the patient monitor may miss patient events when the sensor is less active, particularly during periods of low signal quality. (Ex. 1001, 6:9-24; Ex. 2001, ¶132.) Consequently, the '703 patent describes methods to trigger the monitor to increase sensor activation during "low signal quality periods or when critical measurements are necessary." (*Id.*) Neither Amano nor Turcott include these protections and Petitioner does not propose to add any. For this reason, a POSITA would not have been motivated to reduce activation of Amano's sensor based on Turcott. (Ex. 2001, ¶132.)

Petitioner also fails to explain how the combination of Amano and Turcott would operate to adjust activation of Amano's sensors "[w]hen the apparatus is operating in the lower power consumption state." (Pet. 67; Ex. 2001, ¶¶133-135.) In Ground 3A (claim 9), Petitioner identifies the "lower power consumption level" as the period when Amano's apparatus detects no body movement and suspends the operations of the waveform treating section 20 and body movement component

eliminating section 30. (Pet. 54-55.) In Ground 3B, Petitioner argues that the combined apparatus would reduce the drive current or the duty cycle of the pulse train of the LED when the apparatus is operating in the lower power consumption state. (*Id.*, 67.) However, as discussed with respect to Diab (*supra* IX.D), in order for Amano's apparatus to reduce activation of its sensors at the lower power consumption level (i.e., during a period of no body movement), the apparatus must send the body movement signal to control the emitter drivers and the emitter drivers must be capable of changing the duty cycle of supplied current between different non-zero duty cycles. (Ex. 2001, ¶133.) If the body movement signal is not provided to the emitter drivers, the apparatus cannot synchronize the lower power consumption level (i.e., the detection of no body movement) with a corresponding reduction in sensor activation. (*Id.*) If the emitter drivers are incapable of changing the duty cycle of supplied current between different non-zero duty cycles, Amano's apparatus is unable to operate the emitters at different non-zero duty cycles. (*Id.*) As explained herein, Amano does not provide the body movement signal (determined by the "judging section") to the emitter drivers and also does not describe that the emitter drivers are capable of changing the duty cycle of supplied current between different non-zero duty cycles, and Petitioner does not suggest any modifications to Amano to facilitate this process and different capability. (*Id.*)

As shown in Amano's Figure 1, the output of the judging section 22 [green] is used as an input only for the waveform treating section 21 and body movement component eliminating section 30:

F I G. 1




(Ex. 1004, 21:57-22:6, Fig. 1.) Diab never discloses that the body movement signal is used as an input to any other modules, and particularly not as in input to control

the emitter drivers. (Ex. 2001, ¶134.) Thus, a POSITA would have recognized that Amano's apparatus could not synchronize the detection of no body movement with a reduction in the activation of an attached sensor without substantial modifications to Amano's hardware and/or software. (*Id.*)

Petitioner does not propose any modifications to Amano's hardware and/or software to address these deficiencies. (*See e.g.,* Pet. 66-67.) Therefore, Petitioner has failed to meet its burden of demonstrating a POSITA would have been motivated to combine Amano and Turcott to reduce activation of an attached sensor, much less that a POSITA would have had a reasonable expectation of success in so doing. (Ex. 2001, ¶135.)

For all the above reasons, a POSITA would not have been motivated to combine Amano and Turcott to arrive at the claimed inventions. (Ex. 2001, ¶¶130-136.)

## XII. CONCLUSION

For the reasons stated above, Petitioner has not shown by a preponderance of the evidence that the challenged claims are unpatentable. Thus, Masimo requests that the Board issue a final written decision that the challenged claims are not unpatentable.

Respectfully submitted,
KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: July 28, 2021

/Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)
Customer No. 64,735

Attorney for Patent Owner
Masimo Corporation

**CERTIFICATE OF COMPLIANCE**

Pursuant to 37 C.F.R. § 42.24(d), Counsel for Patent Owner Masimo Corporation hereby certifies that this document complies with the type-volume limitation of 37 C.F.R. § 42.24(b). According to Microsoft Office Word 2010's word count, this document contains approximately 13,977 words, including any statement of material facts to be admitted or denied in support, and excluding the table of contents, table of authorities, mandatory notices under § 42.8, exhibit list, certificate of service or word count, or appendix of exhibits or claim listing.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: July 28, 2021

/Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)
Customer No. 64,735

Attorney for Patent Owner
Masimo Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that, pursuant to 37 C.F.R. § 42.6(e) and with the agreement of counsel for Petitioner, a true and correct copy of **PATENT OWNER RESPONSE and EXHIBITS 2001-2005** is being served electronically on July 28, 2021, to the e-mail addresses shown below:

W. Karl Renner, Reg. No. 41,265
Dan Smith, Reg. No. 71,278
Kim Leung, Reg. No. 64,399
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Tel: 202-783-5070
Fax: 877-769-7945
Email: IPR50095-0002IP1@fr.com
Email: PTABInbound@fr.com; axf-ptab@fr.com; dsmith@fr.com; leung@fr.com

Dated: July 28, 2021

/Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)

Attorney for Patent Owner
Masimo Corporation

33638668