# EXHIBIT 2

Filed: August 2, 2021

Filed on behalf of:
Patent Owner Masimo Corporation
By: Joseph R. Re (Reg. No. 31,291)
Jarom D. Kesler (Reg. No. 57,046)
Joshua J. Stowell (Reg. No. 64,096)
Stephen W. Larson (Reg. No. 69,133)
Jacob L. Peterson (Reg. No. 65,096)
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Tel.: (949) 760-0404
Fax: (949) 760-9502
E-mail: AppleIPR2020-1524-776@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

Case IPR2020-01524
U.S. Patent 10,433,776

**PATENT OWNER RESPONSE**

# TABLE OF CONTENTS

**Page No.**


I. INTRODUCTION ..... 1

II. MASIMO'S PIONEERING TECHNOLOGY ..... 3

A. The '776 Patent ..... 3

B. Introduction To Independent Claims ..... 8

C. Prosecution Of The '776 Patent ..... 10

III. PETITIONER'S REFERENCES ..... 10

IV. LEVEL OF ORDINARY SKILL IN THE ART ..... 11

V. LEGAL STANDARD ..... 12

VI. PETITIONER HAS NOT MET ITS BURDEN ON CLAIM CONSTRUCTION ..... 14

A. Petitioner Failed To Construe The Terms First And Second Duty Cycle ..... 14

B. The Proper Construction Of First And Second Duty Cycle ..... 17

1. The '776 Patent Uses "Duty Cycle" Consistent With Its Plain Meaning ..... 17

2. The First And Second Duty Cycles Cannot Be 0% ..... 19

3. The "First" And "Second" Duty Cycles Are Different ..... 22

# TABLE OF CONTENTS
**(*cont'd*)**

**Page No.**


VII. PETITIONER FAILS TO EXPLAIN HOW RICHARDSON DISCLOSES FIRST and SECOND CONTROL PROTOCOL LIGHT SOURCES ....25

A. The First And Second Control Protocol Light Sources ....26

B. Grounds 1A, 2A: Petitioner Does Not Identify First And Second Control Protocol Light Sources ....27

C. Grounds 1B, 2B: Petitioner Does Not Identify First And Second Control Protocol Light Sources ....28

VIII. GROUNDS 1A-1C FAIL TO DEMONSTRATE OBVIOUSNESS ....29

A. Overview Of Richardson ....31

B. Ground 1A: Petitioner's "First Mapping" Of Richardson Does Not Disclose All Limitations Of The Challenged Claims ....33

1. Overview Of The "First Mapping" ....33

2. Claims 1 And 11: The "First Mapping" Does Not Disclose First And Second Duty Cycles ....35

a) The Red LED Does Not Operate According To A "First Duty Cycle" ....36

b) The Infrared LED Does Not Operate According To First And Second Duty Cycles ....36

# TABLE OF CONTENTS
## (*cont'd*)

**Page No.**


c) The Red And Infrared LEDs Do Not Operate According To First And Second Duty Cycles ....................37

3. Claims 1 And 11: The "First Mapping" Does Not Disclose Generating A Trigger Signal Responsive To Signal Quality Characteristics ....................39

4. Claims 2 And 12: The "First Mapping" Does Not Disclose A First Duty Cycle Having An Active Time....................42

C. Ground 1B: Petitioner's "Second Mapping" Of Richardson Does Not Disclose All Limitations Of The Challenged Claims ....................44

1. Overview Of The "Second Mapping" ....................44

2. Claims 1 And 11: The "Second Mapping" Does Not Disclose First And Second Duty Cycles....................45

3. Claims 1 And 11: The "Second Mapping" Does Not Disclose Generating A Trigger Signal Responsive To Signal Quality Characteristics ....................46

D. Ground 1C: A POSITA Would Not Have Been Motivated To Combine Richardson and Bindszus ....................49

1. Overview Of Bindszus....................49

2. The Addition Of Bindszus To Richardson Would Increase Power Consumption ....................51

IX. GROUNDS 2A-2C FAIL TO DEMONSTRATE OBVIOUSNESS....................52

# TABLE OF CONTENTS
**(*cont'd*)**

**Page No.**

A. Grounds 2A-2C Fail For One Of The Same Reasons As Grounds 1A-1C ....................53

B. Overview Of Turcott ....................54

C. Claims 1 And 11: Turcott Does Not Disclose Or Suggest Operating At First And Second Duty Cycles ....................56

D. Claims 1 And 11: A POSITA Would Not Have Been Motivated To Combine Richardson And Turcott To Arrive At The Claimed Inventions ....................58

E. Claims 1 And 11: A POSITA Would Not Have Been Motivated To Reduce The Duty Cycle In The "First Mapping" ....................62

F. Claims 1 And 11: A POSITA Would Not Have Been Motivated To Reduce The Duty Cycle In The "Second Mapping" ....................64

G. Ground 2C: A POSITA Would Not Have Been Motivated To Combine Richardson And Turcott With Bindszus ....................66

X. CONCLUSION ....................67

# TABLE OF AUTHORITIES

**Page No(s).**

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) ....................30

*CFMT, Inc. v. YieldUp Int'l Corp.*,
349 F.3d 1333 (Fed. Cir. 2003) ....................26

*In re Fritch*,
972 F.2d 1260 (Fed. Cir. 1992) ....................42

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) ....................13

*Harmonic Inc. v. Avid Tech., Inc.*,
815 F.3d 1356 (Fed. Cir. 2016) ....................12, 14, 26, 65

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ....................13

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................13

*In re Magnum Oil Tools, Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ....................13

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ....................23

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) ....................14

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ....................14

*OrthoPediatrics Corp. v. K2M, Inc.*,
Case IPR2018-01548, Paper 9 (March 1, 2019)....................14, 15, 16

## TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................17, 19, 23

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
655 F.3d 1364 (Fed. Cir. 2011) ....................14

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
295 F.3d 1292 (Fed. Cir. 2002) ....................38

## OTHER AUTHORITIES

37 C.F.R. § 42.65 ....................14

37 C.F.R. § 42.100 ....................17

**EXHIBIT LIST**

| Exhibit No. | Description |
|---|---|
| 2001 | Certificate of Correction of U.S. Patent No. 10,433,776 B2 |
| 2002 | Expert Declaration of Vijay K. Madisetti Ph.D. |
| 2003 | Curriculum Vitae of Vijay K. Madisetti Ph.D. |
| 2004 | Excerpts from Rudolf Graf, Modern Dictionary of Electronics, 7th ed. (1999) |
| 2005 | Deposition Transcript of Dr. Brian W. Anthony in *Apple Inc. v. Masimo Corp.*, IPR2020-01524 (July 19, 2021) |
| 2006 | Deposition Transcript of Dr. Brian W. Anthony in *Apple Inc. v. Masimo Corp.*, IPR2020-01523 (July 7, 2021) |
| 2007 | U.S. Patent No. 5,069,214 to Samaras et al. |
| 2008 | U.S. Patent No. 6,393,311 to Edgar, Jr. et al. |

# I. INTRODUCTION

Masimo's U.S. Patent 10,433,776 ("the '776 patent") discloses and claims innovative and nonobvious approaches to managing the power consumption of a low-power patient monitor. Masimo's innovative monitor controls power consumption by intermittently changing the duty cycle of current supplied to sensor LEDs. The monitor determines when to change the duty cycle based on a signal received from the monitor's optical sensor. The inventors recognized that the monitor could use a lower duty cycle during certain conditions where a higher duty cycle was unnecessary. Driving the LEDs at a lower duty cycle consumes less power than driving the LEDs at a higher duty cycle. Importantly, the '776 patent's monitor intermittently changes the duty cycle during operation so that a clinician can continuously receive current patient information despite changes in monitor power consumption.

Petitioner identifies six grounds based on three references: Richardson (Ex. 1004), Turcott (Ex. 1006), and Bindszus (Ex. 1005). In Grounds 1A-1C, Petitioner argues that Richardson discloses every limitation of the '776 patent's independent claims. Yet, Richardson does not teach or suggest intermittently driving LEDs at a "first duty cycle" and a "second duty cycle" during patient monitoring, as required by the challenged claims. Rather, Richardson describes driving its LEDs at a

constant duty cycle of at least 25% or turning the LEDs off completely. For at least this reason, Grounds 1A-1C do not render the challenged claims unpatentable.

In Grounds 2A-2C, Petitioner argues that the combination of Richardson and Turcott render the challenged claims unpatentable. Petitioner argues that Turcott teaches lowering the duty cycle for driving a pulse oximeter's LEDs to reduce power consumption and that this "teaching" would have motivated a person of ordinary skill in the art ("POSITA") to reduce the duty cycle in Richardson's oximeter in particular operating states. However, like Richardson, Turcott does not teach or suggest intermittently driving LEDs at a "first duty cycle" and a "second duty cycle" during patient monitoring. Rather, Turcott teaches that its system is preferably driven at a single, low duty cycle. Consequently, Turcott would not encourage a POSITA to use first and second duty cycles, where one duty cycle is necessarily higher. Instead, Turcott would encourage a POSITA to use a single, low duty cycle. Thus, Turcott would not have motivated a POSITA to modify Richardson to operate at a "first duty cycle" and a "second duty cycle." For at least this reason, Grounds 2A-2C do not render the challenged claims unpatentable.

Petitioner has failed to demonstrate that the asserted references render the challenged claims unpatentable. Masimo, therefore, respectfully requests that the Board affirm the patentability of the challenged claims.

## II. MASIMO'S PIONEERING TECHNOLOGY

Masimo is a global medical device technology company that develops and manufactures innovative patient monitoring technologies, medical devices, and a wide array of sensors. Masimo was founded in 1989 as a garage start-up and went on to revolutionize non-invasive patient monitoring by solving long-standing and difficult problems facing the industry. Today, Masimo is a publicly traded company that employs over 6,300 people worldwide, with annual revenues of over $1.1 billion. A host of manufacturers use Masimo's technology, including Philips, Atom, Mindray North America, GE Medical, Spacelabs, and Zoll.

### A. The '776 Patent

Masimo's '776 patent describes innovative approaches for reducing the power consumption of patient monitors, such as pulse oximeters. Conventional pulse oximeters include a sensor that has red and infrared LEDs and a photodiode detector. (Ex. 1001, 1:13-31.) In operation, the LEDs project light into the patient's tissue. (*Id.*) The photodiode detects the emitted light as it emerges from the tissue. (*Id.*) A signal processor, in communication with the sensor, calculates physiological measurements, including oxygen saturation or pulse rate, based on the detected light. (*Id.* at 1:38-47.) A monitor then displays the calculated measurements to the user. (*Id.*)

The ’776 patent discloses that patient monitors, such as pulse oximeters, are increasingly utilized in portable, battery-operated applications. (*Id.*, 1:51-57.) This expanded use of pulse oximeters has created “an increasing demand for lower power and higher performance pulse oximeters.” (*Id.*, 1:57-59.)

