# EXHIBIT 33

Filed: December 2, 2021

Filed on behalf of:
Patent Owner Masimo Corporation
By: Joseph R. Re (Reg. No. 31,291)
Stephen W. Larson (Reg. No. 69,133)
Jarom D. Kesler (Reg. No. 57,046)
Jacob L. Peterson (Reg. No. 65,096)
Joshua J. Stowell (Reg. No. 64,096)

KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Tel.: (949) 760-0404
Fax: (949) 760-9502
E-mail: AppleIPR2020-1523-703@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

Case IPR2020-01523
U.S. Patent 8,457,703

# PATENT OWNER'S SUR REPLY TO REPLY

# TABLE OF CONTENTS

**Page No.**


I. CLAIM CONSTRUCTION OF "PROCESSING CHARACTERISTICS" ....2

A. Petitioner Failed To Construe "Processing Characteristics" ....2

B. Masimo's Construction Of "Processing Characteristics" Is Correct ....4

II. GROUNDS 1A-1B FAIL TO DEMONSTRATE OBVIOUSNESS ....7

A. A POSITA Would Not "Suspend And Not Execute" Diab's Motion Artifact Suppression Module ....7

1. The Motion Artifact Suppression Module Operates Continuously ....7

2. Figures 20-21 Illustrate A Complete Module ....11

B. A POSITA Would Not Have Been Motivated To Combine Diab And Amano ....13

C. Suspending and Not Executing Diab's Motion Artifact Suppression Module Would Not Necessarily Result In Lower Power Consumption Or Reduce An Amount Of Processing ....15

D. Diab Does Not Disclose Comparing "Processing Characteristics" To A "Predetermined Threshold" ....18

III. GROUND 1C FAILS TO DEMONSTRATE OBVIOUSNESS ....20

A. Petitioner's References Do Not Disclose Or Suggest "Reducing/Reduce Activation Of An Attached Sensor" ....21

B. A POSITA Would Not Have Been Motivated To Combine Diab, Amano, And Turcott ....23

## TABLE OF CONTENTS
## (*cont'd*)

**Page No.**


IV. GROUNDS 3A-3B FAIL TO SHOW OBVIOUSNESS ..............................27

A. Amano Does Not Disclose "Measurement Values For One Or More Physiological Parameters Of A Patient" ..............................27

B. Amano Does Not Compare Processing Characteristics To A Predetermined Threshold ..............................29

C. Amano And Turcott Do Not Disclose Or Suggest "Reducing/Reduce Activation Of An Attached Sensor" And A POSITA Would Not Have Combined The References ..............................29

V. CONCLUSION..............................31

# TABLE OF AUTHORITIES

**Page No(s).**

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ....................4

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
885 F.3d 1367 (Fed. Cir. 2018) ....................27

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................3, 4

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................1

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fec. Cir. 2005)....................19

*Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*,
600 Fed. Appx. 755 (Fed. Cir. 2015)....................14

*Smith & Nephew, Inc. v. Rea*,
721 F.3d 1371 (Fed. Cir. 2013) ....................25

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ....................*passim*

## OTHER AUTHORITIES

37 C.F.R. § 42.23 ....................3

37 C.F.R. § 42.104 ....................2, 3, 4, 28

## EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 2001 | Expert Declaration of Vijay K. Madisetti Ph.D. |
| 2002 | Curriculum Vitae of Vijay K. Madisetti Ph.D. |
| 2003 | Excerpts from the deposition transcript of Brian Anthony, Ph.D. |
| 2004 | U.S. Patent No. 5,827,969 to Lee et al. |
| 2005 | U.S. Patent No. 6,402,690 to Rhee et al. |

The ’703 patent and challenged claims describe devices and methods for “managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor.” (*See e.g.,* Ex. 1001, claim 1.) Petitioner’s cited references do not address this problem, nor do they disclose or suggest the claimed solution, including (1) “continuously operating a patient monitor at a lower power consumption level” and then “transitioning to continuously operating said patient monitor at a higher power consumption level,” (2) “comparing processing characteristics to a predetermined threshold,” (3) “reducing activation of an attached sensor,” (4) wherein “reducing activation comprises reducing a duty cycle of said sensor,” and (5) “reducing an amount of processing by a signal processor.”

Moreover, Petitioner’s arguments that a POSITA would have been motivated to combine Diab, Amano, and Turcott are conclusory, unsupported by evidence, and inadequately explained. Petitioner’s reply confirms that Petitioner improperly uses hindsight to attempt to reconstruct the claimed invention from references that do not teach or suggest all claimed elements. *See e.g.*, *KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (“A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning.”). For these reasons, the Board should reject Petitioner’s request to find the challenged claims unpatentable.

# I. CLAIM CONSTRUCTION OF "PROCESSING CHARACTERISTICS"

## A. Petitioner Failed To Construe "Processing Characteristics"

In the Petition, Petitioner proposed two plausible constructions for "processing characteristics": a "limiting" and "alternative non-limiting" construction. (Pet. 50-51; Ex. 1003, ¶¶97-98.) However, Petitioner and its declarant refused to adopt either construction despite cross-examination from Masimo. (Ex. 2003, 126:13-127:5, 130:12-131:4.)

