MARK D. SELWYN, SBN 244180
  mark.selwyn@wilmerhale.com
THOMAS G. SPRANKLING, SBN 294831
  thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel.: 650.858.6000 / Fax: 650.858.6100

JOSHUA H. LERNER, SBN 220755
  joshua.lerner@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Tel.: 628.235.1000 / Fax: 628.235.1001

AMY K. WIGMORE, *pro hac vice*
  amy.wigmore@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
Tel.: 202.663.6000 / Fax: 202.663.6363

[Counsel appearance continues on next page]

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation,<br><br>Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx)<br><br>**APPLE'S BENCH MEMORANDUM REGARDING "PATIENT MONITOR"**<br><br>Trial: Nov. 4, 2025 |

JOSEPH J. MUELLER, *pro hac vice*
  joseph.mueller@wilmerhale.com
SARAH R. FRAZIER, *pro hac vice*
  sarah.frazier@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: 617.526.6000 / Fax: 617.526.5000

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

KENNETH G. PARKER, SBN 182911
  Ken.parker@haynesboone.com
HAYNES AND BOONE, LLP
660 Anton Boulevard, Suite 700
Costa Mesa, CA 92626
Tel.: 650.949.3014 / Fax: 949.202.3001

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

ARGUMENT ........................................................................................................... 4

I. "PATIENT MONITOR" SHOULD BE CONSTRUED AS A DEVICE DESIGNED TO CAPTURE IMPORTANT EVENTS .................................................................. 4

    A. The Intrinsic Evidence—And Masimo's Own Fact Witness Testimony—Supports Apple's Construction Of "Patient Monitor" ............................... 4

    B. Apple's Proposed Construction Is Also Consistent With This Court's Prior Rulings ........................................................................................... 8

    C. Dr. Madisetti's Testimony Necessitates A Construction Of "Patient Monitor" .............................................................................................. 9

CONCLUSION ...................................................................................................... 13

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020) .................................................................... 12

*CytoLogix Corp. v. Ventana Medical Sys., Inc.*,
  424 F.3d 1168 (Fed. Cir. 2005) .................................................................. 1, 10

*In re Papst Licensing Digital Camera Patent Litigation*,
  778 F.3d 1255 (Fed. Cir. 2015) ...................................................................... 1

*Insituform Techs., Inc. v. Cat Contracting, Inc.*,
  99 F.3d 1098 (Fed. Cir. 1996) ...................................................................... 12

*Mobile Hi-Tech Wheels v. CIA Wheel Group*,
  514 F. Supp. 2d 1172 (C.D. Cal. 2007) .......................................................... 1

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................................... 4

# INTRODUCTION

After the completion of testimony from all of Masimo's liability witnesses, it is clear that Masimo has no plausible infringement argument under a proper interpretation of the term "patient monitor." Apple will be moving for JMOL at the conclusion of the evidence. In the meantime, however, Apple respectfully submits that Masimo's arguments—and more specifically, the opinions of its technical expert, Dr. Madisetti—require the jury to be instructed on the proper scope of "patient monitor." Apple proposes the following instruction, which is rooted in the '776 patent's text, this Court's prior rulings, and last week's testimony from the patent's inventor:

> The asserted claims in the '776 patent are apparatus claims. To infringe an apparatus claim, a device must meet each and every requirement of the claim. Here, the asserted claims require a "patient monitor." A patient monitor is a device designed to capture important medical events while connected to a patient. In terms of performance, a patient monitor need not capture 100 percent of important medical events, but it must be designed not to miss important medical events. In assessing Masimo's infringement allegations, you must decide whether Apple Watch's accused High/Low Heart Rate Notifications make Apple Watch a "patient monitor" that meets the requirements of the asserted claims.

