1  MARK D. SELWYN, SBN 244180
      mark.selwyn@wilmerhale.com
2  THOMAS G. SPRANKLING, SBN 294831
   thomas.sprankling@wilmerhale.com
3  WILMER CUTLER PICKERING
      HALE AND DORR LLP
4  2600 El Camino Real, Suite 400
   Palo Alto, CA 94306
5  Tel.: 650.858.6000 / Fax: 650.858.6100

6  JOSHUA H. LERNER, SBN 220755
      joshua.lerner@wilmerhale.com
7  WILMER CUTLER PICKERING
      HALE AND DORR LLP
8  50 California Street, Suite 3600
   San Francisco, CA 94111
9  Tel.: 628.235.1000 / Fax: 628.235.1001

10  AMY K. WIGMORE, *pro hac vice*
    amy.wigmore@wilmerhale.com
11  WILMER CUTLER PICKERING
       HALE AND DORR LLP
12  2100 Pennsylvania Ave NW
    Washington, DC 20037
13  Tel.: 202.663.6000 / Fax: 202.663.6363

14  [Counsel appearance continues on next page]

15  *Attorneys for Defendant Apple Inc.*

16          **UNITED STATES DISTRICT COURT**
17  **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

18  MASIMO CORPORATION,
    a Delaware corporation; and
19  CERCACOR LABORATORIES, INC.,
    a Delaware corporation,
20
                    Plaintiffs,
21
         v.
22
    APPLE INC.,
23  a California corporation,
24                    Defendant.

|  |  |
|---|---|
| CASE NO. 8:20-cv-00048-JVS (JDEx) | |
| **APPLE'S MEMORANDUM IN SUPPORT OF ITS ORAL MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(A)** | |
| Trial: Nov. 4, 2025 | |

25

26          REDACTED VERSION OF DOCUMENT
27       PROPOSED TO BE FILED UNDER SEAL

28

Wilmer Cutler
Pickering Hale
and Dorr LLP

1    JOSEPH J. MUELLER, *pro hac vice*
       joseph.mueller@wilmerhale.com
2    SARAH R. FRAZIER, *pro hac vice*
       sarah.frazier@wilmerhale.com
3    WILMER CUTLER PICKERING
         HALE AND DORR LLP
4    60 State Street
     Boston, MA 02109
5    Tel.: 617.526.6000 / Fax: 617.526.5000
6
     BRIAN A. ROSENTHAL, *pro hac vice*
7      brosenthal@gibsondunn.com
     GIBSON, DUNN & CRUTCHER LLP
8    200 Park Avenue
     New York, NY 10166-0193
9    Tel.: 212.351.2339 / Fax: 212.817.9539

10   KENNETH G. PARKER, SBN 182911
       Ken.parker@haynesboone.com
11   HAYNES AND BOONE, LLP
     660 Anton Boulevard, Suite 700
12   Costa Mesa, CA 92626
     Tel.: 650.949.3014 / Fax: 949.202.3001

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.    NO REASONABLE JURY COULD FIND THE ACCUSED HIGH/LOW HEART RATE NOTIFICATIONS INFRINGE THE '776 PATENT ........................................................... 4

    A.    Masimo Failed To Establish Literal Infringement Of At Least The "Patient Monitor" Limitation ..................................................... 4

    B.    Dr. Madisetti's Testimony Was Legally Insufficient To Establish Infringement Under The Doctrine Of Equivalents ................................. 12

II.    NO REASONABLE JURY COULD AWARD MORE THAN NOMINAL DAMAGES ........ 15

III.    THIS COURT SHOULD GRANT JMOL OF NO POST-SUIT WILLFULNESS............... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
811 F.3d 1334 (Fed. Cir. 2016) ................................................................. 15

*Alcon Research Ltd. v. Barr Labs., Inc.*,
745 F.3d 1180 (Fed. Cir. 2014) ................................................................. 19

*AquaTex Indus. v. Techniche Sols.*,
479 F.3d 1320 (Fed. Cir. 2007) ................................................................. 15

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*,
14-cv-00911 (E.D. Tex. Feb. 4, 2016) Dkt. 376 ...................................... 19

*Enplas Display Device Corp. v. Seoul Semiconductor*,
909 F.3d 398 (Fed. Cir. 2018) ..................................................................... 3

*Finesse Wireless LLC v. AT&T Mobility LLC*,
-- F.4th --, 2025 WL 2713518 (Fed. Cir. Sept. 24, 2025) ..................... 3, 7

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) ................................................................. 15

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
29 F.4th 1365 (Fed. Cir. 2022) ................................................................... 8

*Info-Hold, Inc. v. Muzak LLC*,
783 F.3d 1365 (Fed. Cir. 2015) .............................................................. 3, 16

*Lear Siegler, Inc. v. Sealy Matress Co. of Mich., Inc.*,
873 F.2d 1422 (Fed. Cir. 1989) ............................................................ 14, 15

*Rex Medical, L.P. v. Intuitive Surgical, Inc.*,
-- F.4th --, 2025 WL 2799030 (Fed. Cir. Oct. 2, 2025)......................... 4, 16

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) .................................................................. 16

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
90 F.3d 1558 (Fed. Cir. 1996) ............................................................. 12, 15

*VLSI Tech. LLC v. Intel Corp.*,
    87 F.4th 1332 (Fed. Cir. 2023) ........................................................... 13, 15

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997) ...................................................................... 13, 14, 15

*Wasica Finance GmBH v. Cont'l Automotive Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017) ................................................................ 7

Wilmer Cutler
Pickering Hale
and Dorr LLP

APPLE'S MEM. ISO JMOL UNDER FRCP 50(A)

iii

CASE NO. 8:20-cv-00048-JVS (JDEx)

# INTRODUCTION

After nearly six years of litigation, Masimo's patent infringement claims—which once included 17 different patents—have narrowed to four claims from a patent that expired in 2022 and is directed to a "patient monitor."  No reasonable jury could find that Apple Watch with the accused High/Low Heart Rate Notifications features satisfies that claim limitation, which this Court has indicated (1) is limiting and (2) refers to a device designed not to miss events.  Dkt. 2790 [MIL Order] at 3-4.

