Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Sheila N. Swaroop (Bar No. 203476)
sheila.swaroop@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
Kendall M. Loebbaka (Bar No. 285908)
kendall.loebbaka@knobbe.com
Douglas B. Wentzel (Bar No. 313452)
douglas.wentzel@knobbe.com
**Knobbe, Martens, Olson & Bear, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Fax: (949) 760-9502

Adam B. Powell (Bar. No. 272725)          Brian C. Horne (Bar No. 205621)
adam.powell@knobbe.com                    brian.horne@knobbe.com
Daniel P. Hughes (Bar No. 299695)         Mark D. Kachner (Bar No. 234192)
daniel.hughes@knobbe.com                  mark.kachner@knobbe.com
**Knobbe, Martens, Olson & Bear, LLP**    **Knobbe, Martens, Olson & Bear, LLP**
3579 Valley Centre Drive                  1925 Century Park East, Suite 400
San Diego, CA 92130                       Los Angeles, CA 90067
Phone: (858) 707-4000                     Phone: (310) 551-3450
Fax: (858) 707-4001                       Fax: (310) 551-3458

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation<br><br>Defendant. | Case No. 8:20-cv-00048-JVS-JDE<br><br>**MASIMO'S OPPOSITION TO APPLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FRCP 50(B) AND APPLE'S MOTION FOR A NEW TRIAL UNDER FRCP 59(A) ON MASIMO'S PATENT INFRINGEMENT CLAIM**<br><br>Date:      March 2, 2026<br>Time:      1:30 p.m.<br>Location:  Courtroom 10C<br>Trial:     Nov. 4, 2025 |

REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

Page No.

INTRODUCTION ........................................................................... 1

LEGAL STANDARDS ...................................................................... 2

ARGUMENT ................................................................................. 3

I.    Substantial Evidence Supports The Jury's Infringement Verdict ......... 3

    A.    Substantial Evidence Establishes Literal Infringement ............. 3

        1.    Substantial Evidence Establishes Literal Infringement Under The Plain And Ordinary Meaning ................................................................ 3

        2.    Apple's Motion Rests On A Belated Construction Of "Patient Monitor" At Odds With The Court's Orders And The Evidence ................................... 6

        3.    Substantial Evidence Establishes Literal Infringement Under Apple's Interpretation Of The Claims ................................................................ 8

        4.    Apple's Arguments Ignore The Claim Language ......... 10

        5.    Each *Apple Watch* Is A "Patient Monitor" As Manufactured ............................................................. 12

    B.    Substantial Evidence Establishes Infringement Under The DOE ........................................................................ 13

        1.    Madisetti Properly Applied Both DOE Tests ............... 13

        2.    Apple Fails To Establish JMOL Is Required ............... 14

    C.    Apple's Scattershot Arguments Do Not Warrant JMOL .......... 16

II.   The Court Should Deny Apple's Motion For A New Trial On Infringement ............................................................................ 19

    A.    The Clear Weight Of The Evidence Supports the Verdict ....... 19

    B.    Apple's Jury-Instruction Arguments Should Be Rejected ....... 19

        1.    The Court Correctly Declined to Construe "Patient Monitor" ................................................................... 19

        2.    The Jury Was Properly Instructed On DOE .................. 25

# TABLE OF CONTENTS
## (cont'd)

**Page No.**

3.   The Court Correctly Excluded Apple's EMT and Physician...............................................................27

4.   The Court Correctly Permitted Masimo To Present Statements From Medical Doctors ...............................28

C.   Apple's Other Arguments Do Not Warrant A New Trial .......33

1.   Routine Evidentiary Rulings Do Not Warrant A New Trial.......................................................................33

2.   There Was No "Undisclosed Infringement Theory"......34

3.   Mercier Was Properly Cross Examined On Warren's Opinion That A Computer Mouse Could Be A "Patient Monitor" .........................................37

4.   Apple's Arguments About The Parties' 2012-2013 Interactions Should Be Rejected ...................................38

D.   The Verdict Must Be Upheld If Evidence Supports A Factual Theory ........................................................39

III.   The Court Should Deny Apple's Motion For JMOL Or A New Trial On Damages ........................................................41

A.   Substantial Evidence Supports the Jury's Damages Verdict...........................................................................41

B.   The Court Should Deny Apple's Motion For A New Trial On Damages.......................................................45

1.   The Clear Weight Of The Evidence Supports The Verdict ...........................................................................45

2.   The Court Properly Denied Apple's *Daubert* Motion on Dr. Reed-Arthurs' and Bergman's Testimony .....................................................................45

3.   The Court Properly Instructed The Jury On Damages .........................................................................46

4.   The Court Did Not Err In Admitting Customer Complaints ...................................................................48

CONCLUSION...........................................................................50

-ii-

1

**TABLE OF AUTHORITIES**

2

**Page No(s).**

3

*Amgen Inc. v. Hospira, Inc.*,

4

944 F.3d 1327 (Fed. Cir. 2019) ................................................................2

5

*Apple Inc. v. Motorola, Inc.*,

6

757 F.3d 1286 (Fed. Cir. 2014) .......................................................46, 47

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,

7

661 F.3d 629 (Fed. Cir. 2011) .........................................................21, 25

8

*Bio-Rad Laby's, Inc. v. 10X Genomics Inc.*,

9

967 F.3d 1353 (Fed. Cir. 2020) ..............................................................26

10

*Biodex Corp. v. Loredan Biomedical, Inc.*,

11

946 F.2d 850 (Fed. Cir. 1991) ................................................................26

12

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,

249 F.3d 1341 (Fed. Cir. 2001) ................................................................3

13

*Bowoto v. Chevron Corp.*,

14

621 F.3d 1116 (9th Cir. 2010) ................................................................49

15

*Brett v. Union, Local 879*,

16

828 F.2d 1409 (9th Cir. 1987) ................................................................40

17

*Byrd v. Maricopa County Sheriff's Dep't*,

18

629 F.3d 1135 (9th Cir. 2011) ................................................................49

19

*Costa v. Desert Palace, Inc.*,

20

299 F.3d 838 (9th Cir. 2002) ....................................................................2

21

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,

424 F.3d 1168 (Fed. Cir. 2005) ..............................................................22

22

*Egenera, Inc. v. Cisco Systems, Inc.*,

23

141 F.4th 1350 (Fed. Cir. 2025) .............................................................39

24

*Ericsson, Inc. v. D-Link Systems, Inc.*,

25

773 F.3d 1201 (Fed. Cir. 2014) ..............................................................39

26

*Escriba v. Foster Poultry Farms, Inc.*,

743 F.3d 1236 (9th Cir. 2014) ..................................................................2

27

28

1

**TABLE OF AUTHORITIES**
**(cont'd)**

2

3

**Page No(s).**

4

*Extreme Networks, Inc. v. Enterasys Networks, Inc.*,
5
    395 F. App'x 709 (Fed. Cir. 2010) .......................................................27

6

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)...............................................................................44
7

8

*FDIC v. Lugli*,
    813 F.2d 1030 (9th Cir. 1987) .............................................................26

9

*Flex-Rest, LLC v. Steelcase, Inc.*,
10
    455 F.3d 1351 (Fed. Cir. 2006) ...........................................................27

11

*Info-Hold, Inc. v. Muzak LLC*,
12
    783 F.3d 1365 (Fed. Cir. 2015) ...........................................................47

13

*Kyocera Senco Indus. Tools Inc. v. ITC*,
    22 F.4th 1369 (Fed. Cir. 2022) ............................................................27
14

15

*Landes Constr. Co. v. Royal Bank of Canada*,
    833 F.2d 1365 (9th Cir. 1987) ...............................................................3

16

*LNC Invs., Inc. v. First Fid. Bank*,
17
    126 F. Supp. 2d 778 (S.D.N.Y. 2001) .................................................44

18

*Magema Tech. LLC v. Phillips 66*,
19
    153 F.4th 1248 (Fed. Cir. 2025) ..........................................................35

20

*Marbled Murrelet v. Babbitt*,
    83 F.3d 1060 (9th Cir. 1996) ...............................................................31
21

22

*Mobile Hi-Tech Wheels v. CIA Wheel Grp.*,
    514 F. Supp. 2d 1172 (C.D. Cal. 2007)...............................................22

23

*Murphy v. City of Long Beach*,
24
    914 F.2d 183 (9th Cir. 1990) .................................................................3

25

*NexStep Inc. v. Comcast Cable Commc'ns, LLC*,
26
    119 F.4th 1355 (Fed. Cir. 2024) .....................................................14, 15

27

*Northpoint Tech., Ltd. v. MDS Am., Inc.*,
    413 F.3d 1301 (Fed. Cir. 2005) ...........................................................40
28

1

**TABLE OF AUTHORITIES**
**(cont'd)**

2

3

**Page No(s).**

4

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ...................................................................20, 21

5

6

*Paice LLC v. Toyota Motor Corp.*,
   504 F.3d 1293 (Fed. Cir. 2007) ...................................................................15

7

8

*PPC Broadband, Inc. v. Corning Optical Commn's. RF, LLC*,
   193 F. Supp. 3d 133 (N.D.N.Y. 2016) ............................................................39

9

10

*Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*,
   599 F.3d 1308 (Fed. Cir. 2010) ...................................................................22

11

12

*Reeves v. Sanderson Plumbing Prod., Inc.*,
   530 U.S. 133 (2000) ...................................................................................2

13

14

*Rembrandt Diagnostics, LP v. Alere, Inc*,
   809 F. App'x 903 (Fed. Cir. 2020) .............................................................40, 41

15

*Rembrandt Vision Techs. L.P. v. Johnson & Johnson Vision Care, Inc.*,
   725 F.3d 1377 (Fed. Cir. 2013) ...................................................................35

16

17

*Retractable Techs., Inc. v. Becton Dickinson and Co.*,
   757 F.3d 1366 (Fed. Cir. 2014) ...................................................................40

18

19

*Rex Med., L.P. v. Intuitive Surgical, Inc.*,
   156 F.4th 1289 (Fed. Cir. 2025) ..............................................................12, 46

20

21

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001) ....................................................................2, 45

22

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
   93 F.4th 222 (4th Cir. 2024) ........................................................................44

23

24

*SPEX Techs., Inc. v. Western Digital Corp.*,
   No. 8:16-cv-01799, Dkt. 651 (June 16, 2025) ...............................................47

25

26

*Sprint/United Management Co. v. Mendelsohn*,
   552 U.S. 379 (2008) ...........................................................................38, 49

27

*Sulzer Textil A.G. v. Picanol N.V*,
   358 F.3d 1356 (Fed. Cir. 2004) ...................................................................26

28

# TABLE OF AUTHORITIES
## (cont'd)

**Page No(s).**

*Syufy Enters. v. Am. Multicinema, Inc.*,
   793 F.2d 990 (9th Cir. 1986).  ..................................................................40

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020) ..............................................................47

*Tennant v. Peoria & Pekin Union Ry.*,
   321 U.S. 29 (1944)..................................................................................3

*United States v. Copeland*,
   291 F. App'x 94 (9th Cir. 2008) ............................................................32

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997)................................................................................13

*WesternGeco LLC v. ION Geophysical Corp.*,
   913 F.3d 1067 (Fed. Cir. 2019) ............................................................40

*Wi-LAN USA, Inc. v. Apple Inc.*,
   830 F.3d 1374 (Fed. Cir. 2016) ........................................21, 22, 25, 37

## OTHER AUTHORITIES

Fed. R. Civ. P. 26 ........................................................................................36

Fed. R. Civ. P. 50 ...........................................................................2, 44, 47

Fed. R. Evid. 402 ........................................................................................29

Fed. R. Evid. 403 ........................................................................................29

Fed. R. Evid. 703 ........................................................................................32

Fed. R. Evid. 801 ..................................................................................30, 31

Fed. R. Evid. 901 ........................................................................................48

Patent L.R. 4.3 ............................................................................................19

Civil L.R. 16-6.1 ........................................................................................49

Fed. Cir. Bar. Assoc. Model Patent Jury Instruction 3.1c ........................25

# TABLE OF AUTHORITIES
## (cont'd)

**Page No(s).**

Fed. Cir. Bar Assoc. Model Patent Jury Instruction 5.5 ........................................... 46

U.S. Const. Seventh Amendment ......................................................... 40

9 Moore's Federal Practice § 51.12 (2025) ....................................................... 26

12 Moore's Federal Practice § 59.13 (2025) ........................................................ 3

11 Wright & Miller, Federal Practice & Procedure § 2805 (3d ed. 2002) .............. 31

# INTRODUCTION

The Apple Watch satisfies every technological requirement of the asserted claims. Masimo's expert explained, Apple's engineers and expert admitted, and its documents showed, that the Watch reduces power consumption by operating under two control protocols, activating light sources under those protocols, calculating measurement values responsive to detected light, generating trigger signals, and changing protocols based on those trigger signals. Apple did not dispute any of this at trial.

Instead, Apple rested its entire defense on the first three words of the preamble: "a patient monitor." But "patient monitor" is not an amorphous, stand-alone claim term. The claim recites "a patient monitor configured to monitor at least a pulse rate of a patient." And Apple's design documents, healthcare website, team of doctors, letters from customers, marketing materials, submissions to other tribunals, and witness testimony all confirmed that the Apple Watch is a patient monitor configured to monitor at least a pulse rate of a patient. In fact, Apple's Chief Operating Officer called the Watch "the most used heart rate monitor in the world." The Watch measures heart rate every second, just like the patient monitor described in the '776 Patent. And the Watch also continuously monitors and notifies for a high or low *resting* heart rate (sometimes referred to as tachycardia or bradycardia). The evidence at trial established that the Apple Watch met the only disputed limitation.

Leading up to the trial, Apple had advocated for the plain and ordinary meaning of "patient monitor." The Court adopted that proposal. But during the trial, Apple attempted to inject new meaning into that term with an untimely construction. And now, in a bid for JMOL, Apple proposes yet another belated construction of that term. But Apple's new constructions are improper for many reasons. JMOL is also unwarranted because the evidence establishes infringement even under Apple's new constructions.

Masimo also presented substantial evidence to support the jury's damages award. Masimo presented unrebutted survey evidence and a thorough economic analysis. Apple presented no alternative amount and now seeks to overturn the jury's verdict by

1    rehashing arguments the Court repeatedly rejected.

2        In its plea for a new trial, Apple accuses this Court of committing at least six errors

3    based on (1) declining Apple's untimely request to construe "patient monitor" at the

4    eleventh hour after Apple repeatedly maintained that term should have its plain and

5    ordinary meaning, (2) excluding claim construction and noninfringement opinion

6    testimony from medical professionals who Apple admits were not POSITAs,

7    (3) admitting statements from medical doctors about the importance of Apple Watch's

8    heart rate features to patients that Apple adopted in the ITC case, (4) making routine

9    evidentiary rulings, (5) denying Apple's FRCP 50(a) motion on DOE, and (6) allowing

10   unrebutted survey evidence on apportionment.  But Apple fails to show any error.

11   Instead, Apple simply disagrees with the jury and the Court.  None of Apple's arguments

12   approaches the high bar to set aside the jury's verdict or warrant another trial.

