UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION - SANTA ANA

| | |
|---|---|
| MASIMO CORPORATION, et al.,<br>Plaintiffs,<br>v.<br>APPLE INC.,<br>Defendant. | Case No. SACV 20-48-JVS (JDEx)<br>Santa Ana, California<br>Monday, March 9, 2026<br>2:14 P.M. to 3:30 P.M. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES V. SELNA
UNITED STATES DISTRICT JUDGE

Appearances: See Page 2

Deputy Clerk: Elsa Vargas

Court Reporter: Recorded; CourtSmart

Transcription Service: JAMS Certified Transcription
16000 Ventura Boulevard #1010
Encino, California 91436
(661) 609-4528

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiffs:

Knobbe, Martens, Olson and Bear, LLP
By: BRIAN C. HORNE
MARK D. KACHNER
1925 Century Park East, Suite 600
Los Angeles, California 90067
(310) 551-3450
brian.horne@knobbe.com
mark.kachner@knobbe.com

Knobbe, Martens, Olson and Bear, LLP
By: BRIAN C. CLAASSEN
SHEILA N. SWAROOP
JOSEPH R. RE
STEPHEN C. JENSEN
DOUGLAS B. WENTZEL
2040 Main Street, 14th Floor
Irvine, California 92614
(949) 760-0404
brian.claassen@knobbe.com
sheila.swaroop@knobbe.com
joseph.re@knobbe.com
steve.jensen@knobbe.com
douglas.wentzel@knobee.com

For the Defendant:

Wilmer Cutler Pickering Hale and Dorr LLP
By: MARK D. SELWYN
THOMAS G. SPRANKLING
2600 El Camino Real, Suite 400
Palo Alto, California 94306
(650) 858-6000
mark.selwyn@wilmerhale.com
thomas.sprankling@wilmerhale.com

Wilmer Cutler Pickering Hale and Dorr LLP
By: JOSEPH J. MUELLER
SARAH R. FRAZIER
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
Joseph.mueller@wilmerhale.com
sarah.frazier@wilmerhale.com

Haynes and Boone, LLP
By: KENNETH G. PARKER
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
(949) 202-3014
ken.parker@haynesboone.com

SANTA ANA, CALIFORNIA, MONDAY, MARCH 9, 2026, 2:14 P.M.

(Call to Order of the Court.)

THE CLERK: Calling item five, SACV 20-48, *Masimo Corporation, et al. v. Apple Inc.*

Counsel, please state your appearances for the record.

BRIAN C. HORNE: Good afternoon, Your Honor. Brian Horne from Knobbe Martens for Masimo.

THE COURT: Good afternoon.

MR. HORNE: Good afternoon. Joined today by my partners Brian Claassen, Sheila Swaroop, and Joseph Re.

THE COURT: Good afternoon. Does anyone else want to make an appearance?

MR. HORNE: Mr. Jensen, Mr. Mark Kachner, and Douglas Wentzel all from Knobbe Martens as well.

THE COURT: Very good. Good afternoon, all.

Mr. Mueller?

JOSEPH J. MUELLER: Good afternoon, Your Honor. Joe Mueller, Wilmer Hale, on behalf of Apple. With me are Sarah Frazier, Mark Selwyn, Tom Sprankling, and Ken Parker, our co-counsel from Haynes and Boone. Also, Natalie Post from Apple is here as well, Your Honor.

THE COURT: Very good. Welcome. Good afternoon.

All right. I think I'd like to begin with Apple.

Mr. Mueller?

MR. MUELLER: Yes, Your Honor. Thank you.

We, on the tentative, Your Honor, would like to raise three categories of issues. With Your Honor's permission, I'll address the first category, which relates to claim construction; Mr. Selwyn, will address doctrine of equivalents; and Ms. Frazier will address some damages issues relating to the next-best alternative set of issues and the role of certain evidence that was admitted in terms of consumer complaints. So with Your Honor's permission, we'd divide it into those three categories.

THE COURT: That's fine.

MR. MUELLER: And, Your Honor, may I hand up some slides?

(Pause.)

THE COURT: Pardon my sneezing. It's the Santa Ana winds and everything it brings with it.

Okay. Mr. Mueller?

MR. MUELLER: May I proceed, Your Honor?

THE COURT: You may.

MR. MUELLER: With respect to the claim construction issues, of course, we've discussed these with Your Honor previously, and I won't retread all of the ground that we covered before, but we do think that the tentative order, respectfully, is in error in a couple key respects that we think do go to the heart of the issues in the case,

and I'll try to synopsize those as quickly as I can.

If Your Honor were to look at Slide 2 in the deck that I handed up, right after the cover page, these are excerpts from Your Honor's rulings at summary judgment and on the motions in limine, and of course you've seen this language before, but Your Honor found, by way of example, that the claimed "patient monitor" generally should not miss events, and Your Honor found that the "patient monitor" must capture important medical events and must perform at a level similar to a clinical device in terms of event capture, and we believe Your Honor was exactly correct in each of these rulings.

Those rulings were made on the basis of the intrinsic evidence, the patent specification, the prosecution history. These were, in substance, claim-construction rulings that dealt with the scope of the term "patient monitor" and what that term means. And although Your Honor did not style those decisions as formal *Markman* rulings, they were, in substance, determinations as to claim scope, and we believe they were correct. Again, to be clear, we think those rulings were correct in Your Honor's interpretation of the intrinsic evidence and the meaning of the claim language.

At trial and before trial, we requested that that guidance be given to the jury, and whether you call it "guidance" or a "ruling" or "construction," it goes to what

those -- the term "patient monitor" means, and that was critical to the trial in terms of the dispute on noninfringement. And if Your Honor were to go to Slide 3, we believe that if "patient monitor" is treated in accord with Your Honor's rulings -- Your Honor's correct rulings as to what that term means, the scope of that term, there's just no basis in the record to find infringement and we believe were entitled to JMOL, and the reason why is quite simple.

Apple Watch doesn't capture important medical events -- huge swaths of important medical events, and Your Honor heard the evidence. There's several reasons for that. One is the relevant functionality is inoperative when the device is in motion, and so there's, of course, a litany of medical events -- important medical events that can occur when a user is in motion. Those are not captured. And it's not once in a while. Your Honor at one point said there doesn't need to be 100 percent event capture, and there's nothing in the record that would suggest that the Apple Watch captures something close to but not quite 100 percent. It doesn't capture anywhere close to 100 percent. There's huge portions of every day of an Apple Watch user's day-to-day life for which medical events will not be captured.

