**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV 20-00048-JVS-JDE | Date | December 18, 2025 |
| Title | Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc. | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| Elsa Vargas | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Findings of Fact and Conclusions of Law**

After Masimo waived its right to a jury trial (Docket Nos. 2076, 2133), the Court held a bench trial beginning on November 5, 2024. See Docket Nos. 2287, 2298, 2299, 2314, 2343, 2344. The Court received direct testimony via declaration before holding in-person proceedings for cross-examination, redirect, and recross. The parties submitted closing briefs and proposed findings of fact and conclusions of law after the trial:

- Masimo's Opening Trial Brief (Docket Nos. 2460 (redacted), 2429 (sealed))

- Masimo's Revised Post-Trial [Proposed] Findings of Fact and Conclusions of Law (Docket Nos. 2461 (redacted), 2430 (sealed))

- Masimo's Responsive Post-Trial Brief (Docket Nos. 2491 (redacted), 2473 (sealed))

- Apple's Post-Trial Brief (Docket Nos. 2455-1 (redacted), 2447 (sealed), 2474 (sealed))

- Apple's Proposed Post-Trial Findings of Fact and Conclusions of Law (Docket Nos. 2455-2 (redacted), 2448 (sealed), 2472-1 (sealed))

- Apple's Post-Trial Reply Brief (Docket Nos. 2483-1 (redacted), 2475 (sealed), 2492 (sealed))

The Court held closing argument on February 3, 2025. Docket No. 2495. Under Rule 52(a) of Federal Rules of Civil Procedure, the Court now enters its findings of fact and conclusions of law.

**CIVIL MINUTES - GENERAL**

Case No.   SA CV 20-00048-JVS-JDE                    Date   December 18, 2025

Title      Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc.

## I.   Bench Trial Background

Masimo's Fourth Amended Complaint (Dockets. 295-2 (redacted), 296-1 (sealed)) and First Supplement to the Fourth Amended Complaint (Dkt. 750) together comprise the operative pleading, subject to the rulings in the Order Regarding Apple's Motion to Dismiss portions of the Fourth Amended Complaint (Docket Nos. 350 (sealed), 361 (redacted)).

By the time of the bench trial, the case included only the following claims and related defenses:

- Trade Secret Misappropriation under the California Uniform Trade Secrets Act ("CUTSA"): Whether Masimo may claim trade secret protection for L4, L5, D1, D3, and D10 and whether Apple misappropriated these trade secrets.

- Correction of Inventorship: Whether Masimo can show that Diab should have been named as a co-inventor in view of his work with Lamego at Masimo.

- Declaratory Judgment of Patent Ownership: Whether Masimo can show that Lamego made inventive contributions to Apple while under an obligation to assign those contributions to Masimo.

- Remedies.  What if any equitable remedies should be afforded to Masimo, to the extent it prevails on any of its claims?

## II.   Party Background

Masimo is a leader in non-invasive monitoring technology.  Joe Kiani founded Masimo in 1989.  Mohamed Diab is a scientist who joined Masimo about six months after its founding and later became Chief Technology Officer ("CTO") of Masimo.  Marcelo Lamego initially joined Masimo as an algorithm engineer for approximately six months in 2000.  Lamego rejoined Masimo in 2003 as a research scientist.  In 2007, Kiani selected Lamego as CTO of Masimo because Diab needed to step down from that role.  Lamego and Diab worked together closely during this transition.  Lamego served as CTO of Masimo until October of 2013, when Kiani declined to make Lamego the CTO.

In late 2012 and early 2013, Apple pursued strategies to expand its non-invasive

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV 20-00048-JVS-JDE | Date | December 18, 2025 |

| | |
|---|---|
| Title | Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc. |

monitoring technology. One of those strategies involved identifying another company that it could collaborate with to develop the technology. Apple identified Masimo as a candidate, and even referred to Masimo's products as the "golden reference" given their high accuracy. JTX-425 at -737. Executives from Apple and Masimo met once to discuss collaboration in May of 2013. Apple ultimately did not take any steps toward acquiring or making any formal arrangement with Masimo.

Another strategy Apple pursued was called "smart recruiting." JTX-316 at -708. After Kiani declined to make him CTO, Lamego reached out to Apple to discuss employment opportunities. Lamego described his experience in the patient monitoring area. He offered Apple his "know how," as opposed to what he learned at Masimo, but acknowledged the two were difficult to separate. 11/7 PM Tr. (Lamego) at 31:5-33:1 and 35:14-22. Steve Hotelling, Apple's VP of Touch Sensing Technology, recognized that he could fulfill Apple's goal of expanding its non-invasive monitoring technologies by hiring Lamego and others with the necessary expertise. Hotelling discussed hiring Lamego with Apple's executive recruiter. Hotelling interviewed Lamego and then recommended hiring him. Lynn Youngs, Hotelling's boss, agreed and gave Lamego an "exceptional offer" at least in part due to his specialized experience. JTX-265 at -567. Apple also hired other Masimo employees with relevant experience.

Lamego provided ideas for improving Apple's sensing technology soon after joining Apple. JTX-143. Apple eventually realized that Lamego posed a risk to Apple's confidential information. Apple VP Myra Haggerty suggested retaining Lamego as a consultant but insulating him from sensitive information. Hotelling rejected this suggestion. Lamego ultimately left Apple.

## III. Findings of Fact and Conclusions of Law

### A. Jurisdiction and Venue

1. The parties do not dispute jurisdiction and venue. Docket No. 2280 at 2.

2. The Court has subject matter jurisdiction over Masimo's inventorship claims under 28 U.S.C. § 1331 at least because these claims arise under federal patent

law.  35 U.S.C. § 256.

3.   The Court has supplemental jurisdiction over Masimo's CUTSA trade secret claims and claims for declaratory judgment of patent ownership under 28 U.S.C. § 1367(a) at least because these claims are related to the inventorship claims and form part of the same case or controversy.

4.   The Court has personal jurisdiction over the parties and venue is proper under 28 U.S.C. §§ 1391(b) and 1400(b) at least because Apple is incorporated in California.

## B.   Witness Testimony

5.   Throughout the course of the bench trial, the Court had the opportunity to observe each witness as they testified in open court.  The Court carefully listened to each witness's testimony and observed their demeanor, which helped inform the Court's overall assessment of each witness's credibility.  The Court's credibility assessments underpin some of the findings of fact set forth in this Order.  In turn, those findings of fact inform the Court's conclusions of law.  Where the Court's conclusions turned on a finding of credibility (or lack thereof), those findings are stated herein.

## C.   Apple's Statue of Limitations, Laches, and Waiver Defenses

6.   "An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ. Code § 3426.6.  "[W]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation." Hays v. VDF Futureceuticals, Inc., 2016 WL 5660395, at *3 (D. Haw. Sept. 28, 2016) (internal citation and quotation marks omitted).

7.   The parties agree that the alleged misappropriation began before January 9, 2017, outside the three-year period.  Docket No. 1901 at 17; Docket. 2280 at 9.

8.   However, for purposes of assessing whether Masimo's claim is time-barred, the limitations period begins on the date that Masimo could have, or should have,

discovered Apple's alleged misappropriation. Hays, 2016 WL 5660395, at *3. The Court previously determined that all asserted trade secrets (L4, L5, D1, D3, and D10) are related for statute-of-limitations purposes such that the limitations period begins as soon as Masimo could have, or should have, discovered that Apple misappropriated any one of these secrets. Docket No. 1715 at Instruction No. 36; Gabriel Techs. Corp. v. Qualcomm Inc., 857 F. Supp. 2d 997, 1003 (S.D. Cal. 2012) (Because "all of Plaintiffs' purported trade secrets were allegedly shared in the same time period and in connection with the same relationship," "suspicion of the first act of alleged misappropriation triggered the statute of limitations for Plaintiffs' entire claim, even as to later acts of misappropriation.")

9.    Masimo's 2014 concerns about Lamego are not sufficient to trigger the limitations period. After Apple hired Lamego, Kiani directed Masimo personnel to send a letter to Apple notifying them of Lamego's confidentiality obligations. Kiani Direct ¶ 209. Masimo sent the letter on January 24, 2014 and expressed concern that Apple hired Lamego for purposes of misappropriating Masimo's trade secrets. Id. ¶¶ 210-11; JTX-2937 (Letter) at 93 (indicating it is "difficult to imagine" any other motivation than trade secret misappropriation); see also 11/5 PM Tr. at 10:9-13. Masimo also cautioned Apple not to misappropriate trade secrets. Id. at 94. Kiani testified that he believed that Lamego would not divulge trade secrets to Apple and that Lamego ultimately left his employment with Apple to avoid divulging trade secrets. Kiani Direct ¶¶ 206-07 and 212. Kiani later learned that Lamego had been dishonest. Id. ¶ 208; see also 11/7 PM Tr. at 46:8-48:13.

10.   The 2014 communications concern potential misappropriation. They do not indicate that Masimo suspected wrongdoing had already occurred. Being suspicious of circumstances and watching for signs of misappropriation does not trigger the limitations period. See Cypress Semiconductor Corp. v. Superior Ct., 77 Cal. Rptr. 3d 685, 694 (2008) (explaining that "hypothetical" misappropriation does not trigger limitations period); see also Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 815 (2005) (explaining that it would be contrary to public policy if the limitations period could begin before there would be a factual basis to file suit).