POSITAs attempted to meet the unmet long-felt need for lower power patient monitors by developing monitors having a “sleep mode.” (*Id.*, 1:64-2:11.) In a sleep mode, the monitor’s processor powers down, except perhaps for a portion of memory. (*Id.*) A monitor operating in sleep mode periodically checks the physiological measurements of the patient based on an internal timer to determine whether to wake up (i.e., power up the monitor’s processor). (*Id.*)

While monitors utilizing a sleep mode reduce power consumption, the ’776 patent identifies a number of disadvantages of applying sleep-mode techniques to patient monitoring, particularly in the case of pulse oximetry. (*Id.*, 2:12-24.) When functioning in the sleep mode, the monitor is inactive and may miss critical patient events, such as oxygen desaturation. (*Id.*) The monitor also does not reflect the time of the last active measurement, which can lead to misunderstandings about the current state of the patient. (*Id.*)

The ’776 patent explains that simply reducing the duration of the sleep mode, to not miss patient events, diminishes power consumption reduction benefits because shorter sleep periods increase power consumption. The ’776 patent also

states, "There is a trade-off between shorter but more frequent sleep periods to avoid a missed event and the increased processing overhead to power-up after each sleep period." (*Id.*) For at least this reason, sleep-mode monitors did not address the long-felt need for patient monitors that use lower power, but remain in active mode, rather than a sleep mode.

The inventions described in the '776 patent do not suffer from the disadvantages of sleep-mode monitors. The inventive patient monitor modifies power consumption by effectively increasing or decreasing the number of input samples received and processed by the monitor. (*Id.*, 6:12-27.) The monitor determines the necessary number of samples by evaluating physiological measurements and/or internal parameters. (*Id.*; *see also id.*, 5:13-29.) Thus, the disclosed patient monitor advantageously controls power consumption based on output parameters, such as physiological measurements, and/or internal parameters, such as signal statistics. (*Id.*, 5:26-29.)

In a preferred embodiment, a patient monitor increases or decreases the input samples by changing the duty cycle of current supplied by the monitor's drivers to the LEDs. (*Id.*, 6:59-7:18.) In a conventional patient monitor, the duty cycle used to drive the LEDs is constant during monitoring. (*Id.*) However, a constant duty cycle can result in significant power consumption because the LED drivers "require a significant portion of the overall pulse oximeter power budget."

(*Id.*, 6:67-7:4.) The '776 patent discloses, "Intermittently reducing the drive current duty cycle can advantageously reduce power dissipation without compromising signal integrity." (*Id.*, 7:2-4.) Thus, in a preferred embodiment, the '776 patent discloses intermittently reducing the duty cycle of the LED drivers from 25% to about 3.125%. (*Id.*, 7:9-11, Fig. 5.)

In addition to advantageously changing the duty cycle, the '776 patent discloses that the patient monitor may have a "data off" period where the LEDs are turned off for longer than one drive cycle. (*Id.*, 7:11-15.) The "data off" state may be used in addition to high and low duty cycles to manage the power consumption of the monitor. (*Id.*, 8:4-46, Fig. 8.) Figure 8[1] below shows the power consumption of the monitor during the high duty cycle state [red], low duty cycle state [green], and data off state. (*Id.*)

[1] Color and labels have been added to figures unless otherwise noted.




FIG. 8

In operation, a patient event, such as low oxygen saturation, may trigger the monitor to move from a low duty cycle or data off state to a high duty cycle. (*Id.*, 8:47-61, Fig. 9.) Conversely, if the monitor is in a high duty cycle state and neither an event nor low signal quality occurs, the monitor may transition to a low duty cycle to conserve power. (*Id.*, 9:6-18.) If the monitor is in the data off state and no event occurs within a prescribed time, the monitor may default to the low duty cycle. (*Id.*, 9:15-18.) Thus, the monitor described and claimed by the ’776 patent better addresses patient events or signal quality issues than a conventional monitor that utilizes a sleep mode. (Ex. 2002, ¶¶27-29.)

## B. Introduction To Independent Claims

The ’776 patent has two independent claims: claims 1 (method) and 11 (apparatus).[2] Claim 1 is illustrative (but not representative) of some relevant features claimed in the ’776 patent. Petitioner has numbered the claim limitations. (*See e.g.*, Pet. 10-11.) Masimo has adopted Petitioner’s numbering system for ease of reference. Claim 1 recites:

**[1p]** A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:

**[1a]** operating the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources; when operating according to the first control protocol, calculating, by a patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control

[2] On November 10, 2020, the Patent office issued a Certificate of Correction for the ’776 patent. (Ex. 2001.) The Certificate corrects the term “second control protocol” in column 13, line 36 of claim 11 to “first control protocol.” (*Id.*)

protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor;

**[1b]** generating a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

**[1c]** in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of the plurality of light sources; and when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor;

**[1d]** wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient

monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle,

**[1e]** wherein power consumption of the first control protocol light source according to the fist duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

### C. Prosecution Of The '776 Patent

During prosecution, the Examiner agreed that the claimed combination of features—including the operation of the patient monitor according to a first duty cycle and a second duty cycle—provided a patentable advance unique in the field. (Ex. 1002, 164-171.)

The Examiner stated that a cited reference (Samaras et al. – Ex. 2007) "teaches an oximeter (Fig. 1-8) comprises an operator command to adjust the intensity and duration of each light source depends on cold or warm climates." (Ex. 1002, 170.) However, the Examiner concluded the prior art of record does not teach or suggest the claimed combinations of features. (*Id.*, 170-171.)

## III. PETITIONER'S REFERENCES

Petitioner relies on three references: Richardson (Ex. 1004), Turcott (Ex. 1006), and Bindszus (Ex. 1005). Petitioner states, "As described in detail below, other prior art references – which were never before the examiner – taught the

features addressed in the examiner's statement of reasons for allowance." (Pet. 6.) However, the Examiner expressly considered Turcott during prosecution:

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,525,386 | B1 | 2/2003 | Mills et al. |
| 6,526,300 | B1 | 2/2003 | Kiani et al. |
| 6,527,729 | B1 | 3/2003 | Turcott |
| 6,541,756 | B2 | 4/2003 | Schulz et al. |
| 6,542,764 | B1 | 4/2003 | Al-Ali et al. |

(Ex. 1001, page 2; Ex. 1002, 184.) Thus, Petitioner either erred in suggesting the references "were never before the examiner," or concedes that Turcott does not disclose the features addressed in the Examiner's statement of reasons for allowance.

## IV. LEVEL OF ORDINARY SKILL IN THE ART

Petitioner argues a POSITA "would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies … [or] … a Master of Science degree in a relevant academic discipline with less than a year of

related work experience in the same discipline." (Pet. 6; Ex. 1003, ¶32.) Petitioner's declarant adds that a "POSITA would have been someone with a working knowledge of physiological monitoring technologies." (Ex. 1003, ¶32.)

Petitioner's asserted level of skill is inconsistent with its declarant's opinion regarding the relevant field. Petitioner's declarant states, "The '776 patent and the prior art references discussed herein are all from the field of non-invasive optical biosensors." (*Id*., ¶16.) Petitioner's declarant confirmed during cross-examination that this statement accurately characterizes the relevant field. (Ex. 2005, 17:19-18:21.) Yet, as shown above and acknowledged by Petitioner's declarant, Petitioner's definition of POSITA does not require any experience with non-invasive optical biosensors and, thus, does not describe the level of skill ***in the art***. (*Id*., 19:2-20:22; Ex. 2006, 85:16-86:4, 96:8-13.)

However, even under a lower standard where a POSITA has a working knowledge of physiological monitoring technologies, Petitioner has failed to show that the asserted grounds render the challenged claims obvious. Thus, for this proceeding, Masimo applies the asserted level of skill identified in the Petition. (Ex. 2002, ¶¶32-33.)

## V. <u>LEGAL STANDARD</u>

"In an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid*

*Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016). The Board is not "free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR." *In re Magnum Oil Tools, Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016). "The petitioner must instead articulate specific reasoning, based on evidence of record," as set out in its petition "to support the legal conclusion of obviousness." *Id*. at 1380. The Board "must base its decision on arguments that were advanced by a party." *Id*. at 1381. The Board cannot "decide unpatentability theories never presented by the petitioner." *Id.*

To prevail on any obviousness ground, a petitioner may not simply identify individual claim components—it must show why a "skilled artisan, with no knowledge of the claimed invention, would have selected these components for combination in the manner claimed." *In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000). The petitioner must support even simple modifications to a reference with some motivation to make the change. *See In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984).

In addition, a petitioner cannot rely on "mere conclusory statements." *Magnum Oil*, 829 F.3d at 1380. Rather, the petitioner must set forth "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007) (internal citation omitted). Similarly, a petitioner cannot simply rely on an

expert's unsubstantiated and conclusory opinions. *See* 37 C.F.R. § 42.65 ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *Harmonic*, 815 F.3d at 1363 (Affirming that the petitioner failed to establish obviousness where expert testimony "add[ed] nothing beyond the conclusory statements in [the] petition.").

An appropriate obviousness inquiry cannot involve even a "hint of hindsight." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co*., 655 F.3d 1364, 1375 (Fed. Cir. 2011). A petitioner may not "simply retrace[] the path of the inventor with hindsight, discount[] the number and complexity of the alternatives, and conclude[] that the invention . . . was obvious." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008). Likewise, "[c]are must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) (internal quotations omitted).

## VI. PETITIONER HAS NOT MET ITS BURDEN ON CLAIM CONSTRUCTION

### A. Petitioner Failed To Construe The Terms First And Second Duty Cycle

The Board's rules "place an affirmative burden on petitioners to 'set forth: … How the challenged claim is to be construed.'" *OrthoPediatrics Corp. v. K2M, Inc.,* Case IPR2018-01548, Paper 9, at 10 (March 1, 2019) (quoting 37 C.F.R.

§ 42.104(b)(3)). "This burden continues by requiring petitioners to adequately explain 'how the *construed* claim is unpatentable.'" *Id.* (quoting 37 C.F.R. § 42.104(b)(4)) (emphasis in original).

Here, Petitioner acknowledges that its unpatentability arguments require specific constructions of "first duty cycle" and "second duty cycle." In Ground 1A, Petitioner argues, "Richardson teaches operating the patient monitor according to different duty cycles, ***under the proper construction*** of 1[d]." (Pet., 16 (emphasis added).) In Ground 1B, Petitioner argues, "Richardson teaches [limitation 1d] ***under an alternate construction*** of this limitation that does not require different duty cycles for the first duty cycle and the second duty cycle." (*Id*., 30 (emphasis added).) Petitioner makes similar arguments in Grounds 2A and 2B. (*Id*., 50, 56.)

Thus, while Petitioner appears to argue that the "proper construction" of "first duty cycle" and "second duty cycle" requires different duty cycles and the "alternate construction" does not, Petitioner never construes "first duty cycle" and "second duty cycle" and does not identify any evidence to support its "proper construction" or "alternate construction." (*See e.g.,* Pet. 30 (citing Ex. 1004, 4:6-10).) The declaration submitted by Petitioner's declarant does not help. The declaration simply repeats the vague references to the proper and alternate constructions without citing supporting evidence. (*See e.g.,* Ex. 1003, ¶¶50, 66, 87, 94.)