In the POR, Masimo agreed with Petitioner's "limiting" construction, which requires the "'processing characteristics' to be obtained from a signal provided by a photodetector," and identified supporting evidence. (Pet. 50; Ex. 1003, ¶97; POR 23-27.) Now, in reply, Petitioner argues its "limiting" construction is "unjustifiably limiting." (Reply 1.)

Yet, while Petitioner attacks its own "limiting" construction, Petitioner still has not identified the correct construction of "processing characteristics." (*See* POR 21-23.) As with the "limiting" construction, Petitioner's declarant refused to adopt Petitioner's "alternative non-limiting" construction as the correct construction and Petitioner's Reply does not adopt that construction. (Ex. 2003, 126:13-127:5, 130:12-131:4.) Thus, Petitioner failed to meet its burden to show "[h]ow the challenged claim is to be construed." 37 C.F.R. §42.104(b)(3).

While Petitioner never identifies the correct construction, Petitioner now advocates for a broader construction than the "limiting" construction. But, it is too late for Petitioner to change or propose new claim constructions. *See* 37 C.F.R. §42.23(b) ("All arguments for the relief requested in a motion must be made in the motion."). Further, it is too late for Petitioner to cite new evidence (claims 4 and 8) as allegedly supporting a broader construction than the "limiting" construction. *See* 37 C.F.R. §42.104(b)(5) (Petition must identify "the supporting evidence relied upon to support the challenge and the relevance of the evidence to the challenge raised, including identifying specific portions of the evidence that support the challenge."). "Unlike district court litigation—where parties have greater freedom to revise and develop their arguments over time and in response to newly discovered material—the expedited nature of IPRs bring with it an obligation for petitioners to make their case in their petition to institute." *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.,* 821 F.3d 1359, 1369 (Fed. Cir. 2016).

Here, Petitioner proposed two plausible claim constructions for "processing characteristics" and recognized that Amano would not render the claims obvious under the "limiting" construction. (Pet. 50-51; Ex. 1003, ¶¶97-98.) Yet, Petitioner decided to adopt neither construction. Having made this decision, and having stymied discovery regarding the correct construction, Petitioner is barred from arguing for a broader construction in reply based on previously unidentified

evidence. *See e.g., Intelligent Bio-Systems,* 821 F.3d at 1369-1370 (affirming Board decision to not consider new arguments raised in reply); *Ariosa Diagnostics v. Verinata Health, Inc.,* 805 F.3d 1359, 1368 (Fed. Cir. 2015) (rejecting previously unidentified portions of a prior-art reference). Petitioner's decision to delay claim construction is inconsistent with its burden to state in the Petition "[h]ow the challenged claim is to be construed." 37 C.F.R. §42.104(b)(3).

## B. Masimo's Construction Of "Processing Characteristics" Is Correct

Petitioner argues Masimo's construction of "processing characteristics" is "unjustifiably limiting" based on claims 4 and 8. (Reply 1-3.)

Claim 4 states:

> *wherein said processing characteristics comprise signal characteristics from one or more light sensitive detectors.*

Petitioner argues, "If 'processing characteristics' were required to be 'determined from a signal received from one or more detectors,' claim 4 would be rendered meaningless." (Reply 1.)

Petitioner is incorrect. Petitioner assumes the limitation "from one or more light sensitive detectors" is the narrowing limitation of claim 4. However, Petitioner ignores that claim 4 is narrower than claim 1 because the "processing characteristics ***comprise signal characteristics***." The '703 patent discloses that processing characteristics can include (1) physiological measurements and (2)

signal statistics, both of which are received from the one or more light sensitive detectors. (Ex. 1001, 4:11-27, Figs. 3-4.) Claim 4 is limited to signal characteristics (i.e., as opposed to physiological measurements).

The clause identified by Petitioner, "from one more light sensitive detectors," ***supports*** Masimo's construction that the "processing characteristics" must come "from a signal received from one or more detectors configured to detect light." (*See also* POR 23-27.)

Claim 8 also does not support Petitioner's argument. Claim 8 states:

> *wherein said processing characteristics include determining an estimate of current power consumption and comparing said estimate with a target power consumption.*

Petitioner argues the "specification makes clear that…the 'estimate of current power consumption'…is not 'determined from a signal received from one or more detectors configured to detect light.'" (Reply 2.) Instead, Petitioner argues that the power consumption estimate is determined "from a signal received from control engine 440." (*Id.*)

Petitioner is incorrect that the "power consumption estimate…is not determined from a signal received from the detector front-end 490." As illustrated by the red lines below, the "process status calculator 460" [orange] estimates the

current power consumption using a signal received from the detector front-end 490 [green]:




FIG. 4

(Ex. 1001, Fig. 4, 5:28-6:55.) While the signal passes through other processing modules before reaching the power status calculator 460, the power consumption estimate is still "determined from a signal received from one or more detectors [490] configured to detect light."