Apple respectfully requests that the jury be given this instruction at the first available opportunity, to cure any misimpressions and confusion from Dr. Madisetti's contrary testimony on Friday. *See In re Papst Licensing Digital Camera Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015) (citing *O2 Micro* and noting that "a district court may (and sometimes must) revisit, alter, or supplement its claim constructions … to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact."). If the instruction is not given now, the record amply supports giving the instruction as part of the final jury instructions. *CytoLogix Corp. v. Ventana Medical Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (district court may permissibly construe claims at "the close of evidence"); *accord Mobile Hi-Tech Wheels v. CIA Wheel Group*, 514 F. Supp.2d 1172, 1188-1889 (C.D. Cal. 2007) ("The only limitation on the district court is that the patent claims must be construed before the jury is instructed[.]").

## BACKGROUND

All remaining asserted claims describe "[a] patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue." *E.g.*, '776 patent at 12:60-62 (Claim 11). The term "patient monitor" is a required element of those claims. Dkt. 2790 at 3 n.1 (rejecting Masimo's argument that the term "patient monitor" is non-limiting).[1]

The specification explains that the patent is directed to a "portable, battery-operated" "low power pulse oximeter." '776 patent at 1:1, 51-52 (capitalization omitted). Such a patient monitor may, for example, "be attached to a patient during emergency transport and remain with the patient as they are moved between hospital wards." *Id.* at 1:52-55. The specification further explains that the claimed patient monitor's approach to reducing power consumption is preferable to the "conventional approach … in portable electronics … to have a 'sleep mode' where the circuitry is powered-down when the devices are idle." *Id*. at 1:59-63. By definition, a "pulse oximeter is not functioning during sleep mode" and "[u]nlike consumer electronics" like "calculators and notebook computers," a patient monitor "**cannot afford to miss events**, such as patient oxygen desaturation." *Id.* at 1:60-62, 2:14-17.

At the *Markman* stage, neither party requested a construction of "patient" or "patient monitor," *see generally* Dkt. 2390 at 8-15, and instead relied on plain meaning. But over time, it has become apparent that Dr. Madisetti and Masimo are diverging from that plain meaning.

For example, Dr. Madisetti's opening report did not offer an opinion on the scope of "patient monitor," but instead stated only that "Apple documents show that Apple Watch Products are patient monitors." *See* Dkt. 2550-1 at ¶¶ 128-129. In his reply report, however, Dr. Madisetti took the position that the word "patient" means "a person" and a "patient monitor" is simply any "device that observes a person," *see* Dkt.

---

[1] Quotation marks, citations, alterations omitted and emphasis added except where noted.

2552-4 ¶¶ 189-192 (emphasis omitted)—essentially rendering "patient" and "patient monitor" superfluous. Under this reading of the claims, in Dr. Madisetti's view, "the term 'patient monitor' itself has no bearing on the characteristics of the required device" "other than conveying that the Asserted Claims require a device that observes a person." *Id.* ¶¶ 194-195.[2]

This Court rejected Dr. Madisetti's definitions of "patient" and "patient monitor" in resolving the parties' (1) summary judgment and *Daubert* motions and (2) MILs. As to "patient," this Court ruled that Dr. "Madisetti's definition nullifies the choice to use the term" and that "[n]o reasonable jury could find" in favor of Dr. "Madisetti's opinion equating 'patient' with 'person.'" Dkt. 2745 at 18. The Court went on to determine that, as a matter of law, the term "patient" refers to "a person receiving care from a medical professional." *Id.*

As to "patient monitor," this Court ruled that "a patient monitor must capture important medical events, like oxygen desaturation, and must perform at a level similar to a clinical device in terms of event capture." Dkt. 2790 at 3-4. A "patient monitor" thus cannot be *designed*, for example, to "use a technique like sleep mode which would cause missed events." *Id.* at 4. However, with respect to device *performance*, this Court's ruling recognized that no device is perfect and barred Apple from (1) "affirmatively defin[ing] 'patient monitor' as a device that continuously monitors and captures 'beat-to-beat' measurements or as a device that captures 'all medical events,'" or (2) "offer[ing] testimony that the Apple Watch is not a 'patient monitor' solely because it does not have a 100% capture rate." *Id.* at 3.