The undisputed evidence at trial established that the accused High/Low Heart Rate Notifications—like all Apple Watch health features—are designed to opportunistically provide reliable information only ***when it is available***.  *E.g.*, 11/12 AM [Brouse] Tr. 77:25-78:6 (Apple's corporate representative testifying that "[a]t Apple … our design philosophy is to provide accurate information to users when we can"); *see also, e.g.*, 11/13 AM [Framhein] Tr. 24:16-24, 39:18-24; 11/13 AM [Caldbeck] Tr. 62:21-63:4, 73:1-9, 75:1-17; 11/13 PM [Mercier] Tr. 37:5-38:19.  For the High/Low Heart Rate Notification features, the circumstances when reliable information is available are limited.  For example, an Apple Watch user will not receive a warning about an unusually low or high heart rate unless numerous conditions are met, including the user has been almost completely stationary for at least ten minutes.  *See, e.g.*, 11/12 AM [Brouse] Tr. 113:8-115:11, 116:9-117:11; *see also* 11/7 PM [Madisetti] Tr. 78:6-12 (Dr. Madisetti agreeing that "Apple Watch … can only provide these high/low heart rate notifications after a ten-minute period of inactivity.").  If an Apple Watch has detected any meaningful motion within those ten minutes, High/Low Heart Rate Notifications will not alert the user to any cardiac events. 11/12 AM [Brouse] Tr. 116:9-117:11; 11/13 PM [Mercier] Tr. 40:25-41:17, 44:15-46:11.  This is precisely the kind of lapse that— according to the '776 patent's inventor—is "inappropriate" for a patient monitor.  *See* 11/5 PM [Al-Ali] Tr. 66:19-67:11 (even "five minutes is a long time for somebody if heart rate changes"—"it's just too long").

From the outset, Apple has been crystal clear about this central flaw in Masimo's infringement theory. *E.g.*, 11/5 AM [Apple Opening] 44:20-45:7 (Apple arguing in opening that "[t]o infringe this patent, a device would need to be a patient monitor.… Apple Watch is not a patient monitor."). In the week since, Masimo has been unable to remedy this failure of proof. Masimo's first witness (Mr. Mohammed Diab) conceded he had not even read the '776 patent, much less knew what features of Apple Watch were accused of infringing it. 11/5 PM Tr. [Diab] 45:9-47:10. Masimo's second witness (Mr. Ammar Al-Ali) agreed that he was "not aware of any evidence regarding whether Apple Watch infringes the '776 patent." 11/6 PM Tr. 16-17. Masimo's third witness (Mr. Steven Scruggs) had "***briefly*** read" the patent for the first time the week before trial and had not considered it "applied to any Apple products." 11/6 PM [Scruggs] Tr. 42:14-23. And two of the three remaining live witnesses—Dr. Rebbecca Reed-Arthurs and Mr. James Bergman—admitted that they had no opinion on infringement. 11/10 Vol. 1 [Reed-Arthurs] Tr. 31:5-21; 11/12 AM [Bergman] Tr. 12:9-11.

Masimo's nearly $750 million infringement case accordingly turns on the testimony of its technical expert, Dr. Madisetti, who could not identify any single document (or other witness) that supported his position that Apple Watch is a "patient monitor" within the meaning of the '776 patent. 11/7 PM [Madisetti] Tr. 46:11-16 ("Q: [C]an you identify as you sit here in that chair right now … one person other than you, one document in which someone said or wrote Apple Watch is a patient monitor? A: I would have to look through them. I cannot speak here right now."). Even Dr. Madisetti's testimony, however, turned on a mistaken view of the scope of the term "patient monitor." And regardless, his infringement testimony was so error-riddled regarding the way medical technology works—and in the case of the doctrine of equivalents, so cursory and conclusory—as to render it insufficient to support a finding of infringement.

Masimo's failure of proof regarding "patient monitor" is enough for this Court to grant JMOL of non-infringement and end this case now before the jury begins to

deliberate. This Court could, however, simply grant JMOL on the amount of the reasonable royalty, and hold that Masimo is in any event entitled to no more than nominal damages. *See Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1371-1372 (Fed. Cir. 2015) ("Where the patentee's proof is weak, the court may award nominal damages.").[1] Masimo's damages case is not just weak, but non-existent, as it requires the jury to believe each of three layers of unbelievable expert testimony: (1) Dr. Madisetti's (flawed) technical assessment of Apple Watch, (2) Dr. Reed-Arthurs' (illogical) survey results based on that technical assessment, and (3) Mr. Bergman's (unrealistic) damages estimate based on that survey. Because there is no basis in the record on which a reasonable jury could award Masimo's inflated $634-749 million range and there is no other damages number in the record, this Court should hold that no reasonable jury could award more than $1—just as it did as recently as six months ago. *See SPEX Techs., Inc. v. W. Digital Techs., Inc.*, No. 8:16-cv-1799, Dkt. 651 at 19 (C.D. Cal. June 16, 2025) (awarding nominal damages where patentee failed to "adequately tie a dollar amount to the infringing acts").

In sum, Masimo has wholly failed to meet its burden to establish infringement or damages. No reasonable jury could find otherwise.