## LEGAL STANDARDS

14       The bar for JMOL is "very high."  *Costa v. Desert Palace, Inc.*, 299 F.3d 838,

15   859 (9th Cir. 2002).  The jury's verdict cannot be overturned unless "there is no legally

16   sufficient basis for a reasonable jury to find for that party on that issue."  *Id*.  The Court

17   must draw all reasonable inferences in Masimo's favor and may not make credibility

18   determinations or weigh the evidence.  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530

19   U.S. 133, 150 (2000).  The Court "must disregard all evidence favorable to the moving

20   party that the jury is not required to believe."  *Id.* at 151.  Infringement and damages are

21   both questions of fact.  *Amgen Inc. v. Hospira, Inc.,* 944 F.3d 1327, 1335, 1341 (Fed.

22   Cir. 2019).  Thus, the "jury's verdict must be upheld if it is supported by substantial

23   evidence that is adequate to support the jury's findings, even if contrary findings are also

24   possible."  *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014).

25       A motion for a new trial may be granted only if "the verdict is contrary to the clear

26   weight of the evidence, or is based upon evidence which is false, or to prevent, in the

27   sound discretion of the trial court, a miscarriage of justice."  *Silver Sage Partners, Ltd.*

28   *v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).  Indeed, "[c]ourts are

1  not free to reweigh the evidence and set aside the jury verdict merely because the jury

2  could have drawn different inferences or conclusions or because judges feel that other

3  results are more reasonable." *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35

4  (1944). Thus, "[a]s a general rule, courts will not disturb jury verdicts in the absence of

5  extreme circumstances, such as a case of manifest injustice or abuse of the jury's

6  function." 12 Moore's Federal Practice § 59.13 (2025).[1] Moreover, a new trial on

7  damages should be granted only when the jury's award is not supported by the evidence

8  or is based on speculation or guesswork. *Biotec Biologische Naturverpackungen GmbH*

9  *& Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1355 (Fed. Cir. 2001).

10                                    **ARGUMENT**

11  **I.   Substantial Evidence Supports The Jury's Infringement Verdict**

12        **A.   Substantial Evidence Establishes Literal Infringement**

13        Apple did not dispute infringement based on any claim limitation other than

14  "patient monitor configured to monitor at least a pulse rate." 11/13 PM Tr. 77:10-12.

15  Substantial evidence established literal infringement for that limitation and all others.

16               **1.   Substantial Evidence Establishes Literal Infringement Under**

17                      **The Plain And Ordinary Meaning**

18        This Court held, at Apple's urging, that the plain and ordinary meaning of "patient

19  monitor" applies. Dkt. 2790 at 3. Overwhelming evidence established that each Apple

20  Watch is a "patient monitor configured to monitor at least a pulse rate" under the plain

21  and ordinary meaning. For example, Apple itself refers to the Apple Watch as a "heart

22  rate monitor." Apple's engineers admitted that "[e]very single watch ever sold by Apple

23  has been a heart rate monitor." 11/12 PM (Brouse) Tr. 83:9-11; *id.* (Waydo) at 133:1-7

24  (similar); *see* JTX-7724 at -539. And Apple's COO Jeff Williams publicly announced

25

26  _____

    [1] Apple's cases do not set forth a different standard. Br. at 18 (citing *Murphy v. City of*
27  *Long Beach*, 914 F.2d 183 (9th Cir. 1990) (granting new trial because misinstructing
    jury resulted in a miscarriage of justice) and *Landes Constr. Co. v. Royal Bank of*
28  *Canada*, 833 F.2d 1365 (9th Cir. 1987) (new trial due only if firm conviction mistake
    was committed after respecting "collective wisdom of the jury")).

1    the Watch is "the most used heart rate monitor in the world."  JTX-7192.1.

2        Apple and its customers also attested to the medical-grade quality of the Watch

3    and its High/Low HR Notifications.  Apple referred to High HR Notifications (also

4    called "Stibnite Confirmations") as one of the Watch's "***Medical*** Features."  JTX-6726

5    at -291.[2]  Apple obtained FDA clearance for the Watch features that use its heart rate

6    sensor.  *See, e.g.*, JTX-7133, JTX-7456, JTX-7602, JTX-7457.  Apple's COO testified

7    that the Watch "collect[s] data, including things like heart rate" that patients "can share

8    with their physician."  Dkt. 2826-5 (Williams) 81:1-10, 81:14-17.

9        And many patients used the Watch's heart-rate measurements to obtain medical

10   treatment.  As Apple's CEO Tim Cook explained:  "[n]early every day, I get notes from

11   customers who share how a heart alert led to a life-saving appointment with the

12   cardiologist."  JTX-567.  Apple collected those "Dear Tim" letters, where customers

13   praised Apple Watch's heart rate monitor and High/Low HR Notifications for saving

14   their life.  JTX-7004, JTX-7005, JTX-7684, DTX-869.  One letter (from a "heart patient

15   since 2012") detailed how a High HR Notification led her to seek "life-saving" medical

16   care.  JTX-7004 at -706.  Another explained how the "Apple Watch alerted [a customer]

17   to a high heart rate later diagnosed as Supraventricular tachycardia" (JTX-7684 at -972),

18   which is one of the medical conditions Apple designed High/Low HR Notifications to

19   monitor.  *Infra* §I.A.3.  And another explained how "doctors wanted to send me home

20   with a heart monitor so they could track me, but we decided the Apple Watch was

21   accurate enough to keep me safe."  DTX-869 at -373 ███████████████████████████

22   ████████████████████████████████████████████

23        Further, Apple promoted the Apple Watch and its High/Low HR Notifications to

24   physicians, for use with their patients.  Apple even created a "healthcare" website for

25   physicians "[t]o highlight the new heart features on Apple Watch and ***give clinicians***

26   ***confidence that they can trust the findings***" from "high/low HR notifications" and

27

28   _____

[2] All emphasis is added unless indicated otherwise.

Watch "heart features."  JTX-126 at -245; *see, e.g.*, Dkt. 2826-1 (Mistri) 315:2-16.
Apple emphasized High/Low HR Notifications, positioning it as the first feature on the
website.  The website also repeatedly described using High/Low HR Notifications with
"patients," including to "help ***give your patients an early warning sign***."  JTX-7178 at
-662; *see, e.g.*, JTX-3254; JTX-7178; JTX-7190; JTX-1581.

And medical doctors use the Watch to measure patients' heart rate.  Cardiologist
Marco Perez, M.D. testified about using the Watch as part of his medical practice,
"primarily" for measuring "heart rate."  Dkt. 2826-3 at 42:07-16.  Another cardiologist
explained that for patients with heart-health concerns, "the Apple Watch is the perfect
support for such cases as it would constantly monitor your heart rate and send you [a]
push notification if [] it detects an abnormal elevated or low resting heart rate."  JTX-
7742 at -631.  Even Apple's VP of Health, Sumbul Desai, M.D., testified she "would
use the Apple Watch" to measure patients' heart rate "[i]n a clinic."  Dkt. 2826-4 at
47:08-18.

Medical doctors also consider the Watch and its High/Low HR Notifications
important for patient care and medical research.  Several doctors submitted statements
to the International Trade Commission explaining the feature's importance.  One doctor
explained the Apple Watch with "high and low heart rate notifications" is "a valuable
tool for many patients and doctors to have in their toolbox to help diagnose monitor and
treat many cardiac conditions."  JTX-7561.  Other doctors expressed similar sentiments
about the Watch.  JTX-7566, JTX-7587.  The Watch was also used for heart-related
medical research, such as "continuous-style monitoring of patients" in the Apple Heart
Failure Study.  JTX-7177 at -624, -629; JTX-7700; Dkt. 2826-2 (Nag) 51:15-21.

Madisetti testified about this evidence—from Apple's own website, public
statements, internal documents, the testimony of Apple's employees, "Dear Tim" letters,
testimony and statements from doctors, FDA submissions, and more—in explaining his
opinion that each accused Apple Watch is "a patient monitor configured to monitor at
least a pulse rate of a patient."  *See, e.g.*, 11/7 AM Tr. 47:20-61:23, 16:7-24:23.

1  Accordingly, substantial evidence supports the jury's finding that the Apple Watch

2  satisfies the plain and ordinary meaning of "patient monitor."

**2.      Apple's Motion Rests On A Belated Construction Of "Patient**

**Monitor" At Odds With The Court's Orders And The Evidence**

5      Rather than rebut Masimo's evidence, Apple sought to construe "patient monitor"

6  during and after trial.  But such attempts were extraordinarily untimely.  *Infra* §II.B.1.

7  Indeed, Apple maintained that term should have its plain and ordinary meaning all the

8  way until trial, when Apple changed its position.  *Id.*  The Court correctly rejected

9  Apple's request for a construction at the eleventh hour.  *Id.*  In response, Apple now

10 advances yet another new construction that it deceptively labels a "holding" of the Court:

11      This Court has held that, in the context of the '776 Patent, the term "patient

12      monitor" at least requires a device that "must perform at a level similar to

13      a ['high performance'] clinical device in terms of event capture," such that

14      it "must" try to capture all "important medical events" (even if it misses

15      some of them in practice).

16 Br. at 7.[3]  But Apple fabricates that "holding" by cobbling together disparate phrases

17 from two separate evidentiary rulings of the Court.  *See* Dkt. 2790 (MIL Order) at 3-4;

18 Dkt. 2745 (*Daubert* Order) at 10-11.  Apple then takes substantial editorial liberty,

19 including inserting the phrase "high performance" in editorial brackets and adding "try

20 to capture all" before "important medical events."  Br. at 7.

21      Apple ignores the Court's actual rulings.  In its *Daubert* Order, the Court noted

22 "[it] did not construe these terms" and "[t]he parties agree these terms have their plain

23 and ordinary meaning to a [POSITA]."  Dkt. 2745 at 9.  In its MIL Order, the Court

24 explained "[t]he parties did not request construction of the term, 'patient monitor'" and

25 thus correctly held the "[p]lain and ordinary meaning applies."  Dkt. 2790 at 3.  The

26 Court thus allowed Apple's fact witnesses to testify "as to their understanding of the

27

28 ───────────────

[3] Apple has now raised four different, untimely constructions of this term.  *Infra* §II.B.1.

1  functionality of the Apple Watch and whether it would be a 'patient monitor,' in view

2  of their understanding of the plain and ordinary meaning of that term." *Id.* at 3.  And

3  Apple's witnesses did exactly that.  11/12 AM Tr. 125:25-126:23; 11/12 PM Tr. 82:4-

4  15, 111:6-10, 131:14-22; 11/13 AM Tr. 16:1-17:4, 46:13-20; 57:21-58:4.

5        Further, Apple's new insertions are at odds with the Court's rulings.  The Court's

6  *Daubert* Order held that Apple's expert "Mercier may not testify that only a device with

7  a 100% capture rate meets the claim limitations, as that is not supported by the intrinsic

8  record." Dkt. 2745 at 11.  The Court also held that "Apple may **not** affirmatively define

9  'patient monitor' as a … device that captures 'all medical events.'"  Dkt. 2790 at 3.

10  Thus, Apple's new insertion of "try to capture all" events deviates from the Court's

11  rulings.  Mercier's testimony did too.  11/13 PM Tr. 37:5-14 (opining the Watch is not

12  a "patient monitor" "[b]ecause it's not designed to try to capture all medical events").

13        Apple's new insertion of "high performance" before "clinical device" is also not

14  supported by the Court's rulings.  The Court's *Daubert* Order explained (and its MIL

15  Order repeated) that "the claimed patient monitor must perform at a level like a clinical

16  device would in terms of event capture."  Dkt. 2745 at 11; Dkt. 2790 at 3.  That

17  comparison was to a clinical device, not a "high performance" clinical device.  *Id.*

18        Moreover, the evidence at trial showed that both of Apple's insertions are wrong

19  because even clinical devices need not try to capture every medical event.  Indeed, at the

20  time of the '776 Patent in July 2001, patient monitors from Nellcor (the market leader

21  and Masimo's primary competitor) were not designed to capture measurements during

22  motion.  11/6 AM Tr.  107:24-109:12.  Nellcor's N-200 was the "dominant" patient

23  monitor at the time but was not designed to capture measurements during motion and

24  gave "the wrong values during motion."  *Id.* at 107:24-108:16, 131:10-15; 11/6 PM Tr.

25  10:21-23.  The later Nellcor N-3000 could not reliably measure during motion either.  It

26  therefore used a "flash and dash" technique to indicate that the device could not measure

27  reliably under current conditions.  11/6 AM Tr. 108:17-109:12, 131:10-15; 11/6 PM Tr.

28  10:15-20.  And Masimo's rainbow patient monitors still do not measure during motion.

11/6 AM Tr. 112:5-113:22, 124:11-125:3.  Each of these clinical devices was undisputedly a "patient monitor" configured to monitor a patient's pulse rate.  11/6 AM Tr. 107:24-108:16; DTX-1399 at 5.  Yet, they did not try to capture all measurements.

Masimo also presented a Receiver Operating Characteristic (ROC) curve, which showed that all tested clinical devices missed events because no device is perfect.  JTX-1270 at -335; 11/5 PM Tr. 18:20-25:1; 11/6 AM Tr. 49-61; 11/7 AM Tr. 18:10-23.  Masimo's witnesses and even Apple's former COO acknowledged that clinical devices do not aim to capture all events because that would result in false positives.  *Id.*; Dkt. 2826-5 (Williams) 183:18-184:09.  And again, despite being designed to miss some events, it was undisputed that every clinical device in the ROC curve is a patient monitor.  11/6 AM (Al-Ali) Tr. 53:8-9, 109:19-24, 113:6-9; 11/7 AM (Madisetti) Tr. 26:12-25.

### 3.    Substantial Evidence Establishes Literal Infringement Under Apple's Interpretation Of The Claims

Apple argues Madisetti "was the only witness who testified the Apple Watch was a 'patient monitor' within the meaning of the '776 patent, but he offered no evidence directed to how a 'high performance clinical device' works in terms of event capture with respect to either high or low heart rate notifications."  Br. at 7-9.  Not so.  Ample evidence, including from Apple's own documents and witnesses, established that the Apple Watch functions like a "high performance clinical device."

***First***, Madisetti explained that the '776 Patent discloses a device that measures heart rate every 1.2 seconds.  11/7 AM Tr. 21:7-22:7.  Madisetti and Apple's engineers (Brouse and Framhein) confirmed the Apple Watch measures heart rate every 1.0 seconds.  *See, e.g.*, 11/7 AM Tr. 17:12-16, 22:21-23:1; 11/12 PM Tr. 23:17-24:16, 25:13-15, 26:3-15, 26:23-27:4, 28:19-21, 38:2-6, 57:19-58:14; 11/13 AM Tr. 49:10-13; JTX-7721 at -711.  Madisetti and Scruggs confirmed Masimo's own commercial devices also measure heart rate every 1.0 seconds.  11/7 AM Tr. 22:17-20; 11/6 PM Tr. 43:22-44:15.  Apple never disputed that those Masimo devices are patient monitors configured to monitor heart rate.  11/7 PM Tr. 13:8-17:8.  Madisetti also compared the frequency of

these measurements and explained the Watch calculates heart rate values ▮▮▮ than the specification's embodiment and ▮▮▮ Masimo's patient monitors.  11/7 AM Tr. 21:7-22:7.  Thus, in addition to Apple's documents, the testimony of Madisetti, Brouse, and Framhein showed the Watch is a patient monitor configured to measure at least pulse rate, just like the embodiment of a patient monitor described in the '776 Patent.