And it's simply not intended to be that type of device. As Your Honor heard at trial, including from the engineers who helped to design the watch, the watch is

designed to be accurate when certain information is available. When opportunistically the device can leverage the availability of the relevant information, it will report that information. It is not intended or designed nor does it function in any form or fashion as a clinical, ongoing monitoring device.

THE COURT: Well, let's talk about intent and design. Does intent and design affect the Court's conclusions when the Court looks at what it does versus what's in the claim?

MR. MUELLER: I'd say two things -- I'm sorry, Your Honor.

THE COURT: Go ahead.

MR. MUELLER: Yeah. I'd say two things on that. One is I think the intent does provide context for how it functions understanding how the engineers created and developed it --

THE COURT: It functions however it functions.

MR. MUELLER: Well, it functions however it functions, but it gives us background on the research and development process.

The second point I'll note, Your Honor --

THE COURT: But if it functions in a manner that, at least arguably, violates the claim in the patent, isn't the intent or design objective of the Apple engineer

irrelevant?

MR. MUELLER: Well, I'd say two things, Your Honor. Number one, you may recall from the charge conference, when the issue of whether design was relevant, Masimo acceded to the instruction of the jury that design could be relevant.

But the second point I'd say is this, Your Honor: Even if you set design or intent aside, it doesn't function in that manner. Even if you set state of mind, even if you set how the engineers aspired for this device to work -- set it all to the side, it doesn't function like a "patient monitor" without regard to design. It doesn't capture important medical events in a variety of scenarios. It doesn't -- because it was designed not to do that, but as a matter of function, it misses important medical events -- large swaths of important medical events and therefore is not a "patient monitor." The patent specification talks about the importance of not missing medical events.

Your Honor, in the rulings I just showed you the excerpts of, recognized the criticality of capturing important medical events for a "patient monitor." It is the sine qua non of a "patient monitor" to capture important medical events, and Apple Watch just doesn't do that. It will in certain occasions capture medical events but not at the level of a clinical device, and that's precisely what Your Honor said was required.

So as a matter of just the record that was presented to the jury, if that is weighed against the scope of the term "patient monitor" as Your Honor interpreted it before trial, there's just no evidence that any reasonable juror could find that the scope Your Honor determined before trial is met. At a minimum, as we see on this slide, a new trial is required because the jury never had that scope.

But we actually don't even think a new trial is required because judgment should enter as a matter of law. There's just no evidence that the Apple Watch captures medical events at the level of a clinical device. It just doesn't. It wasn't designed to. It doesn't function in that way. When in movement, events are missed. When the blackout timer is in effect for a half-hour period, every event is missed in that half-hour period, and on and on. Will it occasionally provide information that's useful for identifying medical events? Absolutely, and Apple is very proud of that, but it's not a "patient monitor."

A "patient monitor" has a higher level of performance for event capture, and the level of performance for event capture required of a true "patient monitor," as Your Honor found before trial, is greater than opportunistically identifying medical events on occasion. It requires something much more stringent, something much more close to, if not at, 100 percent event capture, and the

Apple Watch isn't anywhere close to that. It doesn't function in that way. It's not designed in that way. No matter how you look at it, under a actual true meaning of "patient monitor," it is not that.

And, Your Honor, the problems are compounded by what happened at trial with respect to the presentation made by Masimo, and if we turn to Slide 4, here is a slide excerpting testimony of Dr. Madisetti (reading):

Question: And you would also agree with me that "patient monitors" are designed to capture important medical events, not to miss important medical events; true?

Answer: I would disagree. I would disagree.

And he went on to give an example -- which Your Honor heard evidence about this Nellcor N-3000 device, a patient monitor from the early 2000s, and Dr. Madisetti was attempting to say that that was a device that would miss medical events. Well, there's two problems with that. Number one, the patent and the intrinsic record says nothing about this device. Number two, it turned out it does measure during motion, contrary to what Dr. Madisetti said in this excerpt.

But the key point is he's disagreeing with what Your Honor said before trial with respect to the scope of the claims, and he couldn't have been any more clear about that.

If we turn to Slide 5, I asked him again (reading):

Do you agree with what I just said, sir? I'll say it one more time. Do you agree that a "patient monitor" must capture important medical events like oxygen desaturation and must perform at a level similar to a clinical device in terms of event capture? Agree or disagree?

I would disagree with respect to the "must."

And he's saying by characterizing that as a requirement, as a "must," that that was contrary to his interpretation of "patient monitor." Well, that's what Your Honor said, and you were right to say it. So he was disagreeing with you and with the patent and with the intrinsic evidence, and so he was contravening the actual scope of the claim term, and that was prejudicial to us because the jury never had the correct scope of the claim term as Your Honor had defined it in your pretrial rulings.

And if we go to the next slide, Slide 6, this is one of the excerpts from the first slide, but this, when juxtaposed with the testimony that we just looked at, shows the problem. Your Honor found a "patient monitor" "must" capture important medical events and "must" perform at a level similar to a clinical device in terms of event capture. On the previous page, Dr. Madisetti said (reading): I would disagree with respect to the "must."

He disagreed with Your Honor, and he disagreed with the intrinsic evidence because Your Honor was right to say it. You were right to say what you said in the pretrial rulings. We wanted the jury to have that. We asked for it before trial, we asked for it during trial, and the reason why we asked for it is we knew what was coming in terms of their presentation and Dr. Madisetti. In fact, this came to a head during expert discovery when we realized how far Dr. Madisetti was going to water down the definition. In fact, at one point he was defining "patient monitor" in one of his reports as a device that observes a person, which makes no sense on multiple levels, but it shows how far they were trying to dilute it.

So this came to a head in expert discovery, Your Honor made correct findings as to the legal meaning of that term, and all we asked was that that be given to the jury, that what you had already done -- we weren't asking for additional *Markman* proceeding. We weren't asking for a new hearing. We were asking for you to give what you had already concluded, already determined, to the jury, and the importance of that was because of what Dr. Madisetti was going to say.

And doubly important because with that guidance given to the jury, no reasonable juror could find the standard met. So we have a double problem. If the standard

had been given to the jury, no reasonable juror could find it was met, they didn't have it, and what they did have was an opaque term that Dr. Madisetti redefined in a way that was contrary to what Your Honor had said and contrary to what the patent and the intrinsic evidence say.