11.   Documents linking Lamego to sensor work at Apple do not trigger the limitations

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV 20-00048-JVS-JDE | Date | December 18, 2025 |
| Title | Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc. | | |

period. Documents linking Lamego to physiological sensor work at Apple were public as of 2016. 11/5 PM Tr. (Kiani) at 16:10-15. These documents do not establish any wrongdoing. Masimo could reasonably suspect that Lamego would continue working in the sensor area, consistent with his education and prior work experience. Similar to Lamego's decision to accept employment with Apple, these documents could have triggered concerns about potential misappropriation. Again, however, Masimo's suspicions about potential misappropriation are insufficient to trigger the limitations period.

12. Additionally, U.S. Patent No. 10,078,052 (the "'052 Patent") listed Lamego as an inventor, as published in March of 2016. JTX-1239 at -140. However, as discussed below with respect to inventorship and co-ownership, the '052 Patent is directed to reflective sensors, which is not the subject of the asserted trade secrets. It also does not include material that Lamego learned and developed at Masimo. Accordingly, it would be inconsistent to determine that the '052 Patent should have prompted Masimo to investigate trade secret misappropriation. Further, no evidence establishes that Masimo knew about this patent before October of 2019.

13. A reasonable investigation would not have provided a basis to bring suit until at least September of 2018. Kiani testified that Masimo first learned of the trade secret misappropriation in 2019 when it saw its trade secrets in Apple's patents. Kiani Direct ¶ 221. As to L4, the earliest Masimo could have suspected misappropriation was in September of 2018, when Apple ███████████████████████. Madisetti Direct ¶¶ 102-13. Masimo learned of L5 during discovery when it added that claim. Docket No. 669 at 6 and 7-8. The "D" trade secrets are non-public software algorithms that Masimo contends it did not discover until ██████████████████████ was published in March of 2019. See id. at 5.

14. Apple's laches and waiver defenses fail for the same reasons. Docket No. 1900 at 4 (indicating the parties agree that laches and waiver apply only to the extent the misappropriation claim is untimely).

### D. Trade Secret Misappropriation Under CUTSA

15. To prove a claim for misappropriation under the California Uniform Trade Secrets

Act (CUTSA), Masimo must prove (1) the existence and ownership of a trade secret, and (2) misappropriation of the trade secret. Cal. Civ. Code § 3426.1.

16. Under CUTSA, a trade secret is information that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Cal. Civ. Code § 3426.1(d).

17. "The standard to show that trade secrets derive [independent] economic value is not a high standard." Cisco Sys., Inc. v. Chung, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020). "To have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others." Id.

18. "The [generally known] inquiry is not whether the alleged trade secret has been publicly disclosed at all, but whether it has become 'generally known to the relevant people, i.e., potential competitors or other persons to whom the information would have some economic value[.]'" Kittrich Corp. v. Chilewich Sultan, LLC, No. CV 12-10079-GHK-ARGx, 2013 WL 12131376, at *4 (C.D. Cal. Feb. 20, 2013) (quoting DVD Copy Control Ass'n, Inc. v. Bunner, 116 Cal. 4th 241, 251 (2004)).

19. Masimo bears the burden of proving trade secret misappropriation by a preponderance of the evidence. Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658, 1667 (2003).

**L4 (The Black Foam Test)**

20. Masimo's written description of the trade secrets, as provided to the jurors during the prior jury trial, provides the controlling definition of L4. Docket No. 1715 at Instruction No. 20 (explaining that a party bringing a trade secret claim must "provide a written description of its claimed trade secrets so the defendant understands the scope of the claim."); see also id. ("Those descriptions provide the controlling definitions of the Asserted Trade Secrets in this case."). This finding applies equally to the other asserted trade secrets: L5, D1, D3, and D10.

21.    As the Court previously explained, the factfinder may consider testimony concerning the bounds of the trade secrets. See Docket No. 1898 (Order re Plaintiff's Motion to Reconsider Rule 50(a) Order) at 6. However, plaintiffs may not present evidence altering the scope of their trade secrets during trial. Id. ("Stated differently, testifying about the bounds of existing scope is permitted whereas changing the scope is not."). This finding applies equally to the other asserted trade secrets: L5, D1, D3, and D10.

22.    L4 covers:



Docket No. 2251 at 3.

### **Masimo Possessed L4**

23.    The factfinder may determine that the plaintiff possessed some, but not all, of the disclosed trade secret. Masimo Corp. v. True Wearables, Inc., 2022 WL 17083396, at *10 (C.D. Cal. Nov. 7, 2022) (finding existence and ownership of trade secret with respect to pulse rate and oxygen saturation but not perfusion index). The question under those circumstances is whether the defendant misappropriated only the portion that the plaintiff possessed. See id.

24.    The jury instructions given during the prior trial are not inconsistent with this principle. See Dkt. 1715 at Instruction No. 24 (explains the analysis is based on the trade secret as a whole for the "generally known" inquiry but does not address "possession" in that instruction).

25.    Prior rulings did not address this issue because, at the times those rulings were made, it was sufficient to identify factual disputes as to whether Masimo possessed and whether Apple misappropriated the ██████████████████████ portion

of L4. <u>See</u> Dkt. 1723 (Order re Rule 50(a) Motions) at 9, fn. 4 (indicating that further briefing "on whether a party claiming a trade secret can show that it possessed only part of the asserted trade secret" may be necessary); Dkt. 1901 (Order re Renewed Rule 50(b) Motions) at 5 (identifying conflicting testimony regarding the ███████████████████ portion of L4).

26. Whether the trade secret is sufficiently particular is a separate issue from whether the factfinder may make a determination only as to certain portions of the trade secret. See Imax Corp. v. Cinema Techs., Inc., 152 F.3d 1161, 1167 (9th Cir. 1998).

27. The "or" clause does not render L4 insufficiently particular. *See* Dkt. 264 (Order re Motion to Dismiss) at 6 (finding trade secret disclosure using the phrase, "at least one of the following" sufficient because it suggested selection of one or more items from a closed list). Thus, either ████████████████████████████ ████████████████████████████ would constitute misappropriation, to the extent L4 is a trade secret.

28. Masimo has not shown it possessed the ████████████████████ ██████████████ portion of L4. Madisetti testified that he did not address whether Masimo possessed the ██████ portion of L4 in his witness statement. 11/7 AM Tr. at 10:23-25 and 11:10-15; see also 11/13 Tr. (Warren) at 106:15-25. Warren testified that neither Diab nor Dalke testified tha ████████████████████ █████████████████████████ Id. at 72:12-15; see also Warren Decl. ¶ 57.

29. Moreover, L4 requires ████████████████████████ ████████████████ Madisetti Direct ¶ 82; see also Warren Decl. ¶¶ 36, 38. "Light piping is a physical phenomenon where light from the device does not pass through user tissue but still reaches the photodetectors." *Id.* Masimo witnesses testified that ███████████████████████████ ███████████████████████████ See Poeze Direct ¶¶ 29-30; see also 11/6 AM Tr. (Poeze) at 13:10-12 (testifying that he believed the selection of ██████ had nothing to do with ██████████████████ ).

30. Dalke testified that he selected ████████████████████████

| | | | |
|---|---|---|---|
| Case No. | SA CV 20-00048-JVS-JDE | Date | December 18, 2025 |
| Title | Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc. | | |

████████████████████████. Dalke Direct ¶ 51; see also JTX-935 (Rainbow Piping Testing Procedure) at 966. However, Dalke also admitted he was not comfortable discussing light piping, as it is not an area he has expertise in. 11/6 PM Tr. at 35:25-36:7. Accordingly, this testimony is not compelling.

31. There is no dispute that Masimo has shown it possessed the remaining portions of L4. See Warren Direct ¶ 57 (indicating dispute only as to the ████████ portion of L4; see also Diab Direct ¶¶ 184 and 187-89 (explaining ████████████████████████████████); see also JTX-937 and JTX-1045 (documentation related to Masimo's reflectance sensor).

32. Accordingly, except for the ████████████ portion, Masimo possessed L4.

**L4 Derives Independent Economic Value from Not Being Generally Known**

33. Though Masimo has the burden to prove its trade secrets derived independent economic value from not being generally known, the burden is not high. Cisco, 462 F. Supp. 3d at 1052. Additionally, the generally known inquiry is not only about public disclosure; it is about whether potential competitors who could use the trade secret would have known about it. Kittrich, 2013 WL 12131376, at *4. For this reason, disclosure in a patent establishes that a trade secret was generally known. Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., 587 F.3d 1339, 1355 (Fed. Cir. 2009). However, disclosure in other types of references may be insufficient. Masimo Corp. v. True Wearables, Inc., No. 2021-2146, 2022 WL 205485, at *3 (Fed. Cir. Jan. 24, 2022).