Despite Petitioner's assertion that there are two potential constructions of "first duty cycle" and "second duty cycle" (a "proper" and "alternate" construction), Petitioner never identified the correct construction. In Petitioner's "Claim Construction" section, Petitioner merely states, "no formal claim constructions are necessary in this proceeding." (Pet. 7.) However, by Petitioner's own admission, constructions of at least "first duty cycle" and "second duty cycle" are necessary. Because Petitioner identified a claim construction dispute but failed to identify the applicable construction and supporting evidence, "the Petition fails to identify how the challenged claims are to be construed and applied to the prior art." *OrthoPediatrics,* Case IPR2018-01548, Paper 9, at 10. For at least this reason, Petitioner has not met its burden to show that the challenged claims are unpatentable.

Moreover, even if Petitioner's failure to construe the terms alone does not defeat Petitioner's claims of unpatentability, Petitioner's decision not to identify the correct construction and support that construction with evidence should prevent Petitioner from belatedly doing so in reply after the evidentiary record is closed to Masimo. Upon cross-examination, Petitioner's declarant could not, or would not, identify whether the "proper" or "alternate" construction was the meaning a POSITA would have had of "first duty cycle" and "second duty cycle" in 2001 based on the intrinsic record. (Ex. 2005, 73:22-77:12; *see also id.,* 59:21-73:20.)

Having stymied discovery regarding the correct construction, Petitioner should not be permitted to supplement the record later.

## B. The Proper Construction Of First And Second Duty Cycle

The Board should construe "duty cycle" to mean "the ratio of operating time (or on time) of a light source to the total time period during which the light source is intermittently operated, expressed as a percentage." (Ex. 2002, ¶36.) The Board should also confirm that the "percentage" of the first and second duty cycles cannot be zero and that the first duty cycle is different from the second duty cycle. (*Id.*) These constructions are consistent with how a POSITA would have understood "first duty cycle" and "second duty cycle" at the time of filing based on the plain and ordinary meaning and intrinsic record. (37 C.F.R. § 42.100(b); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); Ex. 2002, ¶36.)

### 1. The '776 Patent Uses "Duty Cycle" Consistent With Its Plain Meaning

A POSITA would have understood the plain and ordinary meaning of "duty cycle" to be "the ratio of operating time to total elapsed time of a device that operates intermittently, expressed as a percentage." (Ex. 2004, 225; Ex. 2002, ¶37.) The '776 patent uses "duty cycle" consistent with this plain and ordinary meaning. (Ex. 2002, ¶¶37-39.) The '776 patent discloses a method of reducing the power consumption of a patient monitor by "intermittently reducing the drive current duty

cycle." (Ex. 1001, 6:59-7:11, Figs. 5, 8.) The "drive current" is the current supplied by the red and infrared LED drivers (also called the "emitter drivers"). (*Id.*, 5:62-7:6:2, Fig. 4.) The LEDs operate (i.e., are turned on and emit light) when the LED drivers supply current. (*Id.*, 8:16-20; Fig. 8.)

The '776 patent consistently describes the "duty cycle" as the ratio of the operating time (or on time) of the red and infrared LEDs to the total time period during which the LEDs are intermittently operated, expressed as a percentage. (*Id.*, 2:43-44; Ex. 2002, ¶39.) For example, Figure 5 illustrates an "emitter driver output current" versus time profile for a pulse oximeter:




(Ex. 1001, 6:59-60, Fig. 5.) As shown, when the LEDs operate in a high duty cycle state 502 [red], the LEDs receive current from the emitter driver and are operating

(i.e., are turned on and emit light) for 25% of the total time period during which the LEDs are intermittently operated. (*Id.*, 6:58-61, 7:4-8; *see also id.,* 8:15-20, Fig. 8 ("In the high duty cycle state 812, the control engine 440 (FIG. 4) causes the emitter drivers 480 (FIG. 4) to turn on sensor emitters for a relatively long time period, such as 25% on time for each of the red 510 and IR 560 drive currents.").) When the LEDs operate in a low duty cycle state 504 [green], the LEDs receive current and operate (i.e., are turned on and emit light) for 3.125% of the total time period during which the LEDs are intermittently operated. (*Id.*, 6:58-61, 7:4-8; *see also id.,* 8:20-24, Fig. 8 ("In the low duty cycle state 814, the control engine 440 (FIG. 4) cause the emitter drivers 480 (FIG. 4) to turn on sensor emitters for a relatively short time period, such as 3.125% of the time for each of the red 510 and IR 560 drive currents.").)

Thus, the '776 patent uses "duty cycle" to mean "the ratio of operating time to total elapsed time of a device that operates intermittently, expressed as a percentage." (Ex. 2002, ¶¶37-39.)

### 2. **The First And Second Duty Cycles Cannot Be 0%**

The "first duty cycle" and "second duty cycle" cannot be 0% based on the claims and '776 patent specification. (Ex. 2002, ¶¶40-47); *see Phillips*, 415 F.3d at 1312, 1314.

Claim 1 requires "operating the patient monitor according to a first control protocol," where the first control protocol "operates the first control protocol light source according to a first duty cycle." (Ex. 1001, 11:45-46, 12:11-13.) Claim 1 further requires that "when operating according to the first control protocol," the patient monitor calculates "measurement values of the pulse rate" that are "responsive to light from the first control protocol light source." (*Id.*, 11:51-57.) Claim 11 includes the same limitations. (*Id.*, 13:2-3, 13:8-14, 13:35-14:1.)

Thus, claims 1 and 11 require the "first control protocol light source" to generate light so that the patient monitor can calculate the pulse rate based on the light. (Ex. 2002, ¶41.) However, if the first control protocol light source had a duty cycle of 0%, the light source would be inactive and would not generate light. (*Id.*, ¶42.) Consequently, the monitor could not calculate the "measurement values of the pulse rate" as required by claims 1 and 11. (*Id.*) Thus, the "first duty cycle" must be a percentage greater than zero so that the first control protocol light source generates light, thereby permitting the monitor to calculate "measurement values of pulse rate" responsive to that light. (*Id.*)

Claim 1 also requires "operating the patient monitor according to a second control protocol different from the first control protocol" where the second control protocol "operates the second control protocol light source according to a second duty cycle." (Ex. 1001, 11:63-65, 12:14-16.) Claim 1 further requires that "when

operating according to the second control protocol," the patient monitor calculates "measurement values of the pulse rate" that are "responsive to light from the second control protocol light source." (*Id.*, 12:4-10.) Claim 11 includes the same limitations. (*Id.*, 13:20-32, 14:2-5.)

Thus, claims 1 and 11 also require the "second control protocol light source" to generate light so that the patient monitor can calculate the pulse rate based on the light. (Ex. 2002, ¶43.) However, if the second control protocol light source had a duty cycle of 0%, the light source would be inactive and would not generate light. (*Id.*, ¶44.) Consequently, the monitor could not calculate the "measurement values of the pulse rate" as required by claims 1 and 11. (*Id.*) Thus, the "second duty cycle" must be a percentage greater than zero so that the second control protocol light source generates light, thereby permitting the monitor to calculate "measurement values of pulse rate" responsive to that light. (*Id.*)

Moreover, the specification never mentions a duty cycle of 0%. Rather, the specification consistently describes a patient monitor having high and low duty cycles greater than 0%. (*E.g.*, Ex. 1001, 2:39-44, 7:4-11, 8:14-15; Ex. 2002, ¶¶45-46.) For example, in a preferred embodiment, the duty cycle "is varied within a range from about 25% to about 3.125%." (Ex. 1001, 7:4-9.)

Rather than describe a 0% duty cycle, the '776 patent discloses a "data off state" where the LEDs are inactive for longer than one cycle. (*Id.*, 7:11-15; Ex.

2002, ¶46.) The '776 patent distinguishes the data off state from the first and second duty cycles. (*E.g.*, Ex. 1001, 8:14-15, 8:16-32, 8:47-61.) The specification explains, "[i]n ***conjunction with*** an intermittently reduced duty cycle or as an ***independent*** sampling mechanism, there may be a 'data off' time period longer than one drive current cycle where the emitter drivers are turned off." (*Id.*, 7:11-15 (emphasis added).)

Consequently, any construction of "duty cycle" that encompasses a duty cycle of 0% would be inconsistent with the claims and specification. (Ex. 2002, ¶¶40-47.) For these reasons, the "first duty cycle" and "second duty cycle" cannot be 0%. (*Id.*)

#### 3. The "First" And "Second" Duty Cycles Are Different

The Board should also construe the "first duty cycle" to be different from the "second duty cycle." (Ex. 2002, ¶¶48-53.)

Petitioner appears to concede that the first and second duty cycles must be different. Petitioner argues that the first duty cycle is different from the second duty cycle under the "***proper***" construction. (Pet., 16, 24, 50, 54; Ex. 1003, ¶¶51, 87.) Thus, while Petitioner has failed to satisfy its burden to construe the claim terms (*supra* §VI.A), Petitioner has at least admitted that the first duty cycle should be different from the second duty cycle.

Masimo agrees that the claims and specification of the ’776 patent require ***different*** first and second duty cycles. Claims 1 and 11 use “first” and “second” to distinguish the duty cycles. This differentiation between the duty cycles strongly suggests that the duty cycles are not the same. If the duty cycles were the same, “first” and “second” would be superfluous. *See e.g.*, *Merck & Co. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1372 (Fed. Cir. 2005) (“A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.”).

Moreover, claims 1 and 11 require operating the patient monitor “according to a first control protocol” and, “in response to receiving the trigger signal, operating the patient monitor according to a second control protocol ***different*** from the first control protocol.” (Ex. 1001, 11:45-46, 11:63-65 (emphasis added).) Claims 1 and 11 further clarify that one of the differences between the first and second control protocols are the duty cycles. (*Id.*, 12:11-21.) For example, claim 1 states that “the first control protocol operates the first control protocol light source according to a first duty cycle” and “the second control protocol operates the second control protocol light source according to a second duty cycle.” (*Id.*) Thus, a POSITA would have understood claims 1 and 11 to require the first duty cycle to be ***different*** from the second duty cycle. (Ex. 2002, ¶49.)

The specification confirms that the first and second duty cycles are different. *See Phillips,* 415 F.3d at 1313, 1315-17 (terms must be construed in light of the

specification). For example, the specification distinguishes the claimed invention from conventional patient monitors that use constant duty cycles. (Ex. 1001, 6:64-7:2 ("In a typical pulse oximeter, the duty cycle of the drive signals is constant….").) The specification explains that using a constant duty cycle will result in higher power consumption because the LED drivers "require a significant portion of the overall pulse oximeter power budget." (*Id.*) Consequently, the '776 patent discloses a novel approach of reducing power consumption based on the recognition that "[i]ntermittently reducing the drive current duty cycle can advantageously reduce power dissipation without compromising signal integrity." (*Id.*, 7:2-4.) In a preferred embodiment, "the drive current duty cycle is intermittently reduced from about 25% to about 3.125%." (*Id.*, 7:9-11, Fig. 5.) Figure 5 illustrates the system's different duty cycles (high 25% duty cycle [red] and a low 3.125% duty cycle [green]):




(*Id.* at Fig. 5; *see also* 8:4-24, Fig. 8.)