This distinguishes the '703 patent from Amano. Amano determines its alleged "processing characteristics" from a signal received exclusively from an acceleration sensor, not a "detector configured to detect light." (Ex. 1004, 21:9-12,

35:25-27, 40:65-41:3; POR 73-75; Reply 24.) For this reason, Amano is substantially different from the ’703 patent.

## II. GROUNDS 1A-1B FAIL TO DEMONSTRATE OBVIOUSNESS

### A. A POSITA Would Not “Suspend And Not Execute” Diab’s Motion Artifact Suppression Module

#### 1. The Motion Artifact Suppression Module Operates Continuously

A POSITA would not have been motivated to “suspend and not execute” Diab’s motion artifact suppression module because the module must continuously operate to generate a clean plethysmograph waveform. (POR 33-41; Ex. 2001, ¶¶63-73; Ex. 1039, 34:9-40:12, 46:4-21, 50:9-52:3.) In reply, Petitioner argues, “Diab discloses that its system can, but does not necessarily need to, provide a clean plethysmograph waveform.” (Reply 4.) Petitioner is incorrect. The embodiment in Figures 20-21, which forms the basis for Petitioner’s unpatentability arguments, always provides a clean plethysmograph waveform. (POR 33-41.)

Petitioner cites Diab’s column 35, lines 42-50 as allegedly supporting its argument. However, that section begins, “In the ***present embodiment***, the output of the digital signal processing system 334 [red] ***provides clean plethysmographic waveform*** [yellow] of the detected signals and provides values for oxygen saturation and pulse rate to the display”:




FIG. 11

(Ex. 1007, 35:43-47, Fig. 11 (emphases added).) The "present embodiment" describes Figure 11, as well as Figures 12-21, which include additional details regarding the same embodiment. (Ex. 1007, 7:56-8:22.) Thus, Diab discloses that the embodiments relied upon by Petitioner (i.e., Figures 20-21) generate a clean plethysmograph waveform.

Petitioner disregards the first sentence of its cited section and focuses on the second sentence, which states, "It should be understood that in ***different embodiments*** of the present invention, one or more of the outputs may be provided." (*Id.*, 35:48-50 (emphasis added).) Petitioner incorrectly implies this sentence applies to Figures 20-21, and ignores the phrase "different embodiments." Further, Petitioner identifies no "different embodiments."

Petitioner also cites Diab's column 49, lines 29-32 as allegedly supporting its argument. (Reply 4.) Again, Petitioner is incorrect. The cited portion states, "[t]he clean waveform at the output of the motion artifact suppression module 580 is a clean plethysmograph waveform which can be forwarded to the display 336." (Ex. 1007, 49:29-32.) The phrase "can be" indicates the clean plethysmograph waveform is able or designed to be ***forwarded to the display***; it does not indicate that the generation of the clean plethysmograph is optional. (Ex. 1039, 47:2-49:10.)

Petitioner also argues, "Diab teaches that a 'clean' plethysmograph waveform would only need to be generated by the correlation canceler of the motion artifact suppression module if motion is detected." (Reply 4.) Petitioner's argument is conclusory and devoid of any explanation for how the string of Diab citations provides support. *See e.g., TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) ("Rejections on obviousness grounds, in particular, cannot be sustained by mere conclusory statements[.]").

Moreover, Petitioner's argument incorrectly assumes that removing motion artifacts is the only purpose of the correlation canceler. To the contrary, Diab explains the correlation canceler removes a "secondary portion" of the signal comprised of noise related to "the venous blood contribution," "motion artifacts," and "respiration." (Ex. 1007, 3:40-4:50.) Consequently, the correlation canceler must operate to remove the other noise sources and generate the clean

plethysmograph waveform, even if motion is not detected. (*Id.*) Petitioner ignores these teachings.

Petitioner also argues that "Masimo's contention that Diab 'requires continuous operation of the motion artifact suppression module' is contradicted by their assertion that modules 'operate ***differently*** depending on whether motion is detected' by the motion status module." (Reply 5 (citing POR 34, 36; Ex. 2001, ¶¶57, 75).) Petitioner argues that because "motion status" is an input to the motion artifact suppression module, the module must operate "differently" when motion is detected. (Reply 5-6.) Masimo's contentions are not contradictory. Regardless of whether the module operates differently when motion is detected, it ***does not*** stop operating depending on motion as Petitioner alleges. (Ex. 1007, Fig. 20; *see also* POR 31-32, 34-35 (describing module).)