During the first week of trial, Apple hewed carefully to this Court's guidance. During Apple's opening statement, for example, Apple's counsel repeatedly emphasized that while patient monitors are "*designed*" to capture (or "*aimed at*" capturing) medical

---

[2] Indeed, these definitions are so broad that they could encompass, for example, a security camera or a GPS ankle monitor. Even Masimo has not suggested that either device could conceivably satisfy the "patient monitor" limitation.

events, their actual performance need not capture 100% of events. *See, e.g.*, 11/5 AM Tr. 46, 56-57, 59-60. While Masimo initially objected to this line of argument on the grounds that it violated this Court's ruling regarding device performance, 11/6 AM Tr. 4-5, Masimo ultimately withdrew its objection after this Court explained that "[t]here is a difference between [1] how [a patient monitor] is designed and what it is intended to accomplish with that design and [2] how it performs," 11/6 AM Tr. 11; *see also* 11/6 AM Tr. 12 (this Court noting that "I think there is a distinction between designing something to do X and whether it in fact does X."); 11/6 PM Tr. 5 (Masimo's counsel noting that "Masimo is withdrawing its objection of the accusation of [Apple] violating the MIL this morning from the opening statement").

## ARGUMENT

### I. "PATIENT MONITOR" SHOULD BE CONSTRUED AS A DEVICE <u>DESIGNED</u> TO CAPTURE IMPORTANT EVENTS

#### A. The Intrinsic Evidence—And Masimo's Own Fact Witness Testimony—Supports Apple's Construction Of "Patient Monitor"

"The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification" and the patent's prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-1314 (Fed. Cir. 2005) (en banc). Here, the available intrinsic evidence all supports Apple's proposed construction that a patient monitor must be designed not to miss important medical events.

The specification explains, for example, that the claimed patient monitor—"[u]nlike consumer electronics"—"cannot afford to miss events." '776 patent at 2:15-16. Moreover, the only examples discussed in the specification regarding the claimed invention's importance all relate to the clinical setting—i.e., a life-or-death environment in which it is highly undesirable for a patient monitor to miss events. The patent discusses, for instance, (1) why a patient monitor configured for "[o]xygen saturation monitoring is crucial in ***critical care and surgical applications***, where an insufficient

blood supply can quickly lead to injury or death," and (2) how a patient monitor "may be attached to a patient during *emergency transport* and remain with the patient as they are moved between *hospital wards*." *Id.* at 1:15-18, 53-55. The patent further emphasizes that the invention can help "provide the flexibility to reduce power without sacrificing performance during, for example, high noise conditions or *oxygen desaturation events*," to enable detection of clinically important events such as "a fast or irregular pulse rate." *Id.* at 6:8-36.

Apple's construction is also consistent with the patent's file history and, in particular, Masimo's representations during IPR proceedings. For example, Masimo stated that the asserted patent is designed so that "a *clinician can continuously receive current patient information*." Dkt. 2533-4 at 1. Similarly, Masimo contended later in the same IPR document that "a patient monitor may need to increase activation of the sensor during 'low signal quality periods or when critical measurements are necessary' because a sensor operating at a reduced activation level may be *more likely to miss important events*." *Id.* at 59. Masimo should not now be permitted to disavow its IPR positions because they are inconvenient to its current litigation strategy.

Finally, this reading is consistent with both the deposition testimony and the trial testimony of the named inventor of the '776 patent, Ammar Al-Ali. *See* Dkt. 2745 at 11 (this Court describing Mr. Al-Ali's views as "[e]xpert testimony" on the scope of the patent). During his deposition, for example, Mr. Al-Ali agreed that "unlike consumer electronics or consumer devices, *patient monitors can't miss events*" and stated that "the type of patient monitor we're talking about, *the expectation* is you would be monitoring the patient continuously." Dkt. 2588-1 at 59-60. And just last week, Mr. Al-Ali confirmed that claim 11 of the '776 patent (from which all other asserted claims depend) refers to a "patient monitor *designed* … to capture important medical events." 11/6 AM Tr. 78:11-13. He went on to state:

> Q. You were designing your units, your patient monitor equipment, to capture important medical events and not miss medical events, true?