## ARGUMENT

"A motion for JMOL is properly granted if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion[.]" *Enplas Display Device Corp. v. Seoul Semiconductor*, 909 F.3d 398, 405-406, 409 (Fed. Cir. 2018) (applying Ninth Circuit law and reversing denial of defendant's JMOL on damages). The Federal Circuit routinely affirms JMOL (or reverses denial of JMOL) of non-infringement and the amount of damages. *E.g.*, *Finesse Wireless LLC v. AT&T Mobility LLC*, -- F.4th --, 2025 WL 2713518, at *4 (Fed. Cir. Sept. 24, 2025) ("We reverse the district court's denial of JMOL of non-infringement for the asserted

---

[1] Internal quotation marks, citations, and alterations omitted and emphasis added, unless noted.

claims … because the jury's infringement verdict is not supported by substantial evidence."); *Rex Medical, L.P. v. Intuitive Surgical, Inc.*, -- F.4th --, 2025 WL 2799030, at *8 (Fed. Cir. Oct. 2, 2025) (affirming JMOL of $1 in damages where neither party "put forth … evidence from which a jury could reasonably determine damages for infringement … without speculation"). The Federal Circuit has been particularly vigilant in policing the limits of infringement under the doctrine of equivalents and has "consistently rejected" such theories "as a matter of law when a patentee's case lacks particularized testimony and linking argument." *NexStep, Inc. Comcast Cable Commc'ns, LLC*, 119 F.4th 1355, 1372 (Fed. Cir. 2024) (collecting cases).

I. **NO REASONABLE JURY COULD FIND THE ACCUSED HIGH/LOW HEART RATE NOTIFICATIONS INFRINGE THE '776 PATENT**

A. **Masimo Failed To Establish Literal Infringement Of At Least The "Patient Monitor" Limitation**

1. **The plain and ordinary meaning of "patient monitor" is a device <u>designed not</u> to miss important medical events**

**a.** This Court has held that "a patient monitor must capture important medical events, like oxygen desaturation, and must perform at a level similar to a clinical device in terms of event capture." Dkt. 2790 at 3-4 ("MIL Order"). This Court has effectively drawn a line between performance (a "patient monitor" need not "have a 100% capture rate" in real-world use) and design (a "patient monitor" should not be designed, for example, to "use a technique like sleep mode which would cause missed events"). *Id.* As this Court summarized in addressing a (later withdrawn) objection to Apple's opening statement, "[t]here is a difference between [1] how [a patient monitor] is designed … and [2] how it performs." 11/6 AM Tr. 11:22-12:8.

As explained in greater detail in Apple's previously filed bench memorandum, this Court's rulings are well-supported by both the intrinsic evidence and the evidentiary record that has developed at trial. *See generally* Dkt. 2814. The specification explains, for example, that the claimed patient monitor—"[u]nlike consumer electronics"—

"cannot afford to miss events." JTX-6001 ("'776 Patent") at 2:15-16; *see also* 11/6 AM [Al-Ali] Tr. 83:13-84:4; 11/6 PM [Al-Ali] Tr. 15:11-25; 11/7 PM [Madisetti] 90:17-24, 92:17-93:10; 11/13 PM [Mercier] Tr. 26:11-27:1. Moreover, the only examples discussed in the specification regarding the claimed invention's importance all relate to the clinical setting—i.e., a life-or-death environment in which it is highly undesirable for a patient monitor to miss events. The patent discusses, for instance, (1) why a patient monitor configured for "[o]xygen saturation monitoring is crucial in ***critical care and surgical applications***, where an insufficient blood supply can quickly lead to injury or death," and (2) how a patient monitor "may be attached to a patient during ***emergency transport*** and remain with the patient as they are moved between ***hospital wards***." '776 Patent at 1:15-18, 53-55; 11/7 PM [Madisetti] 84:8-87:21, 88:18-89:23. The patent further emphasizes that the invention can help "provide the flexibility to reduce power without sacrificing performance during, for example, high noise conditions or ***oxygen desaturation events***," to enable detection of clinically important events such as "a fast or irregular pulse rate." '776 Patent at 6:8-36; 11/5 PM [Al-Ali] Tr. 96:4-12.

Mr. Al-Ali's trial testimony is also consistent with the Court's rulings on "patient monitor." Mr. Al-Ali confirmed, for example, that claim 11 of the '776 patent (from which all other asserted claims depend) refers to a "patient monitor designed … to capture important medical events." 11/6 AM [Al-Ali] Tr. 78:3-13. He also agreed that Masimo and other companies in the industry have—since long before the patent's 2001 priority date—developed patient monitors with "the design goal" of capturing "100 percent … [of] medical events," including when providing high and low heart notifications. 11/6 AM [Al-Ali] Tr. 60:12-22, 71:2-74:20. Mr. Al-Ali made similar points even when being asked friendly, leading questions by Masimo's attorney on direct and redirect examination. *See* 11/5 PM [Al-Ali] Tr. 88:1-19 ("[E]very device that's measuring … physiological parameters, ***we strive*** to not miss event[s] or measurement[s] … [T]hat's what we ***strive*** to do."); 11/6 AM [Al-Ali] Tr. 118:7-14 ("Q: Do you design a product to have a hundred percent true positives? A: A hundred

percent?  We try to. … Q: Do you design a device to have zero percent false positives?  A: Again, I try to[.]").

**b.**     Masimo has not provided the jury with an alternative plain and ordinary meaning of "patient monitor."  Dr. Madisetti is the only witness who clearly disagreed with the plain meaning discussed above.  This Court, however, has refused to credit Dr. Madisetti's disclosed opinion that a patient monitor means any "device that observes a person."  *See*, *e.g.*, Dkt. 2745 at 18 (concluding that "[n]o reasonable jury could" agree with Dr. Madisetti's "opinion equating 'patient' with 'person'").

Accordingly, instead of providing the jury with any concrete explanation of the plain and ordinary meaning of "patient monitor," Dr. Madisetti and Masimo more generally have simply opposed the only meaning that a reasonable jury could discern from the trial record—i.e., that a "patient monitor" is designed to capture all important medical events while attached to a patient.  No reasonable jury could accept Masimo's arguments.