**Second**, Apple repeats its argument that the Watch is not a patient monitor because it does not issue High/Low HR Notifications while a patient is moving.  Br. at 9; *see, e.g.*, 11/5 AM Tr. 45:5-47:25 ("[I]f a watch user is moving … these features are not available…. That's not a patient monitor."; High/Low HR Notifications "are not patient monitors" because "they will miss medical events literally anytime you move"), 78:22-79:17.  But the jury was free to reject that argument given all the evidence that "missing events" during motion was actually a feature, not a bug.

Indeed, Masimo showed the High/Low HR Notifications feature was designed to monitor (and issue notifications) for specific events of interest—high heart rates (tachycardia) or low heart rates (bradycardia) when the user is ***at rest***.  *See, e.g.*, 11/7 AM (Madisetti) Tr. 16:10-18:9, 23:5-24:8, 100:17-101:4; 11/12 PM (Brouse) 32:3-25, 40:19-41:5, (Waydo) 96:3-19 ("stationary discordance" is "what we eventually came to call the high heart rate notification" and refers to "a heart rate that was out of the ordinary for when a person is stationary"), 118:6-119:11, 133:16-138:7 (feature's goal is to "alert users in the case of elevated heart rate while sedentary"), 138:18-140:17; 11/13 AM (Framhein) 33:20-34:1, (Caldbeck) 116:23-117:16; JTX-6599 at -268; JTX-7684 at -972; JTX-7671 at -006 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ JTX-6620 at -907 ("***Stationary*** discordance ('inappropriate sinus tachycardia') is defined as 10 or more minutes of HR above 120 bpm when user is ***sedentary***"; "[c]auses include a variety of serious medical conditions…"); DTX-873 at -602-603 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

-9-

1    ██████████████████████████████  JTX-1539 at -120 (defining Low

2    HR Notification as a "*[s]tationary* bradycardia alert").   Apple's documents even

3    referenced medical literature about these events occurring *at rest*.  JTX-6620 at -907.

4         Masimo also showed that because the feature monitored a condition that occurs

5    *at rest*, "it's not missing anything if it doesn't give you an alert when you're moving."

6    11/14 AM Tr. 58:5-59:7; 11/7 AM (Madisetti) Tr. 17:6-18:9, 23:8-24:8; *see* 11/6 PM

7    (Scruggs) Tr. 69:17-70:3.  Rather, Apple's infringement resulted in a feature that detects

8    high and low resting heart rates with great accuracy and virtually no false alarms.  11/14

9    AM Tr. 50:24-51:19; 11/7 AM (Madisetti) Tr. 100:3-101:4; 11/13 AM (Waydo) Tr.

10   12:16-13:22; JTX-1539 at -120; JTX-7674 at -481-482.   Indeed, High/Low HR

11   Notifications achieved the remarkably high positive predictive value ("PPV") of

12   99-100% for the events of interest.  JTX-7674 at -481-482; 11/13 AM Tr. 13:1-22.

13        ***Third***, the dominant patient monitor at the time of the '776 Patent, the N-3000,

14   also did not measure during motion.  *Supra* § I.A.2.  Apple's expert Mercier speculated

15   the N-3000 did "try to capture all of those pulses" during motion based on the operator's

16   manual statement that "the N-3000 continues to search for the pulse."  11/13 PM Tr.

17   32:13-33:12; DTX-1399 at 45.  At best, the N-3000 could "identify signals" (pulses) but

18   not "actually measure" during motion.  11/6 PM Tr. 9:23-10:10; DTX-1399 at 45

19   (confirming missed pulses are not displayed).  Regardless, the Watch also measures

20   pulse rate every second, even during motion.  *See, e.g.*, 11/7 AM Tr. 17:12-16; 11/7 PM

21   Tr. 95:20-23; 11/12 PM Tr. 25:13-15, 26:3-15, 57:19-58:14; 11/13 AM Tr. 49:10-13.

22        ***Fourth***, Apple ignores evidence of the Watch's clinical performance and use in

23   patient care.  Such evidence included Apple's documents and the sworn testimony of its

24   witnesses, Apple's healthcare website directed at physicians, "Dear Tim" letters,

25   physician statements, clinical studies, FDA filings, and more.  *Supra* §I.A.1.

### 4.    Apple's Arguments Ignore The Claim Language

27        Apple argues that the "High/Low Notifications do not try to capture all important

28   high/low heart rate events, and in fact will miss the vast majority of such events."  Br.

at 8-9.  But as explained, "try to capture all" events is Apple's own editorial insertion (not the claim language).  *Supra* §I.A.2.  And a "patient monitor" does not have to try to capture all (or avoid missing any) events.  *Id.*  Regardless, the evidence showed High/Low HR Notifications did not miss ***the events of interest***—it detected those events with an exceptionally high PPV (99-100%).  *Supra* §I.A.3.

Apple also argues that numerous constraints, such as motion, could result in "No notification reported."  Br. at 9.  But "notification" and "reporting" are not tied to any claim language.  The claim recites "a patient monitor configured to monitor at least a pulse rate of a patient."  There is no dispute all Apple Watches measure at least pulse rate.  None of Apple's belated constructions of "patient monitor" required "notification" or "reporting."  The same is true regarding Apple's newly minted arguments about "level of accessibility."  *Id.* at 10.  Apple also cites no evidence showing the "level of accessibility" allegedly "required in a clinical setting."  *Id.*  Regardless, the Asserted Claims ***do not recite***, and ***do not require***:  reporting to the user, notifications, or any level of accessibility.  *See, e.g.*, 11/7 AM Tr. 93:9-20.

Apple argues the Apple Watch's pulse rate measurements are "opportunistic in nature."  Br. at 10.  But again, Apple's argument is not tied to the claims.  Rather, as the preamble of the Asserted Claims recites, and Apple concedes, the Watch is "configured to monitor at least a pulse rate of a patient."  The body of the Asserted Claims also recites calculating pulse rate measurement values.  The evidence showed the Watch calculates pulse rate measurement values when operating under the first and second control protocols.  The evidence also showed that those calculations are not merely "opportunistic" as Apple now argues.  Br. at 10.  Instead, the Watch ***always*** calculates those pulse rate measurement values.  11/7 AM Tr. 17:12-16, 64:7-25; *supra* §I.A.3.

Lastly, unable to show noninfringement based on the claim language, Apple's argument at trial relied heavily on what it "intended" (or "designed") the Watch to do.  11/5 AM Tr. 68:14-21, 76:1-3; 11/13 PM Tr. 86:12-15; 11/14 PM Tr. 21:6-16, 36:21-37:18.  But Apple's intent was irrelevant.  Indeed, "it is immaterial [what] the designers

of the accused devices *intended*" and "[w]hat matters" is that the accused device "*actually* does" what is claimed. *Rex Med., L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1304 (Fed. Cir. 2025). Dkt. 2790 at 3 (recognizing same principle); 11/13 PM Tr. 70:23-71:6 (Apple's expert admitting same). And the jury heard the evidence of what the Apple Watch does, which thoroughly showed it is "a patient monitor configured to monitor at least a pulse rate of a patient." *Supra* §§I.A.1, I.A.3.

### 5.  Each *Apple Watch* Is A "Patient Monitor" As Manufactured

Apple asserts "Masimo has only ever accused High/Low Notifications of infringing the asserted claims." Br. at 11. As discussed, those particular features meet the "patient monitor" limitation. *Supra* §§I.A.1, I.A.3. Moreover, Apple's assertion is incorrect. Masimo consistently identified the Apple Watch itself as the infringing "patient monitor" because the asserted claims recite various hardware met by the Watch. *See, e.g.*, Dkt. 2552-22. Indeed, the claimed "patient monitor" comprises numerous hardware limitations, including "a plurality of light sources," "at least one detector of an optical sensor configured to receive light," and "processors." JTX-6001 at 12:60-13:1. As Apple's expert Mercier admitted, those hardware limitations are satisfied by the processor and the health sensor on the back of each Watch. 11/13 PM Tr. 75:18-76:4.

Further, Apple attempts to avoid that the Watch is a "patient monitor" by ignoring all of the hardware aspects of the Watch and focusing solely on the embedded High/Low HR Notifications algorithm. Br. at 11. But Apple cannot ignore all the evidence establishing that the *Apple Watch* is a "patient monitor." *Supra* §§I.A.1, I.A.3.

Against the great weight of that evidence, Apple relies on Brouse's testimony to argue that no aspect of the entire Apple Watch is "trying to capture all the important medical events of an Apple Watch user." Br. at 11. But neither Brouse nor Apple ever explained what that means or why the Watch would have to capture "all important medical events of a user" to be a "patient monitor." Nor could they, because the unrebutted evidence showed "there's no instrument out there that measures all kinds of medical events." 11/7 PM Tr. 95:24-96:24. Rather, a "patient monitor" monitors "for a

particular type of event." *Id.* It is not an "omniscient, omni-powerful device that catches everything under every condition." *Id.* And, as explained, nothing about the plain and ordinary meaning requires a patient monitor to "try to capture all" events. Apple made that up for this motion. No device would be a patient monitor under Apple's narrative.

## B.  Substantial Evidence Establishes Infringement Under The DOE

Infringement under the DOE requires showing the accused products "contain elements identical or equivalent to each claimed element of the patented invention," using the "function, way, result" and/or "insubstantial differences" tests. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). Madisetti applied both tests and demonstrated that, even if the Apple Watch were not literally a "patient monitor," the Watch satisfies that limitation under the DOE. Apple identifies no error.

### 1.  Madisetti Properly Applied Both DOE Tests

Because Apple disputed only the phrase "patient monitor," Madisetti linked his DOE infringement opinions to just that phrase. He testified that "to the extent that the 'patient monitor' term is not literally met, it is also met under this function-way-result analysis, [such] that it's met under the doctrine of equivalents." 11/7 AM Tr. 85:7-86:6.

Madisetti explained the Watch performs substantially the same function as the claimed "patient monitor." *Id.* at 85:16-18. He testified "[i]t measures and records medically relevant information, ███████████ *Id.* Apple did not seriously dispute that fact. Nor could it. Virtually every witness so testified. *Supra* §§I.A.1, I.A.3.

Madisetti also explained the Watch performs that function in substantially the same way as the claimed "patient monitor." 11/7 AM Tr. 85:18-21. He testified that the Watch "us[es] noninvasive measurement techniques for light, PPG, to measure medically relevant information." *Id.* Again, Apple did not seriously dispute that fact.

Madisetti further explained the Watch achieves substantially the same result as the claimed "patient monitor." He testified that the Watch "measures and records medically relevant information from the user and provides that data for the users and it's available for clinicians to access." *Id.* at 85:21-25. He concluded that the Watch ████

-13-

1  ███████████████████████████████████████████████████████████ as

2  "the 'patient monitor' term."  *Id.* at 86:1-6.

3       Madisetti then explained his DOE opinion under the insubstantial differences test.

4  He testified that the Watch and a "patient monitor" had "insubstantial differences"

5  because each "collects measurement data and measures the heart rate vital signs ████

6  ████████████████████████████████████"  *Id.* at 86:7-13.  Madisetti thus concluded

7  that ████████████████████████████████████████████████ in his opinion

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████  *Id.* at 86:1-4, 86:14-19.  On cross-examination,

10 Apple's counsel did not ask about these DOE opinions.  11/7 PM Tr. 98:24-99:12.

11      Apple's expert (Mercier) agreed the Watch could "measure heart rate" and the

12 sole distinction he drew was that the Watch was not designed with the "*intention* of

13 trying to capture all medical events."  11/13 PM Tr. 61:5-17; 61:22-62:2.  But on cross-

14 examination, Mercier admitted his intent-based distinction had "***no bearing***" on

15 infringement.  *Id.* at 70:23-71:6.  The jury was free to evaluate the testimony of both

16 experts and reach a conclusion about whether Watch is a "patient monitor" under DOE.

### 2.    Apple Fails To Establish JMOL Is Required

18      ***First***, Apple argues Madisetti failed to provide "particularized testimony and

19 linking argument."  Br. at 12-13.  Apple relies on *NexStep*, but that case is inapposite.

20 There, the patentee's expert failed to even identify the alleged equivalent.  *NexStep Inc.*

21 *v. Comcast Cable Commc'ns, LLC*, 119 F.4th 1355, 1375 (Fed. Cir. 2024).  The court

22 also found the expert failed to identify a function, much less one that "aligns with the

23 claimed function."  *Id.* at 1373  The expert also did not identify the "way" or a "result"

24 tethered to the claim language.  *Id.*  Instead, the expert offered mere "generalized

25 testimony as to the overall similarity between the claims and the accused infringer's

26 product."  *Id.* at 1374  Madisetti's DOE testimony suffered none of these shortcomings,

27 as explained above.

28

Apple also relies on *NexStep* to misleadingly argue that an "expert [] cannot rely on the expert's literal infringement presentation." Br. at 12. But Apple omits that *NexStep* quotes the explanation from *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007) that the "[Federal Circuit's] 'particularized testimony' standard ***does not*** require [an expert] to re-start his testimony at square one when transitioning to a doctrine of equivalents analysis." *Id.*

Apple also quibbles that Madisetti did not explain "how the claimed 'patient monitor' must operate with respect to event capture" or "how Apple Watch's ability to capture" events is close enough to such a device. Br. at 13. Not so. Madisetti provided this information as part of his literal infringement analysis for this limitation. For example, he testified that: (1) "[t]he '776 Patent has an example where it discloses that it measures the heart rate in Col. 7 roughly [every] 1.2 seconds" (2) ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ because (3) the Apple Watch measures heart rate "[o]nce every second." 11/7 AM Tr. 21:7-22:7. Madisetti was not required to repeat that testimony. *Paice*, 504 F.3d at 1305.

Apple argues Madisetti's "answers say nothing about the accused High/Low Notifications at all." Br. at 13. But Apple improperly asks the Court to disregard Madisetti's earlier testimony. Madisetti testified that High/Low HR Notifications "does not" miss events during motion because "[i]t was designed not to look at events when the patient was not at rest." 11/7 AM Tr. 17:6-18:9. The feature is ███████████ for the "event of interest"—███████████████████ *Id.* at 24:1-8. And the feature ██████████████████████ ████████████████████████████ by ensuring ██████████████ ███████████████ their resting heart rate or issues a notification. *Id.* at 23:8-25. Again, Madisetti was not required to repeat that testimony. *Paice*, 504 F.3d at 1305.

***Second***, Apple isolates two sentences of Madisetti's redirect examination to argue Madisetti's DOE theory would "vitiate the 'patient monitor' limitation." Br. at 13-14

1 (citing 11/7 PM Tr. 98-99). But Madisetti correctly explained that, if the jury found the

2 Watch did not literally satisfy the limitation, the complete infringement analysis required

3 assessing whether the Watch infringed under the DOE because it was equivalent to a

4 "patient monitor." 11/7 PM Tr. 98-99; *see, e.g.*, 11/7 AM Tr. 86:1-6, 86:14-19.