So at a minimum, we would respectfully request a new trial on this basis, but frankly, we think that, if the term is given its proper meaning as you had interpreted it, no reasonable juror could find infringement on this record. Apple Watch -- again, forget design and intent. Apple Watch doesn't function in this way. It misses important medical events. In fact, that's uncontested. It misses important medical events throughout the day and only opportunistically, when the conditions are right, will it be able to make a report of anything that could be significant to a medical event. That is the way it's designed, but you don't need to rely on design. The way it functions doesn't meet what Your Honor had said as the test for the scope of "patient monitor."

So, if we go to Slide 7, Your Honor, really there's a couple different ways to look at this. If Your Honor were to now hold that "patient monitor" should be treated, construed, interpreted -- whatever term you want to use -- in accord with what you said before trial, JMOL should enter. The record doesn't provide any evidence from which a

reasonable juror could find the scope met, and at a minimum, a new trial should be held because the jury never received the construction.

If, in contrast -- if, in contrast, you don't hold Masimo to the meaning of "patient monitor" that you had determined before trial and, instead, you were to construe it in accord with Masimo's position, well, there's two problems. The first problem is we don't know as of today what their position is as to "patient monitor." They say "plain meaning," but what is that? What is the scope of the boundaries with respect to the issues in dispute, including most importantly, event capture -- medical event capture? We don't know. It's been a moving target. Again, at one point Dr. Madisetti said it's a device that measures or observes a person. He seems to have been saying something a bit more than that at trial, but we don't know exactly what. So it's opaque, and I would challenge Masimo even today to give us what they say the plain meaning means.

But the second problem is, is that any construction that departed from Your Honor's pretrial rulings would be in error -- would be in error because you had it right before trial. Those determinations that we displayed in the excerpts from your motion in limine and summary judgment decision were correct, were correct based on the intrinsic record. So to find a new definition of "patient monitor"

today would be error because it would depart from the meaning of the term when applying the canons of claim construction set out in federal circuit precedent.

And the final scenario, Your Honor, if we go to Slide 8, would be where we are right now in the tentative, which is no construction, and the "no construction" scenario is, we believe, in error for multiple reasons. Number one, it does, in substance, depart from what Your Honor said before because you have denied us JMOL. You have therefore found that a reasonable juror could find that the term "patient monitor" is met on this evidentiary record, and we don't believe it can be met on this evidentiary record if Your Honor were to hold that the plain meaning of the term is as you had it in your pretrial rulings.

The second problem is *02 Micro* and its progeny requires providing a construction to a jury in circumstances like this. And I'll note, Your Honor, just in the last year there's been two federal circuit cases -- these are in our reply brief at pages 11 through 12, but I'll just note them again. They are in our briefs.

The *WhereverTV v. Comcast Cable* case from last July -- the federal circuit reversed where the district court allowed the meaning of a term to go to the jury even though the court stated that the plain and ordinary meaning of the disputed term was not readily apparent and never clarified

what he viewed as the plain meaning. The second case was the *Laboratory Corp. v.* -- I'll probably mispronounce this but -- *Qiagen* -- Q-i-a-g-e-n -- *Sciences*, where the federal circuit held, and I quote (reading), It was error for the district court to turn a matter of claim construction over to the jury to decide as a factual dispute, end quote.

And I'll just close this portion of our presentation, Your Honor, with the following: There are cases where courts have held that it was untimely to request a construction at certain stages, although I will also note there are many cases where courts have issued constructions even midtrial as they deemed appropriate in those settings. We are aware of no case, not one -- and Masimo has not cited one -- where a court made determinations as to claim scope -- so made determinations as to claim scope, a party requested that those determinations be given to the jury, and the court refused, and the federal circuit gave that its blessing. We're not aware of any such case where that circumstance obtained.

And that's what we have here. Your Honor made determinations as to the scope of the term "patient monitor" in two different pretrial rulings -- at least two different pretrial rulings, we asked that the substance of Your Honor's determinations on those issues be given to the jury, and Your Honor declined our request, and that resulted in the

situation what we have here.

Your Honor, may I have one moment?

(Pause.)

MR. MUELLER: That's the situation we have here. Determinations as to claim scope made before trial. We weren't requesting a new *Markman* proceeding or anything like that. We just said, "We'd like what Your Honor has already held to be given to the jury," and Your Honor declined, and we're not aware of any case where that fact pattern obtained and the federal circuit gave that it's imprimatur and its blessing.

So, again, here we think that, if the term is given its proper scope consistent with Your Honor's pretrial rulings, no reasonable juror could find that scope met, and at a bare minimum the jury should have been -- should have known what that scope was.

THE COURT: Thank you.

Who's going to address this?

BRIAN C. CLAASSEN: Your Honor, Brian Claaseen for Masimo.

Your Honor, the tentative is correctly decided, and as you found on page 4, Madisetti did not testify in a manner inconsistent with the guidance the Court provided in its summary judgment ruling and its ruling addressing the motions in limine. That's correct, Your Honor. His testimony was

consistent with your findings, and those findings were on not Madisetti. Those were Masimo's motions regarding Apple's expert's testimony. So his -- Madisetti's testimony at trial was consistent with your findings.

In addition, there was discussion about the performance level of the Apple Watch. We addressed that pretty fully, Your Honor, in our opposition brief, and that's at pages 8 through 10 of the opposition brief. I'm not going to go through in detail all of that evidence again, but we went through that in painstaking detail showing that the positive predictive value of the Apple Watch for the measurement of interest was 100 percent -- or nearly 100 percent.

Any questions, Your Honor?

THE COURT: Nope. I'd like to wrap up one issue before we move onto the next.

So briefly, Mr. Mueller?

MR. MUELLER: Yes. The only thing I would just say, Your Honor, is I do think that with respect to Dr. Madisetti, the clearest contradiction between his testimony and Your Honor's construction is Slides 5 and 6 of what we handed up. I mean, he just says in black and white -- I was literally quoting from Your Honor's orders in my question, and he said (reading): I would disagree with respect to the "must." The "must" is what Your Honor said.

I mean, I was quoting from Your Honor's orders in my question to him, and he said (reading): I would disagree with respect to the "must."

That's a plain -- he was plainly contravening the substance of what Your Honor had said with respect to the scope of the term, and we think that that well illustrates the problem we faced.

THE COURT: Thank you.

MR. MUELLER: Mr. Selwyn will address doctrine of equivalents with Your Honor's permission.

MR. CLAASSEN: (Inaudible. Not on microphone.)

THE COURT: No. They're the moving party. He gets the last word.

Mr. Selwyn?