34. Masimo met its burden to establish that L4 derives independent economic value from not being generally known.

35. First, witnesses at trial testified that testing for light piping, as covered by L4, ████ ████████████████████. Kiani Direct ¶ 145 (discussing benefits of light piping testing); see also id. ¶ 147 (describing light piping as "sneaky" and explaining that generic solutions are not sufficient); 11/7/ AM Tr. (Madisetti) at 72:1-18. Rather, it is a sensitive measurement. Id.; see also Diab Direct ¶ 185 (explaining that "it was not easy or obvious to ████████████████████

| | | | |
|---|---|---|---|
| Case No. | SA CV 20-00048-JVS-JDE | Date | December 18, 2025 |
| Title | Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc. | | |

█████ "); see also 11/5 AM Tr. (Kiani) at 107:18-25 and 11/5 PM Tr. (Kiani) at 29:3-14; 11/7 AM Tr. (Madisetti) at 68:16-69:6 (explaining that ███████ ██████████████ ).

36. Second, testing for light piping offered significant competitive advantages to Masimo, including a 10-15x improvement over previous procedures. Madisetti ¶ 116; see also Diab ¶¶ 218-19 (discussing competitive advantages of light piping testing).

37. Finally, though light piping itself was known, Masimo's competitors were not ████ ████████████. Kiani Direct ¶ 140 (testifying that "competitors do not seem to recognize █████████████████████████████████████████ ); id. ¶ 142 (noting deficiencies in Nellcor products and stating, "[t]hat's when we realized Nellcor didn't understand how to ████████████."); Diab ¶ 185 (explaining that competitor product, like Nellcor's, suffered from light piping); Madisetti ¶ 117 (testifying that Apple did not ███████████████████████ ).

38. Putting all this together, Masimo has shown L4 derived independent economic value from not being generally known.

39. The Webster reference does not establish that L4 was generally known. The Webster reference (JTX-3887) is a textbook titled "Design of Pulse Oximeters." Warren Direct ¶ 29. Webster discloses an "optical shunt" which occurs when light reaches the photodiode without going through the arteries. *Id.* The "optical shunting" is light piping. Webster also discloses placing barriers between LEDs and photodiodes to reduce light piping. Id. ¶ 51. Though Webster discloses the idea of light piping and discloses at least one technique to counteract light piping, Webster is not directed to ██████████████████████████████████████████████ ████████████. Thus, Webster does not establish that L4 was generally known.

40. The Peterson reference does not establish that L4 was generally known. Peterson (JTX-3778) discloses techniques for "measuring light piping, and in software trying to remove the effect." 11/5 PM Tr. (Diab) at 103:9-104:10; see also Kiani ¶ 143 (explaining that Peterson, "talks about how light piping is a problem and shows that

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV 20-00048-JVS-JDE | Date | December 18, 2025 |
| Title | Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc. | | |

Nellcor used a phantom finger to measure the amount of light piping and then used an algorithm to try to extract it out instead of just fixing the sensor itself to prevent light piping").

41. ████████████████████████████████████████████████████████████ ████████████, Peterson discloses using software calibration to cancel out light piping. See Peterson at 3:13-16 ("The method includes determining and storing a value representative of an amount of shunted light.") and 6:41-43. Thus, Peterson cannot establish that L4 is generally known because it is directed to a software solution as opposed to ████████████████████████████████████████.

42. Further, Masimo witnesses testified that the solution in Peterson is less effective than the solution covered by L4. For instance, Diab explained that Masimo has established ████████████████████████████████████████████ ████████████" 11/5 PM Tr. at 104:2-10. He explained that this method is effective because it brings "the light piping to a very small number" and is indifferent to the type of tissue through which the light passes. Id.

43. Further, to the extent Peterson discloses ██████████████████████████ ████████████████████████████████████████████████████████████ See Warren Direct ¶ 50.

44. Masimo's patents (JTX-4637, JTX-4692, JTX-3879, and JTX-3707) do not establish that L4 was generally known. Diab testified that portions of Masimo's patent disclosed technique for reducing light piping in a transmission sensor. 11/5 PM Tr. at 54:4-55:1. These techniques involved changing physical characteristics. Id. Still, though the patents disclose ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

45. ████████████████████████████████████████████████████████. Warren testified, "I'm not saying either way whether it discloses test procedures, but I think it's reasonable that they are implied in the specification because of ████████████ ████████████ 11/13 Tr. at 82:17-25.

**CIVIL MINUTES - GENERAL**

Case No.  SA CV 20-00048-JVS-JDE                Date  December 18, 2025

Title  Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc.

46.  Implication is not the same as disclosure. This evidence does not establish that Masimo's patents rendered L4 generally known.

Masimo Made Reasonable Efforts to Maintain the Secrecy of L4

47.  Masimo has met its burden to show it made reasonable efforts to maintain the secrecy of L4. The parties do not dispute that Masimo generally took the appropriate steps to maintain the secrecy of L4 and the other trade secrets. 11/5 AM Tr. at 4:24-5:25. Rather, the secrecy dispute is limited to whether certain Masimo patents disclose the trade secrets, and thus destroy their secrecy. See Attia v. Google LLC, 983 F.3d 420, 425 (9th Cir. 2020). For the reasons discussed above, the Masimo patents do not disclose L4 and thus do not pose a secrecy problem.

Apple Had the Requisite Intent for Trade Secret Misappropriation

48.  To prove trade secret misappropriation under Cal. Civ. Code § 3426.1(b)(2)(B)(iii), Masimo has the burden to show that Hotelling disclosed or used Masimo's trade secrets, knowing that his knowledge of the trade secrets was derived from Lamego, who owed a duty of secrecy to Masimo.

49.  "It is well recognized with respect to trade secrets . . . [that] misappropriation and misuse can rarely be proved by convincing direct evidence." Gable-Leigh, Inc. v. N. Am. Miss, 2001 WL 521695, at *17 (C.D. Cal. Apr. 13, 2001) (citing Q-Co Indus., Inc. v. Hoffman, 625 F. Supp. 608, 617 (S.D.N.Y 1985)). "In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may [infer] that [misappropriation] is more probable than not." Id. The trier of fact must balance direct denials from defendants and their witnesses against this circumstantial evidence. Id.; see also JBF Interlude 2009 Ltd, v. Quibi Holdings LLC, 2020 WL 9311954, at *22 (C.D. Cal. Dec. 30, 2020) (citing UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co., 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007).

50.  Masimo has met its burden to prove misappropriation under Cal. Civ. Code § 3426.1(b)(2)(B)(iii) at least based on the circumstantial evidence presented at trial.

51.  First, the background here suggests a likelihood of misappropriation. In 2013, Masimo and Apple executives met to discuss collaborating. See Kiani ¶¶174-75

(explaining Apple regarded Masimo's technology as "the best in the industry" and was interested in integrating Masimo's technology into its products). However, Apple never took concrete steps toward making an offer to acquire Masimo. 11/8 AM Tr. at 54:3-15. Instead, Apple pursued a "smart recruiting" strategy. See JTX-316 at -708 (June 2013 discussion between Cook and Perica). Apple ultimately hired Lamego, indicating "this is an acquisition-like need for specialized capability that we do not have at Apple." 11/8 PM Tr. at 59:10-12. Apple gave Lamego an "exceptional offer" at least in part due to his specialized experience. JTX-265 at -567.

52.   Second, repeated discussions regarding the importance of protecting trade secrets does not necessarily show that they in fact were protected. For instance, Hotelling told Lamego not to bring confidential information from his prior employers. Hotelling ¶ 49. Lamego also signed an employee agreement stating that he would not use or disclose confidential information. Id. ¶¶ 50-51; see also JTX-3044 (Agreement). These discussions and document could show that Apple was exercising caution. They could also show that Apple was concerned that misappropriation was occurring or had occurred, especially given the circumstances under which Lamego came to work for Apple. 11/7 PM Tr. at 100:4-16 (indicating Apple instructed Lamego on a near daily basis that "they didn't want to have any type of transfer from Masimo to Apple.") They do not show that Apple effectively prevented any misappropriation. Still, the Court does not heavily weigh this evidence in either direction given concerns about Lamego's credibility.

53.   Third, Lamego's assurances that he did not disclose trade secrets are not credible. 11/7 PM Tr. (Lamego) at 34:9-12 (admitting it is difficult to separate tasks from know-how").

54.   Fourth, by June of 2014, Haggerty expressed concern to Hotelling that Lamego was a risk to Apple's confidential information. JTX-15 (discussion between Hotelling and Haggerty) at 9. She proposed using him in a consultant capacity but insulating him from Apple's algorithms. Id. Hotelling appears to have rejected this suggestion in the exchange. Id. at 1-2. However, Lamego recalls being "put in the garage." 11/7 PM Tr. at 97:15-98:1. This exchange at least should have alerted Hotelling that

Lamego was using confidential information in a risky manner.

55.   Finally, general denials from Apple do not outweigh the circumstantial evidence here. See Hotelling ¶ 66 (indicating he had no reason to believe Lamego used confidential information from Masimo at Apple); Ness ¶ 7 (generally denying use of Masimo's confidential information); Land ¶ 84 (indicating he never suspected that Lamego disclosed Masimo's confidential information); Block ¶ 16 (denying awareness that Lamego disclosed Masimo's confidential information); Waydo Direct ¶ 61 (denying that Lamego gave him any of Masimo's confidential information); Perica Direct ¶ 6 (generally denying awareness that Lamego disclosed trade secret information to Apple); Russell-Clarke Direct ¶ 30 (generally denying use of Masimo's confidential information).