The specification consistently describes managing the power consumption of a patient monitor by intermittently switching between two ***different*** duty cycles. (*See e.g.,* Ex. 1001, 3:26-28 ("In one embodiment, the reducing step comprises the substep of decreasing the duty cycle of an emitter driver output to the sensor.").) Thus, the intrinsic evidence confirms that the "first duty cycle" must be different from the "second duty cycle." (Ex. 2002, ¶¶50-52.)

## VII. PETITIONER FAILS TO EXPLAIN HOW RICHARDSON DISCLOSES FIRST AND SECOND CONTROL PROTOCOL LIGHT SOURCES

Independent claims 1 and 11 require first and second control protocol light sources. Yet, in ***every*** ground, Petitioner fails to explain how Richardson discloses

the first and second control protocol light sources. Consequently, Petitioner has failed to demonstrate obviousness. *See CFMT, Inc. v. YieldUp Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) (explaining that a petition based on "obviousness requires a suggestion of all limitations in a claim") (citing *In re Royka*, 490 F.2d 981, 985 (C.C.P.A. 1974)). Petitioner has also failed "to show with particularity why the patent it challenges is unpatentable" under any of the asserted grounds. *Harmonic*, 815 F.3d at 1363 (Fed. Cir. 2016). For at least this reason, the Board should find that Petitioner has failed to meet its burden of establishing unpatentability under any of the asserted grounds.

## A. <u>The First And Second Control Protocol Light Sources</u>

Limitations 1[a] and 11[a] require, in part, "(operating/operate) the patient monitor according to a first control protocol, wherein said operating includes activating ***a first control protocol light source*** in accordance with the first control protocol, the first control protocol light source including one or more of (a/said) plurality of light sources." (Ex. 1001, 11:45-50, 13:2-7 (emphasis added).)

Limitations 1[c] and 11[c] require, in part, "operating the patient monitor according to a second control protocol different from the first control protocol, wherein said operating includes activating ***a second control protocol light source*** in accordance with the second control protocol, the second control protocol light

source including one or more of the plurality of light sources." (Ex. 1001, 11:63-12:3, 13:20-27 (emphasis added).)

## B. Grounds 1A, 2A: Petitioner Does Not Identify First And Second Control Protocol Light Sources

Petitioner does not identify the "first control protocol light source" in analyzing limitations 1[a] and 11[a] in Grounds 1A and 2A. (Pet. 12-13, 23, 49, 54; *see also* Ex. 1003, ¶45 (also not identifying the claim limitation).) In limitation 1[a], Petitioner merely concludes, "Richardson's oximeter operates according to a first control protocol, e.g., State 2, including activating the infrared light source and operating the red light source in an off state in accordance with the first control protocol." (*Id.*, 13; *see also id.,* 23 (incorporating limitation 1[a]), 49 (same).) As shown, Petitioner does not use the term "first control protocol light source," other than citing the claim language. (*Id.*) Moreover, Petitioner never explains whether the "first control protocol light source" is allegedly (1) the red LED, (2) the infrared LED, or (3) the red and infrared LEDs.

Petitioner also never identifies the "second control protocol light source" in analyzing limitations 1[c] and 11[c]. (Pet. 14-15, 24, 49, 54; *see also* Ex. 1003, ¶48 (also not identifying the claim limitation).) In limitation 1[c], Petitioner merely concludes, "Richardson's oximeter … operates according to a second control protocol, e.g., State 1, including activating the [sic] both the red and infrared light sources in accordance with the second control protocol." (Pet. 15; *see also id.*, 23

(incorporation limitation 1[c]), 49 (same).) Again, Petitioner does not use the term "second control protocol light source," other than citing the claim language. (*Id.*) Moreover, Petitioner never explains whether the "second control protocol light source" is (1) the red LED, (2) the infrared LED, or (3) the red and infrared LEDs.

As discussed herein, the identification of the first and second control protocol light source is critical to assessing the cited art and whether operation of Richardson's light sources satisfy the first and second duty cycle limitations. Due to Petitioner's obfuscation of the first and second control protocol light sources, Petitioner has not satisfied its burden to show with particularity why the '776 patent claims are unpatentable.

### C. <u>Grounds 1B, 2B: Petitioner Does Not Identify First And Second Control Protocol Light Sources</u>

Petitioner also does not identify the "first control protocol light source" in analyzing limitations 1[a] and 11[a] in Grounds 1B and 2B. (Pet. 26-30, 55; *see also* Ex. 1003, ¶62 (also not identifying the claim limitation).) In limitation 1[a], Petitioner merely concludes, "Richardson's oximeter operates according to a first control protocol, e.g., a first selected frequency, including activating the light sources in accordance with the first control protocol, e.g., the first selected frequency." (*Id.*, 27; *see also id.,* 38 (incorporating limitation 1[a]), 55, 62 (same).) As in Grounds 1A and 2A, Petitioner does not use the term "first control protocol light source," other than citing the claim language. (*Id.*) Moreover, Petitioner never

explains whether the "first control protocol light source" is allegedly (1) the red LED, (2) the infrared LED, or (3) the red and infrared LEDs.

Petitioner also never identifies the "second control protocol light source" in analyzing limitations 1[c] and 11[c]. (Pet. 14-15, 24, 49, 54; *see also* Ex. 1003, ¶48 (also not identifying the claim limitation).) In limitation 1[c], Petitioner merely concludes, "Richardson oximeter … operates according to a second control protocol, e.g., the second selected frequency, including activating the light sources in accordance with the second control protocol (e.g., the second selected frequency)." (Pet. 29-30; *see also id.*, 39 (incorporation limitation 1[c]), 55, 62 (same).) Again, Petitioner does not use the term "second control protocol light source" and never identifies whether the "second control protocol light source" is (1) the red LED, (2) the infrared LED, or (3) the red and infrared LEDs.

Because Petitioner has failed to show with particularity why the '776 patent is unpatentable, and has specifically failed to show how the cited art allegedly satisfies the claim limitations, the Board should confirm the patentability of the challenged claims.

## VIII. <u>GROUNDS 1A-1C FAIL TO DEMONSTRATE OBVIOUSNESS</u>

In Ground 1A, Petitioner argues that a "first mapping" of Richardson renders claims 1-8 and 11-16 obvious. (Pet. 8.) In Ground 1B, Petitioner argues

that a "second mapping" of Richardson renders claims 1-9 and 11-16 obvious. (*Id.*, 26.)

However, despite characterizing Grounds 1A-1B as obviousness challenges, Petitioner never identifies any claim limitation from independent claims 1 and 11 that is missing from the "first mapping" and "second mapping." Likewise, Petitioner never explains how a POSITA would modify Richardson to arrive at the patented inventions described in claims 1 and 11. Rather, Petitioner argues only that Richardson (Grounds 1A-1B) expressly or inherently discloses each claim limitation. Thus, despite characterizing Grounds 1A-1B as obviousness grounds, Petitioner has not presented, or preserved, any obviousness arguments. *See Arendi S.A.R.L. v. Apple Inc.,* 832 F.3d 1355, 1361 (Fed. Cir. 2016) ("Though less common, in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention."). Petitioner has therefore failed to present a *prima facie* case of obviousness.

Petitioner includes a footnote suggesting that its challenge encompasses anticipation and obviousness. (Pet. 8, n.1.) Masimo understands that the Board has rejected Petitioner's attempt to preserve both anticipation and obviousness. (Paper 7 at 9, n.2.) As noted above, Masimo believes that Petitioner's Grounds 1A-1B are best characterized as anticipation grounds. However, regardless of whether

Petitioner's grounds are viewed as anticipation or obviousness, they fail because either mapping of Richardson does not disclose or suggest several limitations from independent claims 1 and 11, including (1) operating according to a "first duty cycle" and "second duty cycle" (limitations 1[d] and 11[d]), and (2) transitioning from operating at the "first duty cycle" to the "second duty cycle" in response to a trigger signal (limitations 1[b-c] and 11[b-c]). Thus, Grounds 1A-1B do not render the challenged claims unpatentable.

In Ground 1C, Petitioner argues that Bindszus satisfies the additional limitations in dependent claims 9 and 10. (Pet. 44-45.) Petitioner does not argue that Bindszus satisfies any limitations in the other challenged claims. (*Id.*) Therefore, Ground 1C fails to render the challenged claims unpatentable for at least the same reasons as Grounds 1A-1B. Additionally, a POSITA would not have been motivated combine Richardson with Bindszus because Bindszus would significantly increase the power consumption of the combined system. For this additional reason, Ground 1C fails to render the challenged claims unpatentable.

## A. <u>Overview Of Richardson</u>

All of Petitioner's unpatentability grounds (Grounds 1A-2C) depend on Richardson. (Pet. 3.) Richardson addresses a different medical problem than the '776 patent. While the '776 patent discloses methods of reducing power consumption in patient monitors, Richardson "relates to a method and apparatus

for detecting and reducing the effects of ambient electromagnetic noise...on electronic instruments." (Ex. 1004, 1:11-15, 2:35-37.) Richardson explains that hospital rooms have a complex background-noise level due to an array of electronic emissions that may influence electronic instruments, such as pulse oximeters. (*Id.*, 1:29-33, 1:53-64.)

Richardson addresses background noise by determining the noise level at each available operating frequency, and then selecting the frequency with the least noise to serve as the operating frequency for the instrument. (*Id.*, 2:37-47.) Richardson also periodically rescans the available frequencies to reevaluate the noise level and switches to a less noisy frequency, if available. (*Id.*) Richardson claims that these "techniques allow the invention to adapt to the total noise found in a given environment, such as a hospital." (*Id.*, 2:48-51.) However, Richardson's oximeter also "requires a computational overhead to constantly monitor which frequency of operation provides the least noise." (Ex. 2008, 4:30-42.)

As discussed herein, Richardson never discloses low power patient monitors that reduce power consumption by intermittently alternating between first and second duty cycles. (*See e.g.,* Ex. 2002, ¶¶55-62.) For at least this reason, Richardson fails to disclose the limitations of the challenged claims.

## B. Ground 1A: Petitioner's "First Mapping" Of Richardson Does Not Disclose All Limitations Of The Challenged Claims

### 1. Overview Of The "First Mapping"

Petitioner's Ground 1A is based on a "first mapping" of Richardson. (Pet. 10.) Petitioner characterizes the "first mapping" as the transition of Richardson's oximeter from State 2 to State 1. (*Id.*) Petitioner argues that State 2 [blue below] is the "first control protocol" and State 1 [orange below] is the "second control protocol" required by claims 1 and 11. (*Id.*)

As shown in Figure 2 below, Richardson describes implementing its noise-reduction methods in a pulse oximeter having three states:




FIG. 2.