Petitioner's argument is also inconsistent with the description of Figures 20-21. As illustrated by Figure 21, the motion status input does not affect the motion artifact suppression module's operation. (Ex. 1007, 48:34-49:32, Fig. 21.) Figure 21 is consistent with Diab's disclosure that the module "is nearly identical to the saturation transform module 406 (FIG. 18)," which also does not use the motion status. (*Id.*, 48:34-40.) Petitioner cited no evidence that the motion status input suspends the motion artifact suppression module. Nor has Petitioner explained how Diab's patient monitor would timely perform the complex task of waking the

module once it is suspended. Diab does not disclose any suspension or wakeup circuitry or modules, and Petitioner has not shown that a POSITA could easily modify Diab's complex calculations to include such circuitry or modules. (Ex. 2001, ¶¶53-59, 65-69.)

For these reasons and those in the POR, a POSITA would not have found it obvious, or been motivated, to "suspend and not execute" Diab's motion artifact suppression module based on Amano.

**2. <u>Figures 20-21 Illustrate A Complete Module</u>**

Petitioner argues that Diab's Figures 20-21 are incomplete. (Reply 4-5.) Petitioner argues in the case of no motion, "a plethysmograph waveform can be generated from the signal using 'traditional filtering techniques, such as simple subtraction, ***low pass***, ***band pass***, and high pass filtering' or 'a static filtering system, such as a bandpass filter.'" (*Id.* (emphasis added).) Petitioner argues Figures 20-21 "do not show the generation of the plethysmograph waveform using 'traditional filtering techniques' because it was well known in the art, as indicated by Diab." (Reply 5.)

However, Figures 20 and 21 do show the alleged "traditional filtering techniques." The motion artifact suppression module utilizes a bandpass filter [red] and a lowpass filter [purple] to generate the clean waveform:



FIG. 21

(Ex. 1007, 48:43-49:13, Fig. 21.) Thus, Figures 20-21 "show the generation of the plethysmograph waveform using 'traditional filtering techniques.'" (Reply 5.)

Petitioner also now argues, "Diab's FIGS. 20 and 21 depict the modules that are executed 'in case of motion.'" (*Id.*) Yet, in the Petition, Petitioner argued that Figure 20 showed the modules used "when motion is not detected" (green line) and when "motion is detected" (purple line):




(Pet. 15-16.) Diab confirms that Figure 20 illustrates the modules used in "the case of no motion." (Ex. 1007, 48:6-9; *see also* 47:55-58, 48:9-33 (further describing Figure 20's motion-free path).

For these reasons, Figures 20-21 are complete and illustrate the modules used for motion and no motion.

## B. A POSITA Would Not Have Been Motivated To Combine Diab And Amano

A POSITA would not have been motivated to, or reasonably expected success in, applying Amano's teachings to Diab due to unique aspects of the devices. (POR 41-45.) In Diab, the modules continuously operate and the spectrum analysis module 590 [orange] selects the output for calculating the raw heart rate:




FIG. 20

(Ex. 1007, 49:64-50:20, Fig. 20.) Unlike the ’703 patent, Diab does not address power consumption and, therefore, runs its modules continuously.

In contrast, Amano addresses power consumption. Amano detects motion at the outset of the signal processing and uses motion to suspend certain operations. (Ex. 2001, ¶¶60-62.) Thus, while Amano uses motion to select an output path to suspend, Diab uses motion to select an input downstream. The consequence is that unlike Amano, Diab cannot “suspend and not execute” its motion artifact suppression module. (POR 41-43.) Suspending and not executing the module would fundamentally alter operation of Diab’s oximeter and make it inoperable for its intended purpose. “[C]ombinations that change the ‘basic principles under which the prior art was designed to operate’ or that render the prior art ‘inoperable for its intended purpose’, may fail to support a conclusion of obviousness.” *Plas-*

*Pak Indus., Inc. v. Sulzer Mixpac AG,* 600 Fed. Appx. 755, 758 (Fed. Cir. 2015) (quoting *In re Ratti,* 270 F.2d 810, 813 (CCPA 1959) and *In Re Gordon,* 733 F.2d 900, 902 (Fed. Cir. 1984)). Diab's oximeter generates multiple potential measurement values and then selects the best value, which was a significant departure from previous techniques that used only one measurement technique at a time.

Petitioner also argues that Masimo's arguments concerning lack of motivation "are misplaced" because "Masimo's arguments primarily focus on whether Diab's and Amano's systems can be physically combined together." (Reply 8.) Petitioner misstates Masimo's arguments. Amano's teachings are incompatible with Diab and a POSITA would not have been motivated to combine the references, or reasonably expected success in doing so. (Ex. 2001, ¶¶70-73.)