>    A. True.
>    Q. That was the design intent of your patient monitors when you wrote this patent, true?
>    A. That's correct.

11/6 AM Tr. 83:23-84:4. In sum, Mr. Al-Ali agreed that his "expectation" in referencing patient monitor in the patent was that the device would "not … miss events" because "missed events can put a patient in danger." *Id.* 80:3-8.[3]

On the other side of the ledger, nothing in the '776 patent suggests that the claimed patient monitor is intended only to work on occasion or that a patient monitor could be designed to cease operating when the patient is moving. As Mr. Al-Ali testified, it is "not appropriate" for a patient monitor to shut down for even a short period of time, such as "five minutes," because "five minutes is a long time for somebody if heart rate changes"—"[e]vents could happen in between, so it's just too long." 11/5 PM Tr. 67:4-11.

Such a device would also be contrary to decades of Mr. Al-Ali's experience at Masimo. For example, Mr. Al-Ali testified that "from the 1990s to today, for over 30 years, Masimo has been designing its patient monitors to measure physiological data during conditions of motion." 11/6 AM Tr. 60:4-7. That is because for both "Masimo" and "for other companies" developing patient monitors, "the ***design goal*** is to capture" "***100 percent*** … [of] medical events." 11/6 AM Tr. 60:12-22. If a patient monitor were designed to be inoperative during conditions of motion, it would not just miss important events while the patient is moving—it would miss *every* event during motion. The '776 patent says literally nothing to suggest it was aimed at patient monitors that are inoperative during motion. To the contrary, Mr. Al-Ali confirmed that "patient monitors

---

[3] Although he has never read the '776 patent, Mr. Diab testified similarly regarding "patient monitor." He informed the jury that while Masimo's patient monitors have, in practice, missed cardiac events, the products do "***try*** to catch all the events." 11/5 PM Tr. 41:12-22. He also stated that while "there is no perfect device" "[i]f it is …being used to monitor a patient, then it ***should not*** miss that event." 11/5 PM Tr. 41:12-42:6.

are a special category … within the universe of medical devices … [f]or which the design intent is to capture important medical events." 11/6 AM Tr. 69:5-13.

Consistent with the language of the patent and the fundamental purpose of patient monitors, Mr. Al-Ali testified that Masimo has historically designed patient monitors that—unlike the accused High/Low Heart Rate Notifications feature—can provide high and low heart rate notifications (or measure physiological parameters more generally) during motion:

- Q. … For every Masimo patient monitor … that has the high/low heart rate notifications, every one of those devices has the Masimo SET technology, correct?
  A. That's correct.
  Q. And has had the Masimo SET technology since it was developed in the 1990s, correct?
  A. We continued employing it.
  Q. Understood. But you have been using the motion approach to high/low heart rate notifications since the 1990s?
  A. Yes.  11/6 AM Tr. 71:19-72:6.

- Q. … Before the development of measure through motion SET technology, so we are talking before 1995 through 1998—before that, pulse oximeters were trying to measure through motion, right?
  A Yes.  *Id.* 73:17-22.

- Q. … Before Masimo's SET technology, even if we go back to the 1970s, these devices, these patient monitors, were designed to try and capture important medical events, right?
  A. I believe so, yes.
  Q. Some did better and some did worse, correct?
  A. Correct.
  Q. From a performance perspective, right?
  A. Yes.
  Q. But the design intent for patient monitors for half a century has been to capture important medical events, true?
  A. True.  *Id.* 74:9-20.

- Q. Sir, let's look at what you said in your patent in the very next sentence.  You said: "Unlike consumer electronics, pulse oximetry cannot afford to miss events … such as patient oxygen desaturation,"

> correct?
> A. Yes.
> Q. And, sir, you were not designing your patient monitors in this time period to work once a day for five minutes, were you, sir?
> A. No. *Id.* 83:13-22.