***First***, Masimo and Dr. Madisetti have repeatedly suggested that "patient monitor" is not an independent claim limitation that needs to be satisfied.  *See*, *e.g.*, 11/5 AM Tr. 32:12-16 (Masimo counsel stating in opening: "[W]e expect Apple is going to say that it doesn't infringe because they don't want to call the Apple Watch a patient monitor … even if it does everything this claim recites[.]"); 11/7 PM [Madisetti] Tr. 97:3-9 ("Q: … So you were asked a number of questions about the first three words, a patient monitor, right?  A [Madisetti]: Yes.  Q: Does the claim stop at a patient monitor?  A: No.  It's a claim as a whole.  You have to look at the entire claim.").  Indeed, Masimo's most recent claim construction brief suggested that the term "patient monitor" is defined by the words that follow it ("configured to measure at least pulse rate").  Dkt. 2818 at 1.  This Court, however, has already definitively rejected Masimo's assertion that the term "patient monitor" in the preamble of the claim is "non-limiting."  Dkt. 2790 at 3 n.1.  And for good reason, as the term appears "throughout Claim 11 of the '776 Patent, as opposed to just in the preamble."  *Id.*; *see also* Dkt. 2693-1 at 9-12 (Apple brief

identifying additional support in the specification and prosecution history for treating "patient monitor" as limiting); *cf. Wasica Finance GmBH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").

**Second**, Dr. Madisetti repeatedly implied during his direct examination that the term "patient monitor" simply refers to any device that monitors patients. 11/7 AM Tr. 49:23-50:10 ("[T]his is an actual doctor's statement confirming that patients could be monitored and are monitored using an Apple Watch."); *id.* at 92:19-93:8 ("The Apple Watch includes the patient monitor because, for example, it's configured to monitor the pulse rate of a patient"). But Dr. Madisetti abandoned this implicit interpretation (i.e., that "monitor" is a verb) on cross-examination, when he admitted that "[p]atient monitor is a device" and the term "patient monitor" that appears in the '776 patent "is a noun." 11/7 PM Tr. 43:6-12. Moreover, Dr. Madisetti confirmed that "patient monitor" refers to a "special category" of products: "They are a type of medical devices." 11/7 PM Tr. 37:14-18. Dr. Madisetti's inconsistency on this critical issue decimates the credibility of his opinions. A "party with the burden of proof" cannot evade JMOL by "rest[ing] its case on an expert's self-contradictory testimony." *Finesse Wireless*, 2025 WL 2713518, at *4.

**Third**, Dr. Madisetti asserted—in an opinion that was not disclosed before trial— that a "patient monitor" should **not** "be designed for capturing every event." 11/7 AM Tr. 18:10-23 ("[E]very designer at design time makes sure to catch as many events as they can with the understanding that some events should not be caught or would not be caught").[2] But even if this new opinion could be squared with this Court's rulings (it cannot), it cannot be reconciled with the intrinsic record, such as the specification, which

---

[2] Apple preserves for appeal its objections under FRCP 26 that Dr. Madisetti's reports failed to disclose his (1) "should not be designed" opinion, which was apparently based on a chart introduced by Mr. Al-Ali on direct, and (2) reliance on the Nellcor N-3000 device, which was also introduced by Mr. Al-Ali on direct. *See* 11/7 AM Tr. 18:24-19:5, 27:11-22 (Apple's overruled objections).

states that the claimed invention "***cannot afford to miss events***." *See supra* pp. 4-6. It is a fundamental principle of interpreting a claim that "expert testimony may not be used to diverge significantly from the intrinsic record" and may not, for example, "contradict the import of … parts of the specification." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022). More broadly, Dr. Madisetti's new opinion conflicts with the uniform trial testimony of all the fact witnesses, for both sides, regarding the plain and ordinary meaning of "patient monitor," as used in the field of the '776 Patent. Most strikingly, Mr. Al-Ali, who has spent decades designing patient monitors for Masimo, confirmed that "[p]atient monitor is a special category of equipment … [f]or which the design intent is to capture important medical events." 11/6 AM Tr. 68:10-15. Apple engineers with experience designing noninvasive patient monitors, such as Dr. Christopher Brouse, and Apple's technical expert, Dr. Patrick Mercier, also testified similarly. *See, e.g.*, 11/12 AM [Brouse] Tr. 77:4-9, 77:25-78:22; 11/13 PM [Mercier] Tr. 27:2-13, 61:18-62:2.

In any event, Dr. Madisetti's undisclosed opinion suffers from a separate flaw. It is based entirely on Mr. Al-Ali's recollection that—when attending a trade show at some point in the distant past—he had seen a demonstration of a commercial product (the Nellcor N-3000) that the demonstrators claimed "was designed to completely stop trying to measure during motion." 11/6 AM Tr. 107:24-109:4; *see also, e.g.*, 11/7 PM [Madisetti] Tr. 39:4-12, 40:11-41:4, 81:1-15 (relying on Mr. Al-Ali's anecdote). But no reasonable jury could credit the vagaries of Mr. Al-Ali's recollection over the clear statements in the Nellcor N-3000's user manual—which states that "as long as continuous motion is detected, the N-3000 continues to search for the pulse," DTX-1399 at 37. Even an article that Mr. Al-Ali read into the record on cross-examination stated that "[t]he N-3000 pulse oximeter ***is designed*** to be able to identify signal artifact ***related to movement*** of the body to which the probe is attached" and that "[i]t may therefore provide a reliable means of ***monitoring*** … [blood oxygen], in awake, ***moving*** patients." 11/3 PM Tr. 8:5-13.

### 2.    Apple Watch's High/Low Heart Rate Notifications are designed to miss events

No reasonable jury could find that Masimo has established that the accused Apple Watch with the accused High/Low Heart Rate Notifications infringes the "patient monitor" limitation because Apple Watch was not designed to perform at a level comparable to a clinical patient monitor.  Rather, the Apple Watch optical sensor "is opportunistic in nature," so the High/Low Heart Rate Notifications features are designed to "surface alerts only when we're as sure as we can be that they are accurate."  11/13 Vol. 1 [Framhein] Tr. 24:16-24, 25:10-18, 39:6-24; *see also* 11/12 PM [Waydo] Tr. 81:2-5.  The trial testimony revealed three central differences between the High/Low Heart Rate Notifications on Apple Watch and devices designed to function as patient monitors: (1) motion, (2) timing, and (3) accessibility.