5 Madisetti never suggested that "patient monitor" was meaningless or not a limitation.

6      ***Third***, Apple argues Masimo's closing raised a "new DOE argument" on which

7 Madisetti "did not provide any testimony." Br. at 14 n.6. But Masimo repeated

8 Madisetti's testimony to present precisely the same theory. 11/14 AM Tr. 55:16-56:1.

9      ***Fourth***, Apple concludes by citing seven cases with no analysis. Br. at 14. All

10 are inapposite because Madisetti provided "particularized" testimony and did not vitiate

11 "patient monitor." Thus, Apple cannot meet the "very high" bar for JMOL.

### C.    Apple's Scattershot Arguments Do Not Warrant JMOL

13      Apple crops Madisetti's testimony to argue he presented a new opinion that "a

14 'patient monitor' should not 'be designed for capturing every event.'" Br. at 14 (quoting

15 11/7 AM Tr. 18:10-23). But Madisetti actually explained a tradeoff: "if you catch every

16 event, you may be catching many false events or false positive…. [s]o ***every designer at***

17 ***design time makes sure to catch as many events as they can*** with the understanding that

18 ***some events should not be caught***…." 11/7 AM Tr. 18:10-23. This was not a new

19 opinion. In his report, Madisetti repeatedly opined that the claimed device is not

20 required to "avoid missing" (or capture all) events. *See, e.g.*, Dkt. 2548-12 ¶¶61, 228,

21 235, 250, 279. And Madisetti responded to Apple's opening statement (11/7 AM Tr.

22 16:10-18:23), where Apple improperly argued the Watch was not a "patient monitor"

23 because it was "not designed to capture ***every*** event" (11/5 AM Tr. 68:16-18, 76:1-3).

24      Apple argues Madisetti's testimony somehow "conflicts" with the Court's

25 "patient monitor" rulings. Br. at 14. But Madisetti's testimony was consistent with the

26 Court's rulings that a "patient monitor" need not capture every event. Dkt 2745 at 11

27 (barring testimony that a "patient monitor" requires "100% capture rate"); Dkt. 2790 at

28 3 (barring defining "patient monitor" as "a device that captures 'all medical events.'").

1    Apple also wrongly argues Madisetti's testimony "cannot be reconciled with the

2    intrinsic record" because the specification "states that the claimed invention 'cannot

3    afford to miss events.'" Br. at 15.  But, as the Court correctly held, "the specification

4    does not definitively say that the claimed 'patient monitor' … can never miss an event"

5    and "a 100% capture rate … is not supported by the intrinsic record." Dkt. 2745 at 11.

6    Apple argues Madisetti contradicted the testimony of "the patent inventor and all

7    the other engineering fact witnesses" on the meaning of "patient monitor." Br. at 15.

8    But that other testimony was consistent with Madisetti's.  *See, e.g.*, 11/6 AM (Al-Ali)

9    Tr. 131:24-132:1 (agreeing "design goal is to capture as many medical events as you

10   can"); 11/5 PM (Diab) Tr. 17:1-10 ("[W]hat you try to do as a designer for those devices

11   is to make it as good as you can….  So you want to minimize the false positive[s] and

12   maximize the true positive[s]."); 11/6 PM (Scruggs) Tr. 59:2-16.  Even Apple's COO

13   described the same design tradeoff to avoid false positives. Dkt. 2826-5 at 178:5-184:09.

14   Apple also asserts that Madisetti suggested infringement could be found even if

15   the Apple Watch was not a "patient monitor" by testifying "[y]ou have to look at the

16   entire claim." Br. at 15-16 (quoting 11/7 PM Tr. 97:3-9).  But Apple takes Madisetti's

17   testimony out of context.  Madisetti did not suggest ignoring the "patient monitor"

18   language.  Rather, he explained Apple was wrong to suggest a "patient monitor" "should

19   monitor for all types of medical events" because the claimed "patient monitor" need only

20   be configured to monitor *pulse rate*. 11/7 PM Tr. 95:24-97:24.  And Apple's own expert

21   provided nearly the same testimony it now complains of.  *Compare* Br. at 16:1-3 *with*

22   11/13 PM Tr. 77:18-21 ("you need to read the claim as a whole").

23   Similarly, Apple asserts Madisetti and Masimo attempted to read "patient

24   monitor" out of the claim by asserting it was "a device defined solely by the words that

25   follow it." Br. at 16.  Not so.  Madisetti and Masimo explained the vast evidence

26   showing the Apple Watch is what the limitation requires: "a patient monitor configured

27   to monitor at least a pulse rate of a patient." 11/7 AM Tr. 16:10-27:10, 48:2-61:23

28   (explaining evidence that the Watch is "a patient monitor as described in the preamble"

and "meets this limitation"); 11/14 AM Tr. 51:20-63:5; 11/14 PM Tr. 60:14-64:12 (detailing Masimo's "basis to say and prove that the [W]atch is a patient monitor"); *supra* §§I.A-B. Thus, Masimo never tried reading a "patient monitor" out of the claim.

Apple argues Masimo failed to consider that the Watch will not issue High/Low HR Notifications if a user is moving too much or the ████████ timer is triggered. Br. at 17. Masimo never ignored those attributes. It showed that the purpose of High/Low HR Notifications is to look for abnormal ***resting*** heart rate. Thus, foregoing notifications when the user is moving shows it works as intended. 11/7 AM Tr. 17:17-18:9, 23:8-18. Masimo also showed the feature will still issue notifications ████████████. 11/12 PM (Brouse) Tr. 43:24-44:18; JTX-6592 at -594 ████████████████ ████████████████████████████████████████████ ████████████ Further, Apple's witnesses confirmed that motion or a timer would merely prevent a ***notification*** from issuing. 11/13 AM Tr. 42:12-17, 46:5-8. But the claims do not require a notification. *Supra* §I.A.4. Instead, the claims recite that the "patient monitor" is "configured to monitor at least a pulse rate of a patient." And extensive evidence, including the testimony of Apple's own witnesses, showed the Apple Watch is configured to measure pulse rate every second. *See, e.g.*, *supra* §I.A.3.

Apple also alleges Masimo presented a "new and improper theory in closing" by arguing the "High/Low [Heart Rate] Notifications" feature is a "patient monitor" because it "looks for a condition called stationary discordance" (i.e., high heart rate while sedentary). Br. at 16-17. But, as described above, "stationary discordance" came from Apple's documents, and Apple also used the term to refer to the High/Low HR Notifications. *Supra* §I.A.3. Masimo has consistently accused this feature, including by reference to "stationary discordance." Dkt. 1957-6 (Masimo's May 2024 Infr. Contentions, Ex. 2) at 445 (citing Apple document stating ████████████ ████████████████████████████████; Dkt. 2550-1 ¶216 ████████████████ ████████████████████████████████████████████

1

2     ████████████████████████    Thus, Masimo's theory was not new.

3     Apple also incorrectly argues "Madisetti did not say a word about 'stationary

4     discordance' in his testimony."  Br. at 17.  Madisetti explained how Apple uses

5     "stationary discordance" in its documents.  *See, e.g.*, 11/7 AM Tr. 100:17-101:4

6

7     ██████████████    76:23-78:10 ████████████████████████

8     ██████████████    JTX-1539 at -120; JTX-6605 at -778-779.

9     Lastly, Apple argues Raja could have rebutted "the notion that 'stationary

10    discordance' is a medical term."  Br. at 17.  However, there was no such notion to rebut.

11    As explained, Apple itself used "stationary discordance" to refer to High/Low HR

12    Notifications and its detection of tachycardia and bradycardia.  *Supra* §I.A.3.  And

13    Apple's documents referred to tachycardia and bradycardia as medical conditions.  *Id.*

## II.    **The Court Should Deny Apple's Motion For A New Trial On Infringement**

### A.    **The Clear Weight Of The Evidence Supports the Verdict**

16    In a single conclusory paragraph, Apple repackages its JMOL arguments as a

17    reason for granting a new trial.  Br. at 19.  Apple's new-trial argument should thus be

18    rejected for the same reasons as its JMOL arguments.  *Supra* §§I.A-C.

### B.    **Apple's Jury-Instruction Arguments Should Be Rejected**

#### 1.    **The Court Correctly Declined to Construe "Patient Monitor"**

21    Apple incorrectly argues "this Court's failure to provide the jury with the Court's

22    interpretation of ['patient monitor'] was error" requiring a new trial.  Br. at 19-24.  The

23    Court's Scheduling Order set dates for a full *Markman* process with a May 2024 deadline

24    for the parties to identify terms for construction.  Dkt. 1944.  Apple did not seek a

25    construction of "patient monitor" during *Markman*, much less identify it as a

26    "significant" or "claim dispositive" term as required by Patent L. R. 4.3(c).

27    Apple also never sought a construction of "patient monitor" during expert

28    discovery, dispositive-motion briefing, or pre-trial briefing.  Instead, Apple repeatedly

-19-

advocated the plain and ordinary meaning applied. During expert discovery, all four of Apple's "expert" witnesses purportedly applied the plain and ordinary meaning. Dkt. 2548, Ex. 1 ¶ 31; *id.*, Ex. 2 ¶ 25; *id.*, Ex. 5 ¶ 137; *id.*, Ex. 10 at 70:25-71:9. During the MSJ and *Daubert* phase, Apple "maintain[ed] that the term has a plain meaning" and merely offered a construction in the alternative. Dkt. 2588 at 12. The Court's *Daubert* Order correctly found "[t]he parties agree these terms have their plain and ordinary meaning" to a POSITA. Dkt. 2745 at 9. Similarly, during the MIL phase, Apple emphasized that its experts "consistently applied the plain and ordinary meaning" of "patient monitor." Dkt. 2703 at 8-9. Thus, the Court's MIL Order explained "[t]he parties did not request construction" of that term and correctly held, at Apple's insistence, that "[p]lain and ordinary meaning applies." Dkt. 2790 at 3.

Apple now argues the Court's *Daubert* Order "was necessarily a construction" of "patient monitor." Br. at 21. Apple is wrong. The *Daubert* Order explained that "The Court did not construe" that term. Dkt. 2745 at 9. Rather, it was an evidentiary ruling about whether Apple's experts could testify about "patient monitor" in a manner inconsistent with the intrinsic record. *Id.* at 10-11. On reconsideration, the Court held its *Daubert* Order was not a construction "but rather resolved the limited issue of whether [Apple's experts'] testimony was appropriate." Dkt. 2790 at 3. The Court properly declined to instruct the jury about the meaning of that term.

Apple waited until the final pretrial conference—two weeks before trial—to ask the Court to instruct the jury on the meaning of "patient monitor." Dkt. 2760 at 7:4-13. The Court indicated it would not do so without the parties' agreement and explained "[t]here's a difference between" "constructions" the Court gave and "factual discussions" about the plain and ordinary meaning of "patient monitor." *Id.* at 7:23-8:5.

Apple then waited until November 9—mid-trial and after Masimo presented its fact witnesses and infringement expert—to file a brief asking the Court to construe "patient monitor." Dkt. 2814. Apple argued *O2 Micro* required a construction, and that there was an "urgent need" to construe the term because Madisetti (1) "refused to

acknowledge" the term is limiting and (2) "contradicted" the Court's rulings. *Id.* at 1, 9-10. Masimo's response detailed many reasons to deny Apple's untimely request, including that Madisetti gave no such testimony. Dkt. 2818. The Court again declined a formal construction in view of its holding that "patient monitor" has its "plain and ordinary meaning." 11/12 AM Tr. 5:20-6:3.

Apple now repeats the untimely argument from its mid-trial brief. Br. at 19-24. Apple's argument fails for the same reasons Masimo explained during trial. *See* Dkt. 2818. The Court's decision not to construe "patient monitor" was correct because (1) Apple's request for a construction was exceptionally untimely and not supported by good cause, (2) Apple repeatedly and successfully requested that the Court need not provide a formal instruction, because the term had a plain and ordinary meaning; (3) construing that term mid-trial would have been immensely prejudicial to Masimo, and (4) Federal Circuit precedent did not require construction. Dkt. 2818.

Apple continues to ignore that *O2 Micro* did not require courts to construe terms whenever a party asks. *O2 Micro* addresses claim construction disputes **timely** presented. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1357, 1361-62 (Fed. Cir. 2008). Subsequent Federal Circuit precedent confirms *O2 Micro* does **not** require construction where the request for construction was **untimely**.

In *Bettcher*, the district court refused to construe two terms because the defendant's request came more than a year after claim construction, and a request "on the eve of or during trial is too late." *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 635, 640-41 (Fed. Cir. 2011). The Federal Circuit affirmed and expressly rejected the argument "that not construing these terms violated *O2 Micro*." *Id.* at 640. The Federal Circuit also confirmed that where, as here, the defendant had "ample opportunity to seek [a] construction," the "district court did not abuse its discretion" in "declining to construe" terms on the eve of trial. *Id.* at 640-41.

Similarly, in *Wi-LAN*, the Federal Circuit held the district court did not abuse its discretion when it "used its case-management discretion to decline to find [a] new

-21-

construction barred." *Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1385 (Fed. Cir. 2016). The Federal Circuit explained "[w]e generally support a district court's case-management authority to set a schedule for claim construction that requires parties to take positions on various dates and holds the parties to these positions." *Id.* The Federal Circuit specifically noted it had elsewhere "upheld [a] district court's determination" to decline to consider a claim construction argument raised after the end of claim construction "because no good cause supported [the] change in position." *Id.*

None of Apple's cases hold otherwise. Instead, Apple cites cases where particular circumstances made a construction during trial appropriate. Br. at 19-20. In *Mobile Hi-Tech Wheels v. CIA Wheel Grp.*, 514 F. Supp. 2d 1172 (C.D. Cal. 2007), the court construed a design patent at "an early point in the trial," after opening statements and one witness testified. *Id.* at 1190. In denying defendant's request for a new trial, the court found no prejudice because it issued the construction before the defendant cross-examined all other witnesses and presented its own case. *Id.* In *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308 (Fed. Cir. 2010), the court refined a prior construction with a supplemental definition during trial. The court found the supplement was "early enough in the trial" (before defendant presented its case) that the defendant could "adjust its arguments." *Id.* at 1315-16. Apple's third case involved the unusual scenario where the parties agreed to forego a *Markman* hearing and instead have the court issue constructions at the close of evidence. *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005). Here, none of these circumstances apply. Apple waited until ***after*** Masimo's witnesses testified to seek a construction. And the parties had a full *Markman* process and never agreed to have claim construction decided at trial. Regardless, none of Apple's cases granted a new trial merely because a court declined one party's mid-trial request for a construction.

Here, Apple's request to construe "patient monitor" was exceptionally untimely because it came more than eighteen months after the Court-ordered deadline. Apple failed to show good cause for its untimely request because it had notice of the alleged

-22-

dispute at every step of this litigation and yet repeatedly told the Court the plain and ordinary meaning of "patient monitor" should apply. *See* Dkt. 2818 at 1-7. Construing the term in the middle of trial would have unfairly prejudiced Masimo. *Id.*

Apple now offers three reasons its mid-trial construction request was somehow timely or not prejudicial to Masimo. None have merit.