MARK D. SELWYN: Good afternoon, Your Honor. I'll address briefly the doctrine of equivalents issue.

With respect, the tentative's observation that Masimo's expert testimony on the DOE issue is, quote, "not extensive" is a significant understatement. Dr. Madisetti testified for about a minute on this issue, and the totality of his testimony fits on one slide -- that's Slide 9 before you -- and Dr. Madisetti spent much of that minute or so explaining his view on what DOE law requires, as opposed to offering a DOE opinion.

And while we're not suggesting that there's some

time test for the sufficiency of DOE evidence, the fact of the matter is that Dr. Madisetti didn't provide anything close to the level of particularized testimony in linking argument that the *Next Step* case and other federal circuit precedent requires. While Dr. Madisetti said the words "function," "way," and "result" of Apple Watch, he never explained -- he never explained why those three things are the equivalent of the claimed "patient monitor."

The federal circuit's *Next Step* case, which the tentative cites, establishes the DOE standard that Masimo had to meet. *Next Step* holds that a patentee must provide, quote (reading), evidence to establish that the function, way, and result of both the claimed device and the accused device are and why those functions -- why those functions, ways, and results are the same, and there must be a, quote, meaningful explanation.

And this, Your Honor, comes back to the same problem that Mr. Mueller was just discussing in the context of the claim-construction instruction. Because Masimo has declined to take a single coherent position on what a "patient monitor" is, Dr. Madisetti couldn't have explained how Apple Watch is a "patient monitor," and he did not. As the tentative rightly observes, for example, Dr. Madisetti did not provide any testimony linking the purported function of a "patient monitor" to Apple Watch.

And, Your Honor, if you'll allow me to focus, in particular, on Dr. Madisetti's failure to provide any linking argument explaining why Apple Watch's "result" and "way" are the same as the "patient monitor." Again, the relevant testimony appears on Slide 9. Dr. Madisetti testifies only about what Apple Watch can do and provides no explanation for what a "patient monitor" does. The tentative rightly observes that Dr. Madisetti, quote (reading), did not expressly link his testimony to the claim language in his DOE discussion.

But the tentative is, respectfully, incorrect when it says in the very next sentence that Dr. Madisetti provided a further explanation of a "patient monitor"'s "way" and "result" in its literal infringement testimony. The tentative doesn't identify what portion of Dr. Madisetti's literal infringement testimony it is relying on, and we're not aware of any. Masimo's briefing didn't even make this argument as it relates to the "way" and "result" issues.

Rather, the principal literal infringement testimony Masimo's briefing cited to, to support its DOE position was a snippet related to how Apple Watch purportedly measures heart rate at a similar frequency as an embodiment in the '776 patent. That conclusory testimony simply has zero connection to Dr. Madisetti's "way" testimony, which focused on Apple Watch's use of noninvasive measurement

techniques for light, or his result testimony, which focused on the fact that Apple Watch provides medically relevant data to users and clinicians.

And, Your Honor, more broadly, the scope of the particular embodiment says nothing about the scope of the claims. Indeed, Your Honor instructed the jury -- and did so at Masimo's urging -- that, quote (reading), infringement does not turn on whether the accused products are described in the patient's -- in the patent's specification.

And finally, if this Court's -- if the Court grants JMOL or a new trial on doctrine of equivalents, it should also grant a new trial on literal infringement.

THE COURT: Why is that?

MR. SELWYN: Well, specifically, Your Honor, if the Court grants JMOL, a new trial is warranted on literal infringement because the substantial risk of jury confusion resulting from the erroneous submission of DOE to the jury and the general weakness of Masimo's literal infringement case. And we'd refer Your Honor to the *Sanofi* --

THE COURT: So the paucity of evidence -- your view -- with respect to the doctrine of equivalents undermines the jury's finding on literal infringement because it confused them?

MR. SELWYN: Well, it's not only --

THE COURT: Is that -- did I hear you correctly?

MR. SELWYN: It's not only that, but as the Ninth Circuit stated in the *Sanofi* decision, quote (reading): As a rule a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury.

So here, if DOE fails, so to must literal; that is, there has to be a new trial as to the whole thing under Ninth Circuit law. It's very possible that the jury found that Apple infringed only the doctrine of equivalents, and if this trial grants -- if the Court grants a new trial on DOE, that issue is sufficiently interwoven with the literal infringement case that the Seventh Amendment also requires a new trial on literal infringement.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Claassen?

MR. CLAASSEN: I'll start with where Mr. Selwyn left off, and I'm going to -- I'd like to approach and hand you a case, Your Honor.

(Pause.)

MR. CLAASSEN: And, Your Honor, you'll have to forgive my German pronunciation, but I believe it's *Hoechst* -- H-o-e-c-h-s-t -- *v. BP Chemicals*, and it's 78 F.3d 1575, and I'd like to direct you to 1581, and this is the federal circuit 1996.

THE COURT: Okay.

MR. CLAASSEN: And directing your attention to the heading "D," "The Issues of Equivalency," and the second paragraph, BP argues that a new trial is required because the jury was not asked to distinguish between literal infringement and infringement by equivalency.

Do you see that, Your Honor?

THE COURT: Got it.

MR. CLAASSEN: This is the issue that Apple is raising now, and what Apple seems to have ignored is its acquiescence in proposing the verdict form that had both literal and doctrine of equivalents in the same question for each and every claim that was decided by the jury.

THE COURT: Right.

MR. CLAASSEN: So, Your Honor, this case is square on point. There is no need for a new trial or JMOL because the jury was given a verdict proposed and acquiesced to by Apple.

Questions on that issue, Your Honor?

THE COURT: No.

MR. CLAASSEN: Okay. Regarding the function-way-result analysis, the tentative is correct on page 5. It sets forth the "function," "way," and "result" that Madisetti set forth. That's the second full paragraph on page 5. Regarding the specific linkage between the "function," "way,"

and "result," the tentative is correct on the last sentence on page 5 regarding the "function"; and the "way" and "result" on page 6, the first full paragraph, last sentence.

Any questions, Your Honor?

THE COURT: No.

Mr. Selwyn?

MR. SELWYN: Your Honor, the case that was handed up to you is not cited in Masimo's briefing. Moreover, it's an application of Fifth Circuit procedural law. What's relevant here is Ninth Circuit procedural law, and that's accurately stated in the *Sanofi* case that we've cited and discussed in our briefs. That's 793 F.2d 990. And again, the point that the Ninth Circuit made here, which this Court must apply, is that a general jury verdict will be upheld only if there is substantial evidence with respect to each and every theory. That's not the situation here given the paucity, the absolute paucity of testimony from Dr. Madisetti.