56.   It is more likely than not the Apple had the requisite intent.

57.   Consistent with its prior ruling, the Court will not revisit the availability of respondeat superior.  Docket No. 1901 at 18, n.7.

58.   At least because Masimo has met its burden under Cal. Civ. Code § 3426.1(b)(2)(B)(iii), the Court need not evaluate whether Masimo may or has prevailed on another theory.

59.   This discussion applies equally to L5, D1, D3, and D10.

Apple Used, Disclosed, or Acquired L4

60.   Masimo has the burden to present a prima facie case that Apple did not independently develop the trade secrets. *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1663–64, 3 Cal. Rptr. 3d 279, 282 (2003).  Once Masimo has made this showing, the burden shifts to Apple to produce rebutting evidence.  Id.

61.   Lamego disclosed L4 to Apple.  JTX-143 at -568 (list of including ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ).

62.   Warren testified that Lamego's disclosure related to a different problem.  11/13 Tr. 44:18-21 (Warren opines that when Lamego says ▮▮▮▮▮▮▮▮ he is referring to "electromagnetic interference shielding.").  For this reason, Warren

testified that disclosure of a ████████████████████████████ in a document memorializing improvements suggested by Lamego is not a disclosure of L4.  Id. at 119:1-19 (discussing JTX-143); see also 11/12 PM Tr. (Land) at 35:10-19 (offering similar testimony regarding electromagnetic interference shielding and concluding that Lamego's suggestion was not related to the black foam quality test).  However, Land also agreed that he "do[es] not have first-hand knowledge of every conversation Marcelo Lamego had at Apple."  11/12 PM Tr. at 21:8-12.

63.  On balance, the record sufficiently establishes that Lamego disclosed L4 in his list of improvements, especially in view of the significant documentary evidence associating ████████████████████████████████████████.

64.  Apple used a black foam test before Lamego was hired.  Block testified that ████ ████████████████████████████████████████████████████████ ████████ 11/13 Tr. at 11:5-21; see also Block Direct ¶¶ 23-24 (explaining that ████ ████████████████████████████████████████████████████ ████████ ; Land Direct ¶ 29 (explaining that Apple ████████████ ████████████████████████████████████ ) and ¶ 42 (explaining that ████████████████████████████████████████████████ ); see also 11/12 PM Tr. (Land) at 30:12-11 (explaining ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ ); see also JTX-1061 at 13 (indicating that ████████████████████████████████████ ).

65.  However, Apple ████████████t after Lamego disclosed L4 to ████████████.  Block Direct ¶¶ 33 and 37 ████████████████████████████ ████████████████████████████████ .

66.  Though Apple's ████████████████████████████ ████████████████████████████████ . See Land ¶ 42. Madisetti emphasized that L4 requires ████████████████████████

████████. 11/6 PM Tr. at 76:9-13; <u>see also id.</u> at 26:13-15 (testifying that ████████ ████████).

67.    Circumstantial evidence supports Masimo's position that Lamego's disclosure prompted the design change.  Though Block testified that Lamego had nothing to do with the decision to ████████████████████████████████████, <u>see</u> 11/13 Tr. (Block) at 9:7-11, Land testified that ████████████████████████ ████████████████ but could not recall who made the decision. 11/12 PM Tr. at 20:5-24.  He said he did not know whether Lamego had passed information to the team on this topic.  <u>Id</u>. at 21:2-12.  Lamego did disclose L4 to Apple and it is unclear what else could have prompted Apple to modify its test.

68.    Apple engineers offered conflicting testimony on the purpose of the black foam test and their testimony regarding the purpose of the design changes appears inconsistent with the above documentary evidence.  For instance, Block testified that ████████ ████████████████████████████████.  11/13 Tr. (Block) at 13:2-5 and 15:1-4.  The documents cited in the previous paragraph suggest otherwise.  Land testified that Apple's ████████████████████████ ████████████████████████████████ <u>see</u> 11/12 PM Tr. at 32:25-33:23, however, Block later testified that the ████████████████████ ████████████.  Id. at 56:2-22 and 60:4-14.

69.    The Court also does not find Apple's position that Masimo has changed the scope of the trade secret persuasive.  The purpose of the trade secret is to ████████████████. Accordingly, when L4 discloses ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Madisetti, as a person having skill in the art, was entitled to opine regarding ████████████████████████████.

70.    In some instances, Madisetti required redirection and instruction from the Court to focus his responses.  The Court does not find that this behavior poses a credibility problem.

71.    ████████████████████████████████████. Madisetti ¶ 102 (████████

████████████████████████████) and ¶103 (███████
████████); see also id. ¶ 111 (testifying that █████
████████); see also JTX-
1078 at 632 and JTX-1070 at 912 (indicating Apple used ████████
████); see also JTX- 1076 at 797 (indicating ██████
██); see also JTX-1064 at -859, 860 (showing that Apple ██████████
████████).

72.   For the foregoing reasons, Masimo has shown by a preponderance of the evidence that Apple acquired and used L4.

Harm

73.   CUTSA does not require harm. Cal. Civ. Code § 3426.1. As discussed above, Masimo has shown by a preponderance of the evidence that (1) L4 existed and (2) Apple improperly acquired, used, or disclosed L4. Accordingly, Masimo has established the liability portion of its trade secret misappropriation claim as to L4. The Court evaluates remedies below. This finding applies equally to L5, discussed below.

L5 (████████████████████)

74.   L5 covers:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████

Docket No. 2251 at 3.

75.   As the Court previously found, L5 does not fail on particularity grounds. Docket No. 1901 at 8. It "identifies a problem unknown in the industry and [] comprises the knowledge that ████████████████████████" the problem. Id. "[I]t does not claim every solution to this problem." Id.; see also 11/7 AM Tr.

(Madisetti) at 106:13-107:7 (testifying that ███████████████████████ ███████████ but that it is not limited to the exact method employed by Masimo).

76.    The best interpretation of L5, based on the record, is that the trade secret focuses on the knowledge of the problem. The knowledge of the problem also comes with knowledge about how to solve the problem – i.e., it can be solved by ████████ ████████. Thus, while the scope does not cover incidental solutions, it does cover ████████████████████████████████████████████████████ ████████████████████████████████.

77.    Knowledge can be claimed as a trade secret. <u>BladeRoom</u> <u>Grp.</u> <u>Ltd.</u> <u>v.</u> <u>Facebook,</u> <u>Inc.</u>, No. 515CV01370EJDHRL, 2017 WL 2224838, at *2 (N.D. Cal. May 22, 2017) (citing <u>Altavion,</u> <u>Inc.</u> <u>v.</u> <u>Konica</u> <u>Minolta</u> <u>Systems</u> <u>Laboratory</u>, 226 Cal. App. 4th 26 (2014)) (explaining that continuum of possible trade secrets includes "general idea[s]"). The issue is whether the "idea" meets the requirements to be a trade secret, including whether it was known to the public. <u>Id.</u>; <u>see</u> <u>Waymo</u> <u>LLC</u> <u>v.</u> <u>Uber</u> <u>Techs.,</u> <u>Inc.</u>, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017) (finding "broad swaths of solutions" not protectable at least because the "considerations and trade-offs were known outside of Waymo.")

<u>Masimo</u> <u>Possessed</u> <u>L5</u>

78.    The parties dispute whether possession is limited to the examples that Masimo presented at trial. As explained below, Masimo has presented evidence that it possessed a few possible solutions in view of its knowledge. Accordingly, the Court does not find a lack of possession because Masimo did not demonstrate it possessed all possible circuit designs. Again, the focus of L5 is knowledge of ████████ ████████████████████████████████████████ ████████. It is not limited to a particular design.

79.    Masimo discovered the ████████████████████████████ on August 1, 2005. 11/6 PM Tr. (Dalke) at 40:8-24; <u>see</u> <u>also</u> Dalke Direct ¶ 66 (describing ████████████ ████████████).

80.   Masimo's ███████████████ establishes possession of L5.  Docket No. 2405-1 (Smith) at 93:13-94:10; see also 11/6 PM Tr. (Dalke) 43:6-16 (explaining that the purpose of ████████████████████████████████████████ ██████ ); see also 11/13 Tr. (Warren) at 122:19-123:19 (confirming that Masimo possessed ████████████████████████████████ ).

81.   The █████████████████ Dalke discusses in his notebook establishes possession of L5 as of August 1, 2005, when Masimo discovered ███████████████████ ██████ .  11/6 PM Tr. (Dalke) at 50:4-25 and 61:3-6; see also JTX-702 (Dalke's notebook) at 215; see also Dalke Direct ¶ 87 ("Further, now that we understood what was causing the problem, we understood why █████████████████████████ ████████████████████████████ .")  When Masimo discovered the problem, it then gained the understanding as to why previous changes were effective.  Thus, these changes establish possession as of the date Masimo gained the knowledge.  The █████████████ that Dalke describes also establish possession. Id.; see also 11/13 Tr. (Warren) at 122:19-123:19 (confirming that Masimo possessed ███████████████████████████████████ ).