(Ex. 1004, 5:41-54, Fig. 2.)

Richardson's pulse oximeter powers up in State 0. (*Id.*) In State 0, the oximeter does not provide power to the red and infrared LEDs (i.e., the LEDs are

turned off). (*Id.*) The oximeter passively measures the noise at the available frequencies and selects an initial operating frequency based on its quietness. (*Id.*) The oximeter then moves to State 1, where both LEDs are turned on and blood oxygen saturation is determined in part from demultiplexing a detected light signal at the initial operating frequency. (*Id.*, 5:55-67.) The oximeter occasionally reverts from State 1 to State 0 to reassess the noise and, if necessary, find a new frequency. (*Id.*)

The pulse oximeter transitions from State 1 to State 2 "every 30 seconds." (*Id.*, 9:39; *see also id.,* 8:46 ("Periodically in State 1 the state is forced to State 2.").) "The purpose of State 2 is to detect new noise sources that may have appeared since the last State 0 measurements." (*Id.*, 9:40-42.) In State 2, the oximeter reassesses the noise "by turning off one LED; typically the red LED." (*Id.*, 6:2-3.) "The red LED is turned off for approximately 1.4 seconds." (*Id.*, 9:52-53.) In State 2, "the pulse oximeter cannot calculate blood oxygen saturation, but it can monitor pulse rate and otherwise give the appearance of operating normally." (*Id.*, 6:4-7.) When the 1.4 seconds (i.e., idle time) expires, the oximeter automatically returns to State 1 where it uses the newly estimated noise values. (*Id.*, 9:63-65; *see also id.,* 9:66-10:5 (discussing idle time).) The oximeter thus remains in State 2 for less than about 4.7% of its operating time (i.e., approximately 1.4 seconds / 30 seconds). (Ex. 2002, ¶61.)

### 2. Claims 1 And 11: The "First Mapping" Does Not Disclose First And Second Duty Cycles

Limitations 1[d] and 11[d] of independent claims 1 and 11 require "(operating/operation) of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said (operating/operation) of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle." (Pet. 15, 24.) Petitioner's "first mapping" does not disclose this limitation.

Petitioner argues, "Richardson discloses that the first control protocol, e.g., State 2, operates the first control protocol light source according to a first duty cycle, e.g., red LED at 0% duty cycle and infrared LED at 25% duty cycle, and the second control protocol, e.g., State 1, operates the second control protocol light source according to a second duty cycle, e.g., red and infrared LEDs at 25% duty cycle." (Pet. 16.) As explained above, Petitioner never identifies the first control protocol light source. (*Supra* §VII.C.) Consequently, Petitioner is unclear whether it relies on the duty cycle of (1) the red LED, (2) the infrared LED, or (3) the red and infrared LEDs.

However, regardless of the light source selected, a POSITA would not have understood (1) the red, (2) the infrared LED, or (3) the red and infrared LEDs in

States 1 and 2 to operate according to a "first duty cycle" and a "second duty cycle" under the proper construction of those terms. (*Supra* §VI.B; Ex. 2002, ¶65.)

#### a) The Red LED Does Not Operate According To A "First Duty Cycle"

The red LED does not operate according to a "first duty cycle" under the proper construction of the term. (Ex. 2002, ¶66.) Petitioner identifies Richardson's State 2 as the "first control protocol" and State 1 as the "second control protocol." (Pet. 10.) Petitioner argues that the red LED "has a duty cycle of 0%" in State 2 and a duty cycle of "at least 25%" in State 1. (*Id*., 16.) Petitioner admits that in State 2 "the red light source is turned off." (*Id*.) Yet, as explained in the claim construction section, a POSITA would have understood that the "first duty cycle" cannot be 0% based on the claims and specification. (*Supra* §VI.B.2.) Thus, under the proper construction of "first duty cycle," turning off the red LED in State 2 (Petitioner's "first control protocol") is not operating according to a "first duty cycle" as required by claims 1 and 11. (Ex. 2002, ¶66.)

#### b) The Infrared LED Does Not Operate According To First And Second Duty Cycles

The infrared LED does not operate according to a "first duty cycle" and "second duty cycle" under the proper construction of the terms. (Ex. 2002, ¶67.) Petitioner concedes that the infrared LED operates at the ***same*** duty cycle, "at least 25%," in States 1 and 2. (Pet. 16; *see also* Ex. 1004, 4:6-7 ("a duty cycle of at least

1 in 4").) As explained in the claim construction section (*supra* §VI.B.3), the first and second duty cycles ***must*** be different under the "proper" claim construction, as admitted by Petitioner (Pet., 16, 24 50, 54). Consequently, operation of the infrared LED at the same duty cycle in State 2 and State 1 is not operating according to a "first duty cycle" and a "second duty cycle" as required by claims 1 and 11. (Ex. 2002, ¶67.)

#### c) **<u>The Red And Infrared LEDs Do Not Operate According To First And Second Duty Cycles</u>**

Petitioner cannot rely on a combination of the red and infrared LEDs to show that Richardson operates according to a "first duty cycle" and a "second duty cycle." As explained in the claim construction section, a duty cycle is the "operating time (or on time) of ***a light source***." (*Supra* §VI.B.1.) Similarly, the duty cycle is "expressed as ***a percentage***." (*Id.*) A POSITA would not have understood "duty cycle" to encompass two distinct percentages of cycles of two drive signals that drive different LEDs. (Ex. 2002, ¶68.) Moreover, a POSITA would not have understood "duty cycle" to refer to the additive percentages of cycles of two drive signals that drive different LEDs. (*Id.*; *see also* Ex. 2005, 58:13-59:19 (confirming that declarant did not opine that the duty cycle percentages are additive).) Richardson, for example, refers to the duty cycles of each light source in State 1 independently (25%). (Ex. 1004, 8:16-20.) Richardson does not add the percentages together (e.g., 50%). (*Id.*)

Additionally, the combination of the duty cycles for the red and infrared LEDs cannot be the first and second duty cycles because it would conflict with Petitioner's arguments regarding limitations 1[e] and 11[e]. (Ex. 2002, ¶69.) Limitations 1[e] and 11[e] require, "wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle." (Ex. 1001, 12:17-21, 14:5-9.) Petitioner argues that only the red LED satisfies this limitation. (Pet. 17.)

However, if the combination of the red and infrared LEDs operated according to the claimed "first duty cycle" and "second duty cycle," then Petitioner would have needed to address the power consumption of the red ***and*** infrared LEDs. Undoubtedly, Petitioner did not do this because Richardson never expressly discusses the power consumption of the red and infrared LEDs in States 1 and 2, and does not state that the power consumption is different, as required by claims 1 and 11. (Ex. 2002, ¶70.)

Moreover, the power consumption in State 1 is not ***inherently*** different from the power consumption in State 2. (*Id.*) "Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.,* 295 F.3d 1292, 1295 (Fed. Cir. 2002). Petitioner made no showing, nor did Petitioner

ever argue, that the power consumption between State 1 and State 2 is ***necessarily*** different, and not merely probable. A POSITA would have recognized that adjustments could be made to the operation of the active LED in State 2, such as increasing the intensity of the active LED to achieve a more reliable reading, that would have made the power consumption of States 1 and 2 the same. (Ex. 2002, ¶70.)

For these reasons, Richardson's red and infrared LEDs (or some combination thereof) do not operate according to a "first duty cycle" and a "second duty cycle" as claimed. (Ex. 2002, ¶¶68-70.)

#### 3. Claims 1 And 11: The "First Mapping" Does Not Disclose Generating A Trigger Signal Responsive To Signal Quality Characteristics

Limitations 1[b]-1[c] and 11[b]-11[c] require: "generating a trigger signal, wherein said trigger signal is responsive to … signal quality characteristics of signals received from the detector" and "in response to receiving the trigger signal, operating the patient monitor according to a second control protocol."[3] Petitioner's "first mapping" does not disclose these limitations. (Ex. 2002, ¶¶71-77.)

---

[3] The claims recite generating a trigger signal responsive to other conditions. However, Petitioner relies on the "signal quality characteristics" so Masimo has focused on that condition.

Richardson transitions from State 2 to State 1 based on a preset idle time, not based on a trigger signal that is responsive to signal quality characteristics. (Ex. 2002, ¶72.) Richardson discloses, "Every 30 seconds, the pulse oximeter enters noise State 2." (Ex. 1004, 9:39; *see also id.*, 8:46 ("Periodically in State 1 the state is forced to State 2.").) "In State 2, the red LED is turned off for approximately 1.4 seconds." (*Id.*, 9:52-53.) During the State 2 idle time, the oximeter computes new noise levels. (*Id.* at 9:40-43.) If the State 2 idle time is sufficient, the oximeter may compute noise levels based on both the red and IR channels. (*Id.*, 9:66-10:5.) Once the idle time expires, the oximeter returns to State 1. (*Id.*, 9:63-65.)

Petitioner incorrectly argues that the "system does not exit State 2 and return to State 1 until the 'new noise level' is calculated" and that "the calculation of the 'new noise level' (a signal quality characteristic of signals received from the detector) causes a trigger signal to be generated." (Pet., 13-14.) As explained above, the new noise level does not "trigger" the oximeter to transition from State 2 to State 1. (Ex. 2002, ¶74.) Rather, the oximeter remains in State 2 for a set time, approximately 1.4 seconds, before returning State 1. (Ex. 1004, 9:52-53; *see also id.*, 9:47-48 ("State 2 is of relatively short duration").) Richardson further explains that the State 2 idle time dictates the extent of the noise calculations and triggers the transition back to State 1. Richardson states, "In some preferred embodiments, the signal noise and ratios are computed for the IR channel as well as the red

channel as an additional precaution." (*Id.*, 9:66-10:1.) "However, ***if the oximeter has insufficient idle time***, these values are computed on the red channel only…." (*Id.*, 10:1-5 (emphasis added).) Thus, the idle time, not the calculation of noise levels, triggers the transition from State 2 to State 1. (Ex. 2002, ¶¶72-74.)