### C. Suspending and Not Executing Diab's Motion Artifact Suppression Module Would Not Necessarily Result In Lower Power Consumption Or Reduce An Amount Of Processing

Even if Diab's motion artifact suppression module were suspended and not executed, Petitioner still failed to show this would result in "lower power consumption levels" or "reducing an amount of processing by a signal processor." (POR 45-48, 52-54.) Petitioner never accounted for the output filter [pink] and spectrum analysis module [orange]:




FIG. 20

(*Id.*)

Diab discloses that the output filter "is slowed down" if motion is large and "can sample much faster" if there is no motion. (Ex. 1007, 50:23-27.) Petitioner now argues, "a POSITA would have understood Diab's disclosure…to refer to the filter dampening being slowed down…." (Reply 10-11.) Petitioner's argument is conclusory, unsupported, and unexplained. *TQ Delta,* 942 F.3d at 1359. The only document Petitioner cites in support is an incomplete and unauthenticated document from "The Wayback Machine." (Reply 10-11 (citing Ex. 1038).) Petitioner fails to explain how this document reflects a POSITA's understanding or relates to Diab. (*Id.*)

Moreover, Diab does not mention "filter dampening." Rather, Diab states the output "filter can sample much faster" or be "slowed down." (Ex. 1007, 50:23-27.) A POSITA would have understood that a "module that samples 'much faster' will process more data and increase the power consumption level." (POR 47; Ex. 2001, ¶76.)

Petitioner also argues that the spectrum analysis module 590 does not consume more power when no motion is detected because the module merely selects one of two values and that "Diab does not describe any difference between these two selections[.]" (Reply 12.) That is not true. The module does not simply select a value; it runs algorithms to determine which value to select. (*See e.g.,* Ex. 1039, 58:13-59:20, 63:14-65:2, 68:2-16, 69:20-72:2 (explaining how module operates).) For example, for no motion, the module selects "the first peak that has an amplitude of at least 1/20th of the largest peak in the spectrum." (Ex. 1007, 48:28-31.) Before selecting a peak, the module first determines the "largest peak" and then runs calculations to identify "the first peak." (*Id.*; POR 47; Ex. 2001, ¶77.) As explained by Masimo's declarant, this process may consume more power than selecting the first harmonic in the case of motion. (Ex. 1039, 68:2-72:2.) Petitioner cited no contrary evidence.

## D. Diab Does Not Disclose Comparing "Processing Characteristics" To A "Predetermined Threshold"

As explained in the POR, Petitioner failed to show that Diab expressly or inherently disclosed comparing processing characteristics to a "***predetermined*** threshold." (POR 48-52 (emphasis added).) While Petitioner noted that Diab's motion status module assesses whether an "average peak width value" is wide, Petitioner never explained how Diab's oximeter met the "predetermined" requirement. (*Id.*) Masimo identified several ways Diab's oximeter could evaluate peak width without using a predetermined threshold (e.g., comparing the peak width to a recent average of peak widths). (*Id.*) Petitioner does not dispute that Diab could use these other ways.

Rather, Petitioner now contends that Diab's "predetermined threshold" is "a width value above which the peaks are considered wide." (Reply 13.) Petitioner argues this "width value" is predetermined because it "must be ***determined before*** the comparison is performed." (*Id.*, 14 (emphasis in original).)

Yet, Petitioner's broad, new construction of "predetermined" would eliminate "predetermined" from the claims. The challenged claims require, "comparing processing characteristics to a predetermined threshold." (*See e.g.,* Ex. 1001, 11:43-44.) In any comparison, the comparators must be "***determined before***" the comparison. If "predetermined" merely meant "determined before," then it is superfluous in the challenged claims because the claims already require

"comparing." Consequently, "predetermined" must have a different meaning than "determined before." *See e.g.*, *Merck & Co. v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1372 (Fec. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claimed is preferred over one that does not do so.").

The '703 patent establishes that the "predetermined threshold" is not recalculated in real time. Rather, the "predetermined threshold" is programmed into the oximeter and remains constant during patient monitoring. The '703 patent states, "The power status calculator 460 also ***stores*** a predetermined power target and compares its power consumption estimate to this target." (Ex. 1001, 6:49-51 (emphasis added); *see also* 2:34-37, 3:52-56.) As shown in Figure 8, the "predetermined target power consumption level 830" [yellow] is constant and establishes a static power target:




FIG. 8

(*Id.*, 8:22-28, Fig. 4.)

If "predetermined" meant "determined before," then the "predetermined threshold" could change during operation. For example, if the "predetermined threshold" were determined from the averages of recent peak widths (*see* POR 51-52), the threshold would change as the average changed. Such a system would create a variable, unpredictable power target, which is inconsistent with the "predetermined power target" described in the '703 patent.

## III. GROUND 1C FAILS TO DEMONSTRATE OBVIOUSNESS

Ground 1C fails for the same reasons as Ground 1A. (POR 57.) Ground 1C also fails because Petitioner identifies no reference that discloses or suggests

"reducing/reduce activation of an attached sensor," as required by independent claims 1 and 15, nor the additional requirement of reducing the duty cycle during operation required by dependent claims 2 and 16. Nor did Petitioner adequately explain why a POSITA would have been motivated to combine Diab, Amano, and Turcott. (*Id.*, 60-67.)