To be sure, no device is perfect, and during real-world performance, patient monitors may vary in their actual success of capturing important medical events. The underlying design goal, however, remains the same regardless of how things work out in practice. As Mr. Al-Ali explained, "in a perfect world," his "design goal … would be to capture 100 percent of medical events" but that "from a performance perspective, no machine is perfect." 11/6 AM Tr. 132:2-7. Mr. Al-Ali made this very point on direct examination: "[E]very device that's measuring … physiological parameters, *we strive* to not miss event[s] or measurement[s].… [T]hat's what we *strive* to do." 11/5 PM Tr. 88:1-19. And he repeated it even when Masimo's counsel attempted to elicit contrary testimony on re-direct examination:

> Q. So let me ask you a little bit more extreme question. ***Do you design a product to have a hundred percent true positives?***
> A. ***A hundred percent? We try to***.
> Q. And do you ever achieve that?
> A. No.
> Q. ***Do you design a device to have zero percent false positives?***
> A. ***Again, I try to,*** but I'll never get there.
> Q. So you'll never get to zero percent false positives; is that right?
> A. There is always something that happens.

11/6 AM Tr. 118:6-17.

### B. Apple's Proposed Construction Is Also Consistent With This Court's Prior Rulings

Apple's proposed construction of "patient monitor" is wholly consistent with this Court's prior (and correct) rulings defining the term. This Court has held that (1) "patient monitor" is a limiting term in the patent and (2) "a patient monitor ***must***

*capture* important medical events, and ***must perform*** at a level similar to clinical device in terms of event capture." Dkt. 2790 at 3 & n.1. At the same time, Apple cannot (1) "affirmatively define 'patient monitor' as a device that continuously monitors and captures 'beat-to-beat' measurements or as a device that captures 'all medical events,'" or (2) "offer testimony that the Apple Watch is not a 'patient monitor' ***solely*** because it does not have a 100% capture rate." *Id.* at 3-4.

Taken together, this Court's rulings logically must mean that a "patient monitor" within the meaning of the '776 patent must be ***designed*** to capture all clinically important events, even though the ***performance*** of a "patient monitor" in the real world may not achieve 100% event capture. As this Court observed earlier this week, "[t]here is a difference between [1] how [a patient monitor] is designed and what it is intended to accomplish with that design and [2] how it performs." 11/6 AM Tr. 11:22-24. Any other reading of "patient monitor" would conflict with this Court's holding that such a device "***must perform at a level similar to [a] clinical device*** in terms of event capture" and its holding that a "patient monitor" need not, in practice, have a "100% capture rate."

### C. Dr. Madisetti's Testimony Necessitates A Construction Of "Patient Monitor"

Dr. Madisetti's testimony on Friday has created an urgent need for a jury instruction clarifying the meaning of "patient monitor." As an initial matter, Dr. Madisetti has even refused to acknowledge that the "patient monitor" language in the patent claims is limiting. Although Dr. Madisetti admitted that "in patents every single word matters," and "to infringe a claim, you must infringe all parts of it," he repeatedly refused to concede that "if this jury concludes that Apple Watch is not a patient monitor, there is no infringement." 11/7 PM (Rough) Tr. 53:11-57:10 ("I leave it to the wisdom of the jury"). Rather, he told the jury that the "claim should be analyzed as a whole." 11/7 PM (Rough) Tr. 57:6-10. This statement is legally incorrect even under the jury instructions that Masimo has proposed. *See* Dkt. 2765 at 116 ("***[E]ach element*** of a claim must be met by the Accused Products either literally or under the doctrine of

equivalents for you to find infringement."). It also directly contradicts the Court's MIL order, which expressly *rejected* Masimo's argument "that the terms 'patient' and 'patient monitor' in the claim are not limiting." Dkt. 2790 at 3 n.1.