***Motion*** – It is undisputed that the accused High/Low Heart Rate Notifications features are designed not to provide any notifications during—or even shortly after— periods of motion.  *See, e.g.*, 11/7 AM [Madisetti] Tr. 23:8-25.  The accused features are designed this way because "the background heart rate that [is used] to power the feature is very motion sensitive, so it can only generate good data when a user is extremely still," and because a sedentary user's heart rate is expected to be low.  *E.g.*, 11/12 PM [Waydo] Tr. 96:24-97:8, 104:17-24.  As Apple engineers and Dr. Mercier explained, the High/Low Heart Rate Notifications algorithms include multiple means of detecting movement (and accordingly stopping notifications).  *See, e.g.*, 11/12 PM [Brouse] Tr. 113:23-114:19; 11/12 PM [Brouse] Tr. 43:19-23, 56:15-23; 11/12 PM [Waydo] Tr. 104:1-106:21; 11/13 Vol. 1 [Framhein] Tr. 31:7-35:1.

For example, the Notifications algorithm ███████████████ ████████████████████████████ to determine if the user is at rest.  *See, e.g.*, 11/13 Vol. 1 [Framhein] Tr. 33:7-34:9.  Accordingly, no alerts will issue unless the Watch determines that the user's body has been sufficiently at rest for the last ten minutes.  *Id.* at 33:20-34:13.  In addition, the algorithm ████████████████

1

2

3

4  ████ 11/12 PM [Brouse] Tr. 57:25-59:13; *see also* 11/13 Vol. 1 [Framhein] (Rough)

5  Tr. 31:8-33:4, 34:14-35:18, 36:19-37:6.

6  The underlying algorithms ████

7  ████

8  ████ DTX-

9  1393 [source code]; DTX-1249 [source code]; 11/13 AM [Framhein] Tr. 31:15-33:4

10 ████ in DTX-1249).  Together with the other signal quality

11 checks, these checks ensure the user is "████

12 ████ meaning that the High/Low Heart Rate

13 Notifications features are ████

14 ████ 11/12 PM [Waydo] Tr. 105:17-24.  However, an Apple Watch user

15 receives no "indication … that they're moving too much for the high heart rate

16 notification to be available." *Id.* at 105:25-106:3.  There is no dispute that—if someone

17 wearing an Apple Watch experiences a clinically significant high heart rate event at any

18 of these times when the Notifications feature is unavailable by design—the event will

19 be missed.  *See* 11/7 AM [Madisetti] Tr. 23:8-25.

20 **Timing** – It is also undisputed that the High/Low Heart Rate Notifications features

21 are designed to become unavailable for significant periods of time where other signal

22 quality checks indicate that high heart rate measurements have been unreliable.  *See,*

23 *e.g.*, 11/7 AM [Madisetti] Tr. 46:18-47:2; 11/13 PM [Mercier] Tr. 49:17- 51:9.  For

24 instance, as Apple engineer Mr. Theodore Framhein testified, the Notifications

25 algorithm includes ████

26

27 ████ 11/13 AM [Framhein] Tr. 40:19-41:14.

28

1      ████████████████ *Id.* at 41:15-22. ████████

2      ██████████████████████████████ *Id.* at 40:19-41:14.

3 There is no way for a user to know ████████████████████████████████

4 ████████████████████████████████████████████████ *Id.*

5 at 41:23-43:6. Accordingly, if someone wearing an Apple Watch experiences a cardiac

6 event that results in a high heart rate during a period ████████████████████

7 it will be missed. *E.g.,* 11/13 PM [Mercier] Tr. 49:17-51:9; 11/13 AM [Framhein] Tr.

8 41:23-42:17. Such a "blackout" period is inconsistent with the event capture

9 requirements of a patient monitor. *See* 11/13 PM [Mercier] Tr. 51:10-25.

10      ***Accessibility*** – Apple Watch's High/Low Heart Rate Notifications features cannot

11 serve as a patient monitor because the Notifications are not suitable for conveying

12 information to a clinician. *See* 11/6 AM Tr. 129:1-8 (Mr. Al-Ali acknowledging that "a

13 patient monitor needs to display [calculations of physiological data] in some form or

14 fashion … to medical professionals"). Among other reasons, a clinician "would have to

15 peer down at the small watch face when the right application is triggered." 11/12 PM

16 [Brouse] Tr. 77:21-78:2. And if an Apple Watch were removed from a user's wrist and

17 were "password protected," a medical provider "would have to know what the password

18 is" to access any Notifications that might have been delivered. *Id.* at 78:3-5. Moreover,

19 the only way a user interacts with the Notifications features is when an alert is delivered;

20 there is no way for a user or medical professional to access data on background heart

21 rate or potential heart rate events that did not result in a High/Low Heart Rate

22 Notification. 11/13 PM [Mercier] Tr. 53:8-22. Nor can a user or a medical professional

23 proactively check anything regarding the user's current health status, including because

24 there is no way to determine whether the absence of a notification is because of an

25 absence of important medical events or if the Notifications features were unavailable

26 due to motion, a stand-off timer, or for some other reason. *See id.* at 51:18-55:3.

27 Nowhere in the record has Dr. Madisetti or any other witness explained how a medical

28

provider could use Apple Watch in a "critical care" situation to obtain information on whether any important medical events had occurred.

\*        \*        \*

To be sure, the numerous "Dear Tim" letters in the record demonstrate that the High/Low Heart Rate Notifications features have provided significant benefits to certain users by leading them to visit their doctors, who used actual patient monitors and other clinical tools to diagnose serious medical conditions. *See, e.g.*, 11/13 AM [Caldbeck] Tr.116:3-18, 117:22-118:10; *see also id.* at 83:16-84:1. But those accounts of users' experiences with the Notifications features merely reflect Apple's design philosophy to provide users with reliable physiological data, when available. *See supra* pp. 9-11; *see also*, *e.g.*, 11/12 PM [Waydo] Tr. 81:2-5; 11/13 Vol. 1 [Framhein] 24:16-24, 25:10-18, 39:6-24. None of this evidence creates a genuine dispute regarding whether Apple Watch's High/Low Heart Rate Notifications features are a "patient monitor" within the plain and ordinary meaning of the term.