*First*, Apple argues it was unaware of a dispute about the meaning of "patient monitor" until receiving Madisetti's June 2025 reply report. Br. at 21-22. That assertion strains credulity. Apple has known since this case began that Masimo alleges the Watch is a "patient monitor." Apple had every opportunity to timely request a construction, and chose not to. Regardless, Apple never sought a construction of "patient monitor" after receiving the June reply report. Rather, as explained above, Apple maintained that the "plain and ordinary meaning" applied.

*Second*, Apple argues it filed its request once it "became clear" from Madisetti's testimony that "Masimo intended to depart from this Court's interpretation" of "patient monitor." Br. at 22-23. But as explained above, Apple misstates Madisetti's testimony. *Supra* §I.C. Madisetti followed this Court's rulings about "patient monitor." *Id.*; *see, e.g.*, 11/7 AM at 24:24-25:2, 30:4-9; 11/7 PM Tr. 65-66.

*Third*, Apple argues that its mid-trial request for a construction was not prejudicial to Masimo because "Masimo had a copy of Apple's proposed jury instruction by October 9." Br. at 23. But Apple's proposals were constantly evolving. Indeed, Apple changed its proposed interpretation at least *four* times:

| Date | Apple's Untimely Proposed Interpretation |
|---|---|
| 8/20/2025 | "Apple maintains that the term has a plain meaning" but in the alternative proposes "a monitor that allows a clinician to receive patient information without missing events." Dkt. 2588 at 12. |
| 11/4/2025 | "[A] device used on a person receiving care from a medical professional, that should not miss events." Dkt. 2792 at 1. |

| Date | Apple's Untimely Proposed Interpretation |
|------|------------------------------------------|
| 11/9/2025 | "A patient monitor is a device designed to capture important medical events while connected to a patient. In terms of performance, a patient monitor need not capture 100 percent of important medical events, but it must be designed not to miss important medical events." Dkt. 2814 at 1. |
| 12/23/2025 | "[T]he term 'patient monitor' at least requires a device that 'must perform at a level similar to a ['high performance'] clinical device in terms of event capture,' such that it 'must' try to capture all 'important medical events' (even if it misses some of them in practice)." Br. at 7. |

Masimo could not have prepared its case in response to Apple's ever-changing, untimely proposed constructions of "patient monitor."

Apple also argues a new trial is required because "Madisetti unilaterally informed the jury of the existence of this Court's interpretation of 'patient monitor' and asserted that he was 'fully abid[ing] by the Court construction." Br. at 20-21. But Madisetti was responding to **Apple's question** about whether his earlier opinion had "treated patient monitor as if it was merely a device that observes a person." 11/7 PM Tr. 66:10-15. Apple specifically inquired about an opinion given months before the Court's MSJ, *Daubert*, and MIL Orders. *Id.* Madisetti's response correctly explained "the Court has subsequently considered that issue and offered a ruling" that he followed. *Id.* Apple cannot reasonably complain when Madisetti answered its question.

Apple further argues a new trial is required because Madisetti and Masimo led the jury to believe that a "patient monitor" could have "no limiting meaning at all." Br. at 20-21. Apple again misstates the record. Madisetti and Masimo repeatedly and consistently treated "patient monitor" as a "limitation" and explained the abundant evidence showing the Apple Watch satisfies that limitation. *Supra* §I.C.

Apple also premises its request for a new trial on this Court "erring in its jury instructions as to the construction of a term central to the infringement dispute." Br. at 23 (cleaned up). But no such error occurred, as explained above. Rather, the Court never construed "patient monitor." And the Court was well within its case-management discretion in deciding to decline Apple's extremely untimely, mid-trial request.

-24-

1  *Bettcher*, 661 F.3d at 640-41; *Wi-LAN*, 830 F.3d at 1385. Masimo thus respectfully

2  submits that in denying Apple's motion, the Court should expressly find Apple requested

3  claim construction too late.

4    Apple also relies on its JMOL arguments to contend that because "no reasonable

5  jury could have found infringement under this Court's interpretation of 'patient

6  monitor,'" Masimo cannot show the only reasonable outcome for a properly instructed

7  jury would have been an infringement finding. Br. at 23-24 (citing *id.* at 6-17). Apple

8  is wrong again. Substantial evidence showed the Apple Watch is a "patient monitor"

9  consistent with the Court's rulings about that term. *Supra* §I. Infringement would have

10  therefore been the only reasonable outcome even if the Court had made an express

11  instruction of its "patient monitor" rulings. Thus, the Court's decision to decline Apple's

12  untimely request to construe "patient monitor" is no reason for a new trial.

13      **2.**  **The Jury Was Properly Instructed On DOE**

14    Before trial, the parties largely agreed on a proposed DOE instruction that closely

15  followed Fed. Cir. Bar. Assoc. Model Patent Jury Instruction 3.1c. Dkt. 2765 at 116-22

16  (Apple stating "[t]he parties' only dispute" on the DOE instruction is whether to use the

17  language "Accused Feature" or "Accused Products"). Then, mid-trial, Apple proposed

18  adding the following to the parties' previously agreed language:

19    Masimo must rely on specific testimony from an expert witness to provide

20    a meaningful explanation why the differences between the asserted claim

21    element and the Accused Features are insubstantial. Generally worded

22    expert testimony about the overall similarity between the claims and the

23    Accused Features will not suffice. The doctrine of equivalents cannot be

24    used to nullify or expand the language of a patent claim.

25  Dkt. 2817 at 59-60. The Court rejected Apple's additional language and adopted the

26  parties' largely agreed-upon instruction. Dkt. 2834 at 21.

27    Apple now argues "a new trial is required" because its additional language was

28  not adopted. Br. at 24-25. But "[l]itigants have no vested right to the court's wholesale

adoption of their proffered instructions, even if the instructions are supported by the evidence and accurately reflect the applicable law." 9 Moore's Federal Practice § 51.12 (2025); *see, e.g.*, *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 853-54 (Fed. Cir. 1991) (same principle); *FDIC v. Lugli*, 813 F.2d 1030, 1032 (9th Cir. 1987) (same principle). Thus, to obtain a new trial on this basis, Apple must show the Court's DOE instruction was both "erroneous" and "prejudicial." *Sulzer Textil A.G. v. Picanol N.V*, 358 F.3d 1356, 1364 (Fed. Cir. 2004). Apple cannot show either for several reasons.

**First**, Apple argues the DOE instruction was incomplete because it left the jury "unaware that Masimo's DOE theory could only rest on Dr. Madisetti's testimony." Br. at 24 (emphasis omitted). Apple insists this is a "crucial" point because Masimo's closing relied on a DOE theory "to which Dr. Madisetti had not testified." *Id.* But Masimo's closing repeated ***precisely the same DOE theory*** to which Madisetti testified. *Compare* 11/7 AM Tr. 85:6-86:19 *with* 11/14 AM Tr. 55:16-56:18; *supra* §I.B.1.

**Second**, Apple argues the instruction was incomplete because Madisetti did not provide a "meaningful" explanation linking the Apple Watch to a "patient monitor" under the DOE, and the jury was unaware of such a requirement. Br. at 24 (citing *id.* at 11-14). As discussed, Madisetti's testimony linked the Watch to a "patient monitor." *Supra* §I.B.2; 11/7 AM Tr. 85:6-86:19. Moreover, Apple's argument strains credulity because "patient monitor" was the sole limitation Apple disputed at trial.

**Third**, Apple argues the instruction was incomplete because Madisetti's DOE testimony somehow "vitiate[ed] the claim language" and "openly invited the jury to disregard the 'patient monitor' limitation entirely." Br. at 25. But vitiation is "***a legal conclusion*** of a lack of equivalence." *Bio-Rad Laby's, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1367 (Fed. Cir. 2020). The Court did not err in omitting a legal issue from the jury instruction. Regardless, as explained above, there was no vitiation. *Supra* §§I.B-C. Madisetti carefully treated "patient monitor" as a limitation and explained that if the Watch was not literally a "patient monitor," it was a "patient monitor" under the DOE. *See, e.g.*, 11/7 AM Tr. 86:1-6. Thus, addressing vitiation was unnecessary.

1   Apple also speculates it was prejudiced because Madisetti "potential[ly]"

2   suggested the jury could find DOE infringement by vitiating "patient monitor" from the

3   claims.  Br. at 25 (citing 11/7 PM Tr. 98-99).  As explained above, Madisetti did no such

4   thing.  *Supra* §§I.B-C.  And the Court's instruction reinforced that infringement under

5   the DOE cannot be found by disregarding a claim limitation because "***each element of***

6   ***a claim must be met*** by the accused products either literally or under the doctrine of

7   equivalents."  11/14 AM Tr. 35:22-24.  Masimo's closing also explained that even if the

8   Watch was not literally a patient monitor, it still infringed because it satisfied the

9   "***patient monitor limitation***" under the DOE.  11/14 AM Tr. 55-56.  Apple cannot show

10   prejudice by the exclusion of its proposed language from the final DOE instruction.

### 3.   The Court Correctly Excluded Apple's EMT and Physician

12   Before trial, the Court excluded Carter (an EMT) and Raja (a physician), who

13   Apple disclosed only as experts and Apple concedes are not POSITAs.  Dkt. 2745 at 9-

14   10; 10/20/25 Tr. 9-17; Dkt. 2790 at 8-9.  The Court correctly found that their disclosed

15   opinions address claim construction and infringement.[4]  *Id.*  The Court thus correctly

16   excluded Carter and Raja's opinions because non-POSITAs lack the specific experience

17   and skill to address claim construction and infringement.  *See, e.g., Kyocera Senco*

18   *Indus. Tools Inc. v. ITC*, 22 F.4th 1369, 1376-77 (Fed. Cir. 2022); *Extreme Networks,*

19   *Inc. v. Enterasys Networks, Inc.*, 395 F. App'x 709, 715 (Fed. Cir. 2010); *Flex-Rest, LLC*

20   *v. Steelcase, Inc.*, 455 F.3d 1351, 1360-61 (Fed. Cir. 2006).

21   Apple now complains the Court excluded Raja testimony about:  "(1) 'the discrete

22   medical/factual question of why Apple Watch's physiological sensing capabilities are

23   insufficient to make them 'patient monitors'" and "(2) the simple fact that the accused

24   High/Low Notifications do miss events and responses to Dr. Madisetti's

---

26   [4] Apple's Offer of Proof Re: Raja and Carter further demonstrates that Apple sought to
27   offer testimony regarding claim construction and infringement, as well as undisclosed
     fact testimony, in support of "legal matters like non-infringement and invalidity."  Dkt.
28   2799 at 3.  As this Court correctly held, such testimony "both interprets the term 'patient
     monitor' and applies that interpretation to the accused products."  Dkt. 2745 at 10.

1  characterizations of how clinicians view Apple Watch[.]" Br. at 25. The Court already

2  rejected these arguments. The Court explained that "[t]estimony as to why the Apple

3  Watch is not a patient monitor is claim construction and non-infringement testimony."

4  Dkt 2745 at 10. The Court continued, "[a]n opinion that the Apple Watch cannot be a

5  patient monitor due to insufficient physiological sensing capabilities both interprets the

6  term 'patient monitor' and applies that interpretation to the accused products." *Id.*

7      On reconsideration, the Court explained "Madisetti and Raja are not similarly

8  situated" because Apple did not dispute that Madisetti is a POSITA. Dkt. 2790 at 8.

9  "Because Raja is not a person having ordinary skill in the art, he cannot rebut Madisetti's

10 expert opinion on topics like the plain meaning of claim terms, infringement, and

11 invalidity." Dkt. 2790 at 8. The Court also addressed Apple's alleged evidentiary

12 imbalance in response to Madisetti, finding that Apple also disclosed Mercier to rebut

13 these same opinions. *Id.* at 8. Apple also employs an entire "team of doctors" that it

14 could have disclosed and called as fact witnesses. Dkt. 2826-10 (Hotelling) 165:12-

15 166:4, 168:10-169:1. But Apple did not do so, presumably because Apple's lead doctor

16 and VP of Health testified she *would* use the Apple Watch to monitor her patients' "heart

17 rate" at home and "in a clinic." Dkt. 2826-4 (Desai) 47:8-18.

18     Apple also complains about Madisetti's allegedly "unfounded medical assertions"

19 and, in particular, the phrase "stationary discordance." Br. at 27. Apple contends

20 Masimo invented that phrase "out of whole cloth." *Id.* But as discussed, that term came

21 from ***Apple's*** documents. *Supra* §I.C. And contrary to Apple's complaint, Madisetti

22 never asserted "stationary discordance" was a medical condition. Rather, he explained

23 the evidence showing High/Low HR Notifications was designed to monitor ***tachycardia***

24 and ***bradycardia***, which ample evidence showed are medical conditions. *Supra* §I.A.3.

25     **4.    The Court Correctly Permitted Masimo To Present Statements**

26         **From Medical Doctors**

27     Apple argues the Court's rulings permitting Masimo to enter doctors' statements

28 into evidence are "impossible to square" with this Court's ruling regarding Raja and

-28-

1   Carter.  Br. at 28.  Not so.  Apple sought to designate Carter and Raja as medical

2   professionals to opine on: (a) interpreting the patent specification, (b) the meaning of the

3   patent claim language "patient monitor," and (c) whether the Apple Watch infringes the

4   "patient monitor" limitations.  That alone distinguishes the admitted statements from the

5   Raja and Carter testimony that the Court excluded.

6           Regarding the experts who testified, both Madisetti and Apple's expert, Mercier,

7   presented their competing opinions about the same doctors' statements.  The jury was

8   free to consider those opinions.  Thus, contrary to Apple's assertion (Br. at 28-29), there

9   was no "evidentiary imbalance," much less an "extreme" one.  Moreover, regarding the

10  doctors' statements, Mercier testified that "***it doesn't really matter what other doctors***

11  ***say***.  You have to look at the actual operation of the device, including the firmware and

12  so on, to see how it actually works, to see if it actually operates like a patient monitor."

13  11/13 PM Tr. 79:2-6.  Apple cannot credibly complain that being unable to present

14  testimony from Raja and Carter somehow warrants a new trial when Apple's own expert

15  told the jury such statements "[don't] really matter."