THE COURT: Did you acquiesce in the verdict given?

MR. SELWYN: There was no -- the parties were in agreement with respect to that phrasing, but that doesn't change the relevant Ninth Circuit procedural law.

THE COURT: I understand that. If both parties agreed to the form of verdict, then neither made any objection to the form of verdict; is that accurate?

MR. SELWYN: Neither party made any objection to

that portion of the verdict form, but that doesn't change the fact that there still has to be, under Ninth Circuit procedural law, a basis for each of the legal theories upon which the infringement claim rested.

THE COURT: It appears that you're claiming an error that wasn't preserved at trial.

MR. SELWYN: We're not claiming that that phrasing was in error. What we're claiming is that there had to be support for each of the legal theories that was considered by the jury to answer that question, and there wasn't, both for the reasons that Mr. Mueller has stated, but with respect to DOE specifically, there was no basis for it. There was no evidentiary basis. So there had to be an independent evidentiary basis for each of the legal theories put forth by the plaintiff to support their infringement claim, and there just wasn't.

THE COURT: Thank you.

SARAH R. FRAZIER: Good afternoon, Your Honor. Sarah Frazier.

Your Honor, we realized the slides we passed up inadvertently omitted the last few pages. May I approach with a supplement?

THE COURT: Sure.

(Pause.)

MS. FRAZIER: Your Honor, I'd like to address the

tentative's opinion with respect to damages and beginning with the tentative's denial of Apple's JMOL. It appears that that denial turns in significant part on a factual error regarding the existence of purported consumer complaints about the original version of the notification feature.

So Your Honor will recall the original version that came in 2017 just used the infrared LEDs and used only the infrared to detect whether there was a high heart rate. The change to the accused version was the addition of that "green light double-check." So, if the sensor using the infrared LEDs thought it saw a too-high or too-low heart rate, it then kicked on the green LEDs to confirm whether that was in fact the case. That additional double-check reduced the number of false positives. It also reduced the number of true positives and delays further when the reporting gets elevated to the user.

But the key, Your Honor, is that addition of the "green light double-check" is what made the feature allegedly infringing. There's no dispute the original version not accused does not meet the claim limitations even under Masimo's theories.

Masimo's damages experts, however, did not just value the incremental benefit of that "green light double-check." They valued the entirety of the feature, and their justification for doing so is because they say the 2017

version was totally unviable, it was completely not commercially viable such that we don't have to attribute any value to all the parts of the feature that already existed in 2017. They didn't apportion at all between the additional incremental benefit of that "green light double-check" and the rest of it. Put differently, Your Honor, their position is that the next-best alternative to the accused feature was no feature at all, was just having nothing.

And, Your Honor, respectfully, that's totally unsupported by the record. The tentative describes the evidence on this point as "not extensive." We think that's a significant overstatement, including because, as I noted, there's actually a factual error in the tentative's description of that evidence. At page 9 the tentative states that there are -- that Apple received consumer complaints about the 2017 feature, and it cites to two documents, Your Honor, JTX7741 and JTX7111. Your Honor, neither of them is a consumer complaint. They are both internal Apple.

JTX7741 we've put on Slide 10, Your Honor. It is generated from Apple's Radar system. You can see it was -- the Radar itself was generated by Dr. Framhein, who testified at trial, and on Slide 11, we have Dr. Framhein's testimony regarding this exact exhibit, where he says what he's doing is copying into the Radar system a report generated by somebody else internally within Apple. This is not a

consumer complaint. It's not from a consumer at all. It's from an internal Apple employee.

With respect to JTX7111, it's the same issue, Your Honor -- excuse me -- and in fact, you can see on Slide 12 the date of this one is July of 2017. That's before the original feature was ever even launched. And as Dr. Waydo described, this "carry radar" (phonetic), which is what JTX7111 is describing, is, again, referring to an internal Apple employee using pre-released software. So this isn't even the version that shipped in that original version. It's something before that, and again, this is not a consumer complaint. It's a reference to internal users, again, using these pre-released softwares.

So neither of these documents, Your Honor, that the tentative says shows Apple receiving consumer complaints is in fact a consumer complaint. And in fact, Masimo damages experts during their cross-examination both conceded they had not seen any consumer complaint. Dr. Reed-Arthurs testified she had not shown the jury any evidence of one. Mr. Bergman testified -- and we have that on Slide 13 -- that he had not shown the jury an instance of consumers complaining about that original version. Again, outside of Apple's own employees, he had not seen anything. The only evidence, Your Honor, of purported consumer complaints that were actually discussed at trial were the two documents that the

tentative rightly concludes should not have been admitted. They were the unproduced chat group -- message board documents. They were unauthenticated hearsay that had never been disclosed.

When you correct for the fact that there are not any consumer complaints to Apple in the record, the evidence that the tentative has described already as "not extensive" is even weaker, and what remains, Your Honor, simply cannot support the $634 million verdict. What remains are three internal documents and some testimony from Dr. Waydo that cited about one of those documents. Dr. Waydo's testimony was summarizing JTX7659, which, again, was a document generated months before the original feature was released.

The tentative states that Apple documents describe problems with the 2017 heart rate feature as a "serious bug," but, Your Honor, if you look at what Dr. Waydo said -- and we've put this on Slide 15 -- he confirmed that if the heart-rate-doubling issue that they were seeing right before launch was a "serious bug," they definitely would not have released it, and so the evidence is -- does not support the notion that what went out to the market had this "serious bug." To the contrary, the evidence is the opposite, that, if it were a "serious bug," they never would have launched it. But again, we have Dr. Waydo and the record itself showing Apple was aware of this issue before they launched the original

feature, they continued to launch that feature, they sold 10 million units with the original version in it and, again, not a single properly admitted consumer complaint out of those 10 million units.

The other documents that the tentative relies on, Your Honor, simply just don't do it. Those are JTX7033 and JTX7674. The tentative describes those as "showing increasing percentages of alarm failure." Your Honor, JTX7033 actually supports Apple's position. If you go to that exhibit, and specifically the Bates Nos. ending 565 to 567, what's being discussed there are Apple employees debating whether the "green light double-check" is even a good idea. They're talking about concerns given the fact that once you add the double-check, it's going to delay even more when a user gets an alert. It's an internal discussion about whether to even add the double-check. It is certainly not support for a finding that the original feature was completely commercially unviable.