      <u>L5 Derives Independent Economic Value from Not Being Generally Known and Masimo Made Reasonable Efforts to Maintain the Secrecy of L5</u>

82.   Masimo has shown, prima facie, that L5 derives independent economic value from not being generally known.  See Diab Direct ¶ 228 ("The understanding of this problem and the solution we came up with enabled us to achieve our desired accuracy which in turn enabled Rainbow technology, a technology that has not been replicated by Masimo's competitors."); see also Madisetti Direct ¶ 162 (testifying that Masimo's competitors did not understand or appreciate ████████████████████ ██████ ); see also Dalke Direct ¶ 94 ("We kept ████████████████ ███████████████████████████████████████████████████████ to ourselves even within Masimo because we did not want to disclose this engineering knowledge to the outside world.")

83.   ████████████████████████████████████████████████████████████ 11/12 PM Tr. (Land) at 38:19-25. ███████████████████████████. Id.

84.   Apple witness did not establish that ████████████████ was generally known. Though Land drew on his college education studying semiconductor physics to explain the phenomenon, he did not testify that he learned about the problem in college. Id. Similarly, Hotelling testified that he "saw LEDs being used for photodiode effect . . ." 11/8 PM Tr. at 90:16-23. Hotelling did not testify that he understood this effect to be problematic.

85.   Apple has not established that Webster renders L5 generally known. Webster discloses reverse biasing but does not disclose ████████████████████ ████████████████████. See Warrant ¶ 103. Webster instead discloses that a photodiode may be unable to distinguish light from an unwanted LED. Id. This is not the same problem and does not establish the knowledge of the problem.

86.   Apple has not established that Mims renders L5 generally known. Mims discloses the idea that an LED may be used to detect the output from a similar LED. Warren Direct ¶¶ 98. Thus, Mims shows that LEDs may act as detectors (photodiodes). Id. Mims does not disclose knowledge that ████████████████████████ ██████.

87.   Apple has not established that Roedel renders L5 generally known. Like Mims, Roedel does not disclose knowledge that █████████████████████████ ██████████████████████████████████████████████████ Warren Direct ¶ 99.

88.   Apple has not established that the Dalke 2006 patent (JTX-3003)  renders L5 generally known. It discloses that, "[t]he diode 4220 is oriented, e.g. anode to row and cathode to column as the LEDs so as to prevent parasitic currents from unwanted activation of LEDs 810 (FIG. 8)." Dalke 2006 at 16:40-43. It shows an example diagram of an emitter array. Id. at 3:22-23; FIG. 8.

Case No.  SA CV 20-00048-JVS-JDE                Date  December 18, 2025

Title  Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc.

89.  Dalke initially testified that, "[f]igure 8 and the specification for this patent does not address or disclose ████████████████████████████ ████████████ Dalke Direct ¶ 92.  He explained that, "[t]he parasitic current flow describes that when we turn on an LED, we want only that one particular LED to turn on. And then we can prevent currents from flowing through other LEDs."  Id. However, Dalke also testified that what was disclosed in FIG. 8 would ██████ ████████████ 11/6 AM Tr. at 47:19-24.  Thus, Dalke's testimony regarding Dalke 2006 is inconsistent.

90.  Still, though Dalke later testified that FIG. 8 would █████████████, Dalke never testified that Dalke 2006 disclosed ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ See Warren Direct ¶ 123.

91.  L5 also covers more than the concept of ████████████.  For this reason, Smith's testimony that Masimo did not maintain the secrecy of the idea of ████████████ is not probative.  See Docket No. 2405-1 at 101:20-23.

Apple Used, Disclosed, or Acquired L5

92.  Masimo has shown that Apple acquired knowledge about the ██████████████ ████████████████████████████████████████████████████████████████

An email exchange between Apple engineers stated:

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

| | | | |
|---|---|---|---|
| Case No. | SA CV 20-00048-JVS-JDE | Date | December 18, 2025 |

| | |
|---|---|
| Title | Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc. |

JTX-541 at 581. This email establishes that Lamego disclosed both the knowledge of the problem and a solution to Apple. See also Madisetti Direct ¶140; see also 11/7 AM Tr. (Madisetti) at 104:3-105:21 (explaining that ███████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████).

93. Apple implemented a short to supply circuit design in all Apple Watches after the Series 0 Watch to solve a "floating LED" problem. JTX-181 (Apple documentation) at 767 ("There shall be switch to short both ends of the LED to its supply when it is not in use. This can avoid floating LED situation."); see also Madisetti Direct ¶ 140 (explaining Series 0 Watch has ██████████████████████).

94. ████████████████████████████████████████████████████████ Warren Direct ¶ 144 (explaining that ██████████████████████ ████████████████████████████████████████████████████████ ██████████). Warren testified that the ██████████████████████ ████████████████████████████████. 11/13 Tr. at 132:9-14 (explaining that ████████████████████████████████████████████████████████ ██████). Block and Warren both testified that ██████████████████ were not a problem in any Apple Watches. Id. at 18:18-20 and 56:19-25; see also 11/12 PM Tr. (Land) at 24:8-10.

95. However, though ████████████████████████████████████████ are not the same, ████████████████████████████████████████████████████████ ████████████████████████████████. See JTX-541 at 581; see also Land Direct ¶ 11/12 PM Tr. (Land) at 38:19-25. Apple engineering documents regarding improvements to the Series 0 Apple Watch design discuss ██████████████ ██████████████. JTX-185 at 824. Thus, the same solution could potentially solve both problems and the problems are not wholly unrelated.

96. Evidence in the record supports the idea that ███████████████████ ████████████████████████████████████████████████████████ For example, Madisetti, quoting Chern, an Apple engineer, testified that ████████ ████████████████████████████████████████████████████████████ ██████████████ 11/7/ AM Tr. at 86:3-4 (discussing JTX-184).

97. Shorting to ground and shorting to supply are different configurations. See 11/7 AM Tr. (Madisetti) at 105:14-16 (shorting to supply and shorting to ground are different configurations); see also 11/13 Tr. (Warren) at 131:16-19.

98. However, the solution that Lamego disclosed to Apple ██████████████ ████████████████████████████████ See JTX-541 at 581; see also JTX-1114 (saying only ████████████); see also 11/13 Tr. (Warren) at 69:14-15; see Land Direct ¶ 51 (Lamego suggested "LED short-circuited when off") (citing JTX-143 at 568).

99. The short circuit to ground language that appears in some documents originated with Apple's engineers, not Lamego. 11/7 AM Tr. at 85:18-86:14 (discussing JTX-143 (Lamego's list of improvements for Series 0 Watch)). Warren testified that Lamego recommended a short to ground solution but the emails do not support that the short to ground language originated with Lamego. See 11/13 Tr. at 127:16-20; but see JTX-184 (printout from Apples RADR system) (referencing Lamego's short to ground solution, though Apple engineers drafted this document). The evidence does not conclusively establish that Lamego limited his suggestion to a short to ground.

100. Apple did not adopt a short to ground solution. JTX-184 at 173; see also 11/13 Tr. (Block) at 18:21-23 (testifying that Apple did not adopt a short to ground solution). Still, it is undisputed that Apple adopted a short to supply solution, which would fall under the general, "short circuit" solution suggested by Lamego.

101. Apple adopted this ███████████████████ with the knowledge from Lamego that it would solve ████████████████████████████████. Some Apple engineers testified that the Apple Watch did not have ████████████████████████ However, other documents suggest that the ████████████████████████ ████████████████████████████████ See, e.g., JTX-184 at 173.

102.    On balance, Masimo has shown by a preponderance of the evidence that Apple adopted the short to supply solution based on Lamego's suggestion and for purposes of ███████████████████████████████████████████████ 11/13 Tr. (Warren) at 65:19-20 ("[T]he same solution can be used for many different problems.")

103.    Masimo has shown that Apple disclosed the problem and solution to ████████. 11/7 PM Tr. (Madisetti) at 87:5-88:4 (explaining that ██████████████████████████████████████████████████████████████████████ ; see also JTX-541 at 581 ███████████████████████████████████████████████████████████████████████████████████████); see also Madisetti Direct ¶¶ 144-45.

104.    Other evidence suggests Apple ultimately focused on the floating LED problem in its further communications with ████████. Land Direct ¶¶ 65-66 (testifying that correspondence with ████████ related to a short to supply solution to address the floating LED problem); see also JTX-1156 at 527 (████████ document titled, "Citrine Analog IP Highlights") (███████████████████████████); see also Warren Direct ¶¶ 133-35. Still, the short to supply solution was known by Apple as ████████████████████████████████████████████████████. Shui's response shows that Apple communicated Lamego's problem and solution to ████████.

105.    For the foregoing reasons, Masimo has established by a preponderance of the evidence that Apple acquired, used, and disclosed L5.

**D1 (Demodulation and Demultiplexing)**

106.    D1 covers:

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Docket No. 225 at 1.

| Case No. | SA CV 20-00048-JVS-JDE | Date | December 18, 2025 |
|---|---|---|---|

| Title | Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc. |
|---|---|

<u>Masimo Possessed D1</u>

107. Masimo has established that it possessed D1. Testimony from at least Diab and Poeze, along with source code documentation, establish possession.