Richardson's disclosure of an automatic transition from State 2 to State 1 based on a fixed idle time is appropriate for the clinical purposes of Richardson's oximeter. (Ex. 2002, ¶75.) Richardson's oximeter cannot remain in State 2 indefinitely while it calculates the new noise levels because it could endanger the patient. (*Id.*; *see also* Ex. 1001, 2:12-24 (describing problems that may occur when a pulse oximeter misses patient events).) "In State 2, the pulse oximeter cannot calculate blood oxygen saturation." (*Id.*, 6:4-5.) Richardson states, "the pulse oximeter may continue to display the last computed oxygen saturation number throughout State 2 ***even though no new saturations numbers can be computed***" because "State 2 is of relatively short duration." (*Id.*, 9:47-51 (emphasis added).) If the transition from State 2 depended on the indefinite calculation of noise levels, and therefore State 2 was not of "relatively short duration," the oximeter may stay in State 2 too long (i.e., longer than 1.4 seconds) and miss critical patient events, such as a drop in blood oxygenation levels. (Ex. 2002, ¶75.) Thus, a POSITA would have understood Richardson to disclose transitioning from State 2 to State 1 based on a preset idle time. (*Id.*)

A preset idle time is not a "signal quality characteristic of signals received from the detector," as required by claims 1 and 11. (Ex. 2002, ¶76.) The '776 patent discloses that a "low signal quality condition is based upon the signal statistics output 344 and may be any signal-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as a low signal level, a high noise level or motion artifact to name a few." (Ex. 1001, 6:37-43.) A preset idle time is not based on any signal statistics. (Ex. 2002, ¶76.) Rather, the idle time in Richardson is preprogramed to be approximately 1.4 seconds. Moreover, Richardson's preset idle time is not "received from the detector." (*Id.*) Rather, the preset idle time is preloaded into the processor. (*Id.*)

Consequently, Petitioner has failed to show that the "first mapping" of Richardson discloses, "generating a trigger signal, wherein said trigger signal is responsive to … signal quality characteristics of signals received from the detector" and "in response to receiving the trigger signal, operating the patient monitor according to a second control protocol." (Ex. 2002, ¶¶71-77.) Petitioner's Ground 1A fails to show obviousness for at least this reason.

#### 4. Claims 2 And 12: The "First Mapping" Does Not Disclose A First Duty Cycle Having An Active Time

"[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious." *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992).

As discussed above, the Petition fails to establish that independent claims 1 and 11 are obvious over the cited reference of Grounds 1A and therefore fails to establish obviousness of any of the challenged dependent claims. At least dependent claims 2 and 12 are nonobvious for additional reasons.

Dependent claims 2 and 12 recite, in part, "the first control protocol light source (operates) on the first duty cycle having an active time and an inactive time according to the first control protocol." (Ex. 1001, 12:22-25, 14:10-14.) Petitioner's "first mapping" does not disclose this limitation. (Ex. 2002, ¶¶78-79.)

Petitioner argues, "for the red LED, the duration of the active time of the first duty cycle of 0% is different from the duration of the active time of the second duty cycle of at least 25%." (Pet. 18; *see also id.*, 25 (relying on claim 2 analysis).) However, as Petitioner concedes, when the red LED operates in State 2 with an alleged "first duty cycle of 0%," the red light source is operated "in an off state." (Pet. 13; *see also* Pet. 15 (State 2 operates "by turning off the red LED").) Thus, the red LED operating at the alleged first duty cycle (i.e., operating in State 2) ***does not*** have an active time – the red LED is turned off and, therefore, inactive. (Ex. 2002, ¶79.) Thus, Petitioner fails to show that the "first mapping" discloses the limitations in claims 2 and 12. (*Id.*)

### C. Ground 1B: Petitioner's "Second Mapping" Of Richardson Does Not Disclose All Limitations Of The Challenged Claims

#### 1. Overview Of The "Second Mapping"

Petitioner characterizes the "second mapping" of Richardson as "the oximeter transitioning from a first operating frequency (as the first control protocol) for State 1 to a second, different operating frequency (as the second control protocol) for State 1." (Pet., 26.) Thus, in the second mapping, State 1 [orange] is the first ***and*** second control protocol.




FIG. 2.

(Ex. 1004, Fig. 2.)

Richardson discloses that once the oximeter is operating in State 1, it periodically returns to State 0 according to a "predefined schedule." (Ex. 1004, 5:57-60, 7:48-51.) In a preferred embodiment, Richardson discloses that the oximeter automatically reverts to State 0 at predefined times ranging from 30

seconds to 15 minutes following the last State 0 routine. (*Id.*, 7:52-57.) Additionally, if the oximeter determines that the signal-to-noise ratio at the selected frequency in State 1 decreases below an acceptable level, the oximeter will move to State 0 to search for a new frequency. (*Id.*, 5:64-67.)

In State 0, the oximeter reassesses the noise at a selected frequency ($f_{TMUX}$), and, if necessary, finds a new frequency. (*Id.*, 5:59-60.) When the oximeter selects a new frequency or confirms that the initial frequency was acceptable, the oximeter moves back to State 1. (*Id.*, 5:55-56.) Thus, when the oximeter returns to State 1, the operating configuration may be the same as they were before the oximeter moved to State 0, or the LEDs may operate at a new frequency. (Ex. 2002, ¶¶59-60.)

### 2. Claims 1 And 11: The "Second Mapping" Does Not Disclose First And Second Duty Cycles

The "second mapping" of Richardson does not disclose a "first duty cycle" and a "second duty cycle" under the proper construction of those terms. (Ex. 2002, ¶¶81-83.) As explained in the claim construction section, and acknowledged by Petitioner, the "first duty cycle" must be different from the "second duty cycle." (*Supra* §IV.B.3.)

Yet, in the "second mapping," Petitioner admits that the duty cycles of the red and infrared LEDs in State 1 are ***always*** at least 25%. (Pet. 30.) Petitioner never argues, nor does Richardson disclose, that its oximeter ever operates at

different duty cycles in State 1. (Ex. 2002, ¶82.) Petitioner even concedes that Ground 1B (i.e., the "second mapping") is an alternative argument that relies on an "alternate construction of this limitation that does not require different duty cycles for the first duty cycle and the second duty cycle." (Pet. 30.) As explained above (*supra* §VI.B.3), Petitioner's "alternate construction" is wrong because the first and second duty cycles must be different. Consequently, Petitioner's "second mapping" does not disclose the claimed "first duty cycle" and "second duty cycle" under the proper construction of those terms. (Ex. 2002, ¶83.)

### 3. **Claims 1 And 11: The "Second Mapping" Does Not Disclose Generating A Trigger Signal Responsive To Signal Quality Characteristics**

Petitioner's "second mapping" (State 1 to State 0 to State 1) cannot satisfy both (1) the "generating a trigger signal" limitation (limitation 1[b]), ***and*** (2) the "operating the patient monitor according to a second control protocol" limitation (limitation 1[c]) in independent claims 1 and 11. (Ex. 2002, ¶¶84-88.)

Petitioner argues that Richardson's transition from State 1 to State 0 is based on the detection of an unacceptable signal-to-noise ratio, which "generates a trigger signal." (Pet. 28.) Petitioner states that while "Richardson's system is operating in State 1, '***if the system determines that the signal-to-noise ratio at*** $f_{TMUX}$' (a processing characteristic) '***decreases below an acceptable level'*** (a threshold) 'it ***moves to State 0*** (process 4)' (generates a trigger signal) 'to search

for a new $f_{TMUX}$." (*Id.*, (emphasis in original).) Thus, Petitioner alleges that process 4 (highlighted below), which is the transition of the oximeter from State 1 to State 0, involves "generating a trigger signal":




FIG. 2.

(Ex. 1004, Fig. 2.)

However, independent claims 1 and 11 also require, "***in response to receiving the trigger signal***, operating the patient monitor according to a second control protocol different from the first control protocol." Petitioner alleges that State 1 is the second control protocol required by the claim. (Pet. 29.) Yet, as shown in Figure 2 above, Richardson's oximeter does not operate according to State 1 "in response to receiving the trigger signal" (i.e., process 4). (Ex. 2002, ¶86.) Rather, Richardson's oximeter operates according to State 0 "in response to receiving the trigger signal" (i.e., process 4). (*Id.*; *see also* Ex. 1004, 5:64-67

(describing process 4).) Richardson never discloses, and Petitioner never argues, that process 4 triggers the transition back from State 0 to State 1. (*Id.*) Such an argument would be inconsistent with Richardson's specification, which states that process 4 triggers only the transition from State 1 to State 0. (Ex. 1004, 5:64-67; Ex. 2002, ¶86.)

Richardson's oximeter uses a different signal (i.e., process 1 – highlighted red) to prompt the transition from State 0 to State 1. (Ex. 2002, ¶87.) Richardson discloses that when the oximeter selects a new frequency or confirms that the initial frequency was acceptable, the oximeter moves back to State 1 with process 1. (Ex. 1001, 5:55-56 ("When $f_{TMUX}$ is settled on in State 0, the system moves to State 1, (process 1) where both LEDs are turned on and the blood oxygen saturation is monitored.").)



FIG. 2.

(*Id.*, Fig. 2.) Thus, Richardson's oximeter unambiguously does not operate "according to a second control protocol different from the first control protocol" in response to the alleged trigger signal (process 4) as argued by Petitioner. (Ex. 2002, ¶87.)

Moreover, State 0 cannot be the second control protocol at least because (1) Petitioner never made this argument, and (2) all LEDs are inactive in State 0 (Ex. 1004, 5:44-54), and thus the oximeter is unable to "calculat[e] the measurement values of pulse rate," as required by claims 1 and 11. (Ex. 2002, ¶88.)

Consequently, Petitioner has failed to show that the "second mapping" of Richardson (Ground 1B) discloses "generating a trigger signal" and "in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different form the first control protocol." (Ex. 2002, ¶¶84-88.)

## D. <u>Ground 1C: A POSITA Would Not Have Been Motivated To Combine Richardson and Bindszus</u>

In Ground 1C, Petitioner argues that either mapping of Richardson in combination with Bindszus renders claims 9 and 10 obvious. (Pet. 3, 40-45.) However, as discussed below, a POSITA would not have been motivated to combine Richardson and Bindszus. (Ex. 2002, ¶¶89, 92-93.)

### 1. <u>Overview Of Bindszus</u>

Bindszus does not disclose low power patient monitors. (Ex. 2002, ¶¶90-91.) Rather, Bindszus discloses methods of "validating the accuracy of measured

oxygen saturation values." (Ex. 1005, 1:5-7.) Bindszus explains that a shortcoming of pulse oximetry is that it "relies on the fact that the arterial blood is the only pulsating component that causes a pulsatile change of the light absorption used to determine the oxygen saturation." (*Id.*, 6:12-15.) "When the source of the pulsatile component is not the patient's arterial blood flow, the oxygen saturation measurement … might derive inaccurate values." (*Id.*, 6:15-17.) As an example, Bindszus identifies a fetal pulse oximeter where "the sensor can accidentally pick up the mother's pulsating blood instead of the fetal pulsating blood and lead to a wrong value of the oxygen saturation." (*Id.*, 6:20-23.)

Bindszus addresses pulse oximeter inaccuracy by comparing the patient's pulse rate, as measured by the pulse oximeter [red], with the patient's heart rate, as measured by an EKG, ultrasound, or other device [blue]:




Fig. 2

(*Id.*, 2:31-49, Fig. 2.) Bindszus further describes a "coincidence recognition unit" [green], which compares the pulse rate from the pulse oximeter and the heart rate from the other device. (*Id.*, 2:50-62.) Bindszus's system then generates a warning signal or other indication if the pulse rate and heart rate do not match. (*Id.*)

### 2. <u>**The Addition Of Bindszus To Richardson Would Increase Power Consumption**</u>

A POSITA would have recognized that combining Bindszus's system with Richardson would increase the power consumption of the combined system. (Ex. 2002, ¶92.) Petitioner acknowledges that adding features from Bindszus to Richardson would require new hardware, such as an EKG, ultrasound, or other device, to obtain the secondary heart rate reading and new software to compare the

heart rates, generate the warning signals, and modify the frequencies of the pulse oximeter when the signals are mismatched. (Pet. 42; Ex. 1005, 3:35-4:29; Ex. 2002, ¶92.) The new hardware and software would increase power consumption of the combined device. (Ex. 2002, ¶92.) Petitioner never addresses the increased power consumption caused by Bindszus.