### A. <u>Petitioner's References Do Not Disclose Or Suggest "Reducing/Reduce Activation Of An Attached Sensor"</u>

Petitioner argued Turcott teaches reducing activation of an attached sensor because it allegedly discloses "reducing the duty cycle to lower power consumption." (Pet. 38.) Masimo demonstrated that a POSITA would not have understood Turcott to teach "reducing activation of an attached sensor" during "continuous patient monitoring," as required by the claims. (POR 60-61.) Rather, a POSITA would have understood Turcott to disclose setting its operating parameters during product design or setup. (*Id.*)

Petitioner argues this conclusion "is unsupported conjecture" (Reply 18), but that is incorrect. Masimo's declarant explained that a POSITA would have reached this conclusion because Turcott (1) does not disclose or enable making adjustments in real-time during continuous monitoring, (2) does not identify any conditions during patient monitoring that would trigger the adjustments, (3) does not disclose the hardware and software necessary to make adjustments in real-time, and (4)

discloses an implantable device where a constant low duty cycle would have been important to prolong the device's life. (POR 61, 64; Ex. 2001, ¶¶103, 109-110.)

Moreover, Petitioner does not dispute that Turcott is silent regarding how it would allegedly perform the complex task of adjusting the duty cycle during continuous patient monitoring. Petitioner simply argues that Turcott's use of the words "adjusted" and "adjusting" means "that multiple values are possible for the adjustment during monitoring and not a single value selected during product design or setup." (Reply 18 (citing Ex. 1006, 11:51-59).) However, these words do not indicate that the adjustments occur during patient monitoring. If anything, Turcott's use of the past tense "adjusted" indicates selecting the duty cycle in the past (i.e., during setup), not during patient monitoring.

Petitioner also argues that Masimo's observations concerning Turcott are "inapposite" because Masimo attacked Turcott individually and did not address the combined references. (Reply 16-17.) That is incorrect. Masimo appropriately responded to Petitioner's argument that Turcott teaches "reducing the duty cycle to lower power consumption in a pulse oximeter." (Pet. 39; Ex. 1003, ¶80.) Masimo explained in detail why a POSITA would not have been motivated to combine Diab, Amano, and Turcott. (POR 61-67.) Masimo showed that neither reference discloses reducing activation of an attached sensor during continuous patient

monitoring, including the dependent claim limitations of reducing a duty cycle. (*Id.*)

For the reasons above and in the POR, Petitioner has failed to demonstrate Turcott alone or with Diab discloses "reducing/reduce activation of an attached sensor."

**B. <u>A POSITA Would Not Have Been Motivated To Combine Diab, Amano, And Turcott</u>**

Petitioner argues a POSITA would have been motivated to combine Diab, Amano, and Turcott "to achieve a patient monitor that optimizes the signal-to-noise ratio and minimizes power consumption." (Reply 19.) This "conclusory assertion with no explanation is inadequate to support a finding that there would have been a motivation to combine…." *TQ Delta,* 942 F.3d at 1359.

A POSITA intent on minimizing power consumption would have run the system at a single, low duty cycle to consume the least amount of power. (POR 62.) This is how Diab and Turcott operate. (*Id.*, 60-62; Ex. 1006, 11:51-52; Ex. 1007, 36:6-15.) Petitioner does not directly dispute this point. (Reply 19.) Rather, Petitioner shifts its argument to assert, "a POSITA would not have merely wanted to minimize power consumption of the patient monitor, but would have also wanted to optimize signal to noise ratio." (*Id.*) Petitioner argues, "a POSITA would have also been motivated to adjust, e.g., ***by increasing***, activation of the sensor to

optimize signal to noise ratio when the signal to noise ratio is low." (*Id.* (emphasis added).)

However, Petitioner's declarant stated, "Turcott teaches that ***reducing*** the duty cycle of the light source optimizes the signal-to-noise ratio" (Ex. 1003, ¶81 (emphasis added)), which directly contradicts Petitioner's attorney argument on reply. (Reply 19.) Moreover, Petitioner never explains why a POSITA would have been motivated to "optimize" Diab's signal-to-noise ratio. (*See* Pet. 38; Ex. 1003, ¶81.) Diab does not disclose or suggest that its oximeter suffers from an unacceptable signal-to-noise ratio. Similarly, Petitioner identifies no vulnerabilities in Diab's oximeter that would require optimization of the signal-to-noise ratio. Petitioner also never explains how "reducing activation" of Diab's sensor would "optimize" the signal-to-noise-ratio for Diab's oximeter.

Petitioner merely cites portions of Amano and Turcott that purportedly describe optimizing the signal-to-noise ratio. (Reply 19.) However, the Federal Circuit has explained, "knowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references." *TQ Delta,* 942 F.3d at 1360. In this case, Petitioner "failed to explain why a person of ordinary skill in the art would have combined elements from [Diab and Turcott] *in the way the claimed invention does*." *Id*. (internal citations omitted, emphasis in original).