Dr. Madisetti's testimony also contradicted this Court's holding that a patient monitor "***must perform*** at a level similar to clinical device in terms of event capture." Dkt. 2790 at 3. When asked point blank about whether he agreed with this Court's ruling, Dr. Madisetti stated that he "disagree[d]" with respect to this Court's use of the word "must":

> A: I have reviewed the Court's order and I understand that the Court has mentioned that certain issues about performance being commensurate with clinical devices at the time of the invention, which is 2001.
>
> …
>
> Q: Do you agree with what I just said, sir? I'll say it one more time. Do you agree that a patient monitor must capture important medical events like oxygen desaturation and must perform at a level similar to a clinical device in terms of event capture? Agree or disagree?
>
> A: ***I would disagree with respect to the must***. It should avoid missing. I mean, that's just an aspiration. The claims describe what the claimed patient monitor must satisfy.

11/7 PM (Rough) Tr. 65:15-66:9. Even if read charitably as recognizing the distinction between design (i.e., to capture important events) and performance (which need not achieve 100% event capture), Dr. Madisetti's testimony only underscores that the jury would benefit from a clear instruction making the design/performance distinction. In fact, the normal "high" "risk of confusing the jury … when experts opine on claim construction before the jury," *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005), was heightened here because Dr. Madisetti implied that he had read—and was complying with—this Court's rulings regarding "patient monitor" even as he was potentially contradicting them. *See* 11/7 PM (Rough) Tr. 65-66.

Moreover, Dr. Madisetti's testimony about "patient monitor" clearly conflicts with the intrinsic evidence (the '776 patent's specification) and Mr. Al-Ali's

testimony—and is an abrupt about-face from his prior opinion that the '776 patent claims a "low power monitor *capable of* preserving measurement confidence and *avoiding missed medical events*." Dkt. 2552-8 at ¶ 1484 (Madisetti Rebuttal Report).[4] Examples where Dr. Madisetti directly contradicted Mr. Al-Ali included:

| Ammar Al-Ali | Dr. Madisetti |
|---|---|
| "Q. … [P]atient monitors are designed not to miss those important medical events. That's the design purpose of the patient monitors, correct?"<br>A. Okay."<br>11/6 AM Tr. 84:22-25. | "Q. … Do you agree with [t]his testimony [at page 84, line 22 of Mr. Al-Ali's cross-examination]?<br>A. No, not with this. It's—clearly he has himself confirmed when he discussed the Nellcor [N-]3000 that it was designed to miss certain events if there was motion."<br>11/7 PM (Rough) 39:4-12.[5] |
| "Q And no device is perfect. It's not going to catch everything, but the design intent for this type of equipment is to capture all medical events, true?<br>A True."<br>11/6 AM Tr. 65:20-23. | "Q. So we have the design intent. I'm designing towards an objective as an engineer. Are you with me?<br>A. Yes.<br>Q. And then how well the machine performs is a different issue, correct?<br>A. As I said, you never—I've designed products. I've seen people design products. You never design products that are designed to catch every event because that's going to raise a lot of false positives. So when you design a product, you're going to ensure that you have some events that you don't detect with intention."<br>11/7 PM (Rough) 41:9-20. |

---

[4] Apple's *Daubert* opposition cited the same paragraph in support of Dr. Madisetti's report, but—due to an error in the cover page of one of Masimo's exhibits—cited the docket entry for Dr. Madisetti's reply report. *Compare* Dkt. 2745 at 11 n.5 (this Court noting Madisetti's rebuttal report appeared to end at paragraph 1087), *with* Dkt. 2576 (Masimo's errata stating "an incorrect cover page" was added to the reply report).

[5] This Court should reject Masimo's brand new assertion that "patient monitor" should be defined based on extrinsic evidence that contradicts the intrinsic evidence—i.e., that one patient monitor (the Nellcor N-3000) was purportedly designed to miss events. That opinion was not disclosed in Dr. Madisetti's reports, is contradicted by the device's user's manual, and has no link to the patent, which does not mention the N-3000.