### B.    Dr. Madisetti's Testimony Was Legally Insufficient To Establish Infringement Under The Doctrine Of Equivalents

#### 1.    The doctrine of equivalents only applies in "exceptional" circumstances and requires particularized expert testimony

"A finding of infringement under the doctrine of equivalents is 'exceptional.'" *NexStep*, 119 F.4th at 1370. To prevail, Masimo was required to prove that the "differences between the claimed invention and the accused device or process are 'insubstantial,'" *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563-1564 (Fed. Cir. 1996), or that "the accused product performs substantially the same function in substantially the same way to obtain the same result" as the elements of the asserted claims, *NexStep*, 119 F.4th at 1370.

Both the Supreme Court and the Federal Circuit have "demand[ed] specificity and completeness of proof" for a patentee's doctrine of equivalents claim to be legally sufficient. *NexStep*, 119 F.4th at 1371. *First*, "the doctrine of equivalents must be

applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997); *see also NexStep*, 119 F.4th at 1370 ("[P]roof under the doctrine of equivalents must be on a limitation-by-limitation basis."). ***Second***, a party may only present a doctrine of equivalents claim through the testimony of an expert witness, qualified as a POSITA. *NexStep*, 119 F.4th at 1371. ***Third***, the patentee's expert "must provide a meaningful explanation of why the element or elements from the accused product or process are equivalent to the claimed limitation." *Id.*  In other words, the patentee's expert must "provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device." *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1343 (Fed. Cir. 2023).

## 2.    No reasonable jury could find that Dr. Madisetti's cursory testimony was sufficient to establish infringement under the doctrine of equivalents

Masimo's doctrine of equivalents testimony does not come close to satisfying the stringent legal standards discussed above.  Masimo's only technical expert was Dr. Madisetti, and his testimony spanned less than three minutes—roughly two minutes devoted to erroneously explaining the doctrine and one minute devoted to insufficiently explaining why Masimo satisfied it.  *See* 11/7 Vol. 1 [Madisetti] Tr. 85:6-86:19; 11/7 Vol. 2 [Madisetti] Tr. 98:24-99:12.  Dr. Madisetti gave only one answer purporting to explain Masimo's theory for how the Apple Watch could be equivalent to a "patient monitor" under the so-called "function-way-result" test:

> So what the Apple Watch does is it ***functions*** like a patient monitor.  It measures and records medically relevant information, such as heart rate. It also uses a ***way***, that is, using noninvasive measurement techniques for light, PPG, to measure medically relevant information.  So that's the "way."  It measures and records medically relevant information from the user and provides that data for the users, and it's available for clinicians to access.  So that shows that the ***result*** is also substantially the same as that of the term "patient monitor."

11/7 Vol. 1 [Madisetti] Tr. 85:16-25.

With respect to the "insubstantial differences" formulation of the doctrine of the equivalents, Dr. Madisetti offered even less:

> I looked—it's called the insubstantial differences analysis test, which says that it collects measurement data and measures the heart rate vital signs in the same way—in substantially the same way.

*Id.* at 86:7-13.

Dr. Madisetti reading one sentence per element directly off his demonstrative slide is not remotely close to the type of "particularized testimony and linking argument" required for a doctrine of equivalents theory to reach the jury. *Lear Siegler, Inc. v. Sealy Matress Co. of Mich., Inc.*, 873 F.2d 1422, 1426 (Fed. Cir. 1989); *see* PDX3.64 (demonstrative). Rather, these are the kinds of "[g]eneral references to the doctrine [that] do not comport with [the Federal Circuit's] requirement[s]." *Lear Siegler*, 873 F.2d at 1426. In fact, the Federal Circuit last year affirmed a grant of JMOL on a DOE theory where the expert provided no more testimony than Dr. Madisetti did. *NexStep*, 119 F.4th at 1372-1373 (transcript excerpt).

Apple respectfully submits that it is particularly important for "judgment [to] be rendered by the court" on this issue because Dr. Madisetti's testimony clearly invited the jury to apply "a theory of equivalence [that] would entirely vitiate" the "patient monitor" limitation by excusing the jury from needing to resolve the definition of "patient monitor." *Warner-Jenkinson*, 520 U.S. at 39 n.8. On redirect, Dr. Madisetti described the "doctrine of equivalents" as "say[ing] that if something works in a similar—to perform a similar function in a similar way to produce a similar result, it can be a patient monitor *even if it's not the patient monitor as one would understand it to be*." 11/7 Vol. 2 [Madisetti] Tr. 99:2-6. Counsel then compounded the legal error by revisiting Dr. Madisetti's incorrect assertion that "patient monitor" is a non-limiting term, and eliciting from Dr. Madisetti the legally incorrect statement that "there are ways by which *even if it were not a real patient monitor*, if it were equal to one as per … the doctrine of equivalents, that would be fine." 11/7 Vol. 2 [Madisetti] Tr. 99:7-12. None of this is an accurate statement of the law, because a DOE "infringement theory … fails

1  if it renders a claim limitation inconsequential or ineffective." *Akzo Nobel Coatings,*

2  *Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016).

3     In sum, because "no reasonable jury could determine [Apple Watch] to be

4  equivalent to" a patient monitor, this Court should hold that Apple is entitled to prevail

5  "as a matter of law" on the doctrine of equivalents—just as the Supreme Court and the

6  Federal Circuit have on numerous occasions. *See Warner-Jenkinson*, 520 U.S. at 39 n.8;

7  *see also NexStep*, 119 F.4th at 1369-1370; *VLSI*, 87 F.4th at 1344-1345; *Tex.*

8  *Instruments*, 90 F.3d at 1567-1568; *AquaTex Indus. v. Techniche Sols.*, 479 F.3d 1320

9  (Fed. Cir. 2007); *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364 (Fed. Cir. 2014); *Lear*

10  *Siegler, Inc. v. Sealy Mattress Co. of Michigan*, 873 F.2d 1422, 1426-1427 (Fed. Cir.