16          Apple also argues the Court erred in its MIL ruling in finding the ITC statements

17  relevant under FRE 402 and 403.  Br. at 29.  But the Court correctly found that the

18  statements "describe the accused product, the Apple Watch."  Dkt. 2790 at 6.  Apple

19  also argues that "the statements focus on public health benefits from unaccused Apple

20  Watch features" and have "no bearing on whether the accused High/Low Notifications

21  operate as a 'patient monitor.'"  Br. at 29.  However, the statements specifically

22  emphasized tracking heart rate and the use of the Watch's heart-rate notifications.  *See*,

23  *e.g.*, 11/5 PM Tr. 7:11-17, 8:6-16; 11/7 AM Tr. 51:18-52:2; JTX-7566 ¶¶ 5-6

24  ("excluding Apple Watch with [high heart rate notifications] would have major negative

25  implications on public health in this country by greatly hindering patient care and/or

26  medical research in critical areas."); JTX-7561 ("high and low heart rate notifications

27  provide significant benefit to consumers in alerting them to potential cardiac

28

conditions"); JTX-7587 ("The Apple Watch has numerous features that make it valuable for healthcare purposes, including the ability to track heart rate …."). [5]

Apple argues that the doctors' letters were hearsay and should have been excluded. Br. at 29. The documents, however, were not mere doctors' letters. They are ITC public interest statements—which are short documents with similar themes—explaining views on how an import ban on the Apple Watch would affect public health or the public good. JTX-7561; JTX-7566; JTX-7587. The Court correctly held the statements were adopted admissions by Apple under FRE 801(d)(2)(B) and therefore not hearsay. *See*, *e.g.*, 11/4 AM Tr. 88:3-90:22; 11/4 PM Tr. 4:19-9:22; 12:6-10. Apple relied on the letters at the ITC to argue that physicians' use of the Apple Watch to monitor patients was critical. *See, e.g.*, Dkt. 2683, Ex. 1 at 39 (Apple's ITC brief relying on physician letters lauding accuracy, including for the "heart rate" feature at issue here). Apple further relied on the letters in response to a request from the ITC. *See*, *e.g.*, 11/5 AM Tr. 6:11-24 (quoting Apple's 6/5/2023 ITC response) ("'several public-interest submissions in this investigation have focused on the profound and well-documented health benefits of Apple Watch devices ….'"). And Apple again relied on the same letters at the Federal Circuit. *See, e.g.*, Dkt. 2683, Ex. 2 at 21-22. Therefore, the statements were adopted admissions.

Apple concedes that at least two of the three ITC statements—JTX-7566 and JTX-7587—were admissible as adopted admissions. Br. at 29. And Apple merely suggests that the third ITC letter, JTX-7561, should have been excluded as inadmissible hearsay because it "does not appear to have been referenced in Apple's ITC briefing." *Id*. But that takes an exceptionally narrow view of Apple's reliance on these public interest statements. If Apple means it did not quote the statement, it did rely on a more expansive "several public-interest submissions in this investigation," as explained above. And,

---

[5] Unlike these statements, the testimony from Masimo's former CEO that Apple raises again in comparison (Br. at 30) referred solely to the unaccused blood oxygen feature of the Apple Watch. *Infra* §II.C.1.

-30-

1  again, at trial, Apple did not object on this basis when JTX-7561 was introduced.  11/7

2  AM Tr. 51:13-14.  Indeed, Apple told the jury it was "incredibly proud" of the ITC

3  public interest statements and that Apple "love[s] to hear" about "physician statements

4  celebrating the benefits of Apple Watch."  11/5 AM Tr. 66:5-8, 69:3-15.

5         Regarding testimony about those statements, as the Court found, "expert

6  witnesses may rely on material that would otherwise be inadmissible so long as the

7  material is of the type that experts in the field would reasonably rely upon."  Dkt. 2790

8  at 9.  Apple now relies on the same quotation to argue that the statements were

9  independently inadmissible.  Br. at 28 (*citing* Dkt. 2790 at 9).  But that was not the

10  Court's finding.  Rather, the Court explained that even if, *arguendo*, public-interest

11  statements were inadmissible, Madisetti as a qualified technical expert would still be

12  able to rely upon those letters.  And Apple ignores that it presented responsive expert

13  testimony from Mercier regarding these statements.

14         Apple also raises multiple arguments about Marco Perez, M.D.'s testimony.  Br.

15  at 30-31.  Masimo called Perez by designation as an Apple witness testifying about a

16  single factual issue—Perez uses the Apple Watch in his clinical practice on his patients.

17         ***First***, Apple never argued Perez's deposition testimony was hearsay in pre-trial

18  briefing, in objecting to Masimo's deposition designations (Dkt. 2794 at 26-27), or at

19  trial.  Thus, Apple waived this hearsay objection and cannot raise it now.  *See*, *e.g.*,

20  *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996); 11 Wright & Miller,

21  Federal Practice & Procedure § 2805 (3d ed. 2002).

22         Further, Perez's testimony is not hearsay under FRE 801(d)(2)(B) because Apple

23  adopted it at trial.  Indeed, Apple had its expert Mercier confirm that Perez's testimony

24  was consistent with testimony from "Ms. Caldbeck of how Apple hopes doctors will

25  incorporate Apple Watch" into their practice.  11/13 PM Tr. 59:8-60:1.

26         Moreover, Apple cites a single case to argue Perez's testimony was hearsay.  Br.

27  at 30.  But that case confirms that even if testimony was hearsay, admitting it was not

28  error where, as here, the testimony was brief and another witness gave similar testimony.

*United States v. Copeland*, 291 F. App'x 94, 97 (9th Cir. 2008).  Indeed, Perez's testimony lasted just ***33 seconds***.  Dkt. 2826-3.  And Perez's testimony was similar to Desai's testimony that she would use the Watch to measure her patient's heart rate in a clinic, as well as Madisetti's testimony about the extensive evidence that the Watch's heart-rate features are used by patients and important to medical doctors.  *Supra* §I.A.1.

   ***Second***, Apple argues about witness availability.  Br. at 31.  But Apple ignores the Court's ruling that "expert deposition transcripts" from the Delaware case are available here.  Dkt. 1946 at 3.  Apple also argues Perez was a "non-testifying expert."  Br. at 30.  But Perez was not relied on as an expert here.  Apple further argues there was "no expert analysis when [Perez's deposition designations] were played," so the Court "could not assess" if the testimony's probative value outweighed any prejudice.  *Id* at 31.  Not so.  Madisetti expressly relied on Perez's testimony in presenting evidence to the jury supporting his opinion that the Watch is a "patient monitor."  11/7 AM Tr. 60.  He explained that Perez's testimony supports his opinion that Apple Watch is configured to monitor at least the pulse rate of patients.  *Id*.  Madisetti then played Perez's testimony.  *Id.*; PDX-3.41.  Thus, there was expert analysis about Perez's testimony.

   ***Third***, Apple faults Masimo for not making "an FRE 703 balancing argument."  Br. at 31.  But Apple never argued Perez's testimony was hearsay.  Apple also argues "Perez's testimony was not relevant because he was not addressing whether Apple Watch is a patient monitor within the meaning of the asserted patent."  *Id*.  But the Court correctly recognized the relevance of Perez's testimony to Masimo's infringement claims.  Dkt. 2745 at 19.  Perez testified that he uses the Watch to monitor his patients.

   ***Fourth***, Apple argues the testimony was unfairly prejudicial because Masimo did not call Perez live, and Apple had no other opportunity to put his passing statement in the proper context.  But Apple could have called Perez live.  And regardless, Apple's expert addressed Perez's testimony.  11/13 PM Tr. 58-60.

   ***Fifth***, Apple argues the Court erred by sustaining an objection to Apple's designation of some testimony that would have shown Perez's statement related to the

blood oxygen feature and not the accused feature.  Br. at 31 (referring to 43:2-22 and 44:2-12 of Perez's deposition transcript).  But that testimony showed that, in addition to using the Watch to measure patients' heart rate, Perez *also* uses the Watch to measure patients' blood oxygen.  Indeed, Perez unambiguously testified that he "*primarily*" uses the Watch to measure patients' heart rate.  Dkt. 2826-3 at 42.

### C.    Apple's Other Arguments Do Not Warrant A New Trial

#### 1.    Routine Evidentiary Rulings Do Not Warrant A New Trial

Apple argues this Court made "lopsided rulings on evidence related to unaccused Apple Watch features."  Br. at 32-33.  The Court did no such thing.  The Court consistently and correctly excluded testimony relating solely to the Apple Watch's *unaccused* blood oxygen feature, while admitting testimony relating to the Watch's *accused* heart rate (or pulse rate) functionality.

Apple faults the Court for excluding the testimony of Joe Kiani (Masimo's former CEO) that he does not view Apple products as patient monitors for purposes of continuously monitoring blood oxygen.  Dkt. 2822.  Apple argues that excluding that testimony "deprived Apple of a direct evidentiary response to Masimo's heavy reliance on testimony from Apple executives about the capabilities of the accused products."  Br. at 32.  But the excluded Kiani testimony pertained solely to the Watch's unaccused blood-oxygen feature.  Dkt. 2822.  Apple's attempt to mislead the jury with this testimony about oxygen saturation was improper.  Thus, the Court correctly excluded Kiani's testimony.

Apple next complains that the Court should not have admitted deposition testimony from Sumbul Desai, M.D. (Apple's VP of Health) because it pertained to the Watch's "unaccused" blood-oxygen feature.  Br. at 33.  But Apple omits that Desai's testimony addressed *accused* functionality too.  Indeed, Desai explained she would use the Apple Watch "to spot check a measurement of someone who is at home and is feeling unwell and wants to check their blood oxygen, *along with their heart rate*."  Dkt. 2826-4 at 47:08-18.  Thus, the Court correctly admitted the testimony because it relates to the

1  Watch's accused heart-rate functionality.  And consistent with its other rulings on this
2  issue, the Court correctly excluded other Desai testimony to the extent it related solely
3  to the unaccused blood-oxygen feature.  Dkt. 2806 at 10-13.

4          Apple accuses Masimo of "exploit[ing] these uneven rulings by leaving the jury
5  with the inaccurate impression that a medical doctor employed by Apple used Apple
6  Watch as a clinical grade device …." Br. at 33.  But as explained, there were no "uneven
7  rulings."   Further, there is nothing inaccurate about the impression left by Desai's
8  testimony.  Desai testified that, as a clinician, she would use the Apple Watch to monitor
9  patients' heart rates.  And the excluded Desai testimony (i.e., that she would not use the
10 Apple Watch "in a hospital" for "continuous pulse oximetry") does not negate the
11 admitted testimony that she would use the Watch to monitor patients' heart rates.

12         Accordingly, the Court correctly and consistently excluded testimony relating
13 solely to the Watch's unaccused blood oxygen feature and admitted testimony relating
14 to the Watch's accused heart-rate functionality.

15         **2.    There Was No "Undisclosed Infringement Theory"**

16         Apple argues that at trial, Madisetti advanced an "undisclosed infringement
17 theory" that a patient monitor should not be designed to capture every event because
18 such a design could result in too many false positives. Br. at 33-34.  Apple argues that
19 "[t]his Court erred by twice denying Apple's requests to strike the testimony outlining
20 this new theory." *Id.*  Apple is wrong for multiple reasons.

21         ***First***, Madisetti did not give a new "infringement theory."  Madisetti reiterated
22 his longstanding opinion that a "patient monitor" is not required to capture every event.
23 *Supra* §I.C.  Madisetti explained his opinion was consistent with testimony that the jury
24 had already heard from Al-Ali, who testified that trying to capture every event would
25 yield too many false positives.  11/7 AM Tr. 18-19, 26-27; 11/6 AM Tr. 49-61.  And
26 Apple's COO, Williams, gave similar testimony.  Dkt. 2826-5 at 178:5-184:09.

27         ***Second***, Apple accuses Masimo of trying to "bootstrap its way to a new
28 infringement theory during trial simply by eliciting new assertions from its own fact

witnesses **during direct examination** and then claiming its expert has a right to respond." Br. at 33-34.  But Madisetti was responding to material **raised by Apple during cross examination** of Al-Ali.  11/6 AM Tr. 49-61 (Apple cross-examining Al-Ali about page -335 of JTX-1270 plotting "True Alarm Detection" vs. "False Alarm Rate").  Al-Ali agreed **on cross** that "[n]o device is perfect" because patient monitors require a tradeoff between "sensitivity and specificity."  11/6 AM Tr. 53:18-21, 60:10-11.  Al-Ali further testified **on cross** that the Nellcor N-3000 device implemented such a tradeoff by "not reading during motion" (and thus potentially missing events during motion) because "the N-200, the previous generation … was giving the wrong values during motion."[6]  11/6 PM Tr. 7-14.  Madisetti later explained that Al-Ali's testimony about this tradeoff—testimony Apple elicited—was consistent with Madisetti's opinion that a patient monitor need not capture every event.  11/7 AM Tr. 18-19, 26-27.

**Third**, Apple cites no authority warranting a new trial.  Apple cites this Court's order (Dkt. 2226) striking portions of expert reports for untimely providing new opinions.  Br. at 34.  But as explained above, Madisetti did not provide a new opinion. Apple relies on *Magema Tech. LLC v. Phillips 66*, but there the Federal Circuit ordered a new trial because the defendant "reneged" by disclosing a new noninfringement theory on the eve of trial, "[d]espite its earlier assurances to the Magistrate Judge and [the plaintiff]" that it would not present that theory.  153 F.4th 1248 (Fed. Cir. 2025). Masimo never reneged on earlier assurances.  And in *Rembrandt Vision Techs. L.P. v. Johnson & Johnson Vision Care, Inc.*, the court struck an expert's testimony "that he had tested a stack of lenses that was 6 mm thick, not 2.54 mm as he had disclosed in his report" and that "the error in his report 'might be a typo.'"  725 F.3d 1377, 1379-80 (Fed. Cir. 2013).  Madisetti did not contradict his report.

---

[6] Apple argues Al-Ali's description of the Nellcor N-3000 "was flawed" because the user manual states "as long as continuous motion is detected, the N-3000 continues to search for the pulse."  Br. at 34, n.11.  But Al-Ali never testified the N-3000 ceases "to search for the pulse."  Rather, Al-Ali testified the N-3000 recognized "when there is motion" and "rejected" readings obtained during such motion.  11/6 PM Tr. 9:23-10:23.

1   **Fourth**, Apple argues the "prejudice to Apple was only further heightened by the

2 fact that Dr. Mercier was barred from fully responding to the N-3000 testimony." Br. at

3 34-35. But, contrary to Apple's assertion, Mercier fully responded to both Al-Ali's and

4 Madisetti's N-3000 testimony. 11/13 PM Tr. 31:16-33:12. The Court merely precluded

5 Mercier from testifying about a test he allegedly performed on the N-3000 the day before

6 he testified. 11/13 PM Tr. 33:13-22. The Court properly prohibited Mercier from

7 testifying about his alleged N-3000 testing because Apple never disclosed that testing to

8 Masimo. *See* Fed. R. Civ. P. 26(a)(2)(B).

9   Apple now claims it "disclosed the fact that Dr. Mercier tested the Nellcor device

10 during the normal evidentiary exchange **the night before Dr. Mercier's testimony**" and

11 Masimo's contrary objection to the Court was "misleading." Br. at 35. Not so. Apple

12 merely disclosed a single demonstrative slide with a picture of a Nellcor N-3000 (Ex. 1

13 at 4, 6), but **refused to disclose** the purpose of that slide or the testimony it would elicit

14 from Mercier about that device. And even if Apple had disclosed Mercier's testing "the

15 night before" he testified, that would have been remarkably untimely.

16   Apple also complains that "the exact same logic" preventing Mercier from

17 testifying about his undisclosed N-3000 testing "should have prohibited Dr. Madisetti

18 from testifying about the Nellcor device several days earlier." Br. at 35. But Madisetti

19 did not perform a last-minute test on the N-3000, nor fail to disclose such a test.

20 Madisetti explained how Al-Ali's testimony about the N-3000 (elicited by Apple) is

21 consistent with Madisetti's longstanding opinion that a patient monitor does not have to

22 capture every medical event, as discussed above. Mercier testified that he disagreed

23 with Madisetti's testimony based on the N-3000's operator's manual. 11/13 PM Tr.