And 7674, Your Honor, is similar. It shows that, yes, adding the "green light double-check" suppressed elevated high-heart-rate false positives. There's no dispute that adding the "green light double-check" does in fact suppress false positives somewhat. It also suppresses true positives. That's a far gap between this "green light double-check" improved the feature and a showing that the

earlier feature was so not viable that not a single dollar of the feature should be attributed to all of the technology that existed in that original version.

Simply put, Your Honor, we just think it's impossible to reconcile that Apple launched the product knowing about this potential for doubling heart rate -- successfully launched it, sold 10 million units of it, waited a year before releasing the update that addressed it and added the "green light double-check," and, again, we don't have a single admissible -- properly admissible complaint to Apple about this. Surely, if it was a serious problem, there would have been something.

And the last point I'd like to address, Your Honor, are those two purported consumer complaints that were improperly admitted. The tentative acknowledges they should not have been admitted. Respectfully, we think it's error to not conclude that that was prejudicial. The right standard to be applying here is whether the erroneous admission was sufficiently prejudicial so that it more probably than not -- more probably than not tainted the verdict. That is the *Applied Medical* case, Your Honor.

The reason these two exhibits meet that standard -- there's two of them. The first is that the admission of those two purported complaints allowed Masimo to backfill this gap in its case on this exceedingly weak theory that the 2017

version was completely unacceptable. Masimo's counsel closed on that point. They put both of those documents that should never have been admitted up before the jury to argue that point, that that 2017 version was completely unacceptable. To the extent the tentative was thinking, "Well, it was harmless error because there were other complaints," as I addressed previously, those were not consumer complaints, just internal Apple reports. So that's the first problem is that the -- it allowed them to really backfill. It's their only evidence of purported consumer complaints.

The second issue, Your Honor, is they then used those documents to repeatedly impugn Apple and its counsel, and, frankly, Mr. Mueller's credibility personally. We had gone through all of discovery. We had thousands of pages of expert reports. We had Mr. Bergman present his entire direct examination never having identified a consumer complaint. Mr. Mueller cross-examines him on the fact that we haven't seen a single consumer complaint. They then introduce them on redirect, we've never seen them before, I don't think Mr. Bergman had seen them before, they get into the record, and then they use that to suggest that Apple's counsel was intentionally misleading them about the state of the record.

And, frankly, Your Honor, that has to be prejudicial. The fact that they were using these to suggest that Apple's counsel, at best, didn't know the record, at

worst, was trying to misrepresent the record to the jury has to be prejudicial. And in fact, in Masimo's opposition brief, it doesn't seriously contest that, if it was error to admit these, they were prejudicial. It, in fact, Your Honor, kind of doubles down on that idea. They end their opposition brief by saying: So be it. Apple deliberately misled them. If the jury decided that Apple's counsel is not credible as a result, so be it.

Your Honor, even they're acknowledging it more probably than not tainted the verdict here. There was no misleading of the jury. Again, no one knew about those documents despite this years of litigation, but when we apply the right standard, the prejudice has to weigh in favor of probably -- more probably than not that had an effect on the verdict.

So, Your Honor, put simply here, we have this $634 million verdict, it's resting on this argument that the original version was completely nonviable, there's nothing to support that, there's no consumer complaints despite what the tentative says -- no properly admitted consumer complaints, and the two that were admitted should never have been admitted and, again, were used in a way that not only helped them plug a significant gap in their evidence but also to attack the credibility of Apple in a way that was prejudicial and that, we believe, does require a new trial.

Unless Your Honor has any questions, thank you for your attention.

THE COURT: Mr. Horne?

MR. HORNE: Good afternoon, Your Honor. May we approach with some slides, Your Honor?

THE COURT: Sure.

(Pause.)

MR. HORNE: I want to start with the notion that Masimo didn't apportion at all and included everything from the 2017 feature that also found its way in the 2018 feature -- not true. If you look at Slide 24 in our deck, this is the question that our survey expert Dr. Reed-Arthurs gave to the participants. She compared the accused feature that includes the double-check that's reliable to measure high and low heart rate to a background heart rate. And so, yes, we did not compare the 2018 infringing version to the 2017 noninfringing version because, as the evidence showed and the Court rightly recognized in its tentative, the 2017 wasn't viable, and there was enough evidence for the jury to agree and find that. But to say we didn't apportion anything is not true. Also --

THE COURT: Well, explain the apportionment you do think took place.

MR. HORNE: They apportion out all the value to having a background heart-rate-measuring feature. The only

difference between the background heart-rate-measuring feature and the 2017 feature was an alarm -- or a notification that was wrong more than half of the time. So having sensors and lights and detectors and detecting a heart rate, which was part of both features, was all apportioned out by this analysis, and you can see that on Slide 25. She compares the delta between having background tracking and a usable, reliable heart-rate notification to having just background tracking by itself. That's what created the value from her survey that then Mr. Bergman relied on.

Now, they're saying she shouldn't have compared to the background, she should have compared to the 2017 feature, that's where the real dispute is, and I'm happy to address some of the comments counsel made there.

On whether -- we're talking about Exhibit 7741 and 7111. It's correct that those are internal Apple employees commenting. Whether we call those "consumers" or "Apple people," they're still complaints, and even if you didn't want to call them "complaints," they're still identifying problems with the 2017 feature and I -- as I read the Court's tentative, there's plenty of other evidence -- and I'll happy -- happy to walk it through with you in the slides we handed you -- to demonstrate that the 2017 feature was not viable and Dr. Reed-Arthurs was not required to compare the infringing feature to that 2017 feature instead of the

background heart rate like she did.

So, if you start at Slide 18, this was the document -- this was in August. This is called a "showstopper," a "serious bug" -- talking about the 2017 feature. Now, counsel said this came before the product launch. True, but if you look at Slide 19 -- this is Exhibit 7741 -- this was November 2017 after the product was launched, and it's still called "Priority 1-Showstopper." So whether we call this a "consumer complaint" or a "complaint," it's still a big problem -- it's a serious problem. It's a "showstopper." (Reading) Four warnings in a row on the same watch about 20 minutes after going to bed. I was sitting idle and bouncing my knee then received the alert.

That sounds like a complaint to me, and that sounds like a serious problem.

Then we go to 7711. When counsel pointed to the slide that Dr. Waydo was talking about -- this is on Slide 12 that counsel handed you referring to July 2017. If we look on the -- Slide 21 from Exhibit 7111 -- this is page 730 of the exhibit -- this is from December 2017 and at the bottom -- this callout here we have: There have been five new "stid night carry radars" (phonetic) for suspected false alerts, again, after the product was launched in 2017.