108. Diab explained that using both ███████████████████████████ ████████████████████. Diab Direct ¶ 151. He testified that Masimo followed this process for its Rainbow sensors to determine the ████████████████. <u>Id</u>. ¶ 152. He described this performance improvement as "unexpected." <u>Id</u>. ¶ 170.

109. Poeze explained how to apply the ████████████████████████ █████████████████. Poeze Direct ¶¶ 44-58. He used the term █████████████ and ████████████████ interchangeably. <u>Id</u>. ¶ 56 ("The ultimate end result is called a ████████████████████."); <u>see also</u> 11/6 AM Tr. (Poeze) at 25:2-4 ("[T]hat very same ████████████ is used for the ████████████.")

110. Poeze further testified that Lamego explained the operations to him and that Poeze then helped develop software. Poeze Direct ¶ 59. He indicated the "software . . . worked as described in my notebook entries." <u>Id</u>. ¶ 65; <u>see also</u> JTX-832 (Poeze Lab Notebook) at 935-36. The software was incorporated into the Pronto-7 product. <u>Id</u>.; <u>see also</u> JTX-5199.1 and JTX-5200 (cover pages for source code); <u>see also</u> 11/6 AM Tr. (Poeze) at 27:18-29:16 (explaining that the ████████████████████████ █████████████████████████████████████████████.

111. Accordingly, Masimo has shown possession of D1.

Masimo Has Not Shown that D1 Derives Independent Economic Value from

Not Being Generally Known

112. Masimo presented evidence showing that D1 has economic value. Diab explained the importance of having clean signals. Diab Direct ¶ 155. He explained that the demodulation and demultiplexing techniques he developed accomplish this goal with "industry-leading, medical-grade accuracy." <u>Id</u>. ¶ 177. He also testified that this technology reduced Masimo's manufacturing costs. <u>Id</u>. ¶ 156. Madisetti opined that Apple learned of D1 for the first time from Lamego and appreciated its value. Madisetti Direct ¶¶ 192 and 194.

113. The Weber 2005 patent establishes that D1 was generally known. Masimo's Weber

2005 patent (JTX-3581) discloses two equations that Sarrafzadeh opines express a demultiplexing matrix. JTX-3581 at 10:33-32; Sarrafzadeh Direct ¶ 63. The patent describes that matrix as "affect[ing] how much crosstalk is seen in the output signals." Id. at 9:17-18. It does not use the term demultiplexing. Still, Sarrafzadeh testified that Weber 2005 discloses D1 in its entirety. 11/12 AM Tr. at 68:14-69:7. Madisetti testified that Weber 2005 does not disclose demultiplexing but did not explain why. Madisetti Direct ¶ 225. Moreover, as discussed in the above sections, Poeze used the terms ███████████████████████████ interchangeably. This, with Sarrafzadeh's testimony establishes that more likely than not the matrix disclosed in Weber 2005 is a demultiplexing matrix.

114.    Further, though Masimo contends that Weber 2005 at FIG. 4 fails to show ███████████, Sarrafzadeh explains how the disclosure in Weber 2005 both in FIG. 4 and at 6:47-56 would show a person having skill in the art how to implement D1. Sarrafzadeh Direct ¶ 62. Finally, though Sarrafzadeh did not opine in his expert report that Weber 2005 discloses the final portion of D1, he did state that based on the evidence presented during trial his testimony was that Weber 2005 disclosed the full trade secret. 11/12 AM Tr. at 13:23-14:4 and 69:7. Masimo does not point to any expert testimony supporting its position that Weber 2005 does not disclose D1. Based on Sarrafzadeh's testimony, Apple has shown by a preponderance of the evidence that Weber 2005 discloses D1.

115.    Weber 2005 is an issued patent. Disclosure in a patent establishes that a trade secret was generally known. Ultimax Cement, 587 F.3d at 1355. Accordingly, D1 was generally known.

116.    Because Apple has established that D1 was generally known, Masimo cannot establish that Apple misappropriated D1. The Court need not evaluate whether Masimo made reasonable efforts to maintain its secrecy or whether Apple acquired, used, or disclosed D1.

**D3 (Demodulation and Demultiplexing)**

117.    D3 covers:

███████████████████████████████████████████████████████████

**CIVIL MINUTES - GENERAL**

Case No.   SA CV 20-00048-JVS-JDE                    Date   December 18, 2025

Title      Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Docket No. 2251 at 1.

Masimo Possessed D3

118. Masimo has established that it possessed D3.  Testimony from at least Diab and Poeze, along with source code documentation, establish possession.

119. Diab testified that Masimo used ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Diab Direct ¶ 131.  He also explained that Masimo used a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Id. ¶ 153-54.

120. Poeze discussed using ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Poeze Direct ¶¶ 25-28.  He explained why ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Id. ¶ 31.  He then explains ▮▮▮▮▮▮▮▮▮▮▮▮. Id. ¶¶ 32-34.  He then explained that ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Id. ¶ 39.

121. Poeze's lab notebook documents these steps, with the exception of the ▮▮▮▮▮▮▮▮ ▮▮▮, which is not shown.  Id.; see JTX-832 (Poeze Lab Notebook) at 907.  As stated above, Poeze uses the term ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ interchangeably.  Though the ▮▮▮▮▮▮▮▮ is not shown in his notebook, Poeze testified at trial that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, as indicated by an arrow in his notebook.  11/6 AM Tr. (Poeze) at 23:3-15.

122. As indicated above, Poeze worked on software incorporating the concepts from his notebook.  The software was implemented in the Pronto-7 product.

123. Accordingly, Masimo has shown that it possessed D3.

Masimo Has Not Shown that D3 Derived Independent Economic Value from Not Being Generally Known

124. Masimo presented evidence showing that D3 has economic value.  For example, Diab explained that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████ . Diab Direct ¶ 153.  The D3 process also results in ███████████████████ ███████████ . Id. ¶ 155.   Poeze also testified that ████████████████████████████████████████████████████████████ . Poeze Direct ¶ 34.  Madisetti opined that Apple was not aware of D3 until Lamego disclosed it. Madisetti Direct ¶ 218.

125.    Poeze 2011 establishes that D3 was generally known.  Sarrafzadeh testified that Masimo's Poeze 2011 patent (JTX-3583) disclosed D3 in its entirety.  11/12 AM Tr. at 78:1-81:5.  He identified ███████████████████████████████ . Id. at 79:18-80:5.  Sarrafzadeh testified at trial that he did not identify Poeze 2011 as one of his "generally known" references in his direct declaration. 11/12 AM Tr. at 46:3-8. Still, Sarrafzadeh opined that Poeze 2011 disclosed all of D3 except the ███████████ step.  Sarrafzadeh Direct ¶¶ 117-18.

126.    At trial, Sarrafzadeh went on to testify that, assuming the ████████████ and ████████████████████ are the same, as Poeze testified, Poeze 2011 discloses ████████████ . Id. at 80:14-81:5 (citing JTX-3583 at FIG. 4A and 4B).  Madisetti concludes that Poeze 2011 does not disclose ███████████████████████ ███████████████████████████████████████████ but does not articulate the basis for his conclusions.  Madisetti Direct ¶ 225.  The Court finds Poeze 2011 discloses ██████████████ in view of Poeze's testimony equating the ███████████████████ .

127.    Because Apple has established that D3 was generally known, Masimo cannot establish that Apple misappropriated D3.  The Court need not evaluate whether Masimo made reasonable efforts to maintain its secrecy or whether Apple acquired, used, or disclosed D3.

## **D10 (Demodulation and Demultiplexing)**

128.    D10 covers:

**CIVIL MINUTES - GENERAL**

Case No.   SA CV 20-00048-JVS-JDE                    Date   December 18, 2025

Title      Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc.

Estimating physiological parameters when modulated light from a first light source and a second light source emitted toward a body part of a user, involving:

(1) determining a first multiplier value by: turning on the first light source, generating a first initial signal in response to capturing a first light sample corresponding to the first light source, demodulating the first initial signal to produce first initial demodulated signals, filtering and decimating the first initial demodulated signals, and determining the first multiplier value based on the filtered and decimated first initial demodulated signals;

(2) determining a second multiplier value by: turning on the second light source, generating a second initial signal in response to capturing a second light sample corresponding to the second light source, demodulating the second initial signal to produce second initial demodulated signals, filtering and decimating the second initial demodulated signals, and determining the second multiplier value based on the filtered and decimated second initial demodulated signals;

(3) capturing multiple light samples while the first light source and the second light source are turned on to emit modulated light toward the body part of the user and converting the multiple light samples into a captured signal;

(4) demodulating the captured signal to produce multiple demodulated signals;

(5) performing a first decimation stage by: low pass filtering each demodulated signal and decimating each demodulated signal;

(6) performing a second decimation stage after the first decimation stage by: low pass filtering each demodulated signal and decimating each demodulated signal;

(7) demultiplexing each demodulated signal after the second decimation stage to produce a first signal associated with the first light source and a second signal associated with the second light source;

| | | | |
|---|---|---|---|
| Case No. | SA CV 20-00048-JVS-JDE | Date | December 18, 2025 |
| Title | Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc. | | |

(8) multiplying the first signal by the first multiplier value using a first multiplier circuit to obtain a first conditioned signal;

(9) multiplying the second signal by the second multiplier value using a second multiplier circuit to obtain a second conditioned signal; and

(10) analyzing the first conditioned signal and the second conditioned signal to estimate the physiological parameter of the user.