Yet, Petitioner argues that Richardson operates to conserve power consumption. (*See e.g.*, Pet. 9 ("Richardson's oximeter measures noise levels *in situ,* which 'may conserve power by reducing LED drive current while maintaining a safe signal-to-noise ratio.'"), 17, 56.) Likewise, Petitioner argues that a POSITA would have been motivated to combine Richardson and Turcott to "minimize power consumption." (*Id.*, 46.) However, a POSITA motivated to conserve power in Richardson's oximeter would not have also been motivated to add the hardware and software required by Bindszus, which would increase the system's power consumption. (Ex. 2002, ¶93.)

For this reason, a POSITA would not have been motivated to combine Richardson and Bindszus. (*Id.*, ¶¶89-93.)

## IX. <u>GROUNDS 2A-2C FAIL TO DEMONSTRATE OBVIOUSNESS</u>

In Ground 2A, Petitioner argues that the "first mapping" of Richardson in combination with Turcott renders claims 1-8 and 11-16 obvious. (Pet., 48-49.) In

Ground 2B, Petitioner argues that the "second mapping" of Richardson in combination with Turcott renders claims 1-9 and 11-16 obvious. (*Id.*, 55.)

Petitioner introduces Turcott only for its alleged "teaching of reducing the duty cycle to lower power consumption in a pulse oximeter." (Pet. 47.) As explained below, Grounds 2A-2C fail for one of the same reasons as Grounds 1A-1C; it does not disclose limitations 1[b-c] and 11[b-c]. Further, Petitioner fails to show that a POSITA would have been motivated to change the duty cycles in one of Richardson's operating states based on Turcott. For these reasons, Grounds 2A-2B do not render the challenged claims unpatentable.

In Ground 2C, Petitioner argues that Bindszus satisfies the additional limitations in dependent claims 9 and 10. (*Id.*, 62-63.) Petitioner does not argue that Bindszus satisfies any limitations in the other challenged claims. (*Id.*) Therefore, Ground 2C fails to render the challenged claims unpatentable for at least the same reasons as Grounds 2A-2B. Additionally, a POSITA would not have been motivated to combine Richardson, Turcott, and Bindszus.

## A. <u>Grounds 2A-2C Fail For One Of The Same Reasons As Grounds 1A-1C</u>

As explained in Grounds 1A-1C, Richardson does not disclose "generating a trigger signal, wherein said trigger signal is responsive to … signal quality characteristics of signals received from the detector" (limitations 1[b] and 11[b]) and "in response to receiving the trigger signal, operating the patient monitor

according to a second control protocol" (limitations 1[c] and 11[c]) under the first or second mappings. (*Supra* §§VIII.B.3, VIII.C.3.) In Grounds 2A-2C, Petitioner relies exclusively on its analysis in Grounds 1A-1C to argue that Richardson discloses these limitations. (Pet. 49, 54-55, 62.) Thus, Petitioner fails to show that Grounds 2A-2C disclose this limitation for the same reasons as Grounds 1A-1C. (Ex. 2002, ¶¶94-95.)

## B. Overview Of Turcott

Petitioner's Grounds 2A-2C depend on Turcott. (Pet., 3.) Turcott addresses a different medical problem than the '776 patent and fails to disclose the '776 patent's claimed inventions. (Ex. 2002, ¶¶96-100.)

Turcott discloses an "implantable monitoring device" for "monitoring the status of a patient with a chronic disease such as heart failure using heart and lung sounds." (Ex. 1006, 1:13-16.) Turcott explains that physicians have difficulty preventing heart failure because the disease progresses quickly and the physicians lack timely information. (*Id.*, 1:19-52.) Thus, Turcott proposes invasively implanting a device in the patient's chest that can detect the sounds made by the patient's heart and lungs and relay that information to the physician several times a day. (*Id.*, 6:58-730.) Turcott asserts that changes in the sounds made by the heart and lungs can signal a medical problem. (*Id.*)

Turcott's device is sized and shaped to be invasively implanted within a tissue pocket in the patient. (*Id.*, 8:65-9:4, 14:11-12.) The device includes a diaphragm, or other component, that can sense acoustic signals (i.e., sounds of the heart or lungs) at different time intervals. (*Id.*, 6:58-17, 9:49-52.) The device calculates the energy of the acoustic signal at each time and compares the energies to determine whether the condition of the patient has deteriorated. (*Id.*)

The device includes an antenna that allows the device to transmit data to an external telemetry unit. (*Id.*, 12:65-13:13:46.)




Fig. 6

(*Id.*, Fig. 6.)

In one embodiment, the implantable device also includes a "light source 26 and detector 28, preferably LEDs and photodiode, respectively." (*Id.*, 9:28-29.) "The source and detector are preferably placed on the side of the device that, following implantation, faces the chest wall." (*Id.*, 9:35-37.) The source and detector are "used for both vascular plethysmography and for measuring the oxygen saturation of arterial hemoglobin." (*Id.*, 9:30-32.)

Turcott, like Richardson, does not disclose low power patient monitors that reduce power consumption by intermittently alternating between first and second duty cycles. (Ex. 2002, ¶100.)

### C. Claims 1 And 11: Turcott Does Not Disclose Or Suggest Operating At First And Second Duty Cycles

Petitioner argues that Turcott suggests reducing the duty cycle of a light source and that this suggestion would have motivated a POSITA to reduce the duty cycle in one of Richardson's states to yield two different duty cycles. (Pet., 46-48, 50, 56-57.)

However, Petitioner's argument fails because Turcott does not disclose or suggest operating a light source according to two different duty cycles as required by the claims. (Ex. 2002, ¶¶101-105.) Rather, Turcott suggests operating a light source according to a ***single***, low duty cycle. (*Id.*) Turcott states, "[t]o conserve energy, the source is preferably driven with a low duty cycle pulse train." (Ex. 1006, 11:51-52.) Turcott never suggests a corresponding high duty cycle pulse

train, much less intermittently changing from a low duty to a high duty cycle. (Ex. 2002, ¶102.)

Similarly, Turcott states, "[t]he optical power generated by the source is adjusted to optimize the signal to noise ratio and to minimize power consumption." (*Id.*, 11:54-57.) Turcott continues "[t]his can be done by adjusting the drive current, the frequency of the pulse train, the pulse duration, or the duty cycle of the pulse train." (*Id.*, 11:57-59.) However, rather than disclosing real-time adjustments during patient monitoring, a POSITA would have understood Turcott to suggest selecting a configuration during product design or setup. (Ex. 2002, ¶¶103-104.) For example, Turcott does not identify any conditions that would trigger a transition from a first duty cycle to a second duty cycle. (*Id.*) Moreover, Turcott does not disclose hardware and software necessary to make such real-time transitions. (*Id.*) Therefore, a POSITA would have understood that Turcott does not disclose or enable "adjusting the drive current, the frequency of the pulse train, the pulse duration, or the duty cycle of the pulse train" in real-time during patient monitoring. (*Id.*) Thus, Turcott would not have motivated a POSITA to modify Richardson's operating states to have first and second duty cycles. (Ex. 2002, ¶104.) To the contrary, Turcott would have motivated a POSITA to reduce ***all*** duty cycles in Richardson's oximeter uniformly during product design or setup. (*Id.*)

For these reasons, a POSITA would not have understood Turcott to disclose or suggest operating a monitor according to a "first duty cycle" and "second duty cycle," and would not have been motivated by Turcott to modify Richardson to operate according to the "first duty cycle" and "second duty cycle." (*Id.,* ¶¶101-105.)

### D. **Claims 1 And 11: A POSITA Would Not Have Been Motivated To Combine Richardson And Turcott To Arrive At The Claimed Inventions**

Petitioner does not explain why Turcott would have motivated a person of ordinary skill in the art to ***adjust*** the duty cycle in Richardson's State 2 ("first mapping") or Richardson's State 1 for different operating frequencies ("second mapping"). Petitioner argues that a "POSITA would have thus been motivated to implement Turcott's teaching of reducing the duty cycle to lower power consumption in a pulse oximeter in combination with Richardson's pulse oximeter to further minimize power consumption." (Pet. 47.) However, as described below, Petitioner's explanation does not provide a motivation to adjust the duty cycle. (Ex. 2002, ¶¶106-112.)

First, if a POSITA merely wanted to "minimize power consumption" of a patient monitor, the person would have set the activation of the sensor at a single level associated with a low power consumption. (*Id.*, ¶107.) The POSITA would have had no motivation to use a different "duty cycle" where one of the duty cycles

would have resulted in a higher power consumption level. (*Id.*) Operating Richardson's oximeter at a constant power consumption level would have been consistent with Richardson's disclosure, which describes operating Richardson's light sources at a constant duty cycle of at least 25%. (Ex. 1004, 4:6-7.) Petitioner never identifies any motivation for a POSITA to intermittently change between a "first duty cycle" and a "second duty cycle" during patient monitoring.

Second, a POSITA would have been ***discouraged*** from changing the duty cycle, as argued by Petitioner, without proper patient and signal protections in place. (Ex. 2002, ¶108.) The '776 patent discloses that a patient monitor may need to increase activation of the sensor during "low signal quality periods or when critical measurements are necessary" because a sensor operating at a reduced activation level may be more likely to miss important events. (Ex. 1001, 6:12-27.) Consequently, the '776 patent describes methods to trigger the monitor to increase the duty cycle during these critical times. Richardson and Turcott do not include a feedback loop whereby physiological measurements or internal parameters are used to adjust the duty cycle. (Ex. 2002, ¶108.) Moreover, Petitioner does not propose modifying Richardson or Turcott to include such a feedback loop.

Third, Turcott is not from the same field as Richardson according to Petitioner's declarant. (*Id.*, ¶109.) The declarant states, "The '776 patent and the prior art references discussed herein are all from the field of non-invasive optical

biosensors." (Ex. 1003, ¶16.) However, Turcott describes an ***invasive*** "implantable monitoring device" for "monitoring the status of a patient with a chronic disease such as heart failure using heart and lung sounds." (Ex. 1006, 1:13-16.) Turcott's device is sized and shaped to be implanted within a tissue pocket in the patient. (*Id.,* 8:65-9:4, 14:11-12.) Based on this difference, a POSITA would have understood that Turcott does not disclose adjusting the activation level of its sensors in real-time, but rather discloses operating the invasive implantable device at a constant low duty cycle to prolong the life of the device. (Ex. 2002, ¶109.) A POSITA would have appreciated that the patient may need to undergo surgery every time the device ran out of power. (*Id.*) Consequently, a POSITA would have been discouraged from ever running the invasive implantable device at a different, higher power consumption level, as required by the challenged claims, because that would reduce the life of the device. (*Id.*)

Fourth, a POSITA motivated to reduce power consumption would not have started with Richardson's system. Richardson's device "requires a computational overhead to constantly monitor which frequency of operation provides the least noise." (Ex. 2008, 4:30-42.) Thus, a POSITA would not have used it as the starting point for a low power patient monitor. (Ex. 2002, ¶110.)