Petitioner also argues, "a POSITA would have further been motivated to reduce Diab's emitter drive current." (Reply 19.) As explained in the POR, the parties agree, as did the Examiner during prosecution, that reducing emitter drive current is not "reducing activation of an attached sensor." (POR 19-21, 63.) Thus, Petitioner's discussion of "drive current" is irrelevant to the limitation "reducing/reduce activation of an attached sensor" and further fails to demonstrate the unpatentability of claims 2 and 16 that require "reducing a duty cycle of said sensor."

Petitioner also failed to adequately address the other reasons a POSITA would not have been motivated to combine the references. (POR 61-67.) For example, Masimo demonstrated that a POSITA would have been discouraged from reducing activation of Diab's sensors without proper patient protections. (POR 62-63.) Petitioner replies, "[t]hese arguments are…based on unclaimed limitations and cannot form the basis for a proper obviousness analysis." (Reply 20-21.)

However, Petitioner misapplies the law it cites. (Reply 21 (citing *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371 (Fed. Cir. 2013)).) In *Smith & Nephew*, the Patent Owner tried to distinguish the prior art based on features that the patent did "not claim or ***otherwise disclose***." *Id.* at 1381 (emphasis added). Here, the '703 patent extensively discloses a feedback loop used to adjust sensor activation in case of low signal quality or patient emergencies. (*See e.g.,* Ex. 1001, 8:43-9:25,

Fig. 9.) Thus, the Board should not disregard this evidence when considering the motivation to combine.

A POSITA would also not have been motivated to combine Diab and Turcott because Turcott discloses ***invasive*** implantable monitoring devices, which are not from the same field as Diab. (POR 63; Ex. 2001, ¶¶109-110.) Petitioner replies that Masimo's argument is "meritless" because Turcott discloses "noninvasive pulse sensors." (Reply 21.) However, Turcott describes the "Field of the Invention" as "implantable monitoring devices." (Ex. 1006, 1:14-17; Ex. 1039, 73:10-78:16.) Moreover, Petitioner relied on no alleged "noninvasive" embodiments for its obviousness arguments. Petitioner exclusively cited to the description of Figure 5a. (*See e.g.,* Pet., 37-40 (citing Ex. 1006, 11:15-61)), which illustrates the "preferred embodiment" of the monitor 20 and is sized and shaped for implantation in a tissue pocket. (Ex. 1006, 8:63-9:3.) Based on these disclosures, a POSITA would have understood Turcott to describe invasive devices and would not have been motivated to combine Turcott with a noninvasive device like Diab. (Ex. 1039, 73:10-78:16; Ex. 2001, ¶¶109-110.)

Finally, Petitioner failed to explain how Diab, Amano, and Turcott "would operate to adjust activation of Diab's sensors." (POR 65-67.) In reply, Petitioner merely argued, "the combination 'would include implementing the oximeter's signal processor to reduce the drive current or the duty cycle of the pulse train of

the LEDs when the oximeter is operating at the lower power consumption level." (Reply 22 (citing Pet. 42; Ex. 1003, ¶85).) This conclusory statement is insufficient to support obviousness and "fraught with hindsight bias." *TQ Delta,* 942 F.3d at 1360.) Petitioner and its declarant "failed to explain how [the] specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate…." (*Id.*)

Petitioner also argues, "the modification of Diab to incorporate Turcott's teachings would have been well within the skill level of a POSITA." (Reply 22.) Yet, Petitioner provides no reasoning or evidence to support this statement. The Federal Circuit's "cases repeatedly warn that references to 'common sense' – whether to supply a motivation to combine or a missing limitation – cannot be used as a wholesale substitute for reasoned analysis and evidentiary support, especially when dealing with a limitation missing from the prior art references." *DSS Tech. Mgmt., Inc. v. Apple Inc.,* 885 F.3d 1367, 1374 (Fed. Cir. 2018). For these reasons, Petitioner's conclusory arguments are insufficient to support a finding of obviousness.

## IV. GROUNDS 3A-3B FAIL TO SHOW OBVIOUSNESS

### A. Amano Does Not Disclose "Measurement Values For One Or More Physiological Parameters Of A Patient"

The Petition did not specify how Amano disclosed "measurement values for one or more physiological parameters of a patient." (POR 69-71.) In reply,

Petitioner argues, "Amano determines measurement values for a physiological parameter of patient by determining a pulse waveform and a pulse condition of a subject being monitored[.]" (Reply 23.) This new argument should not be considered because it was not made in the Petition and is unsupported by evidence. 37 C.F.R. §42.104(b)(4).

Further, Amano's "pulse condition" is a qualitative classification, not a "measurement value." (POR 72; Ex. 2001, ¶124-127.) Petitioner argues, "Masimo did not explain why these alleged 'qualitative classifications' are not 'measurement values'" (Reply 24), but that is untrue. Masimo demonstrated that a POSITA would not consider the qualitative classifications to be measurement values because they describe a patient's general condition. (POR 72.) Petitioner also ignores that it had the burden to demonstrate Amano's "pulse condition" is a measurement value and failed to do so.