As a final attempt to blur the lines of the asserted patent's scope, Dr. Madisetti has wrongly suggested that the jury need not resolve the definition of "patient monitor" if it finds infringement under the doctrine of equivalents. On redirect, Dr. Madisetti described the "doctrine of equivalents" as "say[ing] that if something works in a similar—to perform a similar function in a similar way to produce a similar result, it can be a patient monitor *even if it's not the patient monitor as one would understand it to be*." 11/7 PM (Rough) Tr. 99:2-6. Counsel then compounded the problem by revisiting Dr. Madisetti's incorrect assertion that "patient monitor" is a non-limiting term, and eliciting from Dr. Madisetti the legally incorrect statement that "there are ways by which *even if it were not a real patient monitor*, if it were equal to one as per … the doctrine of equivalents, that would be fine." 11/7 PM (Rough) Tr. 99:7-12.

Dr. Madisetti's assertion that the jury can ignore claim terms when inconvenient (so long as the accused device works in a "similar" way as the claimed invention) is legal error. It is fundamental that the doctrine of equivalents cannot be used to "vitiate[]" claim language—here, "patient monitor." *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1366 (Fed. Cir. 2020). Even under the "function-way-result" test that Dr. Madisetti appeared to invoke, the doctrine only applies in the "exceptional" circumstance where the accused item "performs *substantially the same* function in *substantially the same* way to obtain *the same* result." *NexStep, Inc. Comcast Cable Commc'ns, LLC*, 119 F.4th 1355, 1370 (Fed. Cir. 2024). Put slightly differently, the jury must have a definition of "patient monitor" in mind and then conclude whether the accused Apple Watch with accused High/Low Heart Rate Notifications is so insubstantially different as to justify circumventing the normal rule that "claim meaning defines the scope of the exclusivity right in our patent system." *Id.*; *see also Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1109 (Fed. Cir. 1996) ("[I]t is incorrect to refer to a claim as being expanded or enlarged when infringement is found under the doctrine of equivalents."). The misimpressions and confusion created by Dr.

Madisetti's erroneous statement of the law further reinforce the need for an instruction regarding the scope of "patient monitor."[6]

## CONCLUSION

In sum, Apple respectfully submits that, in light of the confusion introduced by Dr. Madisetti's testimony regarding the proper meaning of "patient monitor," the jury should be given an instruction that clearly defines that term. Apple requests that this Court deliver its proposed curative instruction as soon as possible, but in any event as part of the final jury instructions.

---

[6] Dr. Madisetti's misstatement of the relevant legal standard could justify a separate curative instruction regarding the doctrine of equivalents. At minimum, Apple reserves the right to propose additional language to the parties' current joint proposal, *see* Dkt. 2765 at 116-122, to make clear that Dr. Madisetti's description is not the law.

| | |
|---|---|
| Dated: November 9, 2025 | Respectfully submitted, |// 
| | MARK D. SELWYN |
| | AMY K. WIGMORE |
| | JOSHUA H. LERNER |
| | JOSEPH J. MUELLER |
| | SARAH R. FRAZIER |
| | THOMAS G. SPRANKLING |
| | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | |
| | BRIAN A. ROSENTHAL |
| | GIBSON, DUNN & CRUTCHER LLP |
| | |
| | KENNETH G. PARKER |
| | HAYNES AND BOONE, LLP |
| | |
| | By: */s/ Mark D. Selwyn* |
| | Mark D. Selwyn |
| | |
| | *Attorneys for Defendant Apple Inc.* |

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Apple, Inc., certifies that this brief contains 4,307 words, which:

 X  complies with the word limit of L.R. 11-6.1.

___ complies with the word limit set by court order dated [date].

Dated: November 9, 2025         Respectfully submitted,

MARK D. SELWYN
AMY K. WIGMORE
JOSHUA H. LERNER
JOSEPH J. MUELLER
SARAH R. FRAZIER
THOMAS G. SPRANKLING
WILMER CUTLER PICKERING HALE AND DORR LLP

BRIAN A. ROSENTHAL
GIBSON, DUNN & CRUTCHER LLP

KENNETH G. PARKER
HAYNES AND BOONE, LLP


By: */s/ Mark D. Selwyn*
        Mark D. Selwyn