11  1989).

## II.  NO REASONABLE JURY COULD AWARD MORE THAN NOMINAL DAMAGES

13     The undisputed evidence establishes that the unaccused 2017 High Heart Rate

14  Notifications feature is identical to the accused features in every way but one—the

15  accused features include what has been informally referred to at trial as the "green light

16  double-check." *See, e.g.*, 11/12 AM [Brouse] Tr. 115:6-11, 119:16-23.  As Apple's

17  corporate representative explained, the "green light double-check" was a "refinement to

18  the feature"—not a "dramatic revision"—that was meant to reduce false positives. *Id.*

19  115:25-116:8.  In exchange, the update had the consequence of "reduc[ing] the

20  sensitivity of [Apple Watch]," "increasing [its] chance of missing events," and

21  "increas[ing its] power consumption." *Id.* 116:9-117:25.  Apple provided the software

22  update from the 2017 feature to the 2018 feature without charging its existing users any

23  kind of fee.  11/10 Vol. 1 [Reed-Arthurs] Tr. 55:4-56:6; 11/13 AM [Caldbeck] Tr. 65:18-

24  66:19, 68:15-19, 71:10-72:11.  Masimo's claim that Apple would have paid up to nearly

25  $750 million to license the '776 Patent for a few years for permission to have a green

26  light doublecheck at a certain time—when that light did not actually improve the

27  accuracy of the High/Low Heart Rate Notification features—is not plausible.

28

Section 284 requires nothing more than nominal damages in two circumstances. *First*, "[w]here the patentee's proof is weak," the proper reasonable royalty can be nominal damages. *E.g., Info-Hold*, 783 F.3d at 1371-1372. *Second*, when the patentee fails to "adequately tie a dollar amount to the infringing acts" and there is not "enough evidence in the record to allow the fact finder to formulate a royalty," a $0 or possibly $1 award may be appropriate. *See Rex Medical*, 2025 WL 2799030, at *6 ($1); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) ($0); *SPEX Techs.*, No. 8:16-cv-1799, Dkt. 651 at 19 ($1).

No reasonable jury could find Masimo has met its burden to establish that its proposed reasonable royalty of $634-749 million is non-speculative for at least two reasons. *First*, Dr. Reed-Arthurs (Masimo's survey expert) and Mr. Bergman (Masimo's damages expert) failed to consider the fact that Apple did not charge anyone for adding the accused green-light doublecheck. As Dr. Reed-Arthurs admitted, in 2018 Apple provided millions of existing Apple Watch users with a *free* software update that added the green-light doublecheck to refine the existing High Heart Rate Notifications feature in their Watches. 11/10 Vol 1 Tr. 55:4-56:6. Dr. Reed-Arthurs also conceded that Apple did not "charg[e] an incremental amount specifically tied to" the accused refinement of the Notifications feature in subsequent Watch models. *Id.* at 58:5-21. Dr. Reed-Arthurs's admission that "in the real world, Apple does not price its products or charge users for … the High/Low Notifications," *id.* at 59:1-5, shows that the accused green-light doublecheck added to the unaccused 2017 version of High Heart Rate Notifications provided only *de minimis* value.

*Second*, no reasonable jury could accept Mr. Bergman's nearly $750 million damages figure because his methodology did not plausibly estimate the value of the green-light doublecheck. Specifically, neither Dr. Reed-Arthurs (who conducted the survey that undergirded Mr. Bergman's opinion) nor Mr. Bergman accounted for (1) the existence of the unaccused 2017 feature or (2) the minimal value of the change from the 2017 version to the 2018 version.

Mr. Bergman, for example, openly conceded on cross-examination that he made no meaningful effort to value the unaccused feature. *See, e.g.*, 11/12 AM Tr. 27:10-15 (Q: You didn't put a price tag on it, correct? A: I didn't."). Dr. Reed-Arthurs also made no attempt to determine the value of the unaccused 2017 feature or how much a user would have paid for the accused High/Low Heart Rate Notifications if the 2017 version was provided as an alternative. 11/10 Vol. 1 Tr. 42:16-43:3. Instead, both experts stated that they had not considered the 2017 feature because they believed it was commercially nonviable—opinions that rested on Dr. Madisetti's testimony. *See* 11/10 Vol. 1 43:4-11, 44:14-45:2 (Q: You, yourself, did not undertake a specific analysis to determine whether that high heart rate notifications in the Series 3 was commercially viable, correct? [Reed-Arthurs]: … I did not undertake a separate analysis."); 11/12 AM Tr. 27:10-24 ("Q: …[W]ho knows better as to whether or not that 2017 version was viable, you or [Apple's corporate representative] Dr. Brouse? [Bergman]: I'm not offering opinions as to its viability.").

To be sure, both Dr. Reed-Arthurs and Mr. Bergman indicated in passing that they were also considering "contemporaneous documents" identified by Dr. Madisetti from Apple in assessing nonviability. 11/10 Vol. 1 [Reed-Arthurs] Tr. 44:14-45:2; 11/12 AM [Bergman] Tr. 27:16-24. But again, neither Dr. Reed-Arthurs nor Mr. Bergman claimed to have developed an independent assessment of commercial viability. And Mr. Bergman conceded on cross-examination that he was not aware of (1) whether Apple had received *any* "consumer complaints" regarding the 2017 feature, (2) "how often" the 2017 feature returned a false positive, or (3) "how many more captures of medical events occurred" with the accursed 2018 feature than with the unaccused 2017 feature. 11/12 AM Tr. 27:25-28:12, 32:10-34:7.[3]

---

[3] While Masimo directed Mr. Bergman to two user complaints from an online message board during re-direct, 11/12 AM Tr. 63:3-68:1, Mr. Bergman had no disclosed opinion on those complaints and conceded on re-cross that—even if it was assumed Apple received 20 complaints—such complaints would represent a microscopic fraction of the number of watches sold, 11/2 AM Tr. 73:1-74:22.