24 31:22-33:12. In contrast to this testimony of both experts about the N-3000 generally,

25 the Court properly excluded Mercier's surprise testing because it was never disclosed

26 before he testified (much less in his report). *Id*. at 33:13-22.

27

28

### 3. <u>Mercier Was Properly Cross Examined On Warren's Opinion That A Computer Mouse Could Be A "Patient Monitor"</u>

Apple argues Masimo should not have been permitted to cross examine Mercier (Apple's non-infringement expert) about the opinion of Warren (Apple's invalidity expert) that a computer mouse could be a "patient monitor." Br. at 35. But Apple omits context. Warren's report discussed the "State of the Art" providing, among other things, opinions about computer mice. Dkt. 2549-1 ¶¶151-320. Mercier adopted those opinions "*as [his] own*." Dkt. 2548-5 ¶72. Mercier agreed at trial that Warren's "State of the Art" section "provided an accurate and helpful summary of the technology background of the state of the art." 11/13 PM Tr. 80:4-13. Moreover, Mercier testified that he and Warren shared "*the same opinion* on the plain and ordinary meaning of patient monitor." 11/13 PM Tr. 80:14-17. Because they share the same opinion about the plain and ordinary meaning of the term and Mercier adopted Warren's opinions, Masimo simply asked Mercier to confirm Warren's opinion that a computer mouse could be a "patient monitor." 11/13 PM Tr. 82:5-7. Masimo thus exposed a transparent inconsistency in how Mercier applied the term. That is hardly unfair, particularly when Apple criticized Madisetti for a similar reason, as Masimo's counsel identified. 11/7 PM Tr. 66:10-24.

Apple also argues the relevance of Masimo's questioning "was outweighed by the unfair prejudice and confusion caused by Masimo's attempts to further muddy the waters regarding the meaning of the dispositive claim term." Br. at 35. While Apple may dislike that Masimo exposed the inconsistency in how Mercier applied the term, doing so did not unfairly prejudice Apple. It was highly relevant in a way Apple regrets. And Apple bore that risk by having Mercier adopt and share "the same opinion" as Warren.

Apple also asserts Masimo's cross-examination of Mercier "violated" the parties' "agreement not to raise dropped claims in front of the jury." Br. at 35-36. But only *Apple* (and *Mercier*) mentioned "dropped claims." 11/13 PM Tr. 79:23-24, 82:8-10.

Accordingly, Masimo properly cross-examined Mercier about the "patient monitor" opinions he gave and adopted.

4. **Apple's Arguments About The Parties' 2012-2013 Interactions
Should Be Rejected**

Apple mischaracterizes the Court's MIL Order by claiming the Court broadly ruled that "the ***2012-2013 evidence*** was prejudicial because it 'suggests that Apple copied Masimo's products even though copying is no longer at issue in this case.'" Br. at 36 (citing Dkt. 2790 at 7). Rather, the Court was explaining Masimo could not use the 2012-13 interactions, Apple's benchmarking of Masimo's products, or that Apple hired Masimo's employees to show infringement. Dkt. 2790 at 7. The Court did, however, rule that the parties' 2012-13 interactions were relevant and therefore admissible to prove damages. *Id.* The Court thus allowed Masimo to present that type of evidence as long as it was previously disclosed in Bergman's expert report. *Id.* at 7-8 (precluding reference to Masimo's products but allowing evidence that Apple was interested in acquiring Masimo).

Apple argues "this Court's evidentiary rulings at trial did not remotely adhere to the careful lines drawn in the MIL order." Br. at 36. Apple also broadly and vaguely argues that the Court's evidentiary rulings allowed Masimo to "smuggle" in its Rover/Everest evidence the Court previously recognized was irrelevant and prejudicial. *Id.* at 36-37. But Apple does not contend Masimo presented any evidence about Apple benchmarking or tearing down Masimo's products or hiring Masimo's employees.

In fact, Apple does not explain why any specific evidence admitted by the Court was prejudicial or contradicted the Court's MIL ruling. Instead, Apple vaguely cites to Hotelling's and Perica's designated testimony, and argues that Bergman did not cite to Hotelling's testimony during Bergman's direct testimony. Br. at 37. But Bergman did refer to Perica's and Hotelling's testimony, as well as documents used during their testimony, when he explained that the parties' interactions in 2013 would have informed the hypothetical negotiation. 11/10 PM Tr. 43-46. Thus, the Court's evidentiary rulings give no basis for a new trial. *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (evidentiary rulings are entitled to broad discretion).

-38-

1    Finally, Apple baselessly contends that Masimo "leaned on the Everest/Rover
2  material in closing to imply that Apple had been interested enough in Masimo's
3  technology in 2012-2013 to copy it in 2017-2018." Br. at 37.  Masimo did no such thing.
4  Rather, Masimo merely explained how the events in 2012-2013 are relevant to the
5  hypothetical negotiation.  11/14 AM Tr. 70:5-10 ("[T]hey didn't try to acquire Masimo.
6  They didn't try to license.  But this just shows the interest.  It shows the interest in
7  medical technology.  It shows these markets converging, and it shows what would be in
8  the *heads of people at the hypothetical negotiation*.").  And both parties repeatedly
9  explained, in opening and closing, that Masimo did not allege Apple copied.  11/5 AM
10  Tr. 39:8-16,  61:3-11, 69:23-70:14; 11/14 PM Tr. 19:2-17.

**D.    The Verdict Must Be Upheld If Evidence Supports A Factual Theory**

12    Apple relies on a "general rule" for cases involving "two or more independent
13  legal theories" to argue the Court must order a new trial if it were to find a deficiency
14  with respect to "only one of Masimo's two infringement theories." Br. at 37-39.  But
15  Apple waived that argument by proposing a verdict form that included only one question
16  on infringement, rather than separate questions for literal and DOE infringement.
17  Dkt. 2767 at 19.  Thus, Apple cannot now raise that untimely argument.

18    Apple's argument also fails because Masimo did not present "two or more
19  independent legal theories."    Masimo presented just one legal theory (direct
20  infringement) based on *two alternative factual theories*—literal and DOE infringement.
21  Thus, "if sufficient evidence supports *one factual theory*" that Masimo presented (i.e.,
22  literal or DOE infringement), "the court must uphold the general verdict."  *PPC*
23  *Broadband, Inc. v. Corning Optical Commn's. RF, LLC*, 193 F. Supp. 3d 133, 140-41
24  (N.D.N.Y. 2016).  Indeed, the Federal Circuit has repeatedly explained "[it] will uphold"
25  a general verdict where "there was sufficient evidence to support *any* of the prevailing
26  party's alternative *factual theories*."  *Egenera, Inc. v. Cisco Systems, Inc.*, 141 F.4th
27  1350, 1362-63 (Fed. Cir. 2025) (cleaned up); *see, e.g.*, *Ericsson, Inc. v. D-Link Systems,*
28  *Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014) ("A general verdict will not be set aside

simply because the jury might have decided on a ground that was supported by insufficient evidence, but rather [the] jury verdict should be upheld if there is sufficient evidence to support ***any*** of the plaintiff's alternative ***factual theories***.") (cleaned up); *Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1312 (Fed. Cir. 2005) (similar).

Moreover, Apple fails to cite a single case finding a new trial was warranted on both literal and DOE infringement based on a flaw in only one of those factual theories. Br. at 37-39. And every case Apple cites is inapposite for the same reason, namely, they addressed a general verdict in a case involving independent legal theories, such as infringement and validity, or damages based on different accused products. In *WesternGeco LLC v. ION Geophysical Corp.*, a general verdict was set aside because the "jury could have rested its award on infringement of a now-invalidated claim." 913 F.3d 1067, 1073 (Fed. Cir. 2019). *Retractable Techs., Inc. v. Becton Dickinson and Co.* addressed whether a new trial on damages was required after infringement findings were reversed for one accused product but affirmed for a different accused product. 757 F.3d 1366, 1369-70 (Fed. Cir. 2014). *Syufy Enters. v. Am. Multicinema, Inc.* recognized courts' "discretion to construe a general verdict as attributable to another theory if it was supported by substantial evidence …." 793 F.2d 990, 1001 (9th Cir. 1986). *Syufy* also involved two different antitrust legal theories (monopolization and attempted monopolization) with "distinct" legal requirements. *Id.* at 997-1002 & n.9. And *Brett v. Union, Local 879* was a labor case that restated *Syufy* in deciding to not set aside the verdict. 828 F.2d 1409 (9th Cir. 1987). None of those scenarios applies here because again, Masimo presented alternative factual (not legal) theories, both of which were supported by substantial evidence, as explained above. *Supra* §§I.A-B.

Apple next turns to the Seventh Amendment, arguing that because the facts underlying Masimo's two infringement theories are so intertwined, a finding that one theory is factually deficient would require a new trial on all issues. Br. at 38-39. Again, however, Apple fails to cite a single case addressing literal infringement and DOE. In *Rembrandt Diagnostics, LP v. Alere, Inc.*, the Federal Circuit reversed the district court's

claim construction, requiring a new trial on infringement.  809 F. App'x 903, 911-12 (Fed. Cir. 2020).  The new trial also had to address validity because infringement and validity were "intertwined" and it would be an "injustice" to allow the plaintiff a chance to prove infringement under the new construction while preventing the defendant from trying to prove invalidity under that construction.  *Id.* at 912-13.  *Rembrandt* is thus inapposite because a new trial on one of Masimo's two infringement theories would still allow both parties to fairly present their evidence and argument on that issue.

## III.    The Court Should Deny Apple's Motion For JMOL Or A New Trial On Damages

Apple's argument turns the JMOL standard on its head.  Apple asks the Court to disregard Apple's contemporaneous documents and Masimo's expert testimony regarding Apple's next-best alternative.  Apple also asks the Court to credit Apple's testimony and draw inferences in Apple's favor.  Apple offers no basis for the Court to revisit the jury's factual findings.  And no new trial is warranted here because the damages award matches the evidence.  Masimo's survey expert did not speculate; she applied a survey method based on Nobel Prize-winning economics.  Thus, Apple provides no basis for a new trial.

### A.    Substantial Evidence Supports the Jury's Damages Verdict

Masimo's damages expert, Bergman, relied on Masimo's technical expert, Madisetti, and Masimo's survey expert, Dr. Reed-Arthurs.  Madisetti identified Apple's next-best alternative to the 2018 High/Low HR Notifications feature in the infringing watches.  11/7 AM Tr. 93:21-96:21.  Madisetti explained that Apple's noninfringing 2017 high-only HR feature, which operated in a low-power mode only, was unreliable.  Indeed, that feature had a high false-alarm rate that Apple deemed unacceptable.  *Id*.  Thus, Apple's next-best alternative to infringing was to track background heart rate without falsely alerting for a high heart rate.

Reed-Arthurs relied on those opinions to develop her survey.  11/10 AM Tr. 20:1-19.  She calculated consumer willingness to pay for the benefit Apple received from

infringing the '776 Patent.  11/10 AM Tr. 37:19-24.  Based on Madisetti's next-best alternative opinion, she explained Apple's benefit from infringing was "the ability to provide high/low heart rate notifications that confirm a change in resting heart rate."  *Id*.

Apple argues that "no reasonable jury could conclude Apple's 'next best alternative' to the accused features was ***no*** heart rate notification feature at all."  Br. at 41; *see also id.* (arguing "no reasonable jury could credit [the] opinion" that the unaccused 2017 feature had "'a serious issue that would make it unacceptable.'").  Numerous contemporaneous documents belie Apple's argument at trial and post-trial.

For example, in August and November 2017, shortly before and after Apple launched the 2017 high-only HR feature, Apple engineers called the false-alarm problem a "Serious Bug" and a "Priority 1–Showstopper."  11/13 AM Tr. 11:3-20; 24:25-25:4; 55:3-56:25; JTX-7659; JTX-7741.  And the problems continued.  Apple specified a 98% positive predictive value (PPV), which means false alarms must be less than 2%.  JTX-7069 at -596.  But in February 2018, Apple found as many as 8% of alarms were false when the alert threshold was set to 100 bpm.  JTX-7033 at -564.  Apple expected the false alarms would increase if the alarm threshold were set to the 120 bpm default.  *Id*.

Apple's concerns were confirmed.  An August 2018 presentation explained that at the 120 bpm default, the 2017 feature had a 35.9% PPV (i.e., nearly 64% false alarms).  11/13 AM Tr. 12:5-13:22; JTX-7674 at -481-82.  By contrast, the newer 2018 feature with a high-power confirmation step had a 100% PPV (i.e., 0% false alarms).  *Id.*

Based on Apple's contemporaneous documents, the jury could have determined that the 2017 feature was unacceptable and credited Reed-Arthurs's survey.

Apple nevertheless improperly urges the Court to weigh the evidence in its favor.  But when the Court draws all reasonable inferences in Masimo's favor, as it must, Apple's arguments fail.

Apple argues that it sold watches with the 2017 feature, that its engineers testified at trial that the 2017 feature was acceptable, and moving to the 2018 High/Low HR Notifications with the green LED escalation to eliminate false alarms "was a minor

-42-

'refinement to the feature.'" Br. at 42. Similarly, Apple argues it was aware of the flaws in the 2017 feature and shipped the product anyway. Br. at 43. But the Court cannot weigh Apple's self-serving trial testimony against the contemporaneous internal Apple documents contradicting that testimony. And the jury was not required to believe those flaws were minor merely because Apple shipped the product. The jury could have reasonably found that Apple shipped a substandard product while working on a solution.

Apple next argues that it was aware that heart-rate-doubling caused some false alarms in Summer 2017, before Apple launched the commercial version of its watch in September 2017. Br. at 42. But even if Apple believed it subsequently fixed the false-alarm problem by the time it launched in September 2017, Apple later learned the magnitude and severity of its accuracy problem. JTX-7674 at -481.

Apple also argues that Caldbeck was unaware of complaints about the 2017 feature and that Masimo's witnesses did not identify consumer complaints in their direct testimony. Br. at 43. Apple once again invites the Court to improperly weigh the evidence. Nothing required Masimo to present consumer complaints to demonstrate that the 2017 feature was unacceptable. Moreover, Apple ignores that it received several complaints about the 2017 feature. JTX-7741 at -670 (reporting four false alarms in a row shortly after going to bed); JTX-7111 at -730 (discussing five suspected false alerts); JTX-7707 (complaint on Apple website discussion board); JTX-7708 (same).

Besides arguing the Court should weigh evidence about the 2017 high-only HR feature, Apple argues Masimo did not value the difference between the infringing Watch and a watch using a much larger battery to avoid infringement. *Id.* But Apple ignores that such a watch would be unacceptably large. Apple and its customers highly valued Apple's thin industrial design. 11/10 PM Tr. 30:19-32:17; JTX-1811; JTX-7435; JTX-7690; JTX-7460; JTX-7352; JTX-4387; JTX-7472; JTX-368. The additional battery needed to retain accurate notifications by constantly operating green LEDs at a high duty cycle would have made the Watch two and a half times bigger, making it unacceptable to Apple and its customers. 11/7 PM Tr. (Madisetti) 6:9-8:19; 11/10 PM (Bergman) Tr.