It continues. Now we see on Slide 22 Exhibit 7069. Their spec for this 2017 feature is a greater than 98 percent

PPV, meaning less than 2 percent false alarms. What do we see on this same page, Exhibit 7033? This is in February of 2018 -- as much as 8 percent of alerts at the most aggressive threshold of a hundred beats per minute may be false. That means, as you go to the default, which is at about 120, they expect false alerts to increase.

And then the Exhibit 7674 that they didn't really deal with in their briefing -- I don't believe they addressed it terribly substantively in the reply in here. This is an August document -- Exhibit 7674 -- saying that at the end of the day, after this feature has been out for a year, the PPV that they wanted to be greater than 98 percent was 35.9 percent. In other words, they wanted false alarms to be less than 2 percent, and they were greater than 64 percent -- no response to this. So whether we characterize some of these other documents as "consumer complaints" or not, this shows this feature wasn't viable, and it certainly shows a reasonable jury could find that the feature wasn't viable.

Now, on the consumer complaints which were consumer complaints, the Court in its tentative said that the Court erred by admitting them because they weren't produced in discovery. We respectfully disagree and believe the Court did not err by admitting them. The Court in its tentative said that (reading): Masimo argues it needed to introduce these documents because Apple insinuated that Bergman's

testimony was not -- was -- sorry -- was insufficient.

Well, there's more to that in our briefing, and we have a slide on this too, Slide 26. The Q-and-A at Mr. Bergman's cross said (reading):

Sir, how many consumer complaints did Apple receive about the 2017 version?

Not "How many did you show us?" Not "How many are of record?" Not "How many were in your report?" "How many did Apple receive?"

I don't know

Question: Sir, would it surprise you if the answer is zero?

He's not talking about the record. He's not criticizing Bergman's direct testimony. The question is representing to the jury that there are none, that none exist. That was the moment that caused us to get the consumer complaints that came from a chat room on an Apple website and submit them. So we don't believe that the fact that they weren't produced made it err for the Court to admit them. In fact, Apple, when it cross-examined one of Masimo's witnesses -- in the Stephen Scruggs cross-examination, November 6th, afternoon, page 68 -- they used DTX1400 with Mr. Scruggs, which was a Masimo website that wasn't produced in discovery, and it wasn't used for impeachment. We didn't object because it came from our own website, and we didn't

doubt that it was authentic.

So we don't think the Court erred in admitting those, and given the wealth of evidence that the 2017 feature was a problem, even if the Court did err, that doesn't warrant a new trial.

That's all I have, Your Honor, unless the Court has questions.

THE COURT: No. Thank you.

Ms. Frazier?

MS. FRAZIER: Yes, Your Honor. Briefly, three things.

First, with respect to apportionment, that's exactly the issue, that they compared to background heart rate. The background heart rate is a different feature. In fact, it was at issue earlier in this case. Our issue is that they took all of the value of the heart-rate-notifications feature and said all of that should be given to Masimo. There was no attempt to apportion between all of the other things in the notification feature and the "green light double-check" that was added and is what indisputably made the feature infringing, took the feature from what it was before, in Masimo's opinion, within the scope of the claims.

So that is the only thing tying this feature to Masimo's alleged infringement is the addition of that "green light double-check," and again, we disagree with the premise

-- we think for a lot of reasons that "green light double-check" is not infringing. It does not achieve the goal of the patent to reduce that or increases battery. But putting that aside, Your Honor, there's no attempt to apportion down to just the value contributed by these claims. So that's the first issue, Your Honor, with respect to apportionment.

The second is that the evidence that Mr. Horne continues to point to, to suggest that this feature is just not viable doesn't support that. It doesn't show that. Much of what he pointed you to were the same exhibits we already discussed. They're not consumer complaints. They're internal. Many predate the feature --

THE COURT: What's the difference if they're not consumer complaints but they are internal Apple complaints?

MS. FRAZIER: Two things, Your Honor: The first is that the internal Apple complaints, as we saw from Mr. Waydo's testimony, involve pre-release versions of software. These are versions that Apple rolls out internally to employees to test before the thing hits the market. And so it's not an apples-to-apples comparison because what Apple employees have on their wrist is not always -- often not what ultimately gets rolled out. So, Your Honor, I think that is the first.

And the second point is that given the vast number of sales of these products to consumers, if there really was a "serious bug," there would be a plethora of evidence

reporting that from consumers. If consumers were really getting a high instance of false alarms on this high-heart-rate feature, you would expect to have seen some evidence of that.

THE COURT: So is it your position, then, that the internal evidence, the employees, one, it's supposedly the wrong version; but, two, it isn't sufficient to counteract apparently the lack of consumer complaints for 10 million sets?

MS. FRAZIER: Correct. When viewed in context of the rest of the evidence, which is -- for example, Mr. Horne pointed to one that labeled it a "showstopper." As Dr. Framhein testified during his cross-examination, that's a -- it's a -- comes from a drop-down list, that you have a limited number of choices. It wasn't a "showstopper." They didn't stop the show. They continued to sell the feature. They waited another 11 months before they even rolled out this update to, again, add what was an incremental improvement. All of the Apple engineers confirmed the original version was highly accurate. What they were doing was tweaking it to make it a little more accurate. There's a far cry between a highly accurate version -- again, for which we don't have a single admissible consumer complaint -- improving that slightly and concluding that the original version is so nonviable that none of the amount of damages

calculated should be attributed to the technology that was in that original version.

And finally, Your Honor, with respect to the chat groups that are being classified as the "consumer complaints," there's a significant difference there between cross-examining Mr. Scruggs with something from Masimo's website and examining on redirect your own expert with a document that he never put forward an opinion about. Again, that's just categorically a different thing. And again, it was used in a way not just to plug this evidentiary gap but, again, to suggest that Apple had been intentionally misleading the jury.

And so, Your Honor, we would respectfully request that both the denial of JMOL and the conclusion that there wasn't prejudice resulting from the erroneous admission of those chat groups -- we ask that they be given a close second look, Your Honor.

THE COURT: Okay.

Two minutes.

MR. HORNE: Hopefully be shorter than that, Your Honor.