Docket No. 2251 at 1-2.

Masimo Has Not Established that It Possessed D10

129. Masimo has not shown that it possessed D10 at least because the evidence presented does not establish that Masimo more likely than not possessed step 4.

130. Madisetti opined that the Pronto-7 source code establishes all steps of D10. Madisetti Direct ¶¶ 233-249. Poeze also testified that the demodulation and demultiplexing system was implemented into software described in his notebook series which was ultimately incorporated into the Pronto-7 product. Poeze Direct ¶ 65; see also JTX-832 (Poeze Lab Notebook) at 907, JTX-5199.1 (source code), and JTX-5200.1 (source code).

131. Masimo has established possession of steps 8 and 9 of D10 because the evidence does not support Apple's position that these steps require a hardware component..

132. Madisetti does not opine that the Pronto-7 source code includes a multiplier circuit. See Madisetti Direct ¶ 246; see also Sarrafzadeh Direct ¶¶ 160-61. Rather, Madisetti opines that the source code includes multiplier values and a module for demultiplexing. Madisetti Direct ¶ 246. Sarrafzadeh testified that Madisetti's opinions are inconsistent. 11/12 AM Tr. (Sarrafzadeh) at 85:8-15 (testifying that Masimo has not shown possession of steps 8 and 9 of D10 because Madisetti identifies only source code and these steps require hardware).

133. Poeze testified that "there is no multiplier circuit because this all is software." 11/6 AM Tr. (Poeze) at 12:12-23. He later clarified that a multiplier circuit does exist in

a software implementation. Id. at 19:17-20:4. Thus, Poeze's testimony supports Madisetti's opinion that steps 8 and 9 appear in the Pronto-7 source code.

134. Masimo has not established possession of step 4 of D10 because Madisetti conflates demodulation, decimation, and demultiplexing.

135. Step 4 of D10 requires demodulation. See Sarrafzadeh Direct ¶ 157. Madisetti identified portions of the Pronto-7 source code that he contends show step 4. Madisetti Direct ¶ 243. However, the portions he highlighted show decimation and demultiplexing functions. Id. Still, Madisetti testified that the demodulation consists of decimation and demultiplexing. Id.

136. Madisetti's equation of decimation, demultiplexing, and demodulation is inconsistent with other testimony from Madisetti as well as testimony from Diab. See id. ¶¶ 35 (explaining demodulation), 44 (explaining demultiplexing), and 244 (explaining decimation); see also Diab Direct ¶¶ 107-08 (explaining demodulation and demultiplexing). Even if decimation and demultiplexing together could result in demodulation, as Madisetti contends, D10 covers 10 steps that include decimation, demultiplexing, and demodulating signals at various stages. For instance, steps 5, 6, and 7 require further decimation and demultiplexing after demodulation. Accordingly, merely pointing out decimation and demultiplexing operations in the source code is not sufficient to establish that Masimo possessed step 4.

137. Because Masimo has not established that it possessed D10 by a preponderance of the evidence, Masimo cannot establish that Apple misappropriated D10. The Court need not evaluate whether D10 derived independent economic value from not being generally known, whether Masimo made reasonable efforts to maintain its secrecy, or whether Apple acquired, used, or disclosed D10.

Patent Ownership

138. To prove its ownership interest in a disputed patent, a plaintiff must show, by a preponderance of the evidence, that at least one inventor of that patent did one or both of the following: (1) assigned their interest in the subject matter claimed in the patent; or (2) made their inventive contribution to the subject matter claimed in the patent at

a time and under conditions that created an obligation to assign rights in the invention to plaintiff.  Beech Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248-49 (Fed. Cir. 1993).

139. Lamego did not make inventive contributions to the '052 and '670 Patents while under an obligation to assign inventions to Masimo.

140. The '052 (JTX-1239) and U.S. Patent No. 10,247,670 (the "'670 Patent") (JTX-1241) Patents are directed to a reflective coating that can be applied where or near where light is emitted to increase light collected by the detector.  Ness Direct ¶¶ 30-31.  Claim 1 of the '052 Patent discloses a "reflector disposed about the aperture" and Claim 1 of the '670 Patent discloses a "reflective layer."

141. Due to his contributions, Lamego is a named inventor of the '052 and '670 Patents.  Ness acknowledged that Lamego proposed the idea of using a reflective coating on the back of the watch.  Id. ¶¶ 26 and 33.  Lamego provided this idea during a meeting with Ness and others in February of 2014.  Id. ¶ 46.  Ness also emailed Lamego regarding the information disclosure statement submitted with the applications for the '052 and '670 Patents.

142. However, Lamego was not under an obligation to assign inventions to Masimo at the time of his idea.  Lamego came up with his idea during a brain-storming session in February of 2014.  Id.  Though the patents and claims are not limited to a watch, the session focused on how to use reflectivity on the Apple Watch, as opposed to general principles that Lamego may have learned at Masimo.  See id.; see also Warren Direct ¶ 164.  Lamego was only obligated to assign ideas he developed while working at Masimo and Cercacor.  Madisetti Direct ¶ 264.

143. Masimo presents evidence that Diab designed reflective surfaces to improve the performance of pulse oximeters and other sensors. JTX-1910 (Diab Notebook) at 669 and JTX-1227 (Diab Notebook) at 574; JTX-777 (showing sensor with reflective layer); see also Madisetti Direct ¶¶ 274-77.  The Court acknowledges that in some ways the components of the sensor Diab designed are similar to the claims of the '052 and '670 Patents.  However, Masimo does not present evidence that Lamego and Diab collaborated on this work.

144. Lamego was also a named inventor on other patents belonging to Masimo that relate to reflective layers. See JTX-1206 and 1207; see also Madisetti Direct ¶¶ 285-86. However, Madisetti does not opine that the "reflector disposed . . ." limitation of the '052 Patent or the "reflective layer" limitation of the '670 Patent appear in Lamego's Masimo patents. Id. Apple conceded that the other claim elements were known in the art.

145. For the foregoing reasons, Masimo has not shown by a preponderance of the evidence that Lamego made inventive contribution to the '052 and '670 Patents while under an obligation to assign those contribution to Masimo.

146. Lamego did not make inventive contributions to U.S. Patent No. 9,952,-95 (the "'095 Patent") (JTX-1268) and U.S. Patent No. 11,009,390 (the "'390 Patent") (JTX-1269) while under an obligation to assign inventions to Masimo. These patents relate to analog front ends for sensors. Madisetti Direct ¶ 262.

147. Diab is the named inventor on a Masimo patent (JTX-1267) related to similar technology. Id. ¶ 298. Lamego was named as an inventor on a Masimo published patent application (JTX-1206) that relates to similar technology. Id. Madisetti compared the Diab patent to the claims of the '095 and '390 Patents and identified overlapping subject matter. Id. ¶¶ 299-302. However, Madisetti did not opine, in a more than conclusory manner, that Diab and Lamego collaborated on this material. As to the Lamego patent, Madisetti identified overlap only for the "emitter" limitation of the '085 and '390 patents. Id. ¶ 303. Madisetti does not opine that this idea was not known in the art.

148. Masimo has not presented sufficient evidence showing that Lamego came up with his contributions to the '095 and '390 Patents based on his work at Masimo. Hotelling testified that he and Lamego came up with the ideas in these patents together, while Lamego was employed at Apple. Hotelling Direct ¶ 74.

149. For the foregoing reasons, Masimo has not shown by a preponderance of the evidence that Lamego made inventive contributions to the '095 and '390 Patents while under an obligation to assign those contribution to Masimo.

150. Lamego did not make inventive contributions to U.S. Patent No. 10,219,754 (the "'754 Patent") while under an obligation to assign inventions to Masimo. Madisetti opined that Masimo's Pronto-7 device contains all features of the D10 secret. Madisetti Direct ¶ 267. The D10 secret exactly mirrors the '754 Patent. Id. Madisetti concluded that Lamego worked on the Pronto-7 device. Id. However, Madisetti does not offer a detailed analysis of Lamego's work. Further, as explained above, the Court determined that Masimo did not possess all of D10.

151. Apple presented evidence that Lamego's contributions to the '754 Patent are memorialized in a MATLAB script that Lamego wrote while employed at Apple. Hotelling Direct ¶ 77; see also JTX-880.

152. Based on the foregoing, Masimo has not shown by a preponderance of the evidence that Lamego's inventive contributions to the '754 Patent were contributions he was obligated to assign to Masimo.

Patent Inventorship

153. To prove inventorship, a plaintiff must show at least one of its employees made a substantial contribution to conception of at least one limitation of a claim. Vapor Point LLC v. Moorhead, 832 F.3d 1343, 1348 (Fed. Cir. 2016) ("All inventors, even those who contribute to only one claim or one aspect of one claim of a patent, must be listed on that patent.")