Fifth, Petitioner does not explain how the combination of Richardson and Turcott would operate to adjust Richardson's duty cycle. (*Id.*, ¶¶111-112.) In the

"first mapping," Petitioner argues, "the combination of Richardson and Turcott would include implementing the oximeter to reduce the duty cycle of the pulse train for operating the infrared light source in State 2 as compared to the duty cycle of the pulse train for operating the infrared or red light source in State 1." (Pet. 50-51.) In the "second mapping," Petitioner argues "a POSITA would have found it obvious that the duty cycle for these different frequencies would be adjusted differently to minimize the power consumption, and thus the duty cycle for the first selected frequency of 1[a] would be different from the duty cycle for the second selected frequency of 1[c]." (Pet. 57.)

However, in order for Richardson's oximeter to adjust the duty cycle of Richardson's LEDs, the oximeter must send a signal to the emitter drivers and the emitter drivers must be capable of changing the duty cycle of supplied current between different non-zero duty cycles. (Ex. 2002, ¶112.) Yet, Richardson does not send a signal to the emitter drivers to change the duty cycle. (*Id.*) Richardson only turns the LEDs off or operates the LEDs at a 25% duty cycle. (*Id.*) Richardson would need, at a minimum, additional hardware and/or software to change the duty cycles and some sort of trigger to change the duty cycles. (*Id.*) Yet, Petitioner does not propose any modifications to Richardson's hardware and/or software to address these deficiencies. Therefore, Petitioner has not demonstrated that a POSITA would have been motivated to combine Richardson and Turcott to adjust

the duty cycle of Richardson's oximeter, much less that a POSITA would have had a reasonable expectation of success in so doing. (*Id.*, ¶¶106-112.)

### E. Claims 1 And 11: A POSITA Would Not Have Been Motivated To Reduce The Duty Cycle In The "First Mapping"

Petitioner argues that a "POSITA would have recognized that the predictable modification of Richardson's oximeter as suggested by Turcott would include implementing the oximeter to reduce the duty cycle of the pulse train for operating the infrared light source in State 2, as compared to the duty cycle of the pulse train for operating the infrared or red light source in State 1, to minimize power consumption, as suggested by Turcott." (Pet., 50.) As explained above, Turcott does not disclose or suggest operating according to two different duty cycles. (*Supra* §IX.C.) Moreover, contrary to Petitioner's argument, a POSITA would not have been motivated to reduce the duty cycle of the pulse train for operating the infrared light source in State 2. (Ex. 2002, ¶113.) Rather, a POSITA would have been discouraged from making such a reduction. (*Id.*)

In State 2, Richardson's oximeter reassesses the noise "by turning off one LED; typically the red LED." (Ex. 1004, 6:2-3.) Richardson discloses that "[t]he red LED is turned off for approximately 1.4 seconds." (*Id.*, 9:52-53.) When the one LED is turned off, "the pulse oximeter cannot calculate blood oxygen saturation, but it can monitor pulse rate and otherwise give the appearance of operating normally." (*Id.*, 6:4-7.)

Thus, in State 2, the functionality of the oximeter is compromised. (Ex. 2002, ¶115.) Richardson states, "the pulse oximeter may continue to display the last computed oxygen saturation number throughout State 2 even though no new saturations numbers can be computed." (Ex. 1004, 9:47-51.) In State 2, the information generated by the active LED becomes critical and the only source of real-time information about the patient's condition for the oximeter. (Ex. 2002, ¶115.) A POSITA would not have been motivated to reduce the duty cycle of the only active LED because that reduction in the duty cycle could result in erroneous or unreliable readings. (*Id.*; *see also* Ex. 1001, 6:12-27 (increasing sampling during low signal quality periods), 5:26-29.)

Moreover, Richardson's oximeter remains in State 2 for approximately 1.4 seconds, or less than about 4.7% of its operating time (i.e., approximately 1.4 seconds / 30 seconds). (Ex. 1004, 9:52-53.) Thus, even if the duty cycle of the active LED were reduced in State 2, the power savings would be minimal. (Ex. 2002, ¶116.) A POSITA would not have been motivated to risk the health and safety of a patient for such a minimal power savings. (*Id.*)

Thus, Petitioner has failed to show that a POSITA would have been motivated to reduce the duty cycle in Petitioner's "first mapping" based on Turcott. (*Id.,* ¶¶113-117.)

### F. Claims 1 And 11: A POSITA Would Not Have Been Motivated To Reduce The Duty Cycle In The "Second Mapping"

Petitioner characterizes the "second mapping" of Richardson as "the oximeter transitioning from a first operating frequency (as the first control protocol) for State 1 to a second, different operating frequency (as the second control protocol) for State 1." (Pet. 26.) As explained above, while the operating frequency of State 1 may change, the duty cycle of State 1 is always the same. (*Supra* §V.B.2.b.)

In Ground 2B, Petitioner argues "a POSITA would have found it obvious that the duty cycle for these different frequencies would be adjusted differently to minimize the power consumption, and thus the duty cycle of the first selected frequency of 1[a] would be different from the duty cycle for the second selected frequency of 1[c]." (Pet. 57.) However, Petitioner cites no evidence that supports this argument. (Ex. 2002, ¶119.) Petitioner identifies five lines of Richardson that describe operating the red and infrared LEDs at a 25% duty cycle. (Pet. 57 (citing Ex. 1004, 4:6-10).) However, the cited lines do not mention or suggest operating according to different non-zero duty cycles during patient monitoring. (Ex. 2002, ¶119.) Moreover, the disclosure states that the LEDs need to operate "to a duty cycle of ***at least*** 1 in 4." (Ex. 1004, 4:6-10 (emphasis added).) Petitioner's argument that a POSITA would have found it obvious to reduce the duty cycle in

State 1 at one of the frequencies below 25% is contrary to the "at least" requirement. (Ex. 2002, ¶119.)

Petitioner also cites three lines of Turcott that state, "the frequency of the pulse train can be shifted such that a quiet region of the noise spectrum is used." (Pet. 56 (citing Ex. 1006, 11:59-61).) Again, the lines do not mention or suggest operating according to different non-zero duty cycles during patient monitoring. (Ex. 2002, ¶120.)

Petitioner also cites one paragraph of its declarant's declaration. (Pet. 57 (citing Ex. 1003, ¶96).) However, the cited paragraph is virtually identical to the Petition, and does not identify any additional evidence to support Petitioner's argument. (*Id.*) The declarant's unsupported and conclusory opinions cannot support Petitioner's otherwise unsupported argument. *Harmonic*, 815 F.3d at 1363. Thus, because Petitioner has failed to cite any evidence to support its argument that a POSITA would have been motivated to modify Richardson to operate according to different non-zero duty cycles, Petitioner has failed to show that the challenged claims are obvious. (Ex. 2002, ¶¶118-122.)

Additionally, Petitioner suggests that Turcott would have motivated a POSITA to modify Richardson to use different duty cycles in State 1 at different times. (Pet. 56-57.) However, as discussed above, Turcott encourages the use of a single, low duty cycle pulse train, not different duty cycles. (Ex. 1006, 11:51-59;

*supra* V.C.1.a.) Consequently, Turcott would have motivated a POSITA to uniformly lower the duty cycle for Richardson's State 1. (Ex. 2002, ¶121.) No disclosure in Turcott encourages using different non-zero duty cycles in Richardson's oximeter during patient monitoring. (*Id.*)

For these reasons, Petitioner has failed to show that Turcott would motivate a POSITA to modify Richardson's State 1 to operate at different duty cycles at different times. (*Id.,* ¶¶118-122)

## G. Ground 2C: A POSITA Would Not Have Been Motivated To Combine Richardson And Turcott With Bindszus

In Ground 2C, Petitioner argues that either mapping of Richardson in combination with Turcott and Bindszus renders claims 9 and 10 obvious. (Pet. 3, 62-63.) Petitioner has failed to show that Ground 2C renders claims 9 and 10 unpatentable for the same reasons as Ground 1C. (Ex. 2002, ¶123.)

Additionally, a POSITA would not have been motivated to combine Turcott and Bindszus with Richardson. (*Id.*, ¶124.) Petitioner argues that a POSITA would have been motivated to combine Richardson and Turcott to reduce power consumption. (Pet. 48.) However, as discussed herein, the addition of Bindszus to Richardson and Turcott would increase power consumption because Bindszus requires additional hardware and/or software. (*Supra* §VIII.D.) Consequently, combining Bindszus with Richardson and Turcott is contrary to Petitioner's alleged motivation to combine Richardson with Turcott. (Ex. 2002, ¶124.) As a

result, a POSITA would not have been motivated to combine Richardson with Turcott and Bindszus as suggested by Petitioner. (*Id.*) For these reasons, Petitioner has failed to show that Ground 2C renders the claims unpatentable. (*Id.*)

## X. CONCLUSION

For the reasons stated above, Petitioner has not shown by a preponderance of the evidence that the challenged claims are unpatentable. Thus, Masimo requests that the Board issue a final written decision that the challenged claims are not unpatentable.

Respectfully submitted,
KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: August 2, 2021

/Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)
Customer No. 64,735

Attorney for Patent Owner
Masimo Corporation

**CERTIFICATE OF COMPLIANCE**

Pursuant to 37 C.F.R. § 42.24(d), Counsel for Patent Owner Masimo Corporation hereby certifies that this document complies with the type-volume limitation of 37 C.F.R. § 42.24(b). According to Microsoft Office Word 2010's word count, this document contains approximately 13,939 words, including any statement of material facts to be admitted or denied in support, and excluding the table of contents, table of authorities, mandatory notices under § 42.8, exhibit list, certificate of service or word count, or appendix of exhibits or claim listing.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: August 2, 2021

/Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)
Customer No. 64,735

Attorney for Patent Owner
Masimo Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that, pursuant to 37 C.F.R. § 42.6(e) and with the agreement of counsel for Petitioner, a true and correct copy of **PATENT OWNER RESPONSE and EXHIBITS 2001-2008** is being served electronically on August 2, 2021, to the e-mail addresses shown below:

W. Karl Renner, Reg. No. 41,265
Dan Smith, Reg. No. 71,278
Kim Leung, Reg. No. 64,399
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Tel: 202-783-5070
Fax: 877-769-7945
Email: IPR50095-0003IP1@fr.com
Email: PTABInbound@fr.com; axf-ptab@fr.com; dsmith@fr.com; leung@fr.com

Dated: August 2, 2021

/Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)

Attorney for Patent Owner
Masimo Corporation

33636992