Petitioner also now argues the "pulse waveform" generated by Turcott's device is a "measurement value." (Reply 23.) However, Petitioner cites no evidence to explain how a "pulse waveform" satisfies the "measurement value" requirement. The pulse waveform is a shape of a graph reflecting the change in blood pressure over time. (Ex. 1004, 1:41-45, Fig. 45A.) The pulse waveform itself is not a "measurement value."

**B. Amano Does Not Compare Processing Characteristics To A Predetermined Threshold**

The Parties agree that Amano receives the alleged processing characteristics from an acceleration sensor, not one or more detectors configured to detect light. (Reply 24.) Thus, if the Board adopts Masimo's construction of "processing characteristics" (*supra* §I.B), Petitioner has not shown that Amano satisfies the limitations of the challenged claims and Grounds 3A-3B cannot render the claims unpatentable. (POR 73-75.)

**C. Amano And Turcott Do Not Disclose Or Suggest "Reducing/Reduce Activation Of An Attached Sensor" And A POSITA Would Not Have Combined The References**

As explained above, Turcott does not disclose or suggest reducing/reduce activation of an attached sensor during continuous patient monitoring as required by independent claims 1 and 15. (*Supra* §III.A; POR 57-61.) Thus, Amano and Turcott cannot render claims 1-3 and 15-17 obvious.

Petitioner also fails to explain why Turcott would have motivated a POSITA to reduce activation of Amano's sensor. (POR 75-79.) As in Ground 1C, Petitioner argues, "a POSITA would have been motivated to modify Amano based on Turcott's teachings to achieve a pulse wave examination apparatus that optimizes the signal-to-noise ratio and minimizes power consumption." (Reply 26.) However, this "conclusory assertion with no explanation is inadequate to support a

finding that there would have been a motivation to combine" for the reasons provided in Ground 1C. (*Supra* §III.B (quoting *TQ Delta*, 942 F.3d at 1359).)

Additionally, Amano discloses a ***different*** method for minimizing power consumption and optimizing the signal-to-noise ratio than "reducing activation of an attached sensor." Amano explains, "the noise of [Amano's] body movement detecting section 20 causes a deterioration of the S/N ratio of the signal output from the body movement component eliminating section 30, and power is consumed by the body movement eliminating operation." (Ex. 1004, 21:53-57.) Thus, to "improve the SN ratio" and "reduce power consumption," Amano suspends the body movement sections when no motion is detected. (*Id.*, 21:57-22:6.)

Petitioner never explains why a POSITA would have been motivated to further reduce power consumption and optimize signal-to-noise ratio in Amano's device when Amano already provides a solution to the problem. (*See* Pet. 64; Ex. 1003, ¶119.) Amano does not disclose or suggest that its solution of suspending modules is ineffective. Similarly, Petitioner identifies no problems with Amano's solution that would require further power reduction or optimization of signal-to-noise ratio. Moreover, Petitioner never explains how "reducing activation" of Amano's sensor would "optimize" the signal-to-noise ratio in Amano's apparatus.

Petitioner merely identifies statements in Amano and Turcott that reference power consumption and signal-to-noise ratio. (Reply 19 (citing Exs. 1004, 1006).) The statements do not identify a reason to combine Amano and Turcott. (*Supra* §III.B.)

Masimo also identified reasons why a POSITA would not have been motivated to combine Amano and Turcott. (POR 75-79.) Petitioner now offers the same responses to those reasons that it advanced for Ground 1C. (Reply 25-27.) Those responses are inadequate as provided in Ground 1C. (*Supra* §III.B.)

## V. CONCLUSION

For the above reasons and those in the POR, Petitioner has not shown by a preponderance of the evidence that the challenged claims are unpatentable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: December 2, 2021

/Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)
Customer No. 64,735

Attorney for Patent Owner
Masimo Corporation

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), Counsel for Patent Owner Masimo Corporation hereby certifies that this document complies with the type-volume limitation of 37 C.F.R. § 42.24(b). According to Microsoft Office Word 2010's word count, this document contains approximately 5,532 words, including any statement of material facts to be admitted or denied in support, and excluding the table of contents, table of authorities, mandatory notices under § 42.8, exhibit list, certificate of service or word count, or appendix of exhibits or claim listing.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: December 2, 2021

/Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)
Customer No. 64,735

Attorney for Patent Owner
Masimo Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that, pursuant to 37 C.F.R. § 42.6(e) and with the agreement of counsel for Petitioner, a true and correct copy of **PATENT OWNER'S SUR REPLY TO REPLY** is being served electronically on December 2, 2021, to the e-mail addresses shown below:

W. Karl Renner, Reg. No. 41,265
Dan Smith, Reg. No. 71,278
Kim Leung, Reg. No. 64,399
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Tel: 202-783-5070
Fax: 877-769-7945
Email: IPR50095-0002IP1@fr.com
Email: PTABInbound@fr.com; axf-ptab@fr.com; dsmith@fr.com; leung@fr.com

Dated: December 2, 2021

/Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)
Attorney for Patent Owner
Masimo Corporation

54530602