Accordingly, Masimo's damages case (like its liability case) turns on the strength of Dr. Madisetti's technical opinion. And as with liability, no reasonable jury could credit Dr. Madisetti's opinion regarding the commercial viability of the unaccused 2017 feature. Dr. Madisetti's view is based entirely on a few reports about certain false positive alarms in Apple's "Radar" bug tracking system that engineers—not the businesspeople who would be making commercial decisions—labeled as high-priority. *E.g.*, 11/10 Vol. 2 [Bergman] Tr. 23:11-22 ("I understand that from Dr. Madisetti … [i]t had a number of false positives. They called it a critical one priority bug and that it was a show-stopper."); 11/7 AM [Madisetti] Tr. 95:5-100:15 (discussing bug reports). But Masimo presented no evidence—through Dr. Madisetti or otherwise—to support his assertion that these bug reports led Apple to conclude that the unaccused Notification feature lacked commercial viability. To the contrary, the uncontradicted record shows that Apple distributed the green-light doublecheck as an incremental improvement through a routine software update months after the bug reports. *See* 11/10 Vol. 1 [Reed-Arthurs] Tr. 55:4-56:6; 11/13 AM [Caldbeck] Tr. 65:18-66:19, 68:15-19, 71:10-72:11; 11/12 PM [Waydo] Tr. 127:15-130:19. Indeed, each Apple witness questioned about the issue confirmed that Apple would have rushed out an immediate update if engineers had become aware of a significant problem. *See, e.g.*, 11/12 PM [Waydo] Tr. 129:21-130:19; 11/13 AM [Framhein] Tr. 57:1-11. And Ms. Caldbeck testified that she was unaware of any consumer complaints regarding the unaccused Notifications feature, and that any significant concern about the feature would have come to her attention. *See* 11/13 AM Tr. 66:20-67:15. Even viewing the evidence in Masimo's favor, no reasonable jury could conclude that the unaccused High Heart Rate Notifications feature without the green-light doublecheck lacked commercial viability.

## III.    THIS COURT SHOULD GRANT JMOL OF NO POST-SUIT WILLFULNESS

Since this case was filed in January 2020, Masimo has consistently asserted Apple willfully infringed the '776 patent. *See, e.g.*, Dkt. 1 at ¶ 176. At the summary judgment stage, for example, Masimo opposed Apple's request for summary judgment on pre- and

1  post-suit willfulness even while Masimo simply abandoned another issue (copying).  *See*
2  Dkt. 2573-1 at 13-16.  Masimo continued to press its willfulness argument in the
3  proposed jury instructions, *see* Dkt. 2765 at 123-127, and at the MIL stage, *see* Dkt. 2741
4  at 14, and included willfulness in its portion of the pretrial conference statement, Dkt.
5  2748 at 3-4.

6        Masimo, however, did not present any evidence on willfulness at trial, much less
7  evidence sufficient to meet its burden that (in the words of its own proposed jury
8  instruction) Apple intentionally or deliberately infringed.  Dkt. 2765 at 123.
9  Accordingly, Apple should be granted JMOL of no willfulness.  *See Alcon Rsch. Ltd. v.*
10  *Barr Labs., Inc.*, 745 F.3d 1180, 1193 (Fed. Cir. 2014) (noting court should assess "both
11  what ***the parties expected to try given their statements and conduct*** and what they
12  actually litigated at trial" in determining whether JMOL is appropriate).[4]

## CONCLUSION

13
14        Apple respectfully submits that this Court should grant judgment as a matter of
15  law in Apple's favor that (1) the accused products do not infringe the asserted claims
16  of the '776 patent literally or under the doctrine of equivalents, (2) Masimo is entitled
17  to no more than nominal damages, and (3) Apple's post-suit conduct does not
18  constitute willful infringement.

19
20
21
22
23
24
25
26
27
28

---

[4] Masimo's email to Apple on the Sunday before trial stating it would not pursue willful infringement was too late. *Cf. Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 14-cv-00911 (E.D. Tex. Feb. 4, 2016), Dtk. 376 at 4 ("[T]here may be cases where a party has manifestly expressed its intent to litigate a claim in a way that … requires that the claim be dismissed with prejudice if the party attempts to withdraw it.").

1

2    Dated:  November 14, 2025              Respectfully submitted,

3

4                                          MARK D. SELWYN
                                           AMY K. WIGMORE
5                                          JOSHUA H. LERNER
                                           JOSEPH J. MUELLER
6                                          SARAH R. FRAZIER
7                                          THOMAS G. SPRANKLING
                                           WILMER CUTLER PICKERING
8                                            HALE AND DORR LLP
9
                                           BRIAN A. ROSENTHAL
10                                         GIBSON, DUNN & CRUTCHER LLP
11
                                           KENNETH G. PARKER
12                                         HAYNES AND BOONE, LLP
13

14

15                                         By:  /s/ Mark D. Selwyn
16                                               Mark D. Selwyn
17
                                           *Attorneys for Defendant Apple Inc.*
18

19

20

21

22

23

24

25

26

27

28

1

2                    **CERTIFICATE OF COMPLIANCE**

3          The undersigned, counsel of record for Defendant Apple, Inc., certifies that this

4    brief contains 6,592 words, which:

5          _X_  complies with the word limit of L.R. 11-6.1.

6          ___  complies with the word limit set by court order dated [date].

7

8    Dated:  November 14, 2025              Respectfully submitted,

9
                                            MARK D. SELWYN
10                                           AMY K. WIGMORE
                                            JOSHUA H. LERNER
11                                           JOSEPH J. MUELLER
                                            SARAH R. FRAZIER
12                                           THOMAS G. SPRANKLING
                                            WILMER CUTLER PICKERING HALE AND
13                                           DORR LLP
14
15                                           BRIAN A. ROSENTHAL
16                                           GIBSON, DUNN & CRUTCHER LLP
17                                           KENNETH G. PARKER
18                                           HAYNES AND BOONE, LLP
19
20                                           By:  _/s/ Mark D. Selwyn_____
21                                                Mark D. Selwyn
22
23
24
25
26
27
28