1   21:7-18, 24:12-25:18, 26:24-27:19; Dkt. 2826-5 at 300:21-301:20 (Apple's COO: "you

2   [would] end up with something so big that 12 people would end up wearing it").

3          Apple also argues it provided the functionality for free in a software update for

4   older models. Br. at 44. But Apple presented no evidence that it charges its customers

5   a market rate for each improvement in its products. Instead, evidence shows "Apple and

6   almost any other software company [] provide software updates to existing customers

7   for free." 11/10 AM Tr. 55:15-19. Further, the jury could have found that even though

8   Apple did not charge for the update, it would have been costly for Apple not to update

9   previously sold watches. Apple could have severely damaged its reputation and exposed

10  itself to liability if it had left customers with a substandard product that suffered from an

11  unacceptable false-alarm problem.[7] 11/12 AM Tr. 27:2-15.

12         Finally, in a footnote, Apple argues the Court erroneously prevented Apple from

13  introducing evidence comparing Masimo's reasonable royalty to Apple's profits. Br. at

14  44 n.14. Apple waived this argument by not raising it under Rule 50(a). *See* Dkt. 2830-

15  1 at 15-18; *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485, n.5 (2008). Moreover, this

16  evidentiary ruling cannot be the basis for JMOL. Courts consider Rule 50(b) in light of

17  evidence presented at trial; evidence excluded from trial cannot provide a basis for

18  JMOL. *Sony Music Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222, 240 (4th Cir. 2024)

19  (JMOL analysis disregards evidence not presented at trial); *LNC Invs., Inc. v. First Fid.*

20  *Bank*, 126 F. Supp. 2d 778, 785 (S.D.N.Y. 2001) (evidence excluded from trial "can play

21  no part" in deciding JMOL). Further, the Court had previously sustained Apple's

22  objection that Masimo would violate the entire market value rule by introducing similar

23  evidence that Apple now seeks to rely on. 11/4 AM Tr. 80:14-86:2. The Court did not

24  abuse its discretion by consistently applying its ruling. 11/12 AM Tr. 40:15-41:22.

25  _____

26  [7] Apple argues that it did not charge an incremental price for watches that included the
    2018 notifications feature. Br. at 44. But Apple cites no authority preventing a patent

27  holder from recovering a royalty unless the infringer charges a specific amount for the

28  relevant component of the accused product.

1    For these reasons, Apple has failed to show that a reasonable juror had no option

2    other than to find Masimo was entitled to nothing more than nominal damages.

3    **B.    The Court Should Deny Apple's Motion For A New Trial On**

4    **Damages**

5    **1.    The Clear Weight Of The Evidence Supports The Verdict**

6    Apple fails to show manifest injustice, abuse of the jury's function, or that the

7    verdict is contrary to the clear weight of the evidence, as required to justify a new trial

8    on damages. *See Silver Sage*, 251 F.3d at 819. Apple instead repeats its JMOL argument

9    that Masimo's experts failed to consider the value of the 2017 high-only HR feature. Br.

10   at 45. But as explained above, Masimo considered that the 2017 feature was riddled

11   with false alarms and was not a viable alternative to the 2018 feature that caused the

12   Watch to infringe. *Supra* §III.A. Thus, a watch having only a background heart-rate

13   feature with no notification was the next-best alternative. 11/10 AM Tr. 18:7-19:16.

14   Apple argues it could have made a watch with a much larger battery that could include

15   a reliable notification feature. Br. at 45. But as also explained above, such a watch

16   would have been so large that it would have been commercially unviable. *Supra* §III.A.

17   **2.    The Court Properly Denied Apple's *Daubert* Motion on**

18   **Dr. Reed-Arthurs' and Bergman's Testimony**

19   Apple again argues about the acceptability of the 2017 feature. Br. at 45-46. In

20   doing so, Apple asks the Court to revisit Apple's *Daubert* motion (Dkt. 2551) on that

21   very issue. Br. at 45. But as the Court correctly held when denying Apple's *Daubert*

22   motion, the acceptability of the 2017 feature is a question of fact. Dkt. 2745 at 25-26.

23   And as explained above, ample evidence shows the 2017 feature was plagued by false

24   alarms and was not a viable alternative to the infringing 2018 feature. *Supra* §III.A.

25   Apple also repeats its *Daubert* motion's argument that Reed-Arthurs's description

26   of the 2018 feature "was so expansive as to sweep in both the unaccused 2017 feature

27   and accused High/Low Notifications." Br. at. 46 (citing Dkt. 2551 at 10). Apple is

28   wrong. Apple's 2017 feature lacked a confirmation step, as required in Reed-Arthurs's

-45-

feature description.  11/7 AM Tr. 44:3-45:1; 73:20-74:8; 100:6-9; 11/7 PM Tr. 47:2-5. Apple's 2017 feature also lacked low-heart-rate notifications, as required in Reed-Arthurs's feature description.  11/7 AM Tr. 94:8-16.  Moreover, the 2017 feature could not reliably provide high-heart-rate notifications, and even Apple found it unacceptable. JTX-7033 at -564; JTX-7111 at -737; JTX-7125 at -874; JTX-7674 at -481; JTX-7659 at -214; JTX-7741 at -670, -672; 11/7 AM Tr. 95:20-98:10.  Reed-Arthurs's description inherently stated the feature was reliable and not riddled with false alarms, because the survey stated notifications are only sent "if the watch confirms you're your heart rate is above or below expected boundaries...."  11/10 AM Tr. 18:17-19:5.  Therefore, the survey description did not ensnare the 2017 feature.

### 3.    The Court Properly Instructed The Jury On Damages

The Court properly instructed the jury that Masimo was entitled to at least a reasonable royalty and that Masimo bore the burden of proof by a preponderance of the evidence.  Dkt. 2834 at 22-23.  The Court's instructions mirrored the model jury instructions and Apple's cited precedent.  *See, e.g.*, Fed. Cir. Bar Assoc. Model Instruction 5.5 ("If you find that a patent claim is infringed ... , [patent holder] is entitled to at least a reasonable royalty ....."); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1328 (Fed. Cir. 2014) (stating that even when "the record evidence does not fully support either party's royalty estimate, the fact finder ***must still determine*** what constitutes a reasonable royalty from the record evidence").  An additional instruction on nominal damages was unnecessary and would have only confused the jury.

The parties and the Court eliminated any doubt that the jury knew Masimo's burden, because it was repeated on the verdict form: "What is the total reasonable royalty (in dollars) that Masimo has proven by a preponderance of the evidence should be awarded for Apple's infringement?"  Dkt. 2838 (Jury Verdict) at 2.  The jury's award thus confirms that it found Masimo had proven a reasonable royalty of $634 million.

Apple cites no authority requiring a nominal-damages instruction.  Instead, Apple's cases merely evaluated whether any evidence supported a damages award.  *Rex*,

156 F.4th at 1299 (after exclusion of its expert, patentee "presented no evidence that would allow the jury to overcome the deficiencies in [the] excluded expert opinion"); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) (patentee "presented no evidence of damages"); *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015) (reversing summary judgment of no damages where "[t]here was other record evidence … for determining a reasonable royalty, even after" expert exclusion); *Apple v. Motorola*, 757 F.3d at 1327 (reversing summary judgment of no damages because "a finding that a royalty estimate may suffer from factual flaws does not, by itself, support the legal conclusion that zero is a reasonable royalty"). These cases are inapposite. Masimo provided substantial evidence, including expert testimony, documents, and Apple's sales data, supporting its reasonable royalty.

Apple argues the Court should have instructed the jury on nominal damages as it did in *SPEX*. But when the Court instructed the jury in *SPEX*, it had already excluded the patentee's damages expert entirely and granted a Rule 50(a) motion eliminating a comparable license theory. *SPEX Techs., Inc. v. Western Digital Corp.*, No. 8:16-cv-01799, Dkt. 651 at 2 (June 16, 2025). That unique situation is not relevant here, where the Court denied Apple's motion to exclude Masimo's damages testimony and held it presented a factual issue for the jury. Dkt. 2745 at 25. Nevertheless, and without support, Apple suggests the Court was poised to instruct on nominal damages until it credited Masimo's argument raised "orally at an off-the record charge conference." If Apple disagreed, it should have expressed its disagreement on the record.

Lastly, Apple assumes the jury's award at the low end of the damages range means the jury "implicitly recognized" a weakness in Masimo's damages case. Br. at 47. Nothing supports that assumption. Evidence showed that any number within Masimo's range would be reasonable (11/7 AM Tr. 71:16-72:5), and the jury found Masimo proved $634 million. Dkt. 2838 at 2. Apple complains "there was no other damages evidence the jury could have relied upon" (Br. at 47), but that is a situation of Apple's making. Apple chose not to present its own damages expert, who had opined on a reasonable

1  royalty.  Apple's decision not to call an expert cannot require the Court to instruct the
2  jury on nominal damages.  Holding otherwise would incentivize accused infringers to
3  withhold their own damages expert in exchange for a nominal damages instruction.

### 4.    The Court Did Not Err In Admitting Customer Complaints

5      When Apple cross-examined Bergman, it represented that not one single
6  consumer had ever complained about the 2017 high-only HR feature:

Q.    Sir, how many consumer complaints did Apple receive about the 2017
        version of heart rate notification?

A.    I don't know as I sit here.

Q.    Sir, would it surprise you if the answer is zero?

A.    It would considering that I have seen Apple employees say that they
        themselves were complaining that they were getting double heart rate, so
        they are consumers of their own products.

14  11/12 AM Tr. 27:25-28:7.  Apple's counsel then implied that Bergman's testimony was
15  somehow insufficient: "You haven't provided this jury with a single example of anyone
16  complaining about the 2017 version?  You haven't shown them a document or testimony
17  to that effect, correct?" 11/12 Tr AM 28:8-11.  These questions misrepresented Apple's
18  own website and attacked Bergman's credibility.   Introducing example customer
19  discussions from Apple's own website, JTX-7707 and -7708, became necessary to
20  respond to Apple's false implication.   None of Apple's arguments about the
21  admissibility of JTX-7707 and -7708 support its request for a new trial on damages.

22      Apple's remaining arguments are also baseless.  First, Apple argues that admitting
23  the exhibits violated Federal Rule of Evidence 901(a).  But, consistent with Fed. R.
24  Evid. 901(b)(4), Bergman authenticated both exhibits, printouts from Apple's website,
25  by testifying about their appearance, contents, and distinctive characteristics, including
26  their URLs.  11/12 AM Tr. 63:3-12, 64:5-7, 65:25-66:3, 66:4-21.  Apple cites no cases
27  requiring more authentication.  Apple also never challenged the exhibits' authenticity
28  during its own witnesses' testimony.  Moreover, the Court's ruling admitting the exhibits

is entitled to broad discretion. *Sprint/United*, 552 U.S. at 384. This is especially the case when a party "opens the door," as Apple did here, leaving it to Masimo to correct the record. *See, e.g.*, *Byrd v. Maricopa County Sheriff's Dep't*, 629 F.3d 1135, 1147 n.10 (9th Cir. 2011) (no abuse of discretion in admitting evidence where party "opened the door" during cross-examination); *Bowoto v. Chevron Corp.*, 621 F.3d 1116 (9th Cir. 2010) (no abuse of discretion in admitting evidence where party opened the door during opening statement).

Apple also argues Bergman's testimony about the consumer complaints was an untimely new opinion. Br. at 48. But correcting the record during redirect does not constitute a new opinion. 11/12 AM Tr. 67:21-68:1. Bergman fully disclosed his opinion about the 2017 feature and confirmed these exhibits were consistent with his opinion on the viability of the 2017 feature. 11/12 AM Tr. 65:17-21. The parties disputed whether the 2017 high-only HR feature was acceptable throughout the case, and Mr. Bergman has always understood that the 2017 feature was not a viable alternative. 11/12 PM Tr. 23:11-22, 11/12 AM Tr. at 27:2-9, 69:10-21.

Apple argues Masimo violated the pretrial order and Local Rules. Br. 48. But in the Final Pretrial Order, the parties stipulated that "[f]or *direct examination* of non-adverse witnesses, each side will identify exhibits that will be offered into evidence …." Dkt. 2748 § 14(g)(ii). Local Rule 16-6.1 addresses the compilation of the joint exhibit list. Neither prohibits a party from correcting the record on redirect in response to a misleading question during cross-examination.

Apple alleges Masimo attempted to fill a gap in Bergman's testimony. Br. 49. But Bergman testified extensively on direct why he understood the 2017 high-only HR feature was unacceptable. 11/10 PM Tr. 23:11-22. He supported that opinion with Apple's own documents and Madisetti's testimony. *Id.* at 23:11-22; 11/12 AM

1    (Bergman) Tr. 27:2-9, 69:10-21; *see also* 11/7 AM (Madisetti) Tr. at 94:11-13, 95:5-9,

2    95:20-97:2, 97:10-23.  There was no gap to fill.[8]

3         Finally, Apple complains that Masimo's use of these exhibits "suggest[ed] that

4    Apple and its counsel deliberately misled the jury."  Br. 49.  Apple's counsel did just

5    that by implying Apple received ***no*** consumer complaints.  11/12 AM Tr. 27:25-28:7.

6    Masimo corrected the record.  If the jury then drew conclusions about Apple and its

7    counsel's credibility, it was free to do so.

8                                **CONCLUSION**

9         For the foregoing reasons, JMOL or a new trial on any issues are unwarranted and

10   Apple's motion should be denied in full.

11

12                                        Respectfully submitted,

13                                        KNOBBE, MARTENS, OLSON & BEAR, LLP

14

15   Dated:  January 23, 2026              By: */s/ Douglas B. Wentzel*
16                                             Joseph R. Re
                                               Stephen C. Jensen
17                                             Sheila N. Swaroop
                                               Brian C. Horne
18                                             Brian C. Claassen
                                               Mark D. Kachner
19                                             Adam B. Powell
                                               Kendall M. Loebbaka
20                                             Daniel P. Hughes
                                               Douglas B. Wentzel
21

22                                        Attorneys for Plaintiffs
                                          MASIMO CORPORATION and
23                                        CERCACOR LABORATORIES, INC.

24

25

26   _____
     [8] Apple did not object to the jury learning of JTX-7707 generally: its counsel stated that
27   Masimo would have the opportunity to cross-examine Apple's witnesses on that
     document.  11/12 AM Tr. 64:14-16.
28

                                        -50-

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs' Masimo Corp. and Cercacor
Laboratories, Inc., certifies that this brief contains 50 pages, which:

＿ complies with the word limit of L.R. 11-6.1.

 X complies with the page limit set by court order dated November 19, 2025.


Dated: January 23, 2026                    By: /s/ Douglas B. Wentzel
                                              Joseph R. Re
                                              Stephen C. Jensen
                                              Sheila N. Swaroop
                                              Brian C. Horne
                                              Brian C. Claassen
                                              Mark D. Kachner
                                              Adam B. Powell
                                              Kendall M. Loebbaka
                                              Daniel P. Hughes
                                              Douglas B. Wentzel

                                              Attorneys for Plaintiffs
                                              MASIMO CORPORATION and
                                              CERCACOR LABORATORIES, INC.