Slide 20 of the deck we provided the Court -- counsel just said that Mr. Framhein testified that the "showstopper" part -- you shouldn't give that a lot of weight because there was a drop-down menu. Exhibit DTX1382,

Slide 20, shows that dropdown menu, and it shows the range. Yes, "showstopper" is the highest one. The next-highest one is "high level risk, possible showstopper." He could have picked medium level, "not expected showstopper." He could have picked low level. He didn't. So the best case for them is it's worse than "high level, possible showstopper," and somewhere in between there and "high level risk, showstopper," and they picked that a couple times so I don't think that argument holds a lot of weight.

Finally, I'll just redirect the Court to exhibit -- I'm sorry -- Exhibit 7674, page 23. Counsel said that these complaints were minor and they were all before the feature was listed -- I mean, was launched. This is after the feature has been out a year: PPV 35.9 percent when they want it greater than 98 percent. That's a year later. That's pretty severe, Your Honor.

THE COURT: Okay. Okay. Why don't we take a break here, and we'll come back and address, I believe, the last two topics.

(Recess from 3:17 p.m. to 3:24 p.m.)

AFTER RECESS

(Call to Order of the Court.)

THE COURT: I think I may have misunderstood Mr. Mueller's introduction. I thought that there were three

more in addition to your remarks, but we've --

MR. MUELLER: No. That's it, Your Honor.

THE COURT: -- we've covered the three.

MR. MUELLER: That's correct, Your Honor. Those were our issues that we wanted to raise today. We submit on the remainder preserving our prior positions.

THE COURT: Mr. Horne, I want to go back to the apportionment issue. You suggested, I believe, that even if the premise of nonviability of the predecessor were invalid, there were -- there was an alternative measure there for ensuring that only the value of the improvement was considered. Could you refresh me on that?

MR. HORNE: We said that we apportioned out the value to the background heart rate which --

THE COURT: Right. Right.

MR. HORNE: -- which we believe the evidence supports was the next-best alternative, and that's what Mr. Madisetti testified was the next-best alternative.

THE COURT: So even if the earlier version were in fact viable, this is sufficient apportionment?

MR. HORNE: Yes.

THE COURT: Okay.

Ms. Frazier, you want to address that?

MS. FRAZIER: Yes, Your Honor.

That just can't be true. If the earlier version is

not viable, then it is an alternative and what should have been valued -- and this is our position -- is the incremental benefit of the "green light double-check," which is what they claim rendered the feature invalid. Putting the background heart rate in doesn't do anything. Again, it's a different feature. It was separately accused at one point. The relevant feature at issue is this notifications feature. We have a version of it in 2017, we make this incremental improvement to a already-accurate feature, and they claim, "Well, that original version is not viable; so we get the value of the whole thing."

THE COURT: Right. Right. I understand.

MS. FRAZIER: If that original version is viable, there isn't anything else in the record to support it because there is no valuation that just goes to what was allegedly enabled by the patent, which was the addition of the "green light double-check."

THE COURT: Thank you. Appreciate that.

MS. FRAZIER: Thank you, Your Honor.

THE COURT: Any further comments for today?

MR. HORNE: No, Your Honor. The only issue is just logistics and housekeeping. As the Court may recall, we tabled the prejudgment interest issue until the Court rules on the Rule 50(b) and 59 motions. If the Court were to stick to its tentative, I think we can work out a schedule to brief

that.

THE COURT: Well, fine. Let's see -- let's just see the result of today's arguments.

MR. HORNE: That's what we were planning to do, Your Honor.

THE COURT: So.

Mr. Mueller?

MR. MUELLER: Yes, Your Honor. Just one additional procedural question, actually, not on the patent issues.

With respect to the trade secret issues, when Your Honor enters judgment, the procedural question we had was with respect to what type of briefing, if any, Your Honor would expect on -- at that point on the trade secret issues. Of course, there we're dealing with a bench decision --

THE COURT: Right.

MR. MUELLER: -- as opposed to a jury verdict and we -- we understand Your Honor's -- both Rule 52 and Your Honor's prior precedent to be we should not be trying to relitigate the legal issues and factual issues that we had previously presented to Your Honor --

THE COURT: Right.

MR. MUELLER: -- before the bench decision. Just wanted to make sure we had that right.

THE COURT: I think that's accurate. I mean, unless there's some error in the Court's judgment itself, I

suppose, would mirror the motion for a new trial or -- or some sort of motion challenging the legal sufficiency of it.

MR. MUELLER: Understood. Let me put it another way. Rule 52, as we read it -- and we can brief this to Your Honor if it's better, but Rule 52, as we read it, as applied to bench decisions --

THE COURT: Right.

MR. MUELLER: -- is far narrower in its scope, and we've seen some decisions from Your Honor where you have said that that version of Rule 52 as applied to a bench decision -- a post-trial bench decision --

THE COURT: Right.

MR. MUELLER: -- should not be used as a motion for reconsideration of, for example, legal arguments that we made that you --

THE COURT: Right.

MR. MUELLER: -- you rejected. So we read that to mean we don't have to reargue the legal issues to Your Honor in a post-bench-judgment decision in the same way that we -- in a way that is different from what we're dealing with today. Today we have a jury decision, and there we have a different set of considerations in play, but we understand Rule 52 as applied to a bench decision --

THE COURT: Right.

MR. MUELLER: -- to be far narrower in its sweep.

THE COURT: I don't think there's anything left at this point. And I have your objections to the proposed judgment -- just sat on them. I mean, I'd obviously entered as a -- would not enter as a 54(b) judgment because it doesn't (indecipherable) all the issues. So I've kind of been putting those objections aside, but they're there, and I'll get to them.

MR. MUELLER: Understood. We just wanted to make sure we weren't --

THE COURT: No, I know. I understand.

MR. MUELLER: -- being -- there was -- we were not missing anything that should be on our radar, but it sounds like we're not.

THE COURT: Okay.

MR. MUELLER: Okay. Thank you, Your Honor.

THE COURT: In fairness, I think I need to tell you that most of my April and May, I think, will be taken up by two bellwether trials in an MDL that I have that involves a -- the Kias. So I appreciate that this has gone on quite a while and that it needs to be addressed but I -- I'm not going to get to it in the short (indecipherable).

MR. MUELLER: Understood.

THE COURT: It'll still be on the radar, and it'll still be important.

MR. MUELLER: Thank you very much, Your Honor.

THE COURT: Okay. Anything else?

Mr. Horne?

MR. HORNE: Not from Masimo, Your Honor.

THE COURT: Okay. Okay. Thank you.

THE CLERK: All rise. Court is adjourned.

(Proceedings adjourned at 3:30 p.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa
Julie Messa, CET**D-403
Transcriber

March 12, 2026
Date