154. The standard of proof is clear and convincing evidence. See id.; see also Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1358 (Fed. Cir. 2004).

155. Where the patentee relied on aspects invented by the unnamed inventor to establish patentability, the patentee cannot dispute those aspects are substantial contributions to the overall scope of the claims. Blue Gentian, LLC v. Tristar Prods., Inc., 70 F. 4th 1351, 1360 (Fed. Cir. 2023). However, "[c]ontributions to realizing an invention may not amount to a contribution to conception if they merely explain what was 'then state of the art' [or] if they are too far removed from the real-world realization of an invention." Eli Lilly, 376 F.3d at 1359 (internal citations omitted).

156.   Additionally, though joint inventors need not physically work together, "[i]t is . . . uncontroversial that the alleged joint inventor . . . must demonstrate that his labors were conjoined with the efforts of the named inventors.  Id.; see also Docket No. 1715 at Instruction No. 41.

157.   Masimo has not established by clear and convincing evidence that Diab was a coinventor of the '052, '670, '095, and '390 Patents.

158.   Diab testified that the patents at issue included material that he taught Lamego. 11/2 PM Tr. (Diab) at 107:8-11 ("A lot of the stuff that Mr. Lamego, I taught him personally or he learned at Masimo together, were just in those patents a lot, and it's disappointing.")

159.   However, Diab's testimony alone is insufficient.  Docket No. 1715 at Instruction No. 41.  Masimo must corroborate this testimony.  Id.

160.   Besides Diab's uncorroborated testimony, Masimo presents no evidence that Diab and Lamego's efforts were conjoined.  Masimo cites testimony from Kiani and Poeze, but this testimony only generally supports the idea that Diab and Lamego worked together closely.  See 11/6 PM Tr. at 11:16-17 (Kiani) and 121:6-13 (Poeze).  The testimony does not relate to contributions to the patents at issue.

161.   Further, as discussed above, the Court determined that Lamego was not under an obligation to assign his contributions because, with the exception of material known in the art, he developed his contribution while working at Apple, not Masimo. Further, Lamego and Diab would only have collaborated while Lamego worked at Masimo given Masimo's rigorous confidentiality protocols.

162.   For at least this reason, Masimo has not established co-inventorship by clear and convincing evidence.

Remedies

Declaratory Judgment

**CIVIL MINUTES - GENERAL**

Case No.   SA CV 20-00048-JVS-JDE                Date   December 18, 2025

Title   Masimo Corp. and Cercacor Labs., Inc., v. Apple Inc.

163. The Court enters declaratory judgment that Apple has misappropriated L4 and L5. Samuels v. Mackell, 401 U.S. 66, 70 (1971) (Courts may grant "declaratory relief on the basis of traditional equitable principles.").

Injunction

164. The Court has broad discretion to fashion injunctive relief. Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dep't of Energy, 232 F.3d 1300, 1305 (9th Cir. 2000); Fed. R. Civ. P. 54(c).

165. Masimo has not shown that Apple should be enjoined from misappropriating L4 and L5.

166. A plaintiff seeking a permanent injunction must demonstrate that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); SolarCity Corp. v. Doria, No. 16-cv-03085, 2021 WL 5822608, at *4 (S.D. Cal. Dec. 8, 2021) (applying eBay test in action for trade secret misappropriation under CUTSA).

167. Masimo has not established the irreparable injury requirement.

168. Several district court cases have held that "[a] finding of misappropriation is generally adequate for a finding of irreparable injury in trade secret cases." Equate Media, Inc. v. Suthar, 2024 WL 1217217, at *3 (C.D. Cal. Mar. 20, 2024) (quoting Monster Energy Co. v. Vital Pharms., Inc., 2023 WL 8168854, at *18 (C.D. Cal. Oct. 6, 2023), aff'd, No. 23-55451, 2025 WL 1111495 (9th Cir. Apr. 15, 2025) and Comet Techs. USA Inc. v. XP Power LLC, 2022 WL 4625149, at *2 (N.D. Cal. Sept. 30, 2022)).

169. However, the Ninth Circuit has clearly held that injunctive relief does not automatically flow from a successful trade secret misappropriation claim. Citcon USA, LLC v. RiverPay Inc., No. 20-16929, 2022 WL 287563, at *2 (9th Cir. Jan. 31, 2022) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 32 (2008)); ; see also

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 393 (2006) (rejecting "categorical rule[s]" in determining whether an injunction is appropriate).

170.   Accordingly, the Court determines that Masimo was required to make some showing of irreparable harm beyond its success on its misappropriation claim. See Equate Media, 2024 WL 1217217, at *3 (citing Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc., 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013)).

171.   Masimo argues that Apple's misappropriation caused and would continue to cause a chilling effect on Masimo engineers' ability to collaborate in confidence. However, the only evidence supporting this position is from Kiani. See Kiani Direct ¶ 222. Though Masimo's engineers testified regarding Masimo's confidentiality procedures, they did not express personal opinions that the misappropriation would chill their collaboration efforts. The lack of evidence from Masimo engineers, especially given Kiani's testimony that Masimo's founding CTO expressed concern about sharing ideas, weakens Masimo's position. Id. ¶ 223.

172.   Masimo also argues that it depends on trade secret protection to maintain its competitive advantage. However, if the Court were to determine that irreparable harm would result merely because Masimo chose to pursue trade secret protection, as opposed to other types of intellectual property rights, that would be akin to presuming irreparable harm based on misappropriation alone. Though Masimo's business practices are a factor, a finding of misappropriation does not automatically result in a finding of irreparable injury.

173.   Masimo also argues that misappropriation reduced demand for Masimo's products. See Kiani Direct ¶ 217. However, given a lack of evidence linking the trade secrets and the health module in Masimo's W1 product, Kiani's testimony is not persuasive. See Docket No. 2348 at 2. Evidence at trial also rebuts the idea that Masimo lost or would lose sales to Apple. 11/6 AM Tr. (Muhsin) 98:20-99:6 (testifying that he did not know of any sale that Masimo has lost to Apple).

174.   Masimo has also not shown that monetary damages are inadequate to compensate Masimo for the misappropriation. The Court does not consider Masimo's decision

to forego damages here. The decision to forego damages does not necessarily mean damages would have been an adequate remedy at law.

175. However, Masimo argues damages are inadequate here because they cannot compensate Masimo for future use. This is not always true. See, e.g., Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1314 (Fed. Cir. 2007) (finding an ongoing royalty for patent infringement instead of an injunction could be appropriate). Masimo does not otherwise explain or offer supporting evidence establishing that monetary damages would be inadequate.

176. Based on the foregoing, Masimo has not shown that an injunction is warranted here.

Attorney Fees

177. Here, Masimo has prevailed with respect to L4 and L5. Apple has prevailed on the remaining claims. The Court declines to award fees to either party in view of this mixed result and for the reasons stated below.

178. An award of fees is not automatic under the CUTSA. Although such an award "is equitable in cases against well-funded defendants that commit acts of misappropriation that undermine legitimate competition and innovation," Mattel, 801 F. Supp. 2d at 956, a fee award is not automatic. Cf. 02 Micro Intern. Ltd. v. Monolithic Power Systems, Inc., 399 F. Supp. 2d 1064, 1080 (N.D. Cal. 2005) ("the purpose of the statute is to deter specious misappropriation actions," and attorney's fees are not automatic, even in cases where a jury finds willful and malicious conduct), as amended 420 F. Supp. 2d 1070, affirmed 221 Fed. App'x 996 (Fed. Cir. 2007).

179. Masimo drove the trajectory of this case in a manner that required both parties to spend a significant amount on attorney's fees as they prepared for trial. Several years after the case was filed, at the time of the jury trial, Masimo had narrowed its case down to a handful of trade secrets and the patent inventorship and ownership claims. Masimo further narrowed its case following the jury trial. Masimo also forfeited its right to damages and requested a bench trial over Apple's objection. Further, Masimo prevailed on its claims with respect to L4 and L5, but did not prevail on its claims

with respect to the D trade secrets or its patent claims. In view of these circumstances, it would be inequitable to award Masimo attorney's fees. Even if the Court were inclined to award fees, it would be difficult to parse the fees incurred to review only the claims on which Masimo prevailed.

180.  Accordingly, for the reasons stated, the Court declines to award attorney's fees.

## V.  Conclusion

For the reasons stated above, the Court enters its findings of fact and conclusions of law as stated herein. Masimo shall file a proposed judgment within 7 days of this Order. Apple shall file any objections thereto within 7 days of Masimo's filing. If no objections are received within 7 days, the judgment will be entered immediately, and Federal Rule of Civil Procedure 52(b) will apply upon entry of judgment.

The Court asks the parties to meet and confer and, within 7 days of this Order, notify the Court via email to the Courtroom Deputy Clerk which parts of the sealed Order should be redacted from the publicly filed version of the Order based on the Court's prior sealing orders. When submitting their sealing request, the parties shall attach a copy of this Order with their proposed redactions highlighted for the Court's review. The Court asks the parties to be judicious in their